Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Jeffrey Traurig

*Proposed Bankruptcy Counsel for*
  *the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
: 
In re:                                                       :          Chapter 11
                                                             :          Case No. 09-14398 (AJG)
CABRINI MEDICAL CENTER,                                      :
                                                             :
                                        Debtor.              :
                                                             :
-------------------------------------------------------------x

**DEBTOR'S MOTION FOR FINAL
ORDER (I) AUTHORIZING DEBTOR TO OBTAIN
POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 364(c) AND 364(d) AND (II) AUTHORIZING THE
USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363
AND (III) GRANTING ADEQUATE PROTECTION TO THE
SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364**

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

Cabrini Medical Center ("Cabrini" or the "Debtor") as debtor and debtor

in possession, by its undersigned counsel, hereby moves (the "Motion") this Court for

the entry of a final order ("Final Order") authorizing debtor in possession financing and

authorizing the use of cash collateral. In support of the Motion, the Debtor relies in part

on the Affidavit of Monica Terrano, the Debtor's Chief Financial Officer (the "Terrano

Affidavit") and the Affidavit of Diane Kniejski, the Debtor's Chief Operating Officer,

Pursuant to Local Bankruptcy Rule 1007-2 In Support of Chapter 11 Petition (the

"Kniejski Affidavit") filed contemporaneously with this Motion.[1]  In further support of

this Motion, the Debtor respectfully represents as follows:

## I.     RELIEF REQUESTED

1.      By this Motion, the Debtor seeks entry of a Final Order, pursuant to

Sections 105(a), 361, 362, 363 and 364(c) and (d) of Title 11, United States Code (the

"Bankruptcy Code"), Rules 2002, 4001(b) and (c)**,** and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for

the United States Bankruptcy Court for the Southern District of New York (the "Local

Rules"), granting:

> (a)     authorization under sections 364(c) and (d) of the Bankruptcy Code
> and Bankruptcy Rule 4001(c), for the Debtor to obtain post-petition
> financing ("Postpetition Financing") up to a maximum outstanding
> principal amount of $5 million in accordance with the Debtor in
> Possession Loan Agreement between the Debtor and Missionary
> Sisters of the Sacred Heart, a not-for-profit corporation organized
> under the laws of the State of Illinois ("MSSH-ILL" or "Lender")[2]
> substantially in the form annexed as **Exhibit 1** hereto (the "DIP
> Agreement")[3] and other related documents, including the Final
> Order (collectively with the DIP Agreement, the "DIP Loan
> Documents").

---

[1]     A description of the Debtor's business and the reasons for filing this Chapter 11 case are set forth in
the Kniejski Affidavit.

[2]     Founded in 1892 by Saint Frances Xavier Cabrini, and up until early 2008, the Debtor operated an
acute care voluntary hospital on East 19th Street in Manhattan.  The Debtor is sponsored by the Stella
Maris Province of the Missionary Sisters of the Sacred Heart of Jesus, a religious institute of women
of the Roman Catholic Church.  Originally known as Columbus Hospital, in the early 1970's Cabrini
merged with the Italian Hospital and changed its name to Cabrini Medical Center.

MSSH-ILL and Missionary Sisters of the Sacred Heart, a not for profit corporation organized under
the laws of the State of New York ("MSSH-NY") are not for profit corporations organized and
existing to promote and sustain the religious, charitable and educational activities of the Missionary
Sisters of the Sacred Heart of Jesus. MSSH-ILL and MSSH-NY do not have any civil law relationship
with the Debtor, except that MSSH-NY and the Debtor have certain of the same individuals as
members.

[3]     Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such
terms in the DIP Agreement or proposed Final Order, as applicable.

(b) authorization, under section 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004, for the Debtor to use any cash collateral it is holding or obtains and to use the proceeds from the DIP Financing for the payment of the costs and expenses associated with the operation of the Debtor and this Chapter 11 case in accordance with the terms of the Debtor's proposed budget (the "Budget") (a copy of which is annexed to the DIP Agreement as Exhibit A);

(c) authorization for the Debtor to grant to the Lender assurances for the full and timely payment of the Debtor's obligations to Lender under the DIP Agreement by granting to the Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim, (ii) liens pursuant to sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code, first priority perfected liens (including priming liens as applicable) on the Postpetition Collateral (as defined below), subject only to the Carveout (defined below);

(d) modification of the automatic stay, pursuant to section 362 of the Bankruptcy Code and Bankruptcy Rule 4001, to permit the Lender, in its sole discretion to file financing statements and related documents to evidence its security interests and to take other actions required or permitted by the DIP Loan Documents;  and

(e) authorization for the Debtor to grant to the NYCWB, Sun Life, East 19th Street and MSSH-NY (each as defined below, and collectively, the "Secured Parties") adequate protection, on account of the grant to Lender of a priming lien on the prepetition collateral and the use of cash collateral (as applicable), in the form of replacement liens on the Postpetition Collateral and a superpriority administrative expense claim, junior to the DIP Liens (defined below) and superpriority administrative expense claim of the Lender.

2.      Access to Postpetition Financing and the use of cash collateral is essential to ensure that the Debtor can fund its post-petition capital requirements so that it can preserve and maintain its properties and infrastructure of its buildings while it embarks on a marketing effort to sell and/or lease all or some of its five buildings which will ultimately provide the foundation for its Chapter 11 Plan.  Unlike a fully operational company that could risk diminution of the value of the business in a Chapter 11 case, here the primary assets of the Debtor are its buildings.  As such, the

value of these assets can be maximized through an orderly marketing process, as contemplated by the Debtor. Absent the Postpetition Financing and the use of cash collateral, the Debtor simply would not have the resources to continue operating or to maintain and preserve its properties. Fortunately, the Debtor has been able to negotiate favorable terms for such financing as described below.

3. As more fully set forth in the Terrano Affidavit and the Kniejski Affidavit, access to Postpetition Financing and the breathing spell afforded by Chapter 11 (from the attempts by pre-petition creditors to collect on their claims and judgments) will allow the Debtor the time necessary to maximize the value of its assets and formulate a plan for the benefit of its estate and creditors. The Debtor expects, with the assistance of an experienced real estate broker, Grubb & Ellis, whose retention is subject to Bankruptcy Court approval, to run a marketing process and solicit offers for one or more transactions that will ensure the highest realization of value for the Debtor's property while addressing the Debtor's obligations to creditors under a Chapter 11 plan and the auspices of this Court.

4. In addition to the preservation and maintenance of the Debtor's buildings, the Debtor's financial requirements include its obligations to employees, independent contractors and tenants and to ensure life safety measures, medical records access, security, housekeeping, finance and administration of the Debtor. Having adequate post-petition financing in place also will provide the Debtor's suppliers and other parties in interest with the comfort of knowing that the Debtor can pay for post-petition goods and services (including utilities, elevator maintenance, insurance, audit and safety experts) as and when the Debtor's obligations come due.

5. As described more fully in the Kniejski Affidavit, MSSH-ILL has a long history of providing financing to the Debtor. The existing loans from MSSH-ILL represent, in large part, refinancings of pre-existing indebtedness.

6. The DIP Agreement and Loan Documents have been negotiated at arms' length with each side represented by experienced counsel. Further, as set forth below, the proposed financing is on terms better than the Debtor could obtain from other lenders. If anything, the long-standing debtor and creditor relationship between the Debtor and MSSH-ILL likely has resulted in these better terms and the Lender's agreement not to seek, among other things, additional fees (*i.e.*, commitment fees, exit fees, monitoring fees, etc.) that are customary in such financings.

## II.     JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This mater is a core proceeding under 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

## III.     DESCRIPTION OF PREPETITION SECURED DEBT[4]

### A.     SunLife Mortgage

8. As noted in the Terrano Affidavit and the Kniejski Affidavit, the Cabrini campus is primarily composed of five (5) buildings (the "A", "B", "C", "D" and

---

[4]     For a full discussion of the Debtor's prepetition capital structure and secured debt, the Court is respectfully referred to the Terrano Affidavit and the Kniejski Affidavit, filed contemporaneously herewith. For the purposes of this Motion, a brief overview of the Debtor's secured debt has been provided. Except as otherwise stated, the Debtor reserves its rights to further investigate and/or contest the validity, priority, extent and amount of any security interest or lien asserted against any of the Debtor's assets.

"E" Buildings, or, collectively, the "Property") located through the block from East 19th Street to East 20th Street, between Second Avenue and Third Avenue, in New York County, forming four tax lots.

9. As of the Petition Date, the Property is encumbered by two cross-collateralized mortgages, dated August 8, 2008 that are held by the Sun Life Assurance Company of Canada ("Sun Life") in the aggregate original principal amount of $36 million comprised of a mortgage in the principal amount of $21,500,000 encumbering the "A" and "B" Buildings and a mortgage in the principal amount of $14,500,000 encumbering the "C", "D" and "E" Buildings (together, the "Sun Life Mortgages").

10. The Sun Life Mortgages represent a refinancing of two pre-existing Sun Life mortgages, dated July 29, 2005 (the "Prior Sun Life Mortgages"), on the Property, which as of August 8, 2008 had a combined principle balance of $29,791,609.20 and outstanding interest in the amount of $148,122.90 (as of July 31, 2008). In addition to satisfying the Prior Sun Life Mortgages, proceeds of the Sun Life Mortgages in the amount of $6,315,219.60 were applied as a pre-payment through August 2010 (or the first twenty-four months of debt service under the Sun Life Mortgages). As a result of the pre-payments, Sun Life is holding $3,420,744 of pre-payment funds net of the July 1, 2009 principal and interest payment. The monthly principal and interest payment that Sun Life credits against the Debtor's obligations from the pre-paid funds is $263,134.15.

11. The Debtor's obligations to Sun Life are also secured by an Assignment of Leases and Rents. The Sun Life Mortgages are payable in monthly installments commencing on September 1, 2010 of $157,149.56 and $105,984.59, respectively, through August 1, 2013, including interest at 6.25 % per annum. As of the

Petition Date, there is due and owing approximately $35,146,000 under the Sun Life Mortgages.

**B.    MSSH-ILL Indebtedness**

12.    MSSH-ILL has a long history of providing financing to Cabrini dating back to before 1983.  The existing loans from MSSH-ILL, described below, represent, in large part, refinancings of pre-existing indebtedness.

13.    The "A", "B" and "C" Buildings are encumbered by a subordinate mortgage and security agreement, dated as of July 27, 2005 (the "<u>MSSH-ILL Mortgage</u>"), held by MSSH-ILL.  The MSSH-ILL Mortgage is subordinate in right to the Sun Life Mortgages and the East 19th Loan (as defined below).  As of the Petition Date, there is due and owing on the MSSH-ILL Mortgage, inclusive of accrued interest, the sum of approximately $33,033,478.56.  The leases, rents and other interests related to the "A", "B" and "C" Buildings also are subject to certain security interests held by MSSH-ILL.

**C.    MSSH-NY Indebtedness**

14.    Like MSSH-ILL, MSSH-NY has a long history of providing financing to Cabrini dating back to before 1983. The existing loans from MSSH-NY, described below, represent, in large part, refinancing of pre-existing indebtedness.

15.    Also encumbering the "A", "B" and "C" Buildings is a subordinate mortgage, dated July 27, 2005 (the "<u>MSSH-NY Mortgage</u>"), which is held by MSSH-NY. The MSSH-NY Mortgage is *pari passu* with the MSSH-ILL Mortgage and is subordinate in right to the Sun Life Mortgage and the East 19th Loan.  As of the Petition Date, there is due and owing on the MSSH-NY Mortgage, inclusive of accrued interest, the sum of

approximately $18,739,814.00. The leases, rents and other interests related to the "A", "B" and "C" Buildings also are subject to certain security interests held by MSSH-NY.[5]

### D. SVCMC East 19th Street Mortgage

16.     In connection with the SVCMC Transaction described in the Kniejski Affidavit, on July 28, 2008, Cabrini entered into a subordinate $4 million mortgage loan agreement evidenced by a promissory note of the same date, with an affiliate of St. Vincent's Catholic Medical Center, East Nineteenth Street LLC ("East 19th Street") to fund its operating budget expenditures (the "East 19th Loan") while the SVCMC Transaction was being negotiated and consummated.  Interest on the East 19th Loan is calculated at 4% per annum and the original maturity date was October 31, 2008.  As of the Petition Date, Cabrini had not made any payments to East 19th Street on account of the East 19th Loan.

17.     The East 19th Loan is secured by a (i) mortgage on the Property subordinate to the Sun Life Mortgages and the 1199 Mortgage and Judgments (as defined below);  and (ii) subordinated assignment of all current and future leases and rents from the Property.  As of the Petition Date, the principal amount owed under the East 19th Loan is $4,000,000 exclusive of accrued interest.

### E. Local 1199 SEIU

18.     Based on a Confession of Judgment executed on January 28, 2008 in favor of the Local 1199, Cabrini is indebted to Local 1199 for contributions owed to the 1199 SEIU National Benefit Fund (the "Benefit Fund") aggregating approximately $9.6 million of which $4,903,306.79 is principal and the balance is accrued interest and

---

[5]     MSSH-ILL and MSSH-NY also hold pre-petition unsecured claims against the Debtor aggregating approximately $7 million.

costs. Cabrini's obligation to the Local 1199 is secured by a mortgage lien (the "1199 Mortgage") covering the "A" and "B" Buildings, dated December 4, 2006, in the principal amount of $6,531,049.54.

19. Local 1199 is also the beneficiary of certain recorded judgments (the "Judgments"), which Judgments are part of the obligations addressed in the Confession of Judgment. Pursuant to the Confession of Judgment, $4,039,032.04 of HEAL IV funds received from New York State was assigned and subsequently paid to the Benefit Fund. The Confession of Judgment further provides for the payment of $2,700,000 from the proceeds of the sale of Buildings "C", "D", and "E", which Confession of Judgment was recorded in June 2009.[6]

20. As of the Petition Date, Cabrini owes Local 1199 the remaining principal balance of approximately $100,000 and over $5,000,000 in accrued interest and penalties under the Confession of Judgment, which is secured by the 1199 Mortgage and Judgments. The 1199 Mortgage and Judgments are subordinate to the Sun Life Mortgages pursuant to a subordination agreement between Sun Life and Local 1199, dated August 8, 2008.

F.    **New York City Water Board**

21. By agreement dated August 4, 2008 (the "Water Payment Agreement"), Cabrini and the New York City Water Board settled all past due water and sewage charges billed on or before July 16, 2008 for $3,382,370.21 (exclusive of interest and charges) to be paid $500,000 upon execution of the Water Payment Agreement and the balance in sixty equal monthly payments of $59,833.26, including

---

[6]    The recordation of the Confession of Judgment may be avoided pursuant to section 547(b) of the Bankruptcy Code, and the Debtor reserves its rights in connection therewith.

interest at 9% per annum, until the debt is satisfied. Cabrini's obligations under the Water Payment Agreement are secured by a statutory lien on the Property. As of the Petition Date, approximately $2,230,000 remains due and owing under the Water Payment Agreement.

## G.  ACI Settlement

22.     On or about March 27, 2007, Cabrini entered into an agreement with the United States Attorney for the Southern District of New York relating to certain Medicaid billing, pursuant to which the Debtor agreed to pay $3.4 million (the "Settlement Amount") in full and final settlement of the Government's purported claims. As security for the payment of the Settlement Amount, Cabrini granted the Government a security interest in the "A" and "B" Buildings, which was recorded in the New York County docket on or about April 27, 2007. As of the Petition Date, approximately $2,500,000 is owing to the Government under the "ACI Settlement."

## H.  Intercreditor Agreement

23.     On July 28, 2008, MSSH-ILL, MSSH-NY and East 19th Street entered into an intercreditor agreement (the "Intercreditor Agreement") to address their rights with regard to their respective loans to Cabrini. Specifically, East 19th Street agreed to act as servicing agent for the loans made to Cabrini by MSSH-ILL and MSSH-NY, as well as the East 19th Loan, to collect and remit payments to each party to the Intercreditor Agreement in accordance with the priorities thereunder, which provide for the subordination of the MSSH-ILL Mortgage and the MSSH-NY Mortgage to the East 19th Loan.

## I. Other Judgments, Liens and Security Interests

24. In addition to the secured claims described above, there are a number of judgments and mechanic's liens that have been entered against the Debtor and that have been recorded against the Property but not satisfied in full. The Debtor estimates that less than $42,500 in mechanics liens held by (a) Terjesen Associates Architects PC and (b) Alliance & Son Construction Corp. remain outstanding as of the Petition Date. In addition, there are a number of judgments (not otherwise described above) that have been recorded against the Debtor's real property and that have not otherwise been satisfied. The Debtor estimates that the principal amount owed on such judgments are approximately $2 million to $2.3 million. Such judgments were recorded by (a) the Estate of Jack Rodgon (James Di Giacomo), (b) John Reilly, (c) Med-One Capital Funding LLC and (d) the Commissioner of Labor of State of New York (unemployment).[7]

## J. Proposed DIP Loan Facility

### a. The Need for Postpetition DIP Financing

25. Absent Postpetition Financing, the Debtor will not have sufficient working capital to continue operating or preserve and maintain the Property (including the payment of salaries, utilities and property insurance) while engaging in a marketing process for the sale, lease or other use of the Property that will ensure the highest value

---

[7] There are a number of judgments, in whole or in part, that appear on lien searches. The Debtor is investigating whether they have been satisfied, including liens filed by (a) Laboratory Corporation of America and (b) New York's Health and Human Service, et al., aggregating approximately $320,000 in principal face amounts dating back to 2005 and earlier. The Israel Discount Bank has a lien on the Debtor's interest under a certain Trust Agreement dated November 12, 1985, as amended, by and among health care facilities consisting of charitable institutions and in furtherance of the Medical Malpractice Reform Act of 1985 and HANYS Services, Inc., as trustee. In addition, approximately $379,000 has been tendered to the New York County clerk to secure obligations under a pending appeal relating to litigation with Risk Management Group, Inc.

for the Debtor's assets. Access to adequate post-petition financing is necessary to provide the Debtor's remaining staff, contractors, suppliers and other interested parties with the comfort of knowing that the Debtor can pay for post-petition goods and services (i.e. elevator maintenance, audit expenses and other obligations to the Debtor's tenants, etc.) as and when their obligations come due.

26.     As set forth in the Terrano Affidavit, the Debtor's monthly costs for its contracted services and employees aggregate approximately $120,000 per month. In addition to employee costs, the Debtor estimates that it will have monthly utility expenses aggregating more than $200,000 per month and the Debtor's insurance (including property insurance) is estimated to be approximately $30,000 per month. The foregoing figures also do not take into account the cost of administering the Debtor's estate in bankruptcy. In contrast to the projected postpetition expenses (only some of which have been delineated herein), rental or use and occupancy income aggregates approximately $155,000 per month and the use of such proceeds may be limited to the extent they represent cash collateral. Simply put, the costs associated with continuing operations, as streamlined as they are currently, are greater than the Debtor's income and available cash.

27.     Accordingly, absent the Postpetition Financing, the Debtor's remaining business operations (which are primarily that of a lessor, in addition to fulfilling its obligations under the Berger Commission mandates) and maintenance of the Property will not be possible, and serious and irreparable harm to the Debtor, its estate and creditors will result followed by the likely fire sale of the Property resulting in substantially lower recoveries for creditors. The purpose of the Postpetition Financing will thus be to preserve, maintain and enhance the going concern value of the

Debtor's assets, as well as to permit the entities that lease space from the Debtor to continue providing healthcare and related services, while the Property is marketed.

28.     Given the Debtor's financial condition, financing arrangements, and capital structure, the Debtor does not have significant unencumbered funds and is otherwise unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  As detailed more fully below and in the Terrano Affidavit, financing on a post-petition unsecured or solely on a superpriority basis is not available.  The Lender is willing to provide the Postpetition Financing pursuant to section 364(c)(1) of the Bankruptcy Code, provided that the Lender has priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code other than as described below, and such indebtedness and obligations are secured by the interests in and the liens (including priming liens) upon the property described below pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The Debtor has made inquiry of other lenders and is unable to obtain from another lender the necessary post-petition financing that it needs on terms more favorable in the aggregate than those provided in the DIP Agreement (as discussed below).

**b.     The Economic Terms of the DIP Loan Facility**

29.     Under the terms of the DIP Agreement, annexed as **Exhibit 1** hereto, and the DIP Loan Documents, the Debtor will obtain cash advances and other extensions of credit in the aggregate principal amount of up to $5 million on a revolving credit basis (the "DIP Loans"), subject to the Budget and certain restrictions and limitations as set forth in the DIP Agreement.

30.     The proceeds of the borrowings under the DIP Agreement will be used by the Debtor to, among other things and as set forth in the Budget, (a) fund ongoing working capital and general corporate needs of the Debtor during this Chapter 11 case, (b) pay the fees, costs, expenses and disbursements of professionals retained by the Debtor and any statutory committee appointed in this Chapter 11 case (the "Committee"), and other bankruptcy related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court , and (c) pay the fees and expenses (including without limitation, reasonable attorneys' fees and expenses) incurred by the Lender under the DIP Agreement and the DIP Loan Documents.

31.     The other significant terms of the proposed Postpetition Financing and DIP Loan Documents are as follows:[8]

(a)     <u>Interest, Fees and Expenses</u>: (a) the DIP Loan shall bear interest at a rate equal to the prevailing prime rate as published by the Wall Street Journal plus 6.5%, but in no event to exceed the Highest Lawful Rate, (b) upon the occurrence and during the continuance of a Default, and provided that Lender shall have provided a Notice of Default as provided in Section 6.2 of the DIP Agreement and any applicable cure period has expired, the DIP Loan and all other amounts unpaid and outstanding under the DIP Agreement shall bear interest at a rate equal to the prevailing prime rate as published by the Wall Street Journal plus 10, but in no event to exceed the Highest Lawful Rate, and (c) Interest on the Advances shall be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day) occurring in the period for which such interest is payable, unless such calculation would exceed the Highest Lawful Rate, in which case interest shall be calculated on the per annum.

---

[8]     The terms and conditions set forth herein are qualified in their entirety by reference to the provisions of the DIP Loan Documents, copies of which are available upon request to Counsel for the Debtor. The description of the terms of the DIP Loan Documents set forth in this Motion is provided for the convenience of the Court and the parties-in-interest. In the event of any inconsistency between the description of the terms of the DIP Loan Documents contained in this Motion and the actual DIP Loan Documents, the terms of the DIP Loan Documents shall govern. Capitalized terms used herein, unless herein defined, will be used with the meanings ascribed to such terms under the DIP Loan Documents.

(b)     <u>Collateral</u>:  As security for the Debtor's obligations and indebtedness in respect of the DIP Financing, the Lender shall be granted, in each case subject to the Carveout, pursuant to sections 364(c)(2) and (c)(3) and 364(d)(1) of the Bankruptcy Code, (x) a first priority perfected lien upon all of the right, title and interest of the Debtor in, to and under all present and after-acquired property of the Debtor of any nature whatsoever including, without limitation, all cash contained in any account of the Debtor, and the proceeds of all causes of action, but excluding however causes of action arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code and the proceeds thereof (collectively, with the proceeds and products of any and all of the foregoing, the "Postpetition Collateral"), (the "DIP Liens").  Subject to the Carveout, the DIP Liens shall be prior and senior to all liens and encumbrances of all other secured creditors in and to such Postpetition Collateral granted or arising after the Petition Date.

(c)     <u>Superpriority Administrative Expense Claim;  Carve Out</u>.  As security for the Debtor's obligations and indebtedness in respect of the DIP Financing, the Lender shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed administrative expense claim having priority over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code including, but not limited to, sections 326, 328, 330, 331, 503(b), 507(a), 507(b) and 726 of the Bankruptcy Code, subject only to the Carveout (the "<u>DIP Superpriority Claim</u>"), but excluding however causes of action arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code.  No other claim having a priority superior to or <u>pari</u> <u>passu</u> with the DIP Superpriority Claim shall be granted while any portion of the DIP Financing remains outstanding or available to the Debtor.

(d)     <u>No Subordination</u>:  The Debtor will waive section 510(b) subordination claims and defenses as against Lender on behalf of the estate.

(e)     <u>Term and Events of Default</u>: The Termination Date will be the earliest to occur of (x) December 31, 2009 (or such later date if the Lender consents, which extension thereof shall be effective without further Court approval), (y) unless extended by the Lender, 25 days after the Petition Date if the Final Order has not been entered by this Court on or before such date or (z) upon five (5) business days' written notice to the Debtor (with a copy to counsel for any statutory committee appointed in the Chapter 11 Case and the United States Trustee) after the occurrence and continuance of the following events of default (unless waived by the Lender, "<u>Events of Default</u>") beyond any applicable grace period.

(1)     Failure of the Debtor to reimburse any drawing under any DIP Agreement, or failure of the Debtor to make any other payment to the Lender as and when required by the DIP Agreement or the Final Order, which failure is not cured within five (5) business days after written notice of such default has be received by the Debtor;

(2)     Failure of the Debtor to comply with any term of the Final Order or any other covenant or agreement specified in the Final Order, including any Reporting Requirements, and such failure shall continue unremedied for more than ten (10) business days;

(3)     A default shall have occurred under the DIP Agreement or the Debtor fails to comply with any material term of the DIP Agreement or any other covenant or agreement specified in the DIP Agreement, and such failure shall continue unremedied for more than ten (10) business days;

(4)     The Chapter 11 Case shall be dismissed or converted to a chapter 7 case; or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtor (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Case;

(5)     The Debtor shall assume or reject any lease of an interest in the Property without the prior written consent of the Lender;

(6)     The Debtor shall not have obtained entry of an order of the Bankruptcy Court:

(i)     retaining a broker to market the Debtor's real property and related assets on terms reasonably acceptable to the Lender within 10 days of the appointment of the official committee of unsecured creditors (the "Committee Appointment");

(ii)    approving sale process and bidding procedures reasonably acceptable to the Lender for the Proposed Transaction entered within 75 days of the Petition Date;  and

(iii)   approving a sale transaction providing for Proposed Transaction or other disposition of substantially all of the Debtor's real property and related assets on terms reasonably acceptable to the Lender within 150 days of the Petition Date;

(7)     The Debtor shall fail, within one (1) business day after the closing of the Proposed Transaction, to pay to the Lender on account of the Prepetition Obligations;

(8)     The Debtor's expenditures exceed those forecast in the Budget by more than the Permitted Weekly Variance during any weekly period;

(9)     This Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtor which have an aggregate value in excess of $500,000;

(10)    An order shall be entered reversing, amending, supplementing, staying for a period in excess of three (3) days, vacating or otherwise modifying the Final Order without the consent of the Lender;  and

(11)    Any judgment in excess of $250,000 as to any postpetition obligation not covered by insurance shall be rendered against the Debtor and the enforcement thereof shall not be stayed; or there shall be rendered against the Debtor a non-monetary judgment with respect to a postpetition event which has or could reasonably be expected to have a material adverse effect on the Proposed Sale or the ability of the Debtor to perform its obligations under the Final Order.

(f)     <u>Automatic Stay Modification</u>:  The Final Order provides for the modification of the automatic stay, pursuant to section 362 of the Bankruptcy Code and Bankruptcy Rule 4001, to permit the Lender, in its sole discretion, (a) to file financing statements, deeds of trust, mortgages or other similar documents to evidence its security interests under the DIP Financing and under the Final Order, and (b) to take other actions required or permitted by the DIP Loan Documents.

(g)     <u>Adequate Protection Obligations</u>:  The DIP Loan Documents also provide for the adequate protection for the Secured Parties (as described more fully below), including the granting of replacement liens on the Postpetition Collateral.

(h)     <u>Bankruptcy Court Approval</u>:  The Lender's commitment to fund is subject to entry of a Final DIP Order that is satisfactory to the Lender in its sole discretion.

**K.    GRANTING OF ADDITIONAL SECURITY AND PRIMING LIENS**

32.    The Debtor's obligations under the Postpetition Financing will be secured by: (i) valid, perfected first priority liens and security interests (the "Liens"), granted pursuant to Section 364(c) of the Bankruptcy Code, in and against all of the Postpetition Collateral, subject and junior only to (A) the Carveout, and (B) and Permitted Liens, if any, existing as of the Petition Date;  and (ii) pursuant to Section 364(d) of the Bankruptcy Code, a priming lien on the Debtor's interest in the Prepetition Collateral, senior in right  to the Secured Parties (the "Priming Lien") in such property, to (A) the Carveout, and (B) and Permitted Liens, if any, existing as of the Petition Date. MSSH-ILL and MSSH-NY have consented to the grant of the Priming Lien, subject to the terms set forth in the DIP Loan Documents and the proposed Interim Order, including the granting of the adequate protection to the Secured Parties in the form of replacement liens in all of the Postpetition Collateral, as further described herein.

**L.    GRANTING OF SUPER-PRIORITY ADMINISTRATIVE EXPENSE CLAIM**

33.    As further security for the DIP Financing, Lender shall also be granted the DIP Superpriority Claim, in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code, subject and subordinate only to the Carveout.[9]

---

[9]    The "Carveout" means, as of the Termination Date, (a) the unpaid fees of the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b) (the "Statutory Fees"), (b) following delivery of written notice to the Debtor that an Event of Default (as defined below) has occurred and is continuing and, provided that such Event of Default has not been waived or cured, the payment of allowed professional fees and disbursements (the "Professional Fees and Disbursements") incurred by the professionals retained by the Debtor or any statutory committee (including the reasonable expenses of the members of any such statutory committee) appointed in the Chapter 11 Case not to exceed $500,000 in the aggregate, (c) the costs and administrative expenses not to exceed $10,000 in the aggregate that are permitted to be incurred by any chapter 7 trustee pursuant to an order of this Court following any conversion of any of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code. So long as written notice of the occurrence of an Event of Default shall

34.     The DIP Liens and the DIP Superpriority Claim granted to Lender shall not attach to any actions under chapter 5 of the Bankruptcy Code or the proceeds thereof.

**M.     USE OF CASH COLLATERAL**

35.     As part of its budget, the Debtor also has contemplated and requires the use of the cash collateral in leases and rent proceeds that have been pledged to Sun Life, MSSH-NY, MSSH-ILL and East Nineteenth Street LLC (the "Cash Collateral") prior to the Petition Date.  The use of Cash Collateral will provide the Debtor with the additional necessary liquidity to pay its post-petition expenses.   As set forth below, the Debtor is providing replacement liens to adequately protect the interests of parties entitled to protections for the use of cash collateral.

**N.     ADEQUATE PROTECTION:**

36.     The Secured Parties shall be granted adequate protection for any diminution in the value of the Prepetition Collateral and the use of the Cash Collateral (as applicable) by virtue of the grant of the DIP Liens in favor of the Lender as follows:

- The Secured Parties will be granted valid and perfected, replacement security interests in, and liens (the "Replacement Liens") on the Postpetition Collateral to the extent of the validity of their prepetition liens on the Prepetition Collateral and in the same order of priority as existed on the Petition Date (except as modified by the Final Order).

- The Debtor will provide to MSSH-NY, monthly payments in the amounts set forth in the Budget substantially equal to interest payments due under certain of the MSSH-NY Loan Agreements.

---

not have been delivered to the Debtor and such committee, or any such Event of Default shall have been waived by the Lender or cured, the Debtor shall be permitted to pay without reduction of the Carveout (x) the Statutory Fees and (y) the Professional Fees and Disbursements, as the same may be due and payable. Nothing herein shall be construed as a waiver of the right of the Lender to object to the allowance of any Professional Fees and Disbursements. The Carveout shall be senior to the DIP Liens and the Replacement Liens.

- The Debtor will provide to the Secured Parties, reporting as reasonably requested by the Secured Parties (the "Reporting Requirements"), each in form satisfactory to the Lender, including: commencing on the Friday after the entry of the Final Order, and every Friday thereafter, (A) eight-week rolling cash flow projections for the Debtor showing on a weekly basis for the current week and the succeeding seven weeks (x) beginning and ending liquidity on a consolidated basis, (y) weekly receipts by significant category and (z) weekly disbursements by significant category, and (B) a consolidated comparison of actual weekly cash flows for the week preceding the week in which such comparison is being delivered to the projected cash flows for such week as shown in the most recent eight-week rolling cash flow projections delivered to the Lender. In addition, upon prior reasonable notice to Debtor, the Debtor shall permit representatives, agents and/ or employees of the Lender to have reasonable access to its premises and non privileged records during normal business hours (without unreasonable interference with the proper operation of the Debtor's businesses) and shall cooperate, consult with and provide to such persons all such non-privileged information as they may reasonably request from time to time.

- The Debtor will be authorized and directed, within 20 days of the submission of invoices to the Debtor, the United States Trustee and counsel for the Committee therefor, to pay or reimburse all reasonable fees, costs and charges incurred after July 1, 2009 by the Lender (including, without limitation, the reasonable fees and out-of-pocket disbursements of counsel to the Lender) in connection with matters relating to the DIP Financing or the enforcement and protection of the rights and interests of the Lender in respect of the DIP Financing. None of the fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by the Bankruptcy Court (but the Bankruptcy Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

37. The Replacement Liens in favor of the Secured Parties will be valid, binding, enforceable and perfected with the priorities herein set forth. The Secured Parties shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the Replacement Liens granted by the proposed Interim Order or the Final Order.

38.    The Replacement Liens proposed to be granted to the Secured Parties shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtor's estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien under section 363 and 364 of the Bankruptcy Code.

## O.    CARVEOUT

39.    Notwithstanding the granting of the DIP Liens and the DIP Superpriority Claim, the Carveout shall have priority in payment over the claims of the Lender and the Replacement Liens.

## P.    LENDER LIEN CHALLENGES AND SECTION 506(c) WAIVER:

40.    Without prejudice to the rights of any other party (but subject to the limitations thereon described below and in paragraph 13 of the proposed Final Order), the Debtor acknowledges and agrees that, in accordance with the terms of the Prepetition Loan Documents the Debtor is truly and justly indebted to the Lender and MSSH-NY, without defense, counterclaim or offset of any kind, and that as of the Petition Date the Debtor was liable to the Lender and MSSH-NY in respect of loans made pursuant to the Lender Loan Documents and MSSH-NY Loan Documents (each as set forth on Exhibits "A" and "B" to the proposed Final Order:

- to Lender in the aggregate principal amount of approximately $25,734,375, plus approximately $7,299,103 on account of accrued and unpaid interest thereon; and

- to MSSH-NY in the aggregate principal amount of approximately $18,080,653, plus approximately $659,161 on account of accrued and unpaid interest thereon.

41.    Subject to the limitations described herein and in the proposed Final Order, the Debtor acknowledges and agrees that it will not, and hereby waives any right to, challenge the validity, perfection, enforceability, or priority of the liens and

security interests granted by the Debtor pursuant to the Lender Loan Documents and the MSSH-NY Loan Documents to secure the Lender Prepetition Obligations and the MSSH-NY Prepetition Obligations, respectively (each as defined in the proposed Final Order), upon the Debtor's assets and property, and other tangible and intangible personal property and the proceeds thereof (including any setoff rights described in the Loan Documents and arising by operation of law, collectively, inclusive of Cash Collateral, the "Prepetition Collateral"). The Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral to the extent of the diminution in value thereof resulting from the priming of the Lender's liens on the Prepetition Collateral, including Cash Collateral, by the granting of the DIP Liens.

42.     The proposed Final Order also provides, among other things, that the acknowledgments and agreements contained therein regarding the recognition and validity of certain Secured Prepetition Obligations will be binding upon the Debtor in all circumstances, and will be binding upon all other parties in interest, including without limitation, any statutory committee appointed in the Chapter 11 Case, unless (a) a party in interest (including any statutory committee appointed in the Chapter 11 Case) has properly filed an adversary proceeding or contested matter (subject to the limitations set forth in paragraph 14 of the Final Order) challenging the validity, enforceability or priority of the Secured Prepetition Obligations or the Secured Parties' liens on the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against the Secured Parties on behalf of the Debtor's estate, no later than the date that is sixty (60) days after the date of the appointment of a statutory committee of unsecured creditors, and (b) the Bankruptcy Court rules in favor of the

plaintiff in any such timely and properly filed adversary proceeding or contested matter.

43.     In addition, other than the Carveout, the Debtor shall not assert a claim under section 506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Lender upon the Prepetition Collateral.

## Q.     RESTRICTION ON USE OF CASH COLLATERAL AND CARVEOUT

44.     No Cash Collateral or any portion of the Carveout may be used to assert any claims or causes of action against the Lender or MSSH-NY or object to or contest in any manner, or raise any defenses to, the validity, perfection, priority, extent or enforceability of the Lender Prepetition Obligations, the MSSH-NY Prepetition Obligations or Replacement Liens to be granted in the proposed Final Order, or to assert any claims or causes of action against the Lender or MSSH-NY.

## R.     EFFORTS TO OBTAIN FINANCING

45.     Prior to the Chapter 11 filing, the Debtor explored other potential DIP financing arrangements, but no lender proposed more favorable terms, within the timeframe required by the Debtor, than is provided under the DIP Loan Documents with the Lender.  Several potential lenders were approached on behalf of the Debtor and those willing to provide a proposal included interest rates and fees far in excess of what the Lender is willing to accept and, in general, under all of the circumstances, the terms and conditions proposed by the other lenders were not as favorable as the terms provided by the Lender.  Some of these prospective lenders were unwilling to provide postpetition financing to the Debtor under any circumstances.

46. The proposal from the Lender was the most economic facility providing the Debtor with the ability to meet capital needs within the Debtor's time constraints and without contingencies which was tied to at least one of the alternative proposals. As negotiated, the Postpetition Financing will enable the Debtor to maintain its infrastructure, pay its post-petition operating expenses and maximize the value of the Property. The Debtor's ability to effectuate a sale(s) or other transaction(s) and realize the maximum value for its assets is dependent upon its ability to obtain the postpetition credit sought herein so that the Property can be effectively marketed. The Postpetition Financing is the best alternative available to the Debtor.

47. The Debtor is otherwise unable to obtain an adequate unsecured revolving credit facility allowable under section 503(b)(1) of the Bankruptcy Code. The Lender has also conditioned all advances to be made under the DIP Loan Documents upon the grant to it of (a) a DIP Superpriority Claim allowable under section 503(b) of the Bankruptcy Code with priority over any and all expenses and claims of any kind or nature whatsoever specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carveout, (b) first priority and senior Liens on and security interests in the Postpetition Collateral (subject only to Permitted Liens and the Carveout), all in accordance with sections 364(c)(1), (2) and (3) of the Bankruptcy Code, (c) the granting of the Priming Lien in the Postpetition Collateral, senior in right to the Secured Parties in accordance with section 364(d).

48. Given the nature of the Debtor's financial condition, the Debtor submits that the financing proposed to be provided under the DIP Agreement is fair and reasonable and represents the best financing available to the Debtor under all of the circumstances herein. Certainly, without the Postpetition Financing, it is likely that the

Debtor would abruptly cease operating and the Property would fall into foreclosure, the result of which would be disastrous for all parties in interest.

## IV. BASIS FOR RELIEF REQUESTED

49. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections. 11 U.S.C. § 364(c). A debtor in possession may also obtain postpetition credit secured by liens senior to prior existing liens pursuant to Section 364(d) of the Bankruptcy Code. Section 363(c)(2) of the Bankruptcy Code also contemplates that the Bankruptcy Court may authorize the use of cash collateral without the consent of secured parties courts authorize such use if adequate protection is provided pursuant to section 363(e).

### a. The Postpetition Financing Should be Approved Under Section 364 of the Bankruptcy Code

50. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c). See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b)

of the Bankruptcy Code);  See e.g., In re Photo Promotion Assocs., 89 B.R. 328, 333

(Bankr. S.D.N.Y. 1988) (Section 364(c) financing is appropriate when the debtor in

possession is unable to obtain unsecured credit allowable as an ordinary administrative

claim.). Courts have articulated a three-part test to determine whether a debtor may

obtain financing under section 364(c) of the Bankruptcy Code:

> (i)   The debtor is unable to obtain unsecure credit under section 364(b)(i.e., by granting a lender administrative expense priority);
>
> (ii)  The credit transaction is necessary to preserve the assets of the estate;  and
>
> (iii) The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See  In re Acqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above

test and finding that "[o]btaining credit should be permitted not only because it is not

available elsewhere, which could suggest the unsoundness of the basis for the use of the

funds generated by credit, but also because the credit acquired is of significant benefit

to the debtor's estate and the terms of the proposed loan are within the bounds of

reason, irrespective of the inability of the debtor to obtain comparable credit

elsewhere").In these circumstances, "[t]he statute imposes no duty to seek credit from

every possible lender before concluding that such credit is unavailable." Bray v.

Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir.

1986);  see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).

A debtor need only demonstrate "a good faith effort that credit was not available

without" the protections of section 364(c).  See e.g. In re Snowshoe, 789 F.2d. at 1088.

When there are few lenders likely, able, or willing to extend the necessary credit to the

debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such

an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D.

Ga. 1988), aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

**b.** **The Priming Lien Under the Postpetition Financing Should be Approved Under Section 364(d) of the Bankruptcy Code**

51. The Debtor also seeks approval of the Postpetition Financing under section 364(d)(1) of the Bankruptcy Code to permit the Debtor to grant priming liens on the Prepetition Collateral. The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In addition, the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code must be provided with adequate protection their interests in collateral. See In re Swedeland Dev. Group, Inc., 16 F. 3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); Dunes Casino, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting that '[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").The proposed DIP Liens would "prime" certain of the existing liens of the pre-petition including the Secured Parties by granting to the Lender liens that are senior to the Prepetition Collateral. MSSH-ILL and MSSH-NY do not object to the priming of their pre-petition liens and secured claims aggregating approximately $51,773,292.

52. As set forth above, to obtain postpetition financing, the Debtor and its advisors approached several commercial lenders which provide financing to distressed entities and chapter 11 debtors. After such inquiry, the Debtor determined

that no other financing is available on terms better than proposed under the DIP Agreement based on responses that the Debtor received.

53. In addition, under section 364(d)(1) of the Bankruptcy Code, if interests in collateral are to be "primed," then such "primed" parties must be adequately protected. 11 U.S.C. §364(d)(1). The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11 case); In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (same); In re Beker Indus Corp., 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986) (same).

54. Courts determine the means for providing adequate protection on a case-by-case basis. See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).

55. The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code. Section 361 sets forth three non-exclusive forms of adequate protection: (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property; (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property; and (c) such other relief as will result in a entity realizing the indubitable equivalent of its interest in property. 11 U.S.C. § 361. As the foregoing is neither exclusive nor exhaustive, there is a great deal

of flexibility in terms of what may constitute adequate protection.  In re O'Connor, 808 F. 2d 1393, 1396-97 (10th Cir. 1987).  Ultimately, adequate protection is determined on a case-by-case basis in light of the particular facts and circumstances presented.  Id. (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis);  In re 495 Central Park, 136 B.R. at 631 (stating that, although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive and suggests a broad and flexible definition);  In re Constable Plaza Assocs., L.P. 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion);  Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n. 3 (Bankr. E.D. Pa. 1982) ("While "adequate protection" is not defined in the Bankruptcy Code, the legislative history of section 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles."  (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess.  339 (1977)).

56.     In this case, the Secured Parties' interests in the Prepetition Collateral will be adequately protected by virtue of the Debtor's expenditure of funds in accordance with the Budget, which will at a minimum preserve and maintain the collateral's value so that the Property can be sold, or such other disposition of the assets can be determined in an orderly fashion.  In contrast, if the Property is sold without a marketing process in foreclosure or by a Chapter 7 Trustee in a fire sale, no one other than the senior secured creditors will benefit because it is highly unlikely that the net purchase price will be equal to the net purchase price obtained with marketing (even after considering use of the funds from the DIP Agreement).  The Debtor also believes

that at a minimum the NYCWB and Sun Life have an equity cushion based on appraisals the Debtor has obtained.

57.     In addition, the Budget, which was prepared by the Debtor and reviewed by the Lender and its advisors, provides an additional layer of adequate protection because it ensures that the Debtor's expenditures will be limited to items that are necessary and essential to fund the Debtor's operations and the costs of this case while preserving the value of the Prepetition Collateral. Accordingly, there is no harm done to the Secured Parties' interests by the Debtor's proposed use of the funds from the DIP Agreement since such use and the corresponding maintenance and preservation of the Property protects and enhances the value of the Prepetition Collateral.

58.     Moreover, Sun Life, the senior secured prepetition creditor, already is holding more than $2.2 million as prepayments for its debt service through August 2010. The Debtor anticipates that it will seek authority to continue to make payment to the NYCWB under the Water Payment Agreement due to the favorable terms thereof (*i.e.*, a reduction of liabilities of more than $1.2 million). In addition, as set forth above, the holders of pre-petition security interests will be granted replacement liens to the extent of any diminution in the value of their interests in their Prepetition Collateral and will be entitled to an administrative expense claim under section 507(b) of the Bankruptcy Code to protect the Prepetition Lenders to the extent the other adequate protection to be provided proves inadequate to secure against any diminution in the value of their Prepetition Collateral. The Debtor submits that the foregoing suffices as adequate protection in a case that is anticipated to be expeditiously conducted.

59.     Since mid-2006, the Property has been appraised several times, by different appraisers with values ranging up to $175 million. While it cannot be

disputed that the global economic crisis has negatively impacted real estate values everywhere, and has made obtaining financing to fund acquisitions difficult, there have been indications that the credit crisis is easing. In any event, the true value of the Property cannot be known until the properties are actually marketed, a stalking horse offer(s) obtained and tested by an auction process. Nevertheless, even if the holder of a junior lien is undersecured, such creditor will not be receiving less than they would have received absent the Postpetition Financing and without a marketing process. Accordingly, the granting of the priming lien requested herein is appropriate. See In re Levitt and Sons, LLC, 384 B.R. 630, 641-42 (Bankr. S.D. FL. 2008) (finding a junior lien holder was not entitled to adequate protection if it would receive nothing under non-bankruptcy law); cf., 620 Church Street BLDG. Corp., 57 S. Ct. 88, 89, 299 U.S. 24, 27 (1936) (holding that claimant requesting adequate protection under a plan was not entitled to adequate protection when the claimant's claim had no value because there was no equity in property beyond a first mortgage).

     **c.**    **The Postpetition Financing is Necessary
to Preserve the Assets of the Debtor's Estate**

     60.    The Debtor's need for prompt access to a post-petition credit facility is apparent. As described above, access to credit is necessary to meet the day-to-day operating needs associated with the operation of the remaining business operations and maintenance of the Property and infrastructure to preserve its value. In the absence of postpetition financing, the Debtor's remaining employees, contractors, utilities and vendors will likely refuse to provide services and supplies to the Debtor, and absent which the Debtor will be unable to meet its postpetition obligations, which will derail this Chapter 11 case at inception to the severe detriment for all creditors, secured and unsecured, as well as other parties in interest.

**d.    The Terms of the Postpetition Financing are Fair, Reasonable and
Appropriate and Represent the Sound Exercise of Business Judgment**

61.    As described in the Terrano Affidavit and herein, the Debtor has

concluded after appropriate investigation and analysis that the Lender's proposal is the

best alternative available for post-petition financing. No other post-petition lender

offered terms more favorable than the Lender under the circumstances required by the

Debtor and credit cannot be obtained on an unsecured basis.  As such, the Postpetition

Financing was the best financing option available under the circumstances of this case.

62.    The proposed terms of the Postpetition Financing were negotiated

in good faith and at arms' length among the parties, with both the Debtor and the

Lender represented by separate experienced counsel.  They are fair, reasonable, and

adequate in that the terms do not prejudice the powers and rights that the Bankruptcy

Code confers for the benefit of all creditors, and they do not abridge the rights of other

parties in interest.  As contemplated by the policies underlying the Bankruptcy Code,

the purpose of the Postpetition Financing is to enable the Debtor to maintain the value

of its estate while formulating a confirmable plan of reorganization. See generally, In re

First S. Sav. Assn, 820 F.2d 700, 710-15 (5th Cir. 1987).

63.    Bankruptcy courts routinely defer to the debtor's business

judgment on most business decisions, including the decision to borrow money.  In re

Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (Business judgments should

be left to the boardroom and not to this Court.).  See also, In re Curlew Valley Assocs.,

14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (In general, a bankruptcy court should defer to

a debtor-in-possession's business judgment regarding the need for and proposed use of

funds, unless such decision is arbitrary and capricious).   Courts generally will not

second-guess a debtor in possession's business decisions when those decisions involve

"a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." <u>Curlew Valley</u>, 14 B.R. at 513-14 (footnotes omitted).

64.     The Debtor submits that it has exercised its sound and prudent business judgment in determining the merits and necessity of the Postpetition Financing and has further satisfied the legal prerequisites for incurring debt.  The Debtor additionally submits that it aptly demonstrated that the terms of the Postpetition Financing are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted the requested relief to borrow funds from the Lender on a secured and superpriority basis, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

**e.      Use of Cash Collateral and Proposed Adequate Protection**

65.     As set forth above, the Debtor's budget contemplates the use of the Cash Collateral from lease and rent proceeds.  Under section 363(c)(2) and 363(e) of the Bankruptcy Code, a debtor is not authorized to use cash collateral without the consent of the pre-petition secured lender unless such lender is provided adequate protection of its interest in the Cash Collateral.  To the extent liens on the Cash Collateral constitute valid and perfected security interests as of the Petition Date, the Debtor believes that the Replacement Liens (described above), provided to the Secured Parties whose Cash Collateral is also proposed to be used by the Debtor, adequately protect them from the diminution in value of their interest in such Cash Collateral.

66.     MSSH-ILL and MSSH-NY have consented to the Debtor's use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to adequate protections described above.  The Debtor submits that the proposed adequate protection that is being granted to the Secured Parties through the granting of Replacement Liens (described above) and the equity that exists for senior secured

creditors, which include the parties that may be entitled to adequate protection for the use of their cash collateral, satisfies the requirements of sections 361 and 363(c)(2) of the Bankruptcy Code.

67. Based upon its cash on hand and the expenses it must pay during the first two to three weeks of this case, the Debtor believes it will not need interim borrowing or use of cash collateral pending a Final Hearing on this motion provided that hearing is held not later than 20 days after the Petition Date. The Debtor, however, reserves its right to seek interim borrowing, on notice, if circumstances warrant.

## V.     NOTICE

68. Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) the Debtor's twenty largest unsecured creditors; (c) the Debtor's five largest prepetition secured creditors or any agent thereof; (d) the Debtor's proposed post-petition lender; (e) the Office of the United States Attorney; (f) the Office of New York State Attorney General; (g) the New York State Department of Health; and (h) the Internal Revenue Service and (i) all other parties known by the Debtor claiming to have judgment liens or mechanic's liens recorded against the Debtor's real property. The Debtor submits that under the circumstances no other notice need be given.

69. Because of the exigencies of the circumstances and the irreparable harm to the Debtor, its estates and all parties-in-interest that will ensue if the requested relief is not granted, the Debtor submits that no other notice need be given, and that the notice provided by the Debtor is sufficient.

70. No prior request for the relief sought in this Motion has been made to this or any other court in connection with this Chapter 11 case.

## VI.      CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter the

Final Order substantially in the form annexed hereto as **Exhibit 2** (i) authorizing the

Debtor to incur Postpetition Financing on a secured basis and with administrative

superpriority pursuant to the terms and conditions of the DIP Loan Documents and the

Financing Orders;  (ii) authorizing the use of Cash Collateral;  (iii) granting the DIP

Liens, Replacement Liens and DIP Superpriority Claims, and (iv) granting such other

and further relief as the Court may deem just and proper.

Dated:    New York, New York
           July 9, 2009

                            TOGUT, SEGAL & SEGAL LLP
                            Proposed Attorneys for the
                            Debtor and Debtor in Possession
                            By:

                            /s/Frank A. Oswald
                            FRANK A. OSWALD
                            A Member of the Firm
                            One Penn Plaza, Suite 3335
                            New York, New York 10019
                            (212) 594-5000

**Exhibit 1**
**DIP Agreement**

**Exhibit 2**
**Proposed Final Order**