**DEBTOR IN POSSESSION LOAN AGREEMENT**

between

**CABRINI MEDICAL CENTER,**

a not-for-profit corporation organized under the laws of the state of New York,

as the Debtor,

and

**MISSIONARY SISTERS OF THE SACRED HEART,**

a not-for-profit corporation organized under the laws of the state of Illinois,

as Lender.

## DEBTOR IN POSSESSION LOAN AGREEMENT

THIS DEBTOR IN POSSESSION LOAN AGREEMENT (this "Agreement"), dated July 9, 2009, is entered into between **CABRINI MEDICAL CENTER**, a not-for-profit corporation organized under the laws of the State of New York ("Debtor") on one hand, and **MISSIONARY SISTERS OF THE SACRED HEART**, a not-for-profit corporation organized under the laws of the State of Illinois ("MSSH-ILL" or, "Lender"), on the other hand.

WITNESSETH:

WHEREAS, on July [__], 2009 (the "Petition Date") the Debtor filed with the United States Bankruptcy Court for the Southern District of New York a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

WHEREAS, the Debtor have requested that Lender make a DIP Loan (as defined hereinafter) to the Debtor subject to the terms and conditions set forth herein; and

WHEREAS, Lender is willing, on the terms and conditions hereinafter set forth, to make such a DIP Loan.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties hereto agree as follows:

SECTION 1. DEFINITIONS.

1.1    Defined Terms.   Certain terms are defined in the text of this Agreement. In addition as used in this Agreement, the following terms shall have the following meanings:

"Agreement" means this Debtor in Possession Loan Agreement, as it may hereafter be amended, modified, extended, restated or supplemented from time to time.

"Avoidance Actions" means causes of action of Debtor' estate arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code, as may hereafter be amended from time to time.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated under 28 U.S.C. § 2075, as may be amended from time to time.

"Budget" means the budget annexed hereto as **Exhibit A**.

"Business Day" means any day on which banks are required to be open in New York City.

"Carve Out" means "Carve Out" as defined in the Final DIP Order.

"Chapter 11 Case" means the voluntary bankruptcy case of the Debtor.

"Collateral" means all Property securing the DIP Obligations hereunder, including, without limitation all assets, all real property and all personal property, tangible or intangible, including without limitation all bank accounts, deposits and cash, wherever located, whether now existing or hereafter acquired, of the Debtor, and all proceeds (including the proceeds of any asset sales to third parties), products, rents, revenues and profits of any of the foregoing, all causes of action (except Avoidance Actions), and such other collateral of any nature as may be provided as security for the DIP Obligations in the Final DIP Order or otherwise.

""Debtor Representative" shall mean the Acting Chief Executive Officer, the Chief Operating Officer or the Chief Financial Officer of the Debtor, or any individual designated by any of the foregoing to act as an "Authorized Representative" hereunder.

"Default" means any event specified in Section 6 hereof, whether or not any requirement in connection with such event for the giving of notice, lapse of time, or happening of any further condition has been satisfied.

"Default Rate" has the meaning given such term in Section 3.2(b) hereof.

"DIP Loan" has the meaning given such term in Section 2.1 hereof.

"DIP Loan Commitment" means the commitment of the Lender to loan the Debtor an aggregate principal amount of up to $5,000,000.

"DIP Loan Documents" means, collectively, this Agreement, any Interim DIP Order, the Final DIP Order, and each other order of the Court and each other instrument, document or agreement required to be delivered pursuant to this Agreement or any order of the Court or delivered in connection with this Agreement, including without limitation any documents or instruments executed or delivered by any Entity from time to time as security for the DIP Obligations, in each case as amended, modified, waived, substituted, replaced or extended from time to time.

"DIP Obligations" means all present and future obligations, indebtedness and liabilities, and all renewals and extensions of all or any part thereof, of the Debtor to Lender arising from, by virtue of, or pursuant to this Agreement, any DIP Loan Documents, and any and all renewals and extensions thereof or any part thereof, or future amendments thereto, all interest accruing on all or any part thereof and the reasonable attorneys' fees incurred by Lender for the negotiation and preparation of this Agreement and consummation of the same, execution of waivers, amendments and consents, and in connection with the enforcement or the collection of all or any part thereof, and reasonable attorneys' fees incurred by Lender in connection with the enforcement or the collection of all or any part of the Obligations during the continuance of a Default, in each case whether such obligations, indebtedness and liabilities are direct, indirect, fixed, contingent, joint, several or joint and several.

"Entity" means an individual, partnership, limited liability company, joint venture, corporation, trust, Governmental Unit, unincorporated organization, and government, or any department, agency, or political subdivision thereof.

1240019v.5

"Final DIP Order" means the order entered by the Court on at least 15 days notice as required by Bankruptcy Rule 4001, in form and substance satisfactory to Lender in its sole discretion approving the DIP Loan and the DIP Loan Documents.

"Final Order" means an order, ruling or judgment of a court of competent jurisdiction (a) that is in full force and effect, (b) that is not stayed, (c) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, and no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, and (d) is no longer subject to review, reversal, modification or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules.

"GAAP" means generally accepted accounting principles applied on a consistent basis.

"Governmental Unit" means any state, commonwealth, federal, foreign, territorial, or other court or government body, subdivision, agency, department, commission, board, bureau, or instrumentality of a governmental body.

"Highest Lawful Rate" means, at the particular time in question, the maximum rate of interest which, under applicable law, Lender is then permitted to charge on the DIP Obligations. If the maximum rate of interest which, under applicable law, Lender is permitted to charge on the DIP Obligations shall change after the date hereof, the Highest Lawful Rate shall be increased or decreased automatically, as the case may be, from time to time as of the effective time of each change in the Highest Lawful Rate without notice to the Debtor.

"Interim DIP Order" means any order entered by the Court with respect to the DIP Loan or the DIP Loan Commitment prior to the Final DIP Order, in form and substance satisfactory to Lender in its sole discretion approving the DIP Loan and the DIP Loan Documents.

"Law" means any constitution, statute, law, ordinance, regulation, rule, order, writ, injunction, or decree of any Governmental Unit.

"License" means any license, permit, consent, certificate of need, authorization, certification, accreditation, franchise, approval, or grant of rights by, or any filing or registration with, any Governmental Unit or other Entity necessary for such Entity to own, build, maintain, or operate its business or Property.

"Lien" means any properly filed and perfected mortgage, pledge, security interest, encumbrance, lien, or charge of any kind, including without limitation any agreement to give or not to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement or other similar form of public notice under the Laws of any jurisdiction (except for the filing of a financing statement or notice in connection with an operating lease).

"Litigation" means any proceeding, claim, lawsuit, arbitration, and/or investigation conducted by or before any Governmental Unit or arbitrator, including without limitation proceedings, claims, lawsuits, and/or investigations under or pursuant to any environmental,

occupational, safety and health, antitrust, unfair competition, securities, Tax, or other Law, or under or pursuant to any contract, agreement, or other instrument.

"Material Adverse Change" means any circumstance or event that, by itself or aggregated together with all other events or circumstances, is or would reasonably be expected to materially and adversely affect the validity or enforceability of or any rights of Lender under the DIP Loan Documents or the Final DIP Order.

"Permitted Liens" means:

(a)     any Lien in favor of Lender pursuant to the DIP Loan Documents to secure the DIP Obligations hereunder;

(b)     Liens existing on the Petition Date or any replacement liens, provided, however, that, pursuant to Section 364(d)(1), the Final Order shall provide that all such liens shall be rendered junior and second to the liens and security interest granted Lender herein;

(c)     Liens on (i) real estate for real estate Taxes not yet delinquent and (ii) Liens for Taxes, assessments, governmental charges, levies or claims that are being diligently contested in good faith by appropriate proceedings and for which adequate reserves shall have been set aside on the Debtor's books, but only so long as no foreclosure, restraint, sale or similar proceedings have been commenced with respect thereto;

(d)     Liens of carriers, warehousemen, mechanics, laborers and materialmen and other similar Liens incurred in the ordinary course of business for sums not yet due or being contested in good faith, if such reserve or appropriate provision, if any, as shall be required by GAAP shall have been made therefore; and

(e)     Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or similar legislation.

"Permitted Weekly Variance" shall mean a weekly variance of up to ten percent (10%) with respect to any one line item of the Budget, provided that the overall weekly disbursements do not exceed one hundred five percent (105%) of the budgeted expenses of the Debtor, as reflected in the Budget.

"Pre-Petition Obligations" means all obligations, indebtedness and liabilities, and all renewals and extensions of all or any part thereof, of the Debtor to Lender first arising prior to the Petition Date from, by virtue of, or pursuant to the several loans, notes and financing agreements set forth on **Exhibit B** annexed hereto, and any and all renewals and extensions thereof or any part thereof, or future amendments thereto, all interest accruing on all or any part thereof and the reasonable attorneys' fees incurred by Lender for the negotiation and preparation of and in connection with the enforcement or the collection of all or any part thereof, and reasonable attorneys' fees incurred by Lender in connection with the enforcement or the collection of all or any part of the Pre-Petition Obligations during the continuance of a Default, in each case whether such obligations, indebtedness and liabilities are direct, indirect, fixed, contingent, joint, several or joint and several.

4

"Property" means all types of real, personal, tangible, intangible, or mixed property, whether owned or hereafter acquired in fee simple or leased by the Debtor.

"Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Chapter 11 Case on the Petition Date.

"Superpriority Claims" means any debt or other claim arising out of credit obtained or debt incurred by the Debtor having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Tax" or "Taxes" means all taxes, assessments, imposts, fees, or other charges at any time imposed by any Laws or Governmental Unit.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"UCC" means the Uniform Commercial Code as adopted in the State of New York as of the date of this Agreement.

1.2     Other Definitional Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any other DIP Loan Document or any certificate or other document made or delivered pursuant hereto.

(b)     As used herein, in any other DIP Loan Document and in any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Debtor not defined herein, and accounting terms partly defined herein to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

SECTION 2.  DIP LOAN.

2.1     DIP Loan Commitment.  Subject to and in accordance with the terms and conditions of this Agreement, including, without limitation, the entry of a Final DIP Order that is satisfactory to Lender in its sole discretion, Lender, in its sole discretion, shall make advances to the Debtor up to the maximum principal amount of the DIP Loan Commitment (the "DIP Loan").

2.2     Advances.  Provided that no Default shall have occurred or that circumstances shall exist that, with the giving of notice and/or the passage of time, would constitute a Default,

advances under the DIP Loan shall be made if and when requested in writing on behalf of the Debtor by a Debtor Representative in order to meet the Debtor's cash needs as set forth in the Budget. The Debtor Representative will be required to make any requests for advances from the Lender in writing to Gregory A. Cygnar on the Friday preceding the week during which such advances are required in accordance with the Budget and the Debtor's cash position.

2.3     Use of Proceeds. The proceeds of the DIP Loan shall be used by the Debtor for the sole purpose of financing expenditures in accordance with the Budget, subject to the Permitted Weekly Variance.

2.4     Collateral. As provided in any Interim DIP Order and the Final DIP Order, all indebtedness, including DIP Obligations under this Agreement and the DIP Loan Documents shall be secured by automatically perfected security interests and Liens granted pursuant to Section 364(c) and 364(d)(1) of the Bankruptcy Code, with first priority on all Collateral.

2.5     Repayment of the DIP Loan. The Debtor shall pay monthly interest payments to the Lender in accordance with the terms of this DIP Loan as computed in accordance with Section 3.2 of this Agreement. Unless otherwise consented to by the Lender, if (i) the Debtor has not (a) entered into an agreement for the provision of additional long term financing on or before **[December 31, 2009]** or (ii) any other Default has occurred and is continuing under this Agreement or the Final DIP Order, Notice of Default has been given as provided in Section 6.2 hereof and any applicable cure period has expired, then (A) Lender shall have no further obligation to advance any undisbursed principal under the DIP Loan, and (B) the DIP Loan shall be immediately due and payable in full and the Debtor shall be required to pay the DIP Obligations in full within five Business Days after the date on which Lender provides written notice to the Debtor of the total amount owed to Lender under the DIP Obligations.

2.6     Final DIP Order. For the avoidance of doubt and without waiving any discretion or other rights reserved to the Lender in this Agreement, unless otherwise consented to by the Lender through written authorization, the Final DIP Order will not be acceptable to the Lender and no DIP Loan shall be funded by the Lender, unless the same contains, inter alia, the following provisions:

(a)     Express findings, based upon the Debtor's motion papers and supporting affidavits and testimony, of the priority, extent and validity of the Lender's Pre-Petition Obligations;

(b)     Lender's Pre-Petition Obligations may not be challenged and will be fully enforceable without counterclaim or defense unless challenged within 60 days of the appointment of the official committee of unsecured creditors;

(c)     A first priority, valid, perfected, priming lien on all of the Collateral shall be granted to Lender to secure repayment of the DIP Loan as contemplated by Section 2.4 above;

(d)     Debtor will waive 506(c) benefits as against Lender on behalf of the estate; and

(e)     Debtor will waive 510(b) subordination claims and defenses as against Lender on behalf of the estate.

6

SECTION 3.  GENERAL PROVISIONS APPLICABLE TO DIP LOAN.

3.1    No Note. This Agreement, the DIP Loan Documents, any Interim DIP Orders and the Final DIP Order fully evidence and memorialize the DIP Obligations, and no other instrument is required to evidence such DIP Obligations.

3.2    Interest Rates.

(a)    Interest Rate. Subject to Section 3.2.(b) hereof, the DIP Loan shall bear interest at a rate equal to the prevailing prime rate [as published by the Wall Street Journal on the first Tuesday of each month during the term of the DIP Loan] plus 6.5%, but in no event to exceed the Highest Lawful Rate.

(b)    Default Rate. Upon the occurrence and during the continuance of a Default, and provided that Lender shall have provided a Notice of Default as provided in Section 6.2 and any applicable cure period has expired, the DIP Loan and all other amounts unpaid and outstanding under this Agreement shall bear interest at a rate equal to the prevailing prime rate [as published by the Wall Street Journal on the first Tuesday of each month during the term of the DIP Loan] plus 10%, but in no event to exceed the Highest Lawful Rate (the "Default Rate").

(c)    Computation of Interest. Interest on the Advances shall be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day) occurring in the period for which such interest is payable, unless such calculation would exceed the Highest Lawful Rate, in which case interest shall be calculated on the per annum.

3.3    Collateral.

(a)    Grant of Security Interest. The Debtor hereby grants to Lender a security interest in all of the Collateral as security for the full and prompt payment in cash and performance of the DIP Obligations.

(b)    Perfection; Duty of Care. Until all the DIP Obligations have been paid and performed in full, the Debtor shall take all actions reasonably requested by Lender or otherwise required to perfect, maintain and protect Lender's security interest in the Collateral, including delivering to Lender all Collateral in which Lender's security interest may be perfected by possession together with such endorsements as Lender may request. The Debtor shall pay when due all Tax assessments and other charges imposed upon or with respect to the Collateral or any part thereof, first arising after the Petition Date, unless such assessments and charges are subject to a good faith contest adequately reserved for by the Debtor. If the Debtor shall fail to pay such amounts, upon prior written notice to the Debtor, Lender may do so and add the amount of such payment to the principal owed under the DIP Loan. Upon prior written notice to the Debtor, Lender may discharge any Lien that is not a Permitted Lien, pay for any insurance, or take any other action the Debtor is required to take pursuant to this Agreement but has not taken, and add the amount of such payment to the principal owed under the DIP Loan.

SECTION 4.  AFFIRMATIVE COVENANTS.

The Debtor hereby agrees that, so long as any portion of the DIP Loan or other DIP Obligation remains outstanding and unpaid or any other amount is owing to Lender hereunder, the Debtor shall:

4.1     Payment of DIP Obligations.  Pay, discharge or otherwise satisfy all post-Petition Date obligations and liabilities as required pursuant to the Bankruptcy Code or by order of the Court.

4.2     Insurance.

(a)     Maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and with only such deductibles as are usually maintained by, and against at least such risks (but including, in any event, public liability and product liability insurance) as are usually insured against in the same general area, by companies engaged in the same or a similar business; and furnish to Lender, at their request, full information as to the insurance carried.

(b)     Lender shall be named as an additional insured and as its interests may appear on all insurance maintained by the Debtor pursuant to Section 4.2(a) hereof.

4.3     Books and Records.  Keep proper books of record and account in which complete and correct entries are made of all dealings and transactions in relation to the Debtor's business and activities and which permit financial statements to be prepared in conformity with GAAP and all applicable Laws.

4.4     Cash Accounts.  Deposit and maintain all proceeds of the DIP Loan in only such accounts permitted by the Court's order approving the Debtor's use after the Petition Date of its existing bank accounts, cash management system and investment guidelines.

4.5     Visits and Inspections.  Promptly permit representatives of Lender from time to time upon prior written notice to the Debtor, during normal business hours, to (a) visit and inspect any Property of the Debtor as often as Lender shall reasonably deem advisable, (b) make such inspections of, abstracts from and copies of the Debtor's books and records as Lender shall deem advisable, and (c) discuss with the Debtor's members, officers and the auditors of the Debtor, the Debtor's business, operations, assets, liabilities, financial positions, results of operations and business prospects as often as Lender shall deem advisable.

4.6     Use of Proceeds.  Use the proceeds of the DIP Loan solely in accordance with the Budget (as applicable) subject to the Permitted Variance and upon the terms and conditions set forth in this Agreement, including without limitation Section 2.3 hereof.

4.7     Compliance with Law.  Comply in all material respects with all requirements of law applicable to the Property (including but not limited to requirements relating to the environment or hazardous or toxic substances).

SECTION 5.  NEGATIVE COVENANTS.

8

The Debtor hereby agrees that it shall not, directly or indirectly so long as the DIP Loan or any of the DIP Obligations remain outstanding and unpaid, or any other amount is owing to Lender hereunder (it being understood that each of the permitted exceptions to each of the covenants in this Section 5 is in addition to, and not overlapping with, any other of such permitted exceptions except to the extent expressly provided):

5.1     Debt. Create, incur, assume or suffer to exist any debt, except:

(a)     Debt outstanding on the Closing Date in the form, and with the same Debtor, as is in existence on the date of this Agreement;

(b)     the DIP Loan and this Agreement;

(c)     Debt incurred by the Debtor within the Budget, subject to the Permitted Weekly Variance, in the ordinary course of business in the form of accounts payable and accrued expenses; and

5.2     Limitation on Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens and the Carve Out.

5.3     Use of Proceeds. Use the proceeds of the DIP Loan for any purpose not set forth in each respective Budget or in Section 2.3 hereof, subject to the Permitted Weekly Variance.

5.4     DIP Financing. Incur, or apply to the Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by Section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement and the other DIP Loan Documents or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than as contemplated by the Final DIP Order or in the Budget, or as may be required by order of the Court in connection with the provision of adequate protection to holders of Permitted Liens whose collateral is sold or otherwise disposed of or as to which Lender consents.

5.5     Alteration of Rights of Lender. Limit, affect or modify, or apply to the Court to limit, affect or modify, any of Lender's rights with respect to the DIP Obligations, including rights with respect to the Collateral and the priority thereof, except with the prior written consent of Lender.

5.6     Chapter 11 Claims. Except as permitted under the Final DIP Order, apply to the Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens and the Carve Out) against the Debtor, or any of their assets in the Chapter 11 Case to be pari passu with, or senior to, the Liens and claims of Lender granted and arising under the DIP Loan Documents.

5.7     Superpriority Administrative Expense. Create or permit to exist any Superpriority Claims (other than with respect to this Agreement or the Interim or Final DIP Orders and other than the Carve Out).

5.8    Alterations.  Undertake any alterations or modifications to the Property without Lender's prior written consent.

5.9    Leases.  Enter into, modify or extend any leases or other occupancy agreements relating to any portion of the Property or collect rent thereunder more than thirty (30) days in advance.

5.10    Transfers.  Transfer, directly or indirectly, any of its right, title or interest in, to or under any of the Collateral without the Lender's prior written consent.

SECTION 6.  DEFAULT.

6.1    Default.  The following shall constitute a Default:

(a)    The Debtor shall fail to pay any principal or interest of the DIP Loan or any other DIP Obligation (including any fees or reimbursable amounts) when any such amount becomes due in accordance with the terms hereof, which failure continues for a period of five (5) Business Days after notice thereof from Lender; or

(b)    The Debtor, shall default in the observance or performance of any covenant, agreement, obligation or restriction set forth in this Agreement any other DIP Loan Document, and such Default shall continue for a period of ten (10) Business Days after notice thereof from Lender; or

(c)    The Court shall enter an order with respect to the Debtor dismissing the Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or, without the prior written consent of Lender (i) appointing a trustee in its Chapter 11 Case or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtor's business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section 1106(b); or

(d)    The Debtor shall fail to comply with the terms of the Final DIP Order; or

(e)    There occurs any Material Adverse Change, including without limitation, any impairment to the value of Collateral which Lender in good faith deems will threaten timely payment in full of the DIP Loan; or

(f)    The Court grants any superpriority administrative expense claim or Lien or enters any order granting relief from the automatic stay (if not in favor of Lender) on any assets of the Debtor which have an aggregate value in excess of $500,000, except with the express written consent of Lender.

(g)    The Debtor shall assume or reject any lease of an interest in the Property without the prior written consent of the Lender.

(h)    The Debtor shall fail to secure the entry of an order of the Bankruptcy Court:

10

(i)      retaining a broker to market the Debtor's real property and related assets on terms acceptable to the Lender within 10 days of appointment of the official committee of unsecured creditors;

(ii)     approving sale process and bidding procedures on terms acceptable to the Lender entered within 75 days of Petition Date;

(iii)    approving sale transaction providing for sale or other disposition of substantially all of the Debtor's real property and related assets on terms acceptable to the Lender within 150 days of Petition Date.

6.2    Notice of Default and Certain Remedies. If any Default shall occur, Lender may provide written notice (a "Notice of Default") to the Debtor and counsel for the official committee of unsecured creditors, if any, of such Default. If a Default shall have occurred and Lender shall have provided a Notice of Default, then, upon expiration of any applicable cure period, so long as any such Default shall be continuing, any of the actions set forth in the next sentence may be taken upon written notice by Lender to the Debtor, the U.S. Trustee representative and to the official committee of unsecured creditors, if any, of the Debtor. Lender may (A) without further order of the Court, declare the DIP Loan Commitment reduced to zero whereupon the DIP Loan Commitment and all obligations of Lender relating thereto shall be immediately terminated and declare all or a portion of the DIP Loan hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable, without further notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, protest, or other formalities of any kind, all of which are hereby expressly waived by the Debtor, (B) foreclose or otherwise enforce any Lien granted to Lender for the benefit of itself to secure payment and performance of the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (C) exercise all other rights and remedies available at law or in equity. Except as expressly provided above in this Section 6 hereof, presentment, notice, notice of dishonor, notice of acceleration, notice of intent to accelerate, demand, protest and all other notices of any kind are hereby expressly waived.

SECTION 7. MISCELLANEOUS.

7.1    Amendments and Waivers. No DIP Loan Document nor any terms thereof may be amended, supplemented or modified except in writing signed by Lender and Debtor.

7.2    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three Business Days after being deposited in the mail, postage prepaid, or one Business Day after being entrusted to a reputable commercial overnight delivery service, or, in the case of facsimile notice, when sent, confirmation of receipt received, addressed as follows in the case of the Debtor and Lender or to such other address as may be hereafter notified by such respective parties hereto:

The Debtor:

Cabrini Medical Center
227 E. 19th Street
New York, New York 10003
Attention: Chief Operating Officer

With a copy to

Togut, Segal & Segal, LLP
One Penn Plaza
New York, NY 10119
Attn: Frank Oswald
Phone: (212) 594-5000
Fax: (212) 967-4258

and to:

Garfunkel, Wild & Travis, P.C.
111 Great Neck Road, Suite 503
Great Neck, New York 11021
Attn: Burton Weston
Telephone: (516) 393-2200
Facsimile: (516) 466-5964

Lender:

Missionary Sisters of the Sacred Heart
434 West Deming Place
Chicago, Illinois 60614
Phone: (773) 883-7302
Fax: (773) 525-0513

With a copy to

Klestadt & Winters, LLP
292 Madison Avenue, 17th Fl.
New York, NY 10017
Attn: Tracy L. Klestadt
      Sean C. Southard
Telephone:    (212) 972-3000
Facsimile:    (212) 972-2245

and to:

Ruff, Weidenaar & Reidy. Ltd.
222 North La Salle Street
Suite 700
Chicago, Illinois 60601
Attn: Stephen L. Ruff, Jr.
William B. Weidenaar

12

Telephone: (312) 263-3890
Facsimile: (312) 263-1345

7.3    No Waiver; Cumulative Remedies.    No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

7.4    Survival of Representations and Warranties.    All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the DIP Loan.

7.5    Counterparts.    This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

7.6    Additional Grant of Lien.    All DIP Obligations, contingent or absolute (including, without limitation, the principal thereof, interest thereon, and any costs and expenses owing in connection therewith) which may now or from time to time hereafter be owing by the Debtor to Lender under any of the DIP Loan Documents shall be secured as set forth in the Final DIP Order.

1240019v.5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

[The remainder of this page is intentionally left blank.]

**CABRINI MEDICAL CENTER**, on behalf
of itself and the Debtor
By:_____

Title:_____


LENDER
**MISSIONARY SISTERS OF THE
SACRED HEART**, a Not-for-Profit
corporation organized under the laws of the
state of Illinois
By:_____

Title:_____

15

# EXHIBIT A

## BUDGET





C O N F I D E N T I A L

*Cabrini Medical Center*

Cash Flow Projection and DIP Budget

July 9, 2009

**Getzler Henrich**
*Management & Financial Consultants*

Turnarounds | Workouts | Crisis Management | Interim Management | Bankruptcy & Financial Advisory | Distressed M&A
Performance Improvement | Technology Services | Sales & Marketing Strategy | Post-merger Integration

## Table of Contents

1) Introduction ............................................................................. 3

2) Notes and Assumptions ........................................................... 4

3) Debtor In Possession Budget ................................................... Appendix Page 1

4) Debt Schedule ....................................................................... Appendix Page 2

5) Other Schedules ..................................................................... Appendix Page 3



**Getzler Henrich**
Management & Financial Consultants







## Introduction

This cash flow ("CF") projection for Cabrini Medical Center ("CMC") is based on the collaborative work of Getzler Henrich & Associates LLC ("GH") and CMC's management team. This projection reflects detailed projections of CMC's current operations in weekly increments for the 13 weeks, and monthly increments thereafter for the 6 months after the event of a chapter 11 filing occurring during the week ending Saturday July 11, 2009. This projection also reflects extensive discussions with the management team including identification and removal of extraordinary and non-recurring historical events as well as expectations regarding the timing and impact of future events.

GH has relied on the accuracy of the data provided as well as management's input in preparing these projections. GH is not an accounting firm, does not provide assurance or auditing services, and has not undertaken any activities to verify the accuracy of historical results. This projection has **not** been prepared in accordance with Generally Accepted Accounting Principles (GAAP).

In preparing the Notes & Assumptions to the Projection GH has attempted to reflect the information utilized as well as any additional context that may be helpful in understanding the methodology and nature of projected events. However, notwithstanding GH's best judgment, this projection remains subject to management's adherence to prepared budgets as well as the uncertainty associated with both the timing and magnitude of future events.

**Getzler Henrich**
Management & Financial Consultants



## Notes & Assumptions

o **General**

  o Chapter 11 filing assumed to occur the week ending Saturday July 11, 2009.

  o The DIP budget projects needs of approximately $4.8mm through 1/02/2009, and $6.4mm through 3/31/2010, and assumes 9.75% fixed interest (6.5% + 3.25% Prime) on the DIP loan.

o **Collections**

  o Each month includes rental income and AR that is expected to be received. Statues of limitations of 12-18 months exist on Medicare and Medicaid claims, so CMC won't be able to collect AR at the same rate as it has historically. $50k /month is an estimate provided by the CFO and signed off by The Gaeta Company, who is helping with collections.

  o CMC is receiving rental income from various tenants in the amount of $147k/month, which require certain levels of maintenance and ancillary services such as IT, phone, etc.

o **Disbursements**

  o **IT services** – Considers a contract information systems consultant and fees related to information systems.

  o **Phone / Internet** – Paetec is the phone provider at $5.2k/month. Matrix is the internet provider at $0.9k/month. Management is attempting to reduce the phone bill by citing unused lines, but the antiquated phone system prohibits switching to another phone provider without significant capital outlay.

  o **Elevators** – Monthly cost to maintain elevators for tenants.

  o **Water** – $45k paid quarterly is estimated based on historical use.

  o **Insurance** – General insurance is $23k/month and Directors and Officers Insurance is $6k/month. General insurance must be renewed each December, which requires a one month fee.



**Getzler Henrich**
*Management & Financial Consultants*

4



# Notes & Assumptions (Cont'd)

o **Disbursements (Cont'd)**

 o **Utilities** – Assumes average monthly volume based on historical use, increases in winter, summer and decreases in off months.

 o **Audit** – $40k in September is the contracted rate for the current audit required by Sun Life Mortgage, and $40k in March will be a final stub audit for 2009, close out and tax accounting.

 o **Linear Accelerator Staff** – $5k/month for Radiation Safety Expert.

 o **Principal** – No principal will be paid on MSSH Debt. The Sun Life mortgage will receive principal payments, which will be deducted from the prepaid Sun Life Rent, and not affect the DIP Budget cash flows.

 o $60k/month is related to a settlement with the NY City water board, who has agreed to forgo back payments for water service.

 o **Interest** – Applicable interest rates and payments are detailed in the Debt Schedule.

 o **Bankruptcy Related Items**

 o **Legal and Professionals** – In chapter 11, management has estimated fees for legal and other professionals involved in the case and in the ordinary course of the entity.

 o **Utilities and Water** – CMC may be required to pay one time deposits for continuing use of Utilities and Water.

 o **Claims Agent** – A claims agent has been contacted and requires $20k up front (paid the week ending 7/4/2009) and $10k each month.

 o **US Trustee** – The amount is as suggested by Bankruptcy Counsel

 o **Medical Records Movement** – Disposal of extensive amount of medical records stored in the basement of CMC

 o **Other Building Closure and Disposal** – Disposal of radioactive material related to removal of cancer machine and other hazardous waste.



**Getzler Henrich**
*Management & Financial Consultants*



## Notes & Assumptions (Cont'd)

o **Risks to Cash Flow**

  o **Hospice Rent** – $89k a month of incoming rent from St. Vincent's Hospice is a source of cash equaling $801k through 3/31/2009. Failure to pay would cause an unbudgeted risk to the cash flow model.

  o **Prime Rate** – The prime rate is 3.25% as of 7/8/2009 according to Bloomberg.com. Should this rate increase significantly, it will cause an unbudgeted risk to cash flow.

  o **Collections** – Approximately $291k in cash flow is budgeted to be collected from aged A/R. Should the Gaeta company become less successful in collections, it would cause an unbudgeted risk to cash flow.





**Getzler Henrich**
Management & Financial Consultants

6

# Appendix

**Getzler Henrich**
Management & Financial Consultants

Cabrini Medical Center
13 Week Cash Flow
(dollars in thousands)

CONFIDENTIAL DRAFT
FOR DISCUSSION PURPOSES ONLY

| | NOTES | BUDGET Week Ending 7/31/09 1 | BUDGET Week Ending 7/10/09 2 | BUDGET Week Ending 7/17/09 3 | BUDGET Week Ending 7/24/09 4 | BUDGET Week Ending 8/7/09 5 | BUDGET Week Ending 8/14/09 6 | BUDGET Week Ending 8/21/09 7 | BUDGET Week Ending 8/28/09 8 | BUDGET Week Ending 9/4/09 9 | BUDGET Week Ending 9/11/09 10 | BUDGET Week Ending 9/18/09 11 | BUDGET Week Ending 9/25/09 12 | BUDGET Week Ending 10/2/09 13 | BUDGET Week Ending 10/9/09 14 | BUDGET Week Ending 10/16/09 15 | BUDGET Week Ending 10/23/09 16 | BUDGET Week Ending 10/30/09 17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 002 Week Ending | | | | | | | | | | | | | | | | | | | |
| 011 Beginning Cash Balance | 1 | 250.0 | | | | | | | | | | | | | | | | | 250.0 |
| COLLECTIONS | | | | | | | | | | | | | | | | | | | |
| 014 Old A/R Cash | | | | | | | | | | | | | | | | | | | 251.7 |
| Rental Income Breakdown | | | | | | | | | | | | | | | | | | | |
| 016 SI Revenue | | | | | | | | | | | | | | | | | | | |
| 017 ITU Rent | | | | | | | | | | | | | | | | | | | |
| 018 ITU Research | | | | | | | | | | | | | | | | | | | |
| 019 Bolus | | | | | | | | | | | | | | | | | | | |
| 020 Dr. Archbold | | | | | | | | | | | | | | | | | | | |
| 021 OPDOC | | | | | | | | | | | | | | | | | | | |
| 022 Other Rental Income | | | | | | | | | | | | | | | | | | | |
| 023 St. Vincent's Hospice | | | | | | | | | | | | | | | | | | | |
| 024 Total Rental Income-Current | | | | | | | | | | | | | | | | | | | |
| 026 Total Collections | | | | | | | | | | | | | | | | | | | |
| DISBURSEMENTS | | | | | | | | | | | | | | | | | | | |
| 029 Operational Disbursements | | | | | | | | | | | | | | | | | | | |
| 030 IT Services | | | | | | | | | | | | | | | | | | | |
| 031 Phone/Internet | | | | | | | | | | | | | | | | | | | |
| 032 Misc Expense/Repairs/Cleaning | | | | | | | | | | | | | | | | | | | |
| 033 HY Operations | | | | | | | | | | | | | | | | | | | |
| 034 Water- Current estimated | | | | | | | | | | | | | | | | | | | |
| 035 Insurance-Property/General/Director | | | | | | | | | | | | | | | | | | | |
| 036 Staff / Outside Staff | | | | | | | | | | | | | | | | | | | |
| 037 Utilities | | | | | | | | | | | | | | | | | | | |
| 038 Audit | | | | | | | | | | | | | | | | | | | |
| 039 Lead Accelerator Staff | | | | | | | | | | | | | | | | | | | |
| 040 Collections Agent | | | | | | | | | | | | | | | | | | | |
| 041 Total Operating Disbursements | | | | | | | | | | | | | | | | | | | |
| 043 Cash Flow from Operations | | | | | | | | | | | | | | | | | | | |
| 045 Debt Payments | | | | | | | | | | | | | | | | | | | |
| 047 Principal payments | 3 | | | | | | | | | | | | | | | | | | |
| 048 Interest payments | | | | | | | | | | | | | | | | | | | |
| 049 Total Debt Service | | | | | | | | | | | | | | | | | | | |
| 051 Cash Flow after Debt Service | | | | | | | | | | | | | | | | | | | |
| Bankruptcy Related Items | | | | | | | | | | | | | | | | | | | |
| 054 Legal Fees/Barbados/Garbarini | | | | | | | | | | | | | | | | | | | |
| 055 Bankruptcy Professionals | | | | | | | | | | | | | | | | | | | |
| 056 Professionals for Creditors Committee | | | | | | | | | | | | | | | | | | | |
| 057 Claims Agent | | | | | | | | | | | | | | | | | | | |
| 058 US Trustee | | | | | | | | | | | | | | | | | | | |
| 059 Retention Deposit | | | | | | | | | | | | | | | | | | | |
| 060 Water Board Security Deposit | | | | | | | | | | | | | | | | | | | |
| 061 Medical Records Movement | | | | | | | | | | | | | | | | | | | |
| 062 Other Building Closure and Disposal | | | | | | | | | | | | | | | | | | | |
| 063 DIP Fee | 4 | | | | | | | | | | | | | | | | | | |
| 064 DIP Interest | | | | | | | | | | | | | | | | | | | |
| 066 Total BK Related Items | | | | | | | | | | | | | | | | | | | |
| 068 Total Disbursements | | | | | | | | | | | | | | | | | | | |
| 070 Net Change in Cash | | | | | | | | | | | | | | | | | | | |
| 071 Cumulative (Deficit)/Surplus | | | | | | | | | | | | | | | | | | | |

073 NOTES
074  1  Cash balance estimated as of 7/17/2009 and cash disbursements paid in week of 7/31/2009 assumed paid after 7/17/2009.
075  2  Payroll contains both outside consultants and full time staff.
076  3  Interest payments are calculated weekly. Monthly interest varies due to 3 and 5 week months. October interest contains September interest paid in the week ending 10/9/09.
077  4  DIP of $6.4mm instituted last week of July 2009 and 1st interest payment includes one extra week of accrual.

Prepared by/Getzler Henrich & Associates LLC
with information provided by Cabrini Medical Center

page 1 of 3

CM_CM_CF_v17.xls 7/8/2009 7:05 PM

**Cabrini Medical Center**
**Debt Schedule**
*(dollars in thousands)*

| Line | Debt Listing | Current Payments[1] | Pay in BK? | BK Pmt | BK Interest | Interest | Pmt Date | Comment | Background |
|---|---|---|---|---|---|---|---|---|---|
| 012 | Debt Listing | | | | | | | | |
| 013 | | | | | | | | | |
| 014 | **SECURED DEBT** | | | | | | | | |
| 015 | | | | | | | | | |
| 016 | DIP Loan | $ 6,400 | - | yes | | | 9.75% | 1st | | Includes approximately $250K of cashco. |
| 017 | | | | | | | | | |
| 018 | Sun Life Building A and B | $ 21,085 | 157.15 | yes | 157.15 | | 6.25% | | | Mortgage on Buildings. |
| 019 | Sun Life Building C, D AND E | 14,220 | 105.98 | yes | 105.98 | | 6.25% | 1st | | Mortgage on Buildings. |
| 020 | Prepaid Sun Life Rent | (4,289) | | | | | | | | To be defined as Sun Life interest is due. |
| 021 | Total Sun Life Secured Debt | 31,016 | | | | | | | | |
| 022 | | | | | | | | | |
| 023 | MSSH-New York Province secured | 1,292 | | no | | | 8.00% | end | | Extended credit in the 1980's revolving year to year. Hasn't paid interest since early nineties. |
| 024 | MSSH-New York Province secured | 18,635 | 109.66 | yes | | Interest | 5.57% | 1st | No interest Loan | 7 months behind on interest, but still paying. |
| 025 | MSSH - Working Capital loan | 13,617 | | no | | | | | No interest Loan | Extended credit in the 1980's revolving year to year. |
| 026 | MSSH - Capital Lease loan | 7,975 | | no | | | 3.25% | end | Interest is Prime - assumed to be 3.25% as per Bloomberg.com on 7/8/2009 | Generalite extended credit in the 1980's related to capital assets. Hasn't paid interest since mid nineties. |
| 027 | MSSH - Loan Payable | 2,594 | | no | | | | | No interest Loan | Extended credit in the 1980's, revolving year to year. |
| 028 | MSSH-New York/ Generalite-INTEREST | 7,495 | | no | | | 8.00% | end | Don't have breakdown of accrued interest between tranches | Accrued interest from SN province loan and generalite Capital Lease Loan. Has been accruing since early to mid 90's. |
| 029 | Total MSSH Secured Debt | 51,938 | | | | | | | | |
| 030 | New York City Water Board | 2,343 | 59.83 | yes | 59.83 | | | 1st | Paying in BK. | Back payments for Water service. NYC Water won't charge late fees if CMC makes monthly payments. |
| 031 | United States of America (AG) | 2,487 | $70K until 7/28/2010 then $50K | no | | | 4.61% | 26th | | Settlement of federal whistle blowing lawsuit alleging placement of homeless in Detox unit. |
| 032 | Jack Rodgen Estate (Di Giacomo) | 50 | 50 | no | | | | | | Malpractice of D's Lime which is now $50K, only one more payment. Judgment providing lien on building. |
| 033 | Med-One Capital | 48 | 4 | no | | | | | | Lien on bank account. Have a settlement agreement to pay $4K a month. |
| 034 | Commissioner of Labor (Unemployment) | 2,000 | | no | | | | | | Tax Warrant. |
| 035 | 1199 Confession of Judgment Interest | 4,800 | | no | | | | | | 1199 Union who represents hospital workers. Have a confession of judgment. If confession of judgment is executed, lien on building is granted. Assumed unsecured until lien recorded. |
| 036 | St. Vincent's Loan-Secured | 4,000 | | no | | | 4.00% | | | Secured - Intercreditor Agreement between MSSH and SV providing pari passu ranking. Never collected interest, but should be receiving 4% interest. |
| 037 | Loan Payable 728 | 1,641 | | no | | | 4.75% | 1st | | Secured by HANY's Trust Receivable. |
| 038 | Total Other Secured Debt | 17,279 | | | | | | | | |
| 039 | | | | | | | | | |
| 040 | **Total Secured Debt** | 106,724 | | | | | | | | |
| 041 | | | | | | | | | |
| 042 | **UNSECURED DEBT** | | | | | | | | |
| 043 | | | | | | | | | |
| 044 | MSSH NY Province (Unsecured) | 1,300 | | no | | | 7.00% | | | January 2007 Financing Agreement collateralized by the "Bad Debt Charity Care Pool." CMC is no longer eligible for bad debt payments for the Charity Care Pool. |
| 045 | MSSH NY Province (Unsecured) | 2,000 | | no | | | 4.75% | | Interest is Prime + 1.50% - Prime assumed to be 3.25% as per Bloomberg.com on 7/8/2009 | 2006 Financing agreement with MSSH. |
| 046 | MSSH NY Province Loan Payable-Hotel | 1,520 | | no | | | | | | Advances from MSSH in 2007 - no interest due. |
| 047 | MSSH NY Province Health Insurance advance | 566 | | no | | | | | | Advances from MSSH in 2007 - no interest due. |
| 048 | MSSH NY Province - Apt and garage rentals | 500 | | no | | | | | | Balance of payments owed to MSSH related to apartment building CMC utilized for residents. |
| 049 | MSSH + Allied Irish (vendor CDC) | 3,000 | | no | | | 2.00% | 30th | | Loan between Allied Irish and CDC backed by MSSH. |
| 050 | Total MSSH Unsecured Debt | 9,386 | | | | | | | | |
| 051 | | | | | | | | | |
| 052 | Health Facility Restructuring Pool Loan - DASNY | 2,622 | | no | | | | | | Unsecured - NY State loan for working capital in 2005. |
| 053 | Other Unsecured Claims | 48,592 | | no | | | | | | Supporting Schedule available upon request. |
| 054 | Total Unsecured Debt | 61,100 | | | | | | | | |
| 055 | | | | | | | | | |
| 056 | Capital Equipment Leases | | | | | | | | | |
| 057 | Various Leases | 1,233 | | | | | | | | Secured by equipment (copiers, lab equip, etc.). |
| 058 | Total Capital Equipment Leases | 1,233 | | | | | | | | |
| 059 | | | | | | | | | |
| 060 | **Total CMC Debt** | 169,057 | | | | | | | | |
| 061 | | | | | | | | | |
| 062 | | | | | | | | | |

1. Current payment is the pre-petition scheduled payment, which contains principal and interest. Post-petition, principal w/l cease to be paid.

Prepared by Getzler Henrich & Associates LLC
with information provided by Cabrini Medical Center

**Cabrini Medical Center**
**Other Schedules**
*(Dollars in thousands)*

| | Contingent Receipts / Payments | Expected Amount | Description |
|---|---|---|---|
| 001 | **Item** | | |
| 002 | Heri Grant | $ 1,100 | Applied against $54mm of accrued wages and salaries from financial statements |
| 003 | Medicare Appeals 2004 | 813 | Should receive by December 2009 |
| 004 | Medicare Appeals 2005 | (500) | Will be offset by 2006 Medicare appeals |
| 005 | Medicare Appeals 2006 | 500 | Will be offset by 2005 Medicare appeals |
| 006 | Appeal Bonds | 353 | Uncertain if CMC will receive at all. Waiting for second appeal. |
| 007 | Appeal Bonds | 551 | Uncertain if CMC will receive at all. Tobia Management "fees" of $332p/year since 1994. |
| 008 | Estate Money | 85 | Estate of Lawrence Henderson - bequest by year end |
| 009 | Medicare Appeals 2007 | 1,000 | Won't likely get through administration until mid to late 2010 |
| 010 | Medicare Appeals 2008 | 500 | Won't likely get through administration until early 2011 |
| 011 | Net Liquidation of fixed assets in the building | 250 | After fees, estimated FCV of hospital contents |
| 012 | **Total** | $ 4,664 | |
| 013 | | | |
| 014 | | | |
| 015 | | | |

| | Other Unsecured Claims | Amount | Notes |
|---|---|---|---|
| 016 | Con Edison | $ 4,500 | Con Edison Payable (includes May, June) |
| 017 | Malpractice Liability | 3,000 | |
| 018 | Deferred Compensation Liability | 5,500 | |
| 019 | Malpractice Liability | 4,340 | |
| 020 | Employee Severance and Vacation | 1,300 | |
| 021 | Met Pension Liab | | |
| 022 | St. Vincent's Advances | 2,667 | St. Vincent's advanced cash for operations over the last year. |
| 023 | A/P vendor Debt 5/31/2009 | 27,285 | |
| 024 | **Total** | $ 48,592 | |
| 025 | | | |
| 026 | | | |
| 027 | | | |

| | Other Miscellaneous Cash in Escrow | Amount | Description |
|---|---|---|---|
| 028 | Title Escrow refund | $ 1,400 | When refinancing Sun Life mortgage in March, CMC was unsure of tax liability. Sun Life determined that until this issue is resolved, $1.4mm would be deposited. The agreement stipulates that until the facility is rented to a certain capacity, the funds would not be released. |
| 029 | Escrow for IOB | 69 | Balance of $570k escrow for interest IOB is drawing on. (Debt is secured by HANYS Trust.) |
| 030 | Cash Account for Deferred Compensation Liab | 15 | Cash sitting in the account to service to pay the distribution. |
| 031 | Con Edison Security Deposit | 177 | Con Ed is holding security deposit (through CMC owes $4.5mm) |
| 032 | Codogno | 309 | Self Insured Corporation in Bermuda for payment of malpractice claims. Stopped using it in 2001. Still have pre-01 malpractice claims of $2.8mm prior to 2001 against the hospital related to this fund. Assets of $309k are in trust for the benefit of Cabrini and PHI insurance (claims processed). |
| 033 | | | |
| 034 | **Total** | 1,970 | |

Prepared by Getzler Henrich Associates LLC
with information provided by Cabrini Medical Center

GH_CMC_CF_v07.doc 7/8/2009 7:05 PM

## Getzler Henrich & Associates LLC

Getzler Henrich is one of the most respected names in middle-market turnarounds and corporate restructuring. Our broad business experience, unique professional insights, creativity and unmatched implementation skills form the foundation of our industry leadership.

Getzler Henrich provides management and financial consulting in turnaround and workout situations as well as technology solutions, sales and marketing strategy, operational improvement, and post-merger integration services.

**New York**
295 Madison Avenue
20th Floor
New York, NY 10017
(212) 697 2400

**Boston**
60 State Street
7th Floor
Boston, MA 02109
(617) 742 1230

**Charlotte**
401 N. Tryon Street
10th Floor
Charlotte, NC 28202
(704) 998 5546

**Chicago**
10 South Riverside Plaza
Suite 1800
Chicago, IL 60606
(312) 474 6117

**Irvine**
2030 Main Street
Suite 1300
Irvine, CA 92614
(949) 260 4776

www.GetzlerHenrich.com