## AMENDED AND RESTATED CONTRACT OF SALE

**THIS CONTRACT OF SALE** is entered into as of this 15th day of December, 2009 by and between CABRINI MEDICAL CENTER, a New York not-for-profit hospital, as debtor-in-possession pursuant to the Reorganization Case (as hereinafter defined), with offices at 227 East 19th Street, New York, New York 10003 (**"Seller"**) and, CABRE PARTNERS LLC, a Delaware limited liability company, with offices c/o J.D. Carlisle Development Corp., 352 Park Avenue South, 15th Floor, New York, New York 10010 (**"Purchaser"**).

<u>W I T N E S S E T H</u>

**WHEREAS,** Seller is a debtor in possession under Title 11, United States Code, 11 U.S.C. § 101 et seq., in the case entitled In Re Cabrini Medical Center et. al. (Case No. 09-14398-AJG) (the "**Reorganization Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS**, Seller is the owner of the Premises (as hereinafter defined); and

**WHEREAS,** Seller desires to sell to Purchaser the Premises for the price, and upon the terms and conditions hereinafter set forth; and

**WHEREAS**, Purchaser desires to purchase the Premises for the price, and upon the terms and conditions hereinafter set forth; and

**WHEREAS**, Seller and Purchaser entered into a Contract of Sale, dated as of December 15, 2009, with respect to such sale and purchase of the Premises (the "**Existing Contract**"); and

**WHEREAS,** Seller and Purchaser desire to amend and restate the Existing Contract in its entirety.

**NOW, THEREFORE,** in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and in consideration of the covenants set forth below, and intending to be legally bound, it is mutually covenanted and agreed that the Existing Contract is amended and restated in its entirety as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein and not otherwise defined in this Agreement shall have the following meanings:

"**Adjustment Time**" shall have the meaning set forth in Section 4.1.

"**Agreement**" means this Agreement, the Exhibits and Schedules hereto and all amendments, modifications and extensions hereto and thereto.

"**Assignment and Assumption**" shall have the meaning set forth in Section 9.1.1.

"**Auction**" shall have the meaning set forth in Section 15.2.1.

"**Bidding Procedures Order**" shall have the meaning set forth in Section 15.2.1.

"**Bill of Sale**" shall have the meaning set forth in Section 9.1.1.

"**Broker**" shall have the meaning set forth in Section 16.19.

"**Break-Up Fee**" shall have the meaning set forth in Section 15.2.3.

"**Business Day**" means any weekday on which banks in the State of New York are generally open to conduct regular banking business.

"**Carveout**" shall have the meaning ascribed to such term in that certain final order of the Bankruptcy Court, dated November 8, 2009, authorizing the debtor to utilize debtor-in-possession financing. For the avoidance of doubt, any amendment or modification of such term as defined in such order shall not be effective to modify such term as used in this Agreement.

"**Cash Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Closing**" shall have the meaning set forth in Article 8.

"**Closing Date**" shall have the meaning set forth in Article 8.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.1.

"**Commitment**" shall have the meaning set forth in Section 3.2.1.

"**Confirmation Order**" shall have the meaning set forth in Section 15.2.2.

"**Contract Period**" shall have the meaning set forth in Section 5.1.

"**Deed**" shall have the meaning set forth in Section 9.1.1.

"**Environmental Law**" means all applicable federal, state and local laws, statutes, ordinances, codes, rules, common law, orders, judgments, decrees, regulations and guidance currently in effect relating to the protection of human health and safety or the environment or natural resources including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136

-2-

et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"**Escrow Agent**" means the Title Company.

"**Escrow Agent Direction Letter**" shall have the meaning set forth in Section 9.1.1.

"**Escrow Agreement**" shall have the meaning set forth in Section 2.2.2.

"**Escrow Deposit**" shall have the meaning set forth in Section 2.2.2.

"**Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Excluded Property**" shall have the meaning set forth in Section 2.1.2.

"**Existing Mortgages**" shall have the meaning set forth in Section 3.2.4.

"**Final Order**" shall mean an order, ruling, or judgment of the Bankruptcy Court (a) that is in full force and effect; (b) that is not stayed; (c) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending; and (d) is no longer subject to review, reversal, modification, or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other applicable rules.

"**Fines**" shall have the meaning set forth in Section 3.3.12.

"**Fixtures**" shall have the meaning set forth in Section 2.1.1.

"**Governmental Authority**" means any federal, state, or local government or any court, administrative or regulatory agency, board, committee or commission or other governmental or quasi governmental body, entity or instrumentality, or any department thereof, having jurisdiction over the Property, Seller and/or Purchaser, as the context may require.

"**Hazardous Materials**" means solid or hazardous waste, toxic substance, hazardous chemical, pollutant, contaminant, radioactive substance, their progeny or by-products or other material of whatever kind that is in any way regulated by Environmental Laws or which will subject Purchaser or the Premises to liability under Environmental Laws.

"**Higher Bidder**" shall have the meaning set forth in Section 8.2.

"**Improvements**" shall have the meaning set forth in Section 2.1.1.

"**Inspections**" shall have the meaning set forth in Section 5.6.

-3-

"**Intangible Personal Property**" shall have the meaning set forth in Section 2.1.1.

"**Law**" shall mean the common law and any law, statute, regulation, rule, code, standard, requirement, judgment, decree, permit, or order of any governmental body having jurisdiction of any transaction or matter contemplated hereby.

"**Land**" shall have the meaning set forth in Section 2.1.1.

"**Letter of Credit**" shall have the meaning set forth in Section 2.2.2.

"**Mandatory Removal Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Medical Waste**" shall mean all medical waste and medical inventory and materials regulated by applicable Law, including, without limitation:  (a) "regulated medical waste" as that term is defined in Public Health Law Section 1389-aa; (b) hazardous waste, as regulated under or defined in applicable Law (including, without limitation, the Environmental Conservation Law Section 27-0901), used in hospital operations or in providing health services; (c) any pharmaceutical product, drug, biological product, blood and/or tissue (including without limitation, blood or blood products) that is marketed, distributed, used or made available in the United States for diagnosis or treatment of human disease or conditions; (d) radioactive materials, as regulated under or defined in applicable Law (including, without limitation, in the Rules of the City of New York, Title 24, Section 175.02(a)(181), the regulations of the NYS Department of Health, 10 NYCRR §16.2(101), or the regulations of the NYS Department of Environmental Conservation, 6 NYCRR Part 380-4.1), used in hospital operations or in providing health services; (e) medical inventory including, without limitation, of the type described in the foregoing clauses (a) through (d), chemicals or reagents used in operation or maintenance of laboratories or medical equipment, diagnostic devices containing mercury, containers of compressed gas, containers or equipment (other than readily identifiable refrigeration units) containing fluids that are maintained below zero degrees Celsius, high powered magnets or any superconducting magnets, any device that is intended to generate ionizing radiation in diagnosis or treatment of disease, animals, cell cultures, vaccines, any chemicals or reagents used in film processing; (f) cadavers and body parts, and (g) all other medical waste and medical inventory and materials regulated under any other Law regulating the storage, containment, treatment and disposal of infectious, radioactive or hazardous materials.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Article 10.

"**Outside Vacancy Date**" shall have the meaning set forth in Exhibit I.

"**Permitted Exceptions**" has the meaning ascribed thereto in Section 3.3.

-4-

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, unincorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Personal Property**" shall have the meaning set forth in Section 2.1.1.

"**Plan of Reorganization**" shall mean plan of reorganization or liquidation filed in the Reorganization Case.

"**Premises**" shall have the meaning set forth in the Section 2.1.1.

"**Prevailing Bidder**" shall have the meaning set forth in the Section 15.2.3.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser's Update Certificate**" shall have the meaning set forth in Section 6.2.

"**Qualified Competing Bid**" shall have the meaning set forth in Section 15.2.1.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.4.

"**Real Estate Taxes**" shall have the meaning set forth in Section 3.3.13.

"**Sale Hearing**" shall have the meaning set forth in Section 15.2.1.

"**Sale Order**" shall have the meaning set forth in Section 15.2.2.

"**Scheduled Closing Date**" shall have the meaning set forth in Article 8.

"**Seller's Title Report**" means the copy of Commitment No. 09-7406 20993-NYM issued by Fidelity National Title Insurance Company which is attached hereto and made a part hereof as **Exhibit B**.

"**Seller's Update Certificate**" shall have the meaning set forth in Section 7.3.

"**Service Contracts**" shall have the meaning set forth in Section 2.1.1.

"**Survey**" means that certain survey of the Land and Improvements made by Fehringer Surveying, P.C., dated April 20, 2005 and updated on August 2, 2008.

"**Survey Update**" shall have the meaning set forth in Section 3.2.1.

"**Tangible Personal Property**" shall have the meaning set forth in Section 2.1.1.

-5-

**"Tenancies"** means, collectively, each lease, sublease, subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, every modification, amendment or other agreement relating to such lease, sublease, subsublease or other agreement entered into in connection with such lease, sublease, subsublease or other agreement, and every right or option to enter into, extend or expand any such lease, sublease, subsublease, letting, license, concession or other agreement.

**"Title Company"** means First American Title Insurance Company of New York (and any successor thereto).

"**Title Notice**" shall have the meaning set forth in Section 3.2.1.

**"Transfer Taxes"** means the New York City Real Property Transfer Tax and the New York State Real Estate Transfer Tax imposed as a result of the conveyance contemplated herein, if any.

"**Update**" shall have the meaning set forth in Section 3.2.1.

**"Violations"** shall have the meaning set forth in Section 3.3.12.

1330595v.11

**ARTICLE 2**
**GENERAL TERMS**

SECTION 2.1.        **The Transaction.**  Seller agrees to sell, transfer, convey and assign to Purchaser, and Purchaser agrees to purchase and accept from Seller, the Premises.

2.1.1.  For purposes of this Agreement, the term "**Premises**" means:

(a)        the fee estate in and to those certain plots, pieces and parcels of land located in the Borough of Manhattan, County, City and State of New York at the street address commonly known as 227 East 19th Street, New York, New York and designated as Block 900, Lots 9, 18, 30 and 35 (the "**Land**"), which Land is more particularly described on **Exhibits A-1**, **A-2**, **A-3** and **A-4**, each annexed hereto and made a part hereof, together with (i) all rights and appurtenances pertaining to the Property, including, without limitation, all of Seller's right, title, and interest in and to all oil, gas and other minerals, air and development rights, roads, alleys, easements, streets and ways adjacent to the Property, rights of ingress and egress thereto, any strips and gores within or bounding the Property, all easements, rights of way, privileges, servitudes, appurtenances and other rights, if any, running with the Property, and in all profits or rights or appurtenances pertaining to the Property, and (ii) all of Seller's right, title and interest, if any, in and to any land lying in the bed of any street, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, and all right, title and interest, if any, of Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street;

(b)        the buildings and all other improvements and structures placed, constructed or installed on the Land (collectively, the "**Improvements**") and, subject to the terms of Section 2.1.2, the fixtures built on or attached to the Improvements or the Land (the "**Fixtures**"; together with the Land and the Improvements, collectively, the "**Property**");

(c)        subject to the terms of Section 2.1.2, all of Seller's right, title, and interest in and to the equipment, furniture, machinery, furnishings, tools, spare parts, supplies, inventory and other articles of tangible personal property owned by or hereafter acquired by Seller and located on the Property and used in connection with the ownership, maintenance, use, and operation of the Property which shall remain in or on the Property on the Closing Date (as hereinafter defined), it being acknowledged and agreed by Purchaser that Seller shall have the right to remove all or any portion of the same prior to the Closing without an abatement in the Purchase Price (collectively, the "**Tangible Personal Property**");

(d)        subject to the terms of Section 2.1.2, all of Seller's right, title, and interest in and to any intangible personal property now or hereafter owned by Seller in connection with the Property, to the extent transferable or assignable, and all of Seller's rights under any and all warranties, guaranties, and lien waivers relating to the

-7-

Premises, and all certificates of occupancy, permits, licenses, approvals, authorizations, dedications, subdivision maps and entitlements now or hereafter issued, approved or granted by any Governmental Authority, relating to the development, subdivision, construction, ownership, operation, use and occupancy of the Property or any portion thereof (collectively the "**Intangible Personal Property**"; together with the Tangible Personal Property, collectively, the "**Personal Property**"); and

(e)    all of Seller's rights in and to all contractual rights with respect to the operation, maintenance, repair and improvement of the Property and/or the Improvements, including service and maintenance agreements, construction, material and labor contracts, utility agreements and other contractual arrangements, but only to the extent Purchaser elects to assume the same in accordance with the provisions of Section 4.1.5 (collectively, the "**Service Contracts**"), and warranties of any contractor, manufacturer or materialman.

2.1.2.    Notwithstanding any of the foregoing, the Premises shall not include any of the following items (the "**Excluded Property**"):

(a)    medical equipment and supplies located at the Property;

(b)    moveable trade fixtures and other personal property;

(c)    leased equipment or machinery;

(d)    property belonging to any tenants or other present occupants of the Property other than Seller;

(e)    trademark, copyright or other intellectual property rights with respect to the name "Cabrini," "Cabrini Medical Center," "Columbus Hospital" or any derivations therefrom; or

(f)    claims and  causes of actions owned or possessed by Seller or Seller's chapter 11 estate;

(g)    religious statuary, relics and other religious items.

**SECTION 2.2.    Purchase Price.**

2.2.1.    Subject to adjustment pursuant to the terms and conditions of this Agreement, the "**Purchase Price**" for the Premises is **Eighty Million Dollars (US $80,000,000.00)**, which shall be payable by Purchaser to Seller in cash at Closing by wire transfer of immediately available federal funds to the account or accounts designated by Seller at least three (3) Business Days prior to the Closing.  Seller may direct, among other things, that Purchaser pay a portion of the Purchase Price at the Closing, in an amount or amounts specified by Seller at least three (3) Business Days prior to the Closing, to persons or entities other than

-8-

Seller for Seller's purposes, including to the Title Company for the removal of certain encumbrances on title to the Property.

2.2.2.   Concurrently with the execution and delivery hereof, Seller and Purchaser have agreed that, as security for the performance of Purchaser's obligations hereunder, Purchaser shall deposit with Escrow Agent, by wire transfer to the account described in Schedule 2.2.2, a cash earnest money deposit in the amount of **Eight Million Dollars (US $8,000,000.00)** (the "**Cash Deposit**"), which Cash Deposit and any interest earned thereon shall be held by Escrow Agent, in trust, pursuant to and in accordance with the provisions of an Escrow Agreement among Seller, Purchaser and Escrow Agent, a copy of which is attached hereto and made a part hereof as **Exhibit C** (the "**Escrow Agreement**").  Purchaser shall have the right at any time upon at least five (5) Business Days' prior notice to Seller to deposit with Escrow Agent a clean, unconditional and irrevocable letter of credit in an amount equal to **Eight Million Dollars (US $8,000,000.00)** (payable on sight draft) with a term of at least twelve (12) months (together with any replacements or substitutes therefor, the "**Letter of Credit**"), naming Escrow Agent, in trust, as the sole beneficiary thereof, in substitution for the Cash Deposit, which Letter of Credit, any proceeds from any draw thereon, and any interest earned on such proceeds, shall be held by Escrow Agent, in trust, pursuant to and in accordance with the provisions of the Escrow Agreement.  The Letter of Credit shall be issued by a commercial bank that (a) is a member of the New York Clearinghouse Association, (b) is not an affiliate of Purchaser, (c) has a long-term senior debt rating by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto, of not less than "A" and (d) has a long-term senior debt rating by Moody's Investor Services, or any successor thereto, of not less than "A2".  The form of the Letter of Credit shall be subject to the approval of Seller, which approval shall not be unreasonably withheld, delayed or conditioned.  Purchaser shall cause the Letter of Credit to remain valid and effective at all times that the Escrow Deposit is held by Escrow Agent in the form of the Letter of Credit.  Upon Escrow Agent's receipt of the Letter of Credit and notice from Seller that the form of Letter of Credit is acceptable, the Cash Deposit and any interest earned thereon shall be returned to Purchaser.  The Cash Deposit, the Letter of Credit, any proceeds from any draw thereon and any interest earned on such Cash Deposit or proceeds of the Letter of Credit are herein referred to as, collectively, the "**Escrow Deposit**".

2.2.3.   Upon payment in full of the Purchase Price at Closing, subject to adjustment pursuant to the terms and conditions of this Agreement, the Letter of Credit shall be returned to Purchaser if Escrow Agent then holds the Letter of Credit; provided, however, if the Escrow Deposit is held in the form of cash at Closing (e.g., the Letter of Credit is not substituted for the Cash Deposit, or the Letter of Credit has been substituted for the Cash Deposit and Escrow Agent has made a draw on the Letter of Credit in accordance with the terms of the Escrow Agreement), then at Closing (a) the Escrow Deposit held by Escrow Agent as cash funds (e.g., the initial Cash Deposit or the proceeds from a draw on the Letter of Credit and any interest earned on the Cash Deposit or Letter of Credit proceeds) shall be paid by Escrow Agent to, or as directed by, Seller on account of the Purchase Price, and (b) Purchaser shall receive a credit against the total Purchase Price, as adjusted pursuant to the terms and conditions of this Agreement, in an amount equal to such cash funds paid to, or as directed by, Seller on account of the Purchase Price.

1330595v.11

        2.2.4.  No portion of the Purchase Price is attributable to any personal property transferred hereunder.

### ARTICLE 3
### PERMITTED EXCEPTIONS; TITLE INSURANCE

        **SECTION 3.1.**      **Sale of Premises.**  Seller shall convey, and Purchaser shall accept, fee simple title to the Premises on the Closing Date, free of all Tenancies and insurable by the Title Company at regular premiums, without exceptions or reservations of any type or kind, except the Permitted Exceptions.

        **SECTION 3.2.**      **Title to the Property.**  Purchaser acknowledges that (a) it has received and reviewed the Seller's Title Report and (b) it agrees to accept title to the Premises subject to the Permitted Exceptions.

        3.2.1.  Within five (5) Business Days after the execution and delivery of this Agreement, Purchaser shall order from the Title Company a title insurance report and commitment for a title insurance policy with respect to the interests in the Property to be conveyed by Seller to Purchaser hereunder, which policy shall be in the form currently used by reputable title insurers in the State of New York (such report and such commitment and any updates thereto issued by the Title Company in connection with this Agreement being referred to herein as the "**Commitment**"), and Purchaser, within five (5) Business Days after Purchaser's receipt of the Commitment, shall furnish a copy thereof, together with copies of all Exceptions listed thereon, to Seller and Seller's attorneys.  Purchaser shall also provide to Seller and Seller's attorneys a copy of (a) any update to the Commitment issued by the Title Company on or prior to the Closing Date (an "**Update**") together with copies of all Exceptions listed thereon that Purchaser has not previously delivered copies of to Seller and Seller's attorneys, promptly after Purchaser's receipt thereof, and (b) any update of the Survey or new survey of the Property obtained by Purchaser (each of which Purchaser shall have the right, but no obligation, to obtain) (a "**Survey Update**"), promptly after Purchaser's receipt thereof.  If the Commitment, any Update or any Survey Update discloses any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation or other encumbrance affecting the Property (collectively, "**Exceptions**") that is not a Permitted Exception and to which Purchaser objects (the "**Non-Permitted Exceptions**"), then Purchaser shall give a notice (a "**Title Notice**") to Seller on or prior to the tenth (10th) day after the date upon which Purchaser receives the Commitment, the Update or the Survey Update first containing such Non-Permitted Exception (but in any event not later than the Closing), as applicable, which notice shall identify such Non-Permitted Exception, provided, however, notwithstanding anything herein to the contrary, (x) any and all monetary liens, including, without limitation, all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Property (or any portion thereof) and all Real Estate Taxes (other than Real Estate Taxes that constitute Permitted Exceptions pursuant to Section 3.3), and (y) any and all Tenancies, shall be deemed to be and shall constitute Non-Permitted Exceptions for all purposes and Purchaser shall not be obligated

-10-

to deliver a Title Notice with respect thereto in order for same to constitute Non-Permitted Exceptions. Seller acknowledges that it has timely received a Title Notice with respect to the Commitment. Any Exceptions disclosed in the Commitment, any Update or any Survey Update that are (x) not included in a Title Notice timely given in accordance with the preceding sentence and (y) not deemed Non-Permitted Exceptions in accordance with the preceding sentence shall be deemed Permitted Exceptions. Seller shall, at or prior to Closing, (A) remove the following Exceptions ("**Mandatory Removal Exceptions**"): (i) any and all monetary liens, including, without limitation, all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Property (or any portion thereof) and all Real Estate Taxes (other than Real Estate Taxes that constitute Permitted Exceptions pursuant to Section 3.3), (ii) any and all Tenancies, and (iii) without limitation of the Mandatory Removal Exceptions described in preceding clauses (i) and (ii), any and all of the Non-Permitted Exceptions that Seller willfully placed of record or consented to be placed of record after the effective date of Seller's Title Report, and (B) remove any and all other Non-Permitted Exceptions that may be removed by the entry of the Sale Order. Seller agrees that it shall be obligated to remove all Mandatory Removal Exceptions at or prior to Closing whether or not they may be removed by the entry of the Sale Order. Seller shall have the right to adjourn the Closing Date from time to time, up to sixty (60) days in the aggregate, for the purpose of removing/eliminating Non-Permitted Exceptions.

3.2.2. In the event that there exist Non-Permitted Exceptions which are not Mandatory Removal Exceptions and Seller elects not to remove any Non-Permitted Exceptions which are not Mandatory Removal Exceptions, Seller shall notify Purchaser of such election within ten (10) Business Days of Seller's receipt of the Title Notice disclosing such Non-Permitted Exceptions. Purchaser may elect, within ten (10) Business Days after such notice from Seller to Purchaser that Seller has elected not to remove any Non-Permitted Exceptions which are not Mandatory Removal Exceptions, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, the Escrow Deposit shall be returned to Purchaser and neither of the parties hereto shall have any rights or obligations to the other hereunder (except for those rights and obligations that are expressly stated herein to the survive the termination of this Agreement), it being agreed by the parties that Purchaser shall not be entitled to receive the Break-Up Fee if the Agreement is terminated in accordance with this clause (i), or (ii) consummate the transactions contemplated hereby subject to such Non-Permitted Exceptions which are not Mandatory Removal Exceptions and proceed to Closing without an abatement of the Purchase Price. Failure of Purchaser to send notice of the election available to it pursuant to the preceding sentence within such ten (10) Business Day period shall be deemed an election by Purchaser to close under clause (ii) of the preceding sentence.

3.2.3. Notwithstanding anything herein to the contrary, (a) if the Commitment discloses judgments, bankruptcies or other returns against other persons or entities having names the same as or similar to that of Seller, then Seller, on request and to the extent applicable, shall deliver to the Title Company affidavits (in a form reasonably requested by the Title Company) to the effect that such judgments, bankruptcies or other returns are not against

Seller, (b) if requested by the Title Company to remove any exceptions for rights of parties in possession, Seller shall deliver to the Title Company an affidavit to the effect that there are no leases in force and effect with respect to the Property, and (c) if reasonably required by the Title Company, Seller agrees to execute, acknowledge and deliver such other standard and customary owner's title affidavits at Closing.

3.2.4.  At the request of Purchaser, Seller shall endeavor to cause the holder of any mortgages encumbering the Property which are not subject to any then pending challenge in the Reorganization Case as to its validity or enforceability (the "**Existing Mortgages**") to assign the Existing Mortgages and the promissory note(s) secured thereby to Purchaser's lender (without recourse, representation, or warranty, other than a representation as to ownership of the Existing Mortgages and the then outstanding principal balance of the debt secured by the Existing Mortgages) at Closing; provided, however, (a) Purchaser shall pay all fees, charges, costs and expenses of the holder of the Existing Mortgages in connection with such assignment of the Existing Mortgages and the promissory note(s) secured thereby, the preparation of the documents effectuating such assignment and the recording thereof, (b) if the holder of the Existing Mortgages agrees to such assignment and such assignment is consummated at Closing, Purchaser shall accept title to the Property subject to (i) the Existing Mortgages assigned at the Closing, the promissory note(s) secured thereby and any financing statements relating thereto and (ii) the other Permitted Exceptions, and Purchaser shall receive at Closing a credit against the Purchase Price, in an amount equal to the outstanding principal balance of and outstanding interest accrued on such Existing Mortgages assigned at the Closing, presuming payment of such amounts by or on behalf of Purchaser to the holder of such Existing Mortgages, and (c) to the extent that any mortgage obtained Purchaser in connection with the acquisition of the Premises is exempt from mortgage recording tax under Article 11 of the Tax Law, Purchaser shall pay to Seller at Closing an amount equal to 50% of the mortgage recording tax that would have otherwise been due in connection with the recording of Purchaser's mortgage but for the exemption described herein after subtracting the out-of-pocket expenses incurred by Purchaser and described in clause (a) above.  Such assignment of the Existing Mortgages and the promissory note(s) secured thereby shall be in compliance with the applicable requirement of Section 275 of the New York Real Property Law.

3.2.5.  In the event the Title Company is unable or unwilling to insure title to the Premises in the manner required to be delivered hereunder, Purchaser agrees that Fidelity National Title Insurance Company shall constitute the "Title Company" for purposes of the provisions of Section 7.4.3.

SECTION 3.3.        **Permitted Exceptions.**  "**Permitted Exceptions**" means:

3.3.1.  all matters set forth on Schedule 3.3.1 attached hereto and made a part hereof;

3.3.2.  reserved;

3.3.3.  building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

-12-

3.3.4.   consents for the erection of any structures on, under or above any streets, alleys, roads or highways which abut the Premises (other than any such consents that Seller willfully placed of record or consented to be placed of record after the effective date of Seller's Title Report);

3.3.5.   (a) any state of facts disclosed by the Survey, and (b) any state of facts that a current, accurate survey or visual inspection of the Property would disclose, provided same do not render title uninsurable at standard rates and do not materially and adversely affect the use or development of the Property in any manner permitted by current applicable Law, including, without limitation, current zoning laws;

3.3.6.   possible lack or revocability of the right, if any, to maintain or use or receive value for any vaults, marquees, stoops, awnings, signs and sidewalk openings located on, under or above any sidewalks, streets, alleys, roads or highways that abut the Property;

3.3.7.   all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Premises, provided the same do not materially and adversely affect the use or development of the Property in any manner permitted by current applicable Law, including, without limitation, current zoning laws;

3.3.8.   any variations between the tax diagram or the tax map and the record description;

3.3.9.   such other matters with respect to which Purchaser expressly has agreed to take subject pursuant to the provisions of this Agreement, including without limitation, any matters which Purchaser elects to take subject to pursuant to Section 3.2.2;

3.3.10. subsurface conditions affecting the Premises not disclosed by any instrument of record;

3.3.11. rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Premises existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Purchaser) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Premises;

3.3.12. all violations of law or municipal ordinances, codes, orders or requirements (collectively, **"Violations"**) noted in or issued by any governmental agency or department having authority as to lands, housing, buildings, fire, health and labor conditions affecting the Premises, but excluding any monetary fines, charges, penalties, judgments, liens, and/or fees, together with any interest accruing thereon (collectively, the **"Fines"**) imposed as a result of and/or relating to such Violations which existed prior to the date hereof, which Fines shall remain the obligation of Seller and (i) shall be paid in full by Seller at or prior to the Closing, or (ii) Purchaser shall otherwise be satisfied, in its reasonable discretion, that Purchaser shall have no liability therefor at any time;

-13-

3.3.13. real property taxes, water rates and charges, sewer taxes and rents, vault charges and similar items with respect to the Property (collectively, "**Real Estate Taxes**"), not yet due and payable and subject to apportionment as provided herein;

3.3.14. assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing;

3.3.15. reserved;

3.3.16. any Exceptions disclosed in the Commitment, any Update or any Survey Update that are not Non-Permitted Exceptions and deemed Permitted Exceptions pursuant to Section 3.2.1; and

3.3.17. the Existing Mortgages and related documents if and to the extent assigned to Purchaser's lender as provided in Section 3.2.4.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

**SECTION 4.1.**     **Apportionments Relating to the Premises.**  To the extent applicable, the following shall be apportioned as of as of 11:59 p.m., New York City time, on the date immediately prior to the Closing Date (the "**Adjustment Time**"): (a) Real Estate Taxes; (b) electricity, steam, gas, fuel and all other utilities, including, without limitation, taxes thereon; (c) charges, payments or assessments pursuant to any Service Contracts that Purchaser elects to assume pursuant to Section 4.1.5, on the basis of the respective periods for which such charges, payments or assessments relate (but not including any cure amounts payable pursuant to any Service Contracts that Purchaser elects to assume pursuant to Section 4.1.5 for any period prior to the filing of the Reorganization Case, which shall be the sole obligation of Purchaser), and (d) such other items as are customarily apportioned in accordance with real estate closings of commercial properties in the New York City.  The net amount thereof shall either be (i) paid by Purchaser to Seller by wire transfer of immediately available federal funds to a bank account designated by Seller or (ii) credited by Seller to Purchaser against the Purchase Price, as applicable.

4.1.1.  Without limiting the terms of Section 4.2, (a) apportionment of Real Estate Taxes shall be made on the basis of the fiscal year for which assessed, and (b) if the Closing Date occurs before any real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Property are finally fixed for the fiscal year in which the Closing Date occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation.

4.1.2.  Fuel oil, if any, owned by Seller and located at the Property on the Closing Date shall be adjusted at the cost thereof to Seller on a first in-first out basis.  Seller shall arrange for the amount of fuel oil to be determined in writing by the fuel company presently supplying fuel to the Property as of a date which is not more than ten (10) business days prior to

-14-

the Closing Date.  With respect to the other utilities described in clause (b) of Section 4.1, where possible, Seller shall secure cutoff readings for all utilities as of the Adjustment Time.  To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the parties as of the Adjustment Time on the basis of the most recent actual (not estimated) bill for such service.

4.1.3.  If there are any meters measuring water consumption at the Property, Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned based upon the last meter readings.

4.1.4.  The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Property, with interest and penalties thereon to the Adjustment Time, may, at the option of Seller, be allowed as a credit to Purchaser out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished by Seller at the Closing.  Purchaser, if request is made at least three (3) business days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds, payable as directed by Seller, in an aggregate amount not exceeding the balance of the Purchase Price (as adjusted in accordance herewith) due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Adjustment Time.  Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Property that are delinquent as of the Adjustment Time, subject to apportionment as herein provided.

4.1.5.  Purchaser may elect, by notice delivered to Seller at least ten (10) Business Days prior to the Sale Hearing, to assume Seller's interests under any Service Contracts, provided Purchaser shall be responsible for curing any defaults under such Service Contracts assumed by Purchaser relating to the period prior to the Closing Date.  Any Service Contracts that Purchaser does not expressly elect to assume shall be deemed a Non-Permitted Exception and shall be terminated by Seller on or prior to Closing.

**SECTION 4.2.       Taxes and Assessments**.  If, as of the Adjustment Time, the Property or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in annual installments, or which the first installment is then a charge or lien, or has been paid, all the unpaid installments of any such assessment which are due and payable prior to the Closing Date, shall be paid by Seller.  The unpaid installments of such assessment or assessments which are due and payable after the Closing Date shall be paid and discharged by Purchaser, and Purchaser shall take title to the Premises subject thereto without reduction of the Purchase Price.  Notwithstanding any other

-15-

provision of this Agreement, Seller shall have no responsibility for any taxes or assessments that accrue, and are due or payable with respect to the period, after the Adjustment Time as a result of the loss of any exemption following the transfer of the Premises.

SECTION 4.3.    **Transfer Taxes.**    Purchaser and Seller shall each be responsible for fifty percent (50%) of any Transfer Taxes imposed in connection with the sale, assignment, transfer and conveyance of the Premises to Purchaser as contemplated by the provisions of this Agreement.

SECTION 4.4.    **Tax Returns.**    Purchaser and Seller shall deliver to the Title Company the returns, questionnaires, certificates, affidavits and other documents required in connection with the payment of any Transfer Taxes (collectively, the **"RE Tax Returns"**). If the procedures required by the state, county, or municipality require that any RE Tax Returns be filed, reviewed or approved prior to the Closing Date, Purchaser and Seller shall complete, sign and swear to the RE Tax Returns and deliver same to the Title Company for delivery to the appropriate authority sufficiently in advance of the Closing Date so as to permit the sale contemplated hereby to be consummated by the Closing Date.

SECTION 4.5.    **Violations**.    Subject to Seller's obligations under the terms of Section 3.3.12, Seller and Purchaser acknowledge that Purchaser is purchasing the Premises subject to all Violations that may be of record with respect to the Premises as of the Closing Date.    Seller hereby authorizes Purchaser to conduct a customary and ordinary search at the request of the Title Company for the purpose of determining whether any Violations have been noted or issued with respect to the Premises.    Seller and Purchaser shall each promptly notify the other party and provide the other party with a copy of all notes or notices of Violations which Seller or Purchaser shall receive after the date hereof through the date of Closing.

SECTION 4.6.    **Title Charges.**    Purchaser shall pay the cost of Purchaser's title insurance premiums and the cost(s) of recording or filing the Deed.

SECTION 4.7.    **Transaction Expenses.**    Seller shall pay all costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby incurred by Seller.    Purchaser shall pay all costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby incurred by Purchaser.

SECTION 4.8.    **Tax Certiorari Proceedings**.    At any time after the Sale Order is entered by the Bankruptcy Court and prior to the Closing, Purchaser (or its representatives) shall have the right, in the name and on behalf of Seller or otherwise as a contract vendee, to institute tax reduction or other proceedings to reduce the assessed valuation of the Property with respect to the period ending at the end of the fiscal year in which the Sale Order is entered and/or any period thereafter, provided that Purchaser (or its representatives) shall notify Seller of, and keep Seller reasonably informed with respect to, any such proceedings. Seller shall, at Purchaser's cost and expense, cooperate with Purchaser (and its representatives) in

-16-

any such proceedings, as reasonably requested by Purchaser (or its representatives).  To the extent that any tax reduction or other proceedings to reduce the assessed valuation of the Property are pending on the Closing Date, Seller shall execute and deliver at Closing such documents as reasonably requested by Purchaser to substitute Purchaser in such proceedings.

SECTION 4.9.    **Survival.**  The provisions of this Article 4 shall survive the Closing or earlier termination of this Agreement.

## ARTICLE 5
## COVENANTS REGARDING THE PREMISES

SECTION 5.1.    **Maintenance of the Premises.**  Between the date hereof and the Closing Date (such period hereinafter referred to as the "**Contract Period**"), Seller shall have no obligation to maintain the Premises; provided, however, that (a) during the Contract Period, at Seller's sole cost and expense and without reimbursement from Purchaser or adjustment to the Purchase Price, Seller shall be obligated to maintain security measures (including, without limitation, providing security personnel at the Premises) reasonably necessary to protect the Premises from vandalism and/or arson, and (b) Seller shall be obligated to convey the Premises to Purchaser at Closing in its "as is, where is" condition, excepting only ordinary wear and tear and natural deterioration or damage or alteration due to casualty or condemnation as provided in Article 12 hereof during the Contract Period.  Notwithstanding anything contained in the foregoing to the contrary, Seller shall be permitted to perform such routine maintenance work, or such other work as may be necessary to preserve and protect the Property, as Seller elects, in its sole and absolute discretion, at Seller's sole cost and expense and without reimbursement from Purchaser or adjustment to the Purchase Price.

SECTION 5.2.    **Alteration; Demolition**.  During the Contract Period, Seller shall not (a) alter, demolish or damage the Premises in any material respect or (b) alter, demolish or damage any structural component of the Improvements.

SECTION 5.3.    **Medical Waste**.  Notwithstanding anything herein to the contrary, prior to the Closing, Seller shall (a) cause all Medical Waste at the Premises to be removed from the Premises and disposed of in compliance with all applicable laws (including, without limitation, all applicable Environmental Laws), and (b) provide Purchaser reasonable evidence of such removal and disposal of Medical Waste from the Premises in compliance with all applicable laws (including, without limitation, all applicable Environmental Laws).

SECTION 5.4.    **Insurance**.  During the Contract Period, Seller shall maintain substantially the same insurance coverage with respect to the Property as it maintains on the date hereof, as set forth in Schedule 7.2.8.

SECTION 5.5.    **Licenses and Permits**.  During the Contract Period, Seller shall not amend or modify any Licenses and Permits with respect to the Property, except to comply with any applicable law or insurance requirements.

1330595v.11

SECTION 5.6.        **Inspection and Testing of Premises by Purchaser**. Purchaser and Purchaser's representatives, agents and consultants shall have the right, at Purchaser's sole cost and expense, to enter upon the Property for the purpose of inspecting, examining, testing (including, without limitation, intrusive and non-intrusive physical testing (structural or otherwise) and sampling (e.g., soil borings, ground water samplings and the like)) and surveying the same (individually or collectively, "**Inspections**"), subject to the following conditions:  (i) such Inspections shall be conducted at reasonable times and upon reasonable prior notice to Seller; (ii) Purchaser shall obtain and deliver to Seller evidence of commercial general liability insurance as provided below, (iii) neither Purchaser nor any representative, agent or consultant of Purchaser shall interfere with the use or occupancy of the Property by Seller or any tenant thereof, (iv) Purchaser shall restore any damage to the Property caused by such Inspections, to the extent reasonably requested by Seller (provided that no such restoration shall be necessary as long as this Agreement remains in effect and a Sale Order approving the sale of the Premises to another bidder has not been entered), (v) Seller shall have a right, at Seller's sole cost and expense, to have a representative of Seller accompany Purchaser and any representatives, agents or consultants of Purchaser at all times during which Purchaser or any such representatives, agents and consultants of Purchaser are present at the Property, (vi) Purchaser shall indemnify and hold Seller and its officers, directors, members, employees, agents, representatives and contractors free and harmless from and against all liabilities, obligations, cost and expenses (including, without limitation, reasonable attorneys' fees and disbursements) asserted against or incurred by Seller or its officers, directors, members, employees, agents, representatives and contractors in connection with Inspections, which indemnity shall survive the Closing or any termination of this Agreement, and (vii) Purchaser shall provide Seller with copies of any written reports or results related to the Inspections. Purchaser shall maintain or cause to be maintained, at Purchaser's sole cost and expense, a policy of general public liability insurance with a combined single limit of not less than $1,000,000 per occurrence for bodily injury and property damage, and an excess umbrella liability policy for bodily injury and property damage in the amount of $5,000,000, insuring Purchaser and Seller as additional insureds, against any injuries or damages to persons or property that may result from Purchaser's Inspections.

## ARTICLE 6
## COVENANTS, REPRESENTATIONS AND WARRANTIES OF PURCHASER

SECTION 6.1.        **Generally.**  Purchaser represents and warrants to Seller that, as of the date hereof:

6.1.1.  (a)  Purchaser is a duly formed and validly existing limited liability company under the laws of the state of its formation, (b) Purchaser has the full right, authority and power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under the Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes and the Closing Documents to which it is a party upon execution will constitute valid and legally binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, except to the extent that enforcement may be limited

-18-

by applicable bankruptcy, insolvency, moratorium and other principles relating to or limiting the rights of contracting parties generally;

6.1.2.   there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against or affecting Purchaser that would adversely affect in any material respect Purchaser's legal authority or financial ability to perform its obligations under this Agreement and the Closing Documents to which it is a party;

6.1.3.   the execution and delivery of this Agreement, the consummation of the transactions contemplated by Purchaser hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict with any judgment, decree or order of any court or any Law or permit applicable to it, (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation by which Purchaser is bound, or (c) require the consent or approval of any Governmental Authority or any other Person which has not been obtained;

6.1.4.   reserved;

6.1.5.   Purchaser has committed funds and/or committed financing sources as of the date of execution, sufficient to close the transactions contemplated by this Agreement on or before the Scheduled Closing Date;

6.1.6.   Purchaser's Federal Tax Identification Number is 32-0296754; and

6.1.7.   neither Purchaser, nor any person or entity that controls Purchaser, constitutes a person or entity that the Office of Foreign Assets Control of the United States Department of the Treasury has listed on its list of Specially Designated Nationals and Blocked Persons.

**SECTION 6.2.      Downdate at Closing; Survival of Representations and Warranties**.   At Closing, Purchaser shall deliver to Seller a certificate duly executed by Purchaser restating on and as of the Closing Date each of the representations and warranties of Purchaser set forth in Section 6.1, except that Purchaser, in such certificate, may modify the representations made by Purchaser in Section 6.1.2 and clause (a) of Section 6.1.3 to reflect facts and circumstances that exist on and as of the Closing Date (such certificate being referred to herein as the "**Purchaser's Update Certificate**").   The representations and warranties of Purchaser set forth in Section 6.1, as restated (and updated as applicable) in Purchaser's Update Certificate, shall not survive the Closing, except that the representations and warranties set forth in Section 6.1.1(a) shall survive the Closing without limitation.

**SECTION 6.3.      Closing Conditions**.   The following are conditions precedent to the obligations of Seller to consummate the transaction contemplated by this Agreement, any or all of which may, at Seller's option, be waived by Seller:

6.3.1.   Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same

-19-

on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date, and (d) obtained all consents of any Governmental Authority or other person required to be obtained by Purchaser for Purchaser's consummation of the transactions contemplated hereby and not applicable to Seller or the Reorganization Case;

6.3.2.    (a) each representation or warranty made by Purchaser in Section 6.1 or in any Closing Documents to which it is a party are true and correct in all material respects when made, and (b) the Purchaser's Update Certificate indicates that Purchaser's representations and warranties made by Purchaser in Section 6.1 are true and correct in all material respects as of the Closing Date without being modified as of the Closing Date to reflect changed facts or circumstances, and such representations and warranties are true and correct in all material respects as of the Closing Date;

6.3.3.    all other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived by Seller); and

6.3.4.    Seller shall have received (a) the approval of the Supreme Court of the State of New York as required by Sections 510 and 511 of the New York Not-for-Profit Corporation Law and any related notice to the Charities Bureau of the Office of the Attorney General of the State of New York, and (b) any required approvals from the Roman Catholic Church.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.        Generally.**    Seller represents and warrants to Purchaser that, as of the date hereof:

7.1.1.    (a) it is a duly formed and validly subsisting not-for-profit corporation under the laws of the State of New York, (b) it has the full right, authority and power to enter into this Agreement, (c) subject to the entry of the Sale Order or the Confirmation Order and to the receipt of the approvals set forth in Section 6.3.4, as the case may be, it has the full right, authority and power to consummate the transactions contemplated herein, enter into the Closing Documents to which it is a party and to perform its obligations under the Closing Documents to which it is a party, all of which have been duly authorized by all necessary actions on the part of Seller, (d) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, (e) this Agreement constitutes valid and legally binding obligations of Seller enforceable against it in accordance with its terms, and (f) subject to the entry of the Sale Order or the Confirmation Order, as the case may be, and the receipt of the approvals set forth in Section 6.3.4, the Closing Documents to which Seller is a party upon execution will constitute

-20-

valid and legally binding obligations of Seller enforceable against it in accordance with their respective terms;

7.1.2. to the actual knowledge of Seller and subject to the entry of the Sale Order or the Confirmation Order, as the case may be, and the receipt of the approvals set forth in Section 6.3.4, the consummation of the transactions contemplated hereby by Seller, the execution and delivery by Seller of the Closing Documents to which it is a party, and the performance by Seller of its obligations under the Closing Documents to which it is a party do not and will not (a) violate or conflict with any judgment, decree or order of any court or any law or permit applicable to it, (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the Persons comprising Seller is a party or by which any of them is bound, or (c) require the consent or approval of any Governmental Authority or any other Person which has not been obtained;

7.1.3. Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code Section 1445, as amended, and the regulations promulgated thereunder;

7.1.4. Seller's Federal Tax Identification Number is 13-5648609; and

7.1.5. neither Seller, nor any person or entity that controls Seller, constitutes a person or entity that the Office of Foreign Assets Control of the United States Department of the Treasury has listed on its list of Specially Designated Nationals and Blocked Persons.

**SECTION 7.2.        Premises Representations.**  Seller represents and warrants to Purchaser that as of the date hereof:

7.2.1. (a) Seller has no actual knowledge that any portion of the Premises is or will be subject to or affected by any special assessment, whether or not presently a lien, and (b) Seller has no actual knowledge of any condemnation, eminent domain or similar proceeding pending, threatened or contemplated against all or any portion of the Premises;

7.2.2. annexed hereto as <u>Schedule 7.2.2</u> and made a part hereof is a true and complete list of all material Service Contracts relating to the Premises, true and complete copies of which have been delivered to Purchaser;

7.2.3. there are no employees of Seller whose employment Purchaser shall be obligated to retain from and after the Closing or with respect to whom Purchaser shall be liable for severance or other payments;

7.2.4. except as may be expressly set forth in any of the Permitted Exceptions, Seller has not made any commitment to any board, bureau, commission, department or body of any municipal, county, state or federal governmental unit or any subdivision thereof, having jurisdiction over the Premises or the use or improvement thereto or to any third party to

1330595v.11

dedicate or grant any portion of the Premises for roads, easements, rights-of-way, or for any other public purposes, to impose any restrictions or incur any other expense or obligation;

7.2.5.    subject to the issuance of the Sale Order or the Confirmation Order, as the case may be, neither this Agreement nor anything provided to be done hereunder, including but not limited to, the transfer, assignment and sale of the Premises, violates or shall violate any contract, agreement or instrument to which Seller is a party or that affects the Property or any part thereof;

7.2.6.    annexed hereto as <u>Schedule 7.2.6</u> and made a part hereof is a true and complete list of all Tenancies relating to the Premises, true and complete copies of the documents with respect to which have been delivered to Purchaser;

7.2.7.    there are no rights or options to purchase all or any part of the Property that have been created by Seller, except for the rights in favor of Purchaser created hereunder; and

7.2.8.    Seller currently maintains insurance coverage with respect to the Property as described on <u>Schedule 7.2.8</u>.

**SECTION 7.3.        Downdate at Closing; Survival of Representations and Warranties**.  At Closing, Seller shall deliver to Purchaser a certificate duly executed by Seller restating on and as of the Closing Date each of the representations and warranties of Seller set forth in Sections 7.1 and 7.2, except that Seller, in such certificate, may modify the representations made by Seller in Sections 7.2.1, 7.2.2, and 7.2.6 to reflect facts and circumstances that exist on and as of the Closing Date (such certificate being referred to herein as the "**Seller's Update Certificate**").  The representations and warranties of Seller set forth in Section 7.1 and 7.2, as restated (and updated as applicable) in Seller's Update Certificate, shall not survive the Closing, except that the representations and warranties set forth in Section 7.1.1 and 7.1.2 shall survive the Closing without limitation.

**SECTION 7.4.        Closing Conditions.**    The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may, at Purchaser's option, be waived by Purchaser:

7.4.1.    Seller shall have (or, with respect to obligations of Seller to be performed on the Closing Date, Seller shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Seller at or prior to Closing (including, without limitation, pursuant to Section 9.1.1), (b) performed its obligations under Article 5 hereof, (c) performed in all material respects all other material obligations on Seller's part to be performed hereunder on or prior to the Closing Date, and (d) obtained all consents of any Governmental Authority or other Person required to be obtained by Seller for Seller's consummation of the transactions contemplated hereby and not applicable solely to Purchaser;

-22-

7.4.2.   (a) each representation or warranty made by Seller in Sections 7.1 and 7.2 or in any Closing Documents to which it is a party are true and correct in all material respects when made, and (b) the Seller's Update Certificate indicates that Seller's representations and warranties made by Seller in Section 7.1, clause (a) of Section 7.2.1 and Sections 7.2.3, 7.2.4, 7.2.5, and 7.2.7 are true and correct in all material respects as of the Closing Date without being modified as of the Closing Date to reflect changed facts or circumstances, and such representations and warranties are true and correct in all material respects as of the Closing Date;

7.4.3.   on the Closing Date, the condition of and title to the Premises, and the ability of Seller to deliver possession of the Premises to Purchaser free and clear of all Tenancies and without any liability in respect of Service Contracts not expressly elected to be assumed by Purchaser, shall be as required by this Agreement, and the Title Company shall be willing to issue to Purchaser a current form of owner's title insurance policy (or equivalent form of owner's title insurance policy then customarily being accepted by purchasers of properties in Manhattan comparable to the Property), or irrevocable binder to issue the same, dated, or updated, to the Closing Date, insuring, or irrevocably committing to insure, at normal statutory premium rates, without the requirement for additional premiums or escrows, Purchaser's fee title to the Property, subject only to Permitted Exceptions;

7.4.4.   the Bankruptcy Court shall have entered the Sale Order or the Confirmation Order and such Sale Order or Confirmation Order, as applicable, shall have become a Final Order;

7.4.5.   all other conditions precedent set forth herein to Purchaser's obligation to consummate the transaction contemplated hereby have been satisfied in all material respects (or waived by Purchaser); and

7.4.6.   Seller shall have received (a) the approval of the Supreme Court of the State of New York as required by Sections 510 and 511 of the New York Not-for-Profit Corporation Law and any related notice to the Charities Bureau of the Office of the Attorney General of the State of New York, and (b) any required approvals from the Roman Catholic Church, or any subsidiary or affiliate thereof, or from any other authority within the Roman Catholic Church or the other governing bodies related to or controlling Seller, including without limitation, its Board of Directors and members.

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1.**       **Closing Date.**  The consummation of the conveyance of the Premises contemplated by this Agreement (the **"Closing"**) shall take place on the date (the **"Scheduled Closing Date"**) that is: (a) sixty (60) days after the date on which the Sale Order or the Confirmation Order, as applicable, approving the sale of the Premises to Purchaser is entered by the Bankruptcy Court or, if such date is not a Business Day, the Business Day immediately following such date; or (b) such earlier Business Day as may be designated by Purchaser by notice given to Seller not less than ten (10) Business Days prior to such Business Day designated by Purchaser, provided that (i) the Property is vacant and free of all Tenancies prior to Purchaser

giving any such notice and (ii) if Purchaser designates such an earlier Business Day in accordance with this clause (b), at any time (and from time to time) prior to the Closing, Purchaser shall have the right to adjourn the Closing to the date specified in clause (a) or any other Business Day occurring from and after the Business Day designated by Purchaser pursuant to clause (b) and prior to such date specified in clause (a) upon not less than two (2) Business Days' notice, in which case such Business Day to which Purchaser adjourns the Closing shall be the Scheduled Closing Date; or (c) such later Business Day to which the Closing is adjourned in accordance with the provisions of Section 3.2.1 or **Exhibit I** attached hereto; or (d) such later Business Day to which the Closing may be adjourned by mutual agreement of Seller and Purchaser (it being agreed that neither party shall have any obligation to agree to any adjournment of the Closing except as expressly permitted pursuant to the terms of this Agreement) (the date on which the Closing occurs is referred to herein as the **"Closing Date"**).

SECTION 8.2.    **Closing Date if Purchaser is Second Highest Bidder.**  If (i) the Bankruptcy Court enters a Sale Order approving the sale of the Premises (or any portion thereof) to any bidder other than Purchaser or enters a Confirmation Order confirming a Plan of Reorganization providing for the sale of the Premises (or any portion thereof) to any bidder other than Purchaser (in either case, any such bidder other than Purchaser is referred to herein as a "**Higher Bidder**"), (ii) Purchaser is the second highest bidder and bound to close pursuant to the terms of such Sale Order or Confirmation Order, as applicable, in the event that all Higher Bidders fail to close, (iii) this Agreement is not terminated pursuant to the provisions of Section 11.3.1(e), and (iv) all Higher Bidders fail to close, then the Scheduled Closing Date shall be determined in accordance with Section 8.1 above, except that the sixty (60) day period described in Section 8.1(a) shall commence upon the date that Purchaser is notified by Seller that all Higher Bidders have failed to close and Seller has terminated the sale agreement with each Higher Bidder and is bound to sell the Property to Purchaser.

SECTION 8.3.    **Place of Closing.**    The Closing shall be held on the Scheduled Closing Date at 10:00 A.M. at the offices of Seller's counsel, Togut, Segal & Segal, LLP, One Penn Plaza, Suite 3335, New York, New York 10119, or such other time and place in the City, State and County of New York as may be designated by Purchaser.

### ARTICLE 9
### CLOSING DOCUMENTS

SECTION 9.1.    **Closing**.

9.1.1.    At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 9.1.1 and in Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**) the following items:

(a)    One (1) fully-executed and acknowledged bargain and sale deed with covenants against grantor's acts conveying the Property and Improvements to Purchaser ("**Deed**") in the form attached as **Exhibit D**;

(b)    copies of any required RE Tax Returns properly executed and acknowledged by Seller;

(c)    a Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(d)    one (1) fully-executed bill of sale, if requested, for the Personal Property (the "**Bill of Sale**") in the form attached as **Exhibit E**;

(e)    if applicable, one (1) fully-executed assignment and assumption of the Service Contracts (the "**Assignment and Assumption**") in the form attached as **Exhibit F** with respect to any Service Contracts that Purchaser elects to assume pursuant to Section 4.1.5;

(f)    to the extent in the possession of Seller or Seller's agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Improvements, appropriately tagged for identification;

(g)    delivery of possession of the Property free of any Tenancies;

(h)    if the Existing Mortgages are being assigned to Purchaser's lender at Closing in accordance with Section 3.2.4, all documents required in connection therewith;

(i)    if the Escrow Deposit is held in the form of the Letter of Credit, a direction letter to Escrow Agent and the bank that issued the Letter of Credit authorizing and directing (x) Escrow Agent to return the Letter of Credit to Purchaser and (y) the bank that issued the Letter of Credit to cancel or terminate the Letter of Credit, duly executed by Seller (the "**Escrow Agent Direction Letter**"); provided, however, to the extent that Escrow Agent holds all or any portion of the Escrow Deposit as cash at Closing, the Escrow Agent Direction Letter shall authorize and direct Escrow Agent to pay same (i.e., the portion of the Escrow Deposit held as cash, together with any interest accrued thereon) in accordance with Section 2.2.3;

(j)    Seller's Update Certificate, duly executed by Seller;

(k)    a good standing certificate for Seller from the appropriate officers of the State of New York, dated within thirty (30) days prior to the Closing Date, and such evidence, delivered to Purchaser and the Title Company, as reasonably required

-25-

to evidence the due authorization, execution, and delivery by Seller of the Deed and other Closing Documents to which Seller is a party;

      (l)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Purchaser; and

      (m)    any other document, instrument, agreement or other item (x) required to be delivered by Seller at or prior to the Closing hereunder or (y) otherwise necessary to consummate the transactions contemplated herein reasonably requested by Purchaser or the Title Company; provided, however, that Seller shall not be obligated to cause the delivery of any such documentation under clause (y) to the extent it would increase or expand Seller's obligations or liability in any material respect.

      9.1.2.    At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller the following items:

      (a)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price;

      (b)    copies of any required RE Tax Returns properly executed and acknowledged by Purchaser;

      (c)    if applicable, one (1) fully-executed Assignment and Assumption with respect to any Service Contracts that Purchaser elects to assume pursuant to Section 4.1.5;

      (d)    the Escrow Agent Direction Letter, duly executed by Purchaser;

      (e)    Purchaser's Update Certificate, duly executed by Purchaser;

      (f)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Purchaser; and

      (g)    any other document, instrument, agreement or other item (x) required to be delivered by Purchaser at or prior to the Closing hereunder or (y) otherwise necessary to consummate the transactions contemplated herein reasonably requested by Seller or the Title Company; provided, however, that Purchaser shall not be obligated to cause the delivery of any such documentation under clause (y) to the extent it would increase or expand Purchaser's obligations or liability in any material respect.

**SECTION 9.2.        Transfer Taxes.**  To the extent applicable, Purchaser and Seller shall each pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Premises) payable by it pursuant to Section 4.3.

# ARTICLE 10
## NOTICES

Any notice, demand, request, direction, designation, consent, approval, waiver, election or other communication required or permitted to be given or made under this Agreement or any exhibit hereto (collectively, **"Notices" or "notices"**) must be in writing and given to the party to whom or which such notice is being sent, (a) by certified mail, postage prepaid, return receipt requested, (b) by nationally recognized overnight delivery service with receipt acknowledged in writing (or proof of attempted delivery), or (c) by hand delivery, against a signed receipt (or proof of attempted delivery), in each case, addressed as follows:

| | |
|---|---|
| If to Seller: | Cabrini Medical Center |
| | 227 East 19th Street |
| | New York, NY 10003 |
| | Attention: Ms. Diane Kniejski |
| | |
| With a copy to: | Garfunkel, Wild & Travis, P.C. |
| | 111 Great Neck Road |
| | Great Neck, New York  11021 |
| | Attention: Burton S. Weston, Esq. |
| | |
| | and |
| | |
| | Togut, Segal & Segal, LLP |
| | One Penn Plaza, Suite 3335 |
| | New York, New York 10119 |
| | Attention: Frank A. Oswald, Esq. |
| | |
| If to Purchaser: | Cabre Partners LLC |
| | c/o J.D. Carlisle LLC |
| | 352 Park Avenue South |
| | 15th Floor |
| | New York, New York 10010 |
| | Attention: Mr. Jules Demchick / Mr. Evan Stein |
| | |
| With a copy to: | Proskauer Rose LLP |
| | 1585 Broadway |
| | New York, New York 10036 |
| | Attention:  Perry A. Cacace, Esq. |

Any notice sent in accordance with this Article 10 being deemed to have been given, served and

-27-

received when delivered or delivery is rejected. From time to time, any party may designate another or additional addresses for all purposes of this Agreement by giving the other party no less than ten (10) days' prior notice of such change of address in accordance with the provisions of this Article 10. Each party's counsel shall have the right to deliver Notices on behalf of its client and any such Notice shall be effective as if sent by such party.

## ARTICLE 11
## DEFAULTS

SECTION 11.1.    **Purchaser's Default.**    Without limiting the terms of Section 11.3 (or any other termination rights of Seller expressly set forth in this Agreement), if (a) all conditions precedent to Purchaser's obligation to consummate the transaction contemplated by this Agreement as expressly set forth in this Agreement shall have been satisfied by Seller (or Seller is ready willing and able to satisfy same) or waived by Purchaser and Purchaser shall fail or refuse to close as required by the terms of this Agreement, or (b) Purchaser defaults in any of its material obligations hereunder (of which default Seller shall notify Purchaser and give Purchaser a reasonable period of time, not to exceed thirty (30) days, to cure), then, in any such case, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default by Purchaser, Seller's sole remedy (except with respect to any of Purchaser's obligations that are expressly stated herein to survive the termination of this Agreement) shall be to terminate this Agreement by giving notice thereof to Purchaser, and upon the giving of such notice this Agreement shall terminate and neither party shall thereafter have any rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that, subject to the terms of the Escrow Agreement, Escrow Agent shall, if applicable, draw in full on the Letter of Credit (i.e., if the Escrow Deposit is then held in the form of the Letter of Credit and Escrow Agent has not done so prior thereto) and deliver the Escrow Deposit to or as directed by Seller and Seller shall retain the Escrow Deposit (free and clear of any rights or claims of Purchaser therein) as liquidated damages and as Seller's sole and absolute remedy (except with respect to any of Purchaser's obligations that are expressly stated herein to survive the termination of this Agreement). Except with respect to any of Purchaser's obligations that are expressly stated herein to survive the termination of this Agreement, and without limiting Seller's rights under the preceding sentence, Seller expressly agrees that Seller shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts, or to seek specific performance, against Purchaser as a result of any default by Purchaser. Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Section 16.19, and Seller shall have all rights and remedies available at law or in equity (including, without limitation, the right to specific performance) for any breach by Purchaser with respect to such obligations and liabilities. The terms of this Section 11.1 shall survive Closing or termination of this Agreement.

SECTION 11.2.    **Seller's Default.**    Without limiting the terms of Section 11.3 (or any other termination rights of Purchaser expressly set forth in this Agreement), if (a) all

conditions precedent to Seller's obligation to consummate the transaction contemplated by this Agreement as expressly set forth in this Agreement shall have been satisfied (or Purchaser is ready willing and able to satisfy same) or waived and Seller shall fail or refuse to close as required by the terms of this Agreement, or (b) Seller defaults in any of its material obligations hereunder (including, without limitation, its obligation pursuant to Section 3.2.1 to remove all Mandatory Removal Exceptions at or prior to Closing, whether or not they may be removed by the entry of the Sale Order), of which default Purchaser shall notify Seller and give Seller a reasonable period of time, not to exceed thirty (30) days, to cure (provided, however, that, with respect to Seller's obligations set forth in Article 5, it shall not be considered a default hereunder if (1) Seller shall have commenced to cure such default within a reasonable period of time after notice thereof and (2) Seller shall thereafter proceed with due diligence and good faith to complete the curing of such breach within a reasonable period of time, and provided further, that such reasonable period of time shall not extend beyond the Scheduled Closing Date), or (c) Seller fails to satisfy any of the closing conditions set forth in Section 7.4 (including, without limitation, the closing condition set forth in Section 7.4.6, notwithstanding that such closing condition set forth in Section 7.4.6 also constitutes a closing condition pursuant to Section 6.3.4) on or before the Scheduled Closing Date, unless such failure shall be waived by Purchaser, then, in any such case, Purchaser shall be entitled (i) to terminate this Agreement upon notice to Seller, and upon the giving of such notice this Agreement shall terminate and thereafter neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Purchaser shall receive a return of the Escrow Deposit upon such termination and payment of the Break-Up Fee in accordance with Section 15.2.3, or (ii) to seek specific performance by Seller of its obligations under this Agreement.  Except as otherwise provided in this Agreement (including, without limitation, in this Section 11.2), Purchaser expressly agrees that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller as a result of any default by Seller.  Nothing contained in this Section shall limit or diminish Seller's obligations or liabilities under Section 16.19, and Purchaser shall have all rights and remedies available at law or in equity (including, without limitation, the right to specific performance) for any breach by Seller with respect to such obligations and liabilities.  The terms of this Section 11.2 shall survive Closing or termination of this Agreement.

### SECTION 11.3.      Additional Termination Rights.

11.3.1. Anything in this Agreement to the contrary notwithstanding, but without limiting any other termination rights expressly provided in this Agreement and the provision relating thereto and subject to the provisions of Sections 11.3.2 and 11.3.3, this Agreement may be terminated at any time prior to the Closing as follows:

(a)      at any time by mutual consent of Purchaser and Seller, in their sole and absolute discretion;

(b)      if the Bidding Procedures Order is not entered by the Bankruptcy Court on or before January 8, 2010, then Purchaser shall have the right to terminate this

Agreement, in its sole and absolute discretion, upon notice to Seller given at any time prior to the entry by the Bankruptcy Court of the Bidding Procedures Order;

(c)    if all required approvals of the members of Seller are not obtained and written notice of such approvals have not been provided to Purchaser on or before the date that is sixty (60) days following entry of a Sale Order approving the sale of the Premises or a Confirmation Order confirming a Plan of Reorganization providing for the sale of the Premises, or if such date is not a Business Day, the Business Day immediately following such date, then Purchaser shall have the right to terminate this Agreement, in its sole and absolute discretion, upon notice to Seller given at any time prior to such member approvals having been obtained and notice thereof provided;

(d)    if the Bankruptcy Court does not enter a sale order approving the sale of the Premises or a confirmation order confirming a Plan of Reorganization providing for the sale of the Premises, in each case, on or before the date that is sixty (60) days following entry of the Bidding Procedures Order, or if such date is not a Business Day, the Business Day immediately following such date, then Purchaser shall have the right to terminate this Agreement, in its sole and absolute discretion, upon notice to Seller given at any time prior to the entry by the Bankruptcy Court of an order approving the sale of the Premises or an order confirming a Plan of Reorganization providing for the sale of the Premises;

(e)    if (i) the Bankruptcy Court enters a Sale Order approving the sale of the Premises (or any portion thereof) to any Higher Bidder or enters a Confirmation Order confirming a Plan of Reorganization providing for the sale of the Premises (or any portion thereof) to any Higher Bidder, and (ii) Purchaser is the second highest bidder and bound to close pursuant to the terms of such Sale Order or Confirmation Order, as applicable, then this Agreement shall terminate (x) automatically if and when Seller consummates the sale of the Premises (or any portion thereof) to any Higher Bidder, or (y) unless the Closing hereunder has previously occurred or this Agreement has been previously terminated, upon notice from Purchaser to Seller terminating this Agreement, which notice may be given by Purchaser at any time after the date that is sixty (60) days after the entry of such Sale Order or Confirmation Order (and not before the date that is sixty (60) days after the entry of such Sale Order or Confirmation Order);

(f)    if (i) the Bankruptcy Court enters an order approving the sale of the Premises (or any portion thereof) to any Higher Bidder or enters an order confirming a Plan of Reorganization providing for the sale of the Premises (or any portion thereof) to any Higher Bidder, and (ii) Purchaser is not the second highest bidder and bound to close pursuant to the terms of such order in the event that all Higher Bidders fail to close, then this Agreement shall terminate automatically upon the entry of such order by the Bankruptcy Court;

(g)    except as hereinafter provided, if, as a result of an order of the Bankruptcy Court, the Reorganization Case is (i) converted to Chapter 7 and a Chapter 7

-30-

trustee is appointed with respect to Seller, or (ii) dismissed, then Purchaser shall have the right to terminate this Agreement, in its sole and absolute discretion, upon notice to Seller given at any time thereafter. Notwithstanding the foregoing provisions of this Section 11.3.1(g), if, within 30 days after entry of an order converting the Reorganization Case to Chapter 7, such Chapter 7 trustee elects to proceed with the transactions contemplated by this Agreement and agrees to be bound hereby, then Purchaser shall not have the right to terminate the Agreement pursuant to this Section 11.3.1(g), provided however, that (i) during this thirty (30) day period Purchaser shall not have the right to terminate this Agreement pursuant to this Section 11.3.1(g) and (ii) the foregoing provisions of this Section 11.3.1(g) shall not extend any of the time periods set forth in this Agreement (including, without limitation, any time period after which Purchaser has the right to terminate this Agreement).

11.3.2. If this Agreement is terminated in accordance with clause (a) or (b) of Section 11.3.1, then from and after such termination neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Purchaser shall receive a return of the Escrow Deposit upon such termination.

11.3.3. If this Agreement is terminated in accordance with clause (c), (d) (e), (f) or (g) of Section 11.3.1, then from and after such termination neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Purchaser shall receive a return of the Escrow Deposit upon such termination and payment of the Break-Up Fee in accordance with Section 15.2.3.

11.3.4. The terms of this Section 11.3 shall survive the termination of this Agreement.

## ARTICLE 12
## CONDEMNATION; CASUALTY

**SECTION 12.1.    Material Casualty or Condemnation.** If, prior to the Closing Date, all or any material portion of the Property is subject to an actual or threatened taking by a public authority, by the power of eminent domain or otherwise, or is destroyed or materially damaged by fire or other casualty (material damage shall be that which is reasonably estimated to cost $10,000,000.00 or more to repair), Purchaser shall have the right, exercisable by giving notice to Seller within fifteen (15) days after Purchaser's receipt of notice from Seller of such taking and the determination of the amount of any related award, or receipt of notice from Seller of such destruction or material damage, as the case may be, either (a) to terminate this Agreement and its obligation to purchase the Premises, in which case, Purchaser's obligation to purchase, and Seller's obligation to sell, the Premises shall terminate, and neither party shall have any further obligation to the other, except (x) with respect to any rights or obligations that are expressly stated herein to survive the termination of this Agreement and (y) Purchaser shall receive a return of the Escrow Deposit upon such termination, or (b) to accept the applicable

-31-

portion of the Premises in its then existing condition, in which case, (x) with respect to any condemnation, all proceeds of condemnation awards, as the case may be, payable to Seller by reason of such condemnation shall be paid or assigned to Purchaser, after deducting any reasonable amount which Seller has paid or is obligated to pay in obtaining such proceeds, including reasonable attorneys' fees and disbursements or any reasonable fees incurred in connection with securing any damaged portion of the Premises, and (y) with respect to any casualty, the terms of Section 12.2 shall apply.  If Purchaser elects to proceed under clause (b) above, Seller shall not compromise, settle or adjust any claims to such proceeds of any condemnation award without Purchaser's prior reasonable consent.  If Purchaser fails to elect either clause (a) or clause (b) above within the 15-day period specified above, then Purchaser shall be deemed to have elected clause (a) above, with the same force and effect as if Purchaser had delivered notice thereof within such 15-day period.  The terms of this Section 12.1 shall survive Closing or termination of this Agreement.

## SECTION 12.2.    Casualty Insurance.

12.2.1. If, prior to the Closing, there shall occur damage to or destruction of the Property caused by fire or other casualty and Purchaser does not have the right to terminate this Agreement (or elects not to exercise any right it does have to terminate this Agreement) by reason thereof, then (x) Seller shall assign to Purchaser at the Closing, by instrument in form and substance reasonably satisfactory to Purchaser, all of the insurance proceeds payable on account of any such fire or casualty, shall deliver to Purchaser any such proceeds actually paid to Seller (after deducting any reasonable amount which Seller has paid or is obligated to pay in obtaining such proceeds, including reasonable attorneys' fees and disbursements or any reasonable fees incurred in connection with securing any damaged portion of the Premises), and shall afford to Purchaser at Closing a credit against the Purchase Price in an amount equal to the amount of any deductible (but not greater than the amount that Purchaser is obligated to expend to restore such fire or casualty), and (y) Seller shall not compromise, settle or adjust any claims to such proceeds of such insurance without Purchaser's prior reasonable consent.  If the limit of Seller's insurance policy with respect to a casualty at the Premises is less than the cost of restoration to a clean and safe condition, fully enclosed and ready for Purchaser's renovation, then Purchaser shall be entitled to a further reduction in the Purchase Price in an amount equal to the difference between the cost of rendering the Property in such condition and the limit of such insurance policy (less the deductible).  The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

12.2.2. Seller agrees not to repair any damage to the Premises (other than emergency repairs) without Purchaser's prior consent.  Purchaser shall have the right to participate in any discussions, claims adjustments or settlements with insurance companies regarding any damage to the Premises.

12.2.3. The provisions of this Article 12 shall be construed to "expressly provide otherwise" for purposes of General Obligations Law § 5-1311.

-32-

## ARTICLE 13
## AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS

SECTION 13.1.        **Disclaimers; As-Is**.

13.1.1. Notwithstanding anything to the contrary contained herein, Purchaser acknowledges and represents that it (a) is a sophisticated purchaser, with experience in owning and operating real property in the nature of the Premises, (b) realizes the nature of this transaction, understands and is freely taking risks, if any, involved in connection with this transaction, (c) has undertaken such independent investigations and evaluations of the Premises as it has determined to be necessary or desirable in connection with the transaction contemplated herein, including the matters set forth in Section 13.1.2 below, and (d) acknowledges that the foregoing is reflected in the Purchase Price and the terms upon which Purchaser is willing to purchase and Seller is willing to sell.

13.1.2. Except as otherwise expressly set forth in this Agreement, the Premises are being sold by Seller and Purchaser agrees to accept the Premises AS IS AND WHERE IS, in its condition on the date hereof (subject to reasonable wear and tear and natural deterioration between the date hereof and the Closing Date).   Purchaser acknowledges, represents and warrants that (i) Purchaser has had ample opportunity to make an independent investigation and examination of the Premises (and all matters of every nature related thereto), and to become fully familiar with the physical condition, state of title, compliance with Law and environmental conditions of the Premises, (ii) Purchaser inspected, examined, investigated and sampled the Premises to its satisfaction and is familiar with the physical conditions, state of title, compliance with Law and environmental conditions of the Premises and uses thereof and will rely on that inspection, examination, investigation and sampling, (iii) Purchaser has inspected, examined and investigated to its satisfaction all laws, ordinances, and governmental rules and regulations relating thereto and is purchasing the Premises subject to any Violations thereof, (iv) Purchaser has inspected and examined to its satisfaction all licenses and permits relating to the facility, including but not limited to environmental and operational permits, and it agrees to be bound by the terms of those licenses and permits and/or will ensure that it obtains new or additional licenses and permits to fully comply with all applicable governmental rules and regulations, (v) Purchaser has independently investigated, analyzed and appraised the value and the profitability of the Premises, (vi) Purchaser has independently investigated the tenant files made available for review by Purchaser and all other due diligence documents delivered to Purchaser by Seller, (vii) Purchaser has independently investigated and evaluated all matters of a financial nature relating to the Premises, and (viii) except for Seller's representations and warranties expressly set forth in this Agreement, Seller has not made and shall not make any verbal or written representations, warranties or statements of any nature or kind whatsoever to Purchaser, whether express or implied, with respect to the above, and, in particular, except as expressly set forth herein, no representations or warranties have been made or shall be made with respect to (a) the physical condition or operation of the Premises, including the existence of any environmental hazards or conditions thereon (including the presence of asbestos containing materials or the release or threatened release of Hazardous Materials), (b) the revenues or expenses of the Premises, (c) the zoning and other laws applicable to the Premises or the

-33-

compliance of the Premises therewith, (d) the status of any approvals required for the development of the Premises, (e) the nature and extent of any matter affecting title to the Premises or to any personalty, (f) the quantity, quality, or condition of the personalty, or (g) any other matter or thing affecting or relating to the Premises, or any portion thereof, the interests therein to be conveyed to Purchaser pursuant to the terms of the transactions contemplated hereby or the status thereof.  Purchaser has had the opportunity to inspect the Premises and will rely on that inspection and its other investigations and evaluations of the Premises.

13.1.3. Purchaser acknowledges that, except for Seller's representations and warranties expressly set forth in this Agreement, Seller has not made, and Seller is not liable for or bound in any manner by, any express or implied warranties, guarantees, promises, statements, inducements, representations or information pertaining to the Premises or any part thereof, the physical condition, size, zoning, income, expenses or operation thereof, the uses which can be made of the same or of any other manner or thing with respect thereto.  Without limiting the foregoing, except for Seller's representations and warranties expressly set forth in this Agreement, Purchaser acknowledges and agrees that Seller is not liable for or bound by, and Purchaser has not relied upon, any verbal or written statements, representations, or any other information respecting the Premises furnished by Seller or any broker, employee, agent, consultant or other person representing or purportedly representing Seller.

13.1.4. Except as set forth in this Agreement, Seller hereby specifically disclaims any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in this Section 13.1 and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Premises.  Purchaser declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in the consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction, Purchaser further declares and acknowledges that this disclaimer has been brought to the attention of Purchaser and explained in detail and that Purchaser has voluntarily and knowingly consented thereto

13.1.5. Purchaser waives any and all rights to bring an action against Seller arising out of the past or present environmental condition of the Property, except for any statutory or common law rights of indemnity or contribution arising as a result of an action or proceeding brought against Purchaser by a non-affiliated third party.

**SECTION 13.2.     Acceptance of Closing Documents; Waivers.**  Except for those matters expressly set forth in this Agreement to survive the Closing and except for the agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed and the other Closing Documents shall be and be deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder and that Seller shall have no further liability with respect thereto.

**SECTION 13.3.     Survival.**  The provisions of this Article 13 shall survive the Closing.

-34-

## ARTICLE 14
## ESCROW

**SECTION 14.1.**     **Escrow Terms**.   The Escrow Deposit shall be held in escrow by Escrow Agent in accordance with the terms of the Escrow Agreement.

## ARTICLE 15
## QUALIFIED COMPETING BID

**SECTION 15.1.**     **Competing Bids**.

15.1.1. This Agreement is subject to entry by the Bankruptcy Court of the Bidding Procedures Order and Seller's obligation to consummate the transaction contemplated hereunder is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids.

15.1.2. Until (but not after) entry of the Sale Order by the Bankruptcy Court, Seller is permitted to cause its representatives and affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Premises.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Premises and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Premises to prospective purchasers.

**SECTION 15.2.**     **Bidding Procedures Order**.

15.2.1. Seller shall file a motion for approval of the bidding procedures order within two (2) Business Days after the date hereof, in the form annexed hereto as **Exhibit G** (the "**Bidding Procedures Order**"), which shall be reasonably acceptable in form and substance to Purchaser, and shall include provisions, among other things (i) setting the date for a hearing to approve the sale of the Premises (the "**Sale Hearing**"), (ii) authorizing Seller to conduct an auction (the "**Auction**") of the Premises in the event that any Qualified Competing Bids are received for the sale of the Premises in accordance with the Bidding Procedures Order and setting a date for such Auction, (iii) establishing bidding procedures reasonably acceptable to Purchaser, (iv) ordering the payment of the Break-Up Fee in accordance with Section 15.2.3 hereof, (v) providing that Purchaser's claim to the Break-Up Fee shall be secured by a priority lien on: (a) that portion of the Property comprised of, and known as, the C, D & E buildings (Tax Map Section 3, Block 9, Lots 18, 30 and 35) senior to all other liens and claims other than the Carveout and liens for Real Estate Taxes not in excess of $3,200,000 (less any portion of such Carveout and/or Real Estate Taxes paid from the proceeds of the portion of the Property described in clause (b) immediately following this clause (a)); (b) that portion of the Property comprised of, and known as, the A & B buildings (Tax Map Section 3, Block 9, Lot9) senior to all other liens and claims other than the senior mortgage liens thereon in favor of Sun Life

Insurance Company of Canada ("**Sun Life**"), the Carveout and liens for Real Estate Taxes not in excess of $3,200,000 (less any portion of such Carveout and/or Real Estate Taxes paid from the proceeds of the portion of the Property described in clause (a) immediately preceding this clause (b)); and entitled to superpriority administrative expense claim treatment in the Bankruptcy Cases, subject only to the Carveout but senior to all other superpriority claims, whether now or hereafter incurred or accrued (for the avoidance of doubt, the priority lien securing the Break-Up Fee shall be senior to all liens and claims with respect to debtor in possession financing presently existing or hereafter obtained by Seller), (vi) providing that no prospective purchaser will be permitted to bid at the Auction unless such party has been deemed "qualified" by Seller in accordance with certain criteria set forth in the Bidding Procedures Order, which at a minimum, shall require any such prospective purchaser to (a) provide documentation establishing that such prospective purchaser has sufficient financial wherewithal or other creditworthy party to ensure such prospective purchaser's ability to meet its commitments pursuant to its bid, (b) submit a definitive binding agreement (marked to show changes, if any, from this Agreement), and (c) provide a deposit of ten percent (10%) of the purchase price contained in such completing bid (each such qualified bid, a "**Qualified Competing Bid**"), (vii) providing that no prospective purchaser who bids for the Premises at the Auction shall be entitled to purchase the Premises unless such prospective purchaser submits to Seller in writing in accordance with the Bidding Procedures Order a bid which Seller believes to be higher or better, and then $100,000.00 greater for any additional incremental bid, and (viii) requiring Seller to provide to Purchaser, upon receipt thereof, a copy of any and all bids received by Seller and all proposed agreements related thereto.  Seller shall have the right, in its sole and absolute discretion, to establish a cash escrow in the amount of the Break-Up Fee to secure payment of the Break-Up Fee when and if it becomes due and payable hereunder.  In the event that (i) Seller establishes such cash escrow in the amount of the Break-Up Fee, (ii) Purchaser is granted a first priority, perfected security interest in such cash, in a manner reasonably acceptable to Purchaser, to secure payment of the Break-Up Fee when and if it becomes due and payable hereunder, and Purchaser is provided with an opinion of counsel with respect to the creation of such first priority, perfected security interest, in form and substance reasonably acceptable to Purchaser, and (iii) the creation of such cash escrow and the granting to Purchaser of such first priority, perfected security interest in such cash to secure payment of the Break-Up Fee is approved by the Bankruptcy Court in a manner reasonably acceptable to Purchaser, then Purchaser shall deliver any documentation reasonably required by Seller to release its priority lien on the Property securing the Break-Up Fee.

       15.2.2. Should there be an Auction and should overbidding take place, Purchaser shall have the right, but not the obligation, to participate in the overbidding and to be approved as the successful overbidder at the Sale Hearing based upon any such overbid, provided, however, that Purchaser shall receive a credit against the Purchase Price in an amount equal to the amount of the Break-Up Fee (i.e., $3,000,000.00).  At the conclusion of such Auction, Seller shall select and recommend for approval to the Bankruptcy Court the highest and best offer for the purchase of the Premises and shall ask the Bankruptcy Court to enter an order approving the same or enter an order confirming a Plan of Reorganization providing for the sale of the Premises to the party making the highest and best offer therefor.  Without limiting the foregoing:  (a) if Purchaser is the successful bidder, (x) such order shall approve this Agreement

and all of the terms and conditions hereof and approve and authorize Seller to consummate the transactions contemplated hereby, and such order shall be substantially in the form of the sale order attached hereto as **Exhibit H**, with such changes as are reasonably acceptable to Purchaser, or (y) such order shall confirm a Plan of Reorganization providing for the sale of the Premises to Seller in accordance with the terms of this Agreement and such order shall be in form and substance reasonably acceptable to Purchaser; and (b) if Purchaser is the second highest bidder, such order shall approve this Agreement and all of the terms and conditions hereof and approve and authorize Seller to consummate the transactions contemplated hereby in accordance with the terms of this Agreement, provided that the successful bidder defaults in its obligation to consummate the purchase of the Premises contemplated therein or its agreement to purchase the Premises as contemplated therein otherwise terminates, and such order shall be in form and substance reasonably acceptable to Purchaser (as used herein, the term **"Sale Order"** means any order of the Bankruptcy Court, in form and substance required hereunder, approving Purchaser as the successful bidder or second highest bidder, approving this Agreement and all of the terms and conditions hereof and approving the sale of the Premises as set forth in this sentence; and, as used herein, the term **"Confirmation Order"** means any order of the Bankruptcy Court, in form and substance required hereunder, confirming a Plan of Reorganization providing for the sale of the Premises to Purchaser as the successful bidder or second highest bidder, approving this Agreement and all of the terms and conditions hereof and approving the sale of the Premises as set forth in this sentence).  If, at the conclusion of such Auction, Purchaser is the successful bidder at a purchase price that is higher than the Purchase Price set forth in Section 2.2 hereof, then, (i) for all purposes of this Agreement, such higher amount shall be deemed to be the "Purchase Price" hereunder, (ii) at Closing, Purchaser shall be allowed a credit against the Purchase Price in the amount of the Break-Up Fee (i.e., $3,000,000.00), and (iii) Purchaser shall be required, within forty-eight hours after entry of the Sale Order or Confirmation Order to increase the amount of the Escrow Deposit such that the Escrow Deposit shall be ten percent (10%) of an amount equal to (x) the Purchase Price minus (y) the amount of the Break-Up Fee (i.e., $3,000,000.00).  If, at the conclusion of such Auction, Purchaser is the second highest bidder at a purchase price that is higher than the Purchase Price set forth in Section 2.2 hereof, then, (i) for all purposes of this Agreement, such higher amount shall be deemed to be the "Purchase Price" hereunder, and (ii) at Closing, Purchaser shall be allowed a credit against the Purchase Price in the amount of the Break-Up Fee (i.e., $3,000,000.00), but Purchaser shall not be required, at any time to increase the amount of the Escrow Deposit.  The terms of this Section 15.2.2 shall survive the Closing.

15.2.3. **Approval of Break-Up Fee**.  In the event that Seller does not consummate the transaction contemplated by this Agreement with Purchaser for any reason (other than a termination of this Agreement in accordance with Section 3.2.2, Section 11.1, clauses (a) or (b) of Section 11.3 or Section 12.1), including, but not limited to, by reason of Seller's acceptance or selection, or the Bankruptcy Court's approval, of a Qualified Competing Bid in excess of the Purchase Price (the "**Prevailing Bidder**"), then Purchaser shall be entitled to receive a break-up fee in the amount of $3,000,000.00, together with interest thereon at the rate of six percent (6%) per annum accruing from and after the date such break up fee becomes due and payable hereunder until paid (it being agreed for purposes of the calculation of such interest that if such break up fee becomes due and payable pursuant to clause (b) of the following

-37-

sentence, then such break up fee shall be deemed due and payable two (2) Business Days after the date of termination of this Agreement, whether or not Seller has sufficient available funds to make payment of such break up fee on such date) (inclusive of such interest, the "**Break-Up Fee**").  The Break-Up Fee shall be due and payable to Purchaser upon the earlier of:  (a) a closing of a sale of the Premises (or any portion thereof) to any Person other than Purchaser; or (b) the date that is two (2) Business Days after the date of any termination of this Agreement (other than a termination of this Agreement in accordance with Section 3.2.2, Section 11.1, clauses (a) or (b) of Section 11.3 or Section 12.1); provided, however, if Seller does not have sufficient available funds to make such payment of the Break-Up Fee at the time of such termination, then Seller shall make such payment at such time that Seller thereafter first obtains sufficient available funds to make such payment (including, without limitation, by reason of the closing of a sale of the Premises (or any portion thereof) to any Person other than Purchaser); provided, further, if the Break-Up Fee is secured by the cash escrow described in Section 15.2.1 as of the date of such termination, then Seller shall be deemed to have sufficient available funds to make such payment of the Break-Up Fee at the time of such termination and such cash escrow shall be used to pay the Break-Fee within two (2) Business Days after the date of any termination of this Agreement.  For the avoidance of doubt, in all events, Seller shall be obligated to pay the Break-Up Fee at the closing of a sale of the Premises (or any portion thereof) to any Person other than Seller.  Purchaser acknowledges that, notwithstanding the fact that a Prevailing Bidder may obtain the right to purchase the Premises (or a portion thereof) through the Auction, Purchaser shall proceed with diligence and shall be prepared to close the transaction in accordance with the terms of this Agreement in the event that the Prevailing Bidder shall fail to close on the acquisition of the Premises (or a portion thereof).  The provisions of this Agreement regarding the payment of the Break-Up Fee shall be subject to the approval of the Bankruptcy Court as part of the Bidding Procedures Order and Seller shall make prompt application to the Bankruptcy Court seeking entry of the Bidding Procedures Order in accordance with Section 15.2.1.  The terms of this Section 15.2.3 shall survive the termination of this Agreement.

   15.2.4. **Seller's Inability to Deliver Vacant Possession**.  The rights and remedies of Purchaser related to Seller's inability to deliver vacant possession of the Premises at Closing shall be set forth on **Exhibit I** attached hereto and made a part hereof.

   **SECTION 15.3. Seller's Right to Convey Pursuant to a Plan of Reorganization**.  Notwithstanding any other provision of this Agreement, Seller reserves the right to proceed to Closing pursuant to a Plan of Reorganization.  Upon notice that Seller has so elected, Purchaser shall reasonably cooperate (at Seller's sole cost and expense) with Seller in obtaining approval of and effectuating a Plan of Reorganization that includes a sale of the Premises on the terms herein; provided, however, the Purchaser shall not be required to incur any material expenses in connection with such cooperation; provided, further, that the foregoing provisions of this Section 15.3 shall not extend any of the time periods set forth in this Agreement (including, without limitation, any time period after which Purchaser has the right to terminate this Agreement).

## ARTICLE 16
## MISCELLANEOUS

**SECTION 16.1.     Entire Agreement.**  This Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Premises and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.2.     Modification.**  Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.3.     Binding Agreement.**  Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto and their respective successors and assigns and is intended to be binding upon any Chapter 11 or Chapter 7 trustee, any successor trustee and the estate of the Debtor. This Agreement shall not inure to the benefit of or be enforceable by any other Person.   The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.4.     Assignment.**  Without the express consent of Seller, this Agreement may not be assigned by Purchaser, including, assignment by operation of law. Except as provided for hereunder, any assignment by Purchaser without Seller's prior written consent shall be deemed null and void ab initio and shall be a material default entitling Seller, at its option, to exercise any of its powers, privileges, rights or remedies under this Agreement or at law or in equity.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.5.     Illegality.**  If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.6.     Choice of Law.**   THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH,

-39-

THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

SECTION 16.7.    **Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to **"this Agreement"** shall be deemed to include the Exhibits and Schedules attached hereto. The terms **"hereby"**, **"hereof"**, **"hereto"**, **"hereunder"** and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term **"including"** when used herein shall mean **"including, without limitation."** Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 16.8.    **Ambiguities.**  Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 16.9.    **Intentionally Omitted.**

SECTION 16.10.    **Counterparts.**  This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 16.11.    **Waiver of Trial by Jury**.  The respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, or for the enforcement of any remedy under any statute, emergency or otherwise.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

-40-

**SECTION 16.12.     Third Party Beneficiaries**.  No Person other than the parties hereto, shall have any rights or claims under this Agreement.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.13.     Jurisdiction**.

16.13.1.     PURCHASER AND SELLER AGREE THAT THE BANKRUPTCY COURT OF THE SOUTHERN DISTRICT OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION OVER DISPUTES AND OTHER ACTIONS RELATED TO THIS AGREEMENT.

16.13.2.     THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 16.14.     No Recording**.  Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement and, if Purchaser breaches the provisions of this Section, Seller shall have the option of terminating this Agreement and retaining the Escrow Deposit as liquidated damages in addition to any other rights or remedies that Seller may have.

**SECTION 16.15.     No Waiver.**  The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.16.     Severability.**  If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby.  Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 16.17.     Intentionally Omitted.**

**SECTION 16.18.     Non-Liability.**  Each party agrees that neither the trustees, directors, officers, employees, managers, members, shareholders nor any agents of the other party shall have any personal obligations under this Agreement.  Neither party shall seek or assert any claim or enforce any of its rights under this Agreement against such trustees, directors, officers, employees, managers, members, shareholders or agents or against any other person, partnership, corporation or trust, as principal of the other party, whether disclosed or undisclosed.  The foregoing acknowledgments and agreements shall continue so long as either

party has any liability to the other, and even if either party fails to comply with the legal requirements relating to the incorporation or other formation of legal entities in the state of its incorporation or other formation. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 16.19.    **Broker**.  Seller and Purchaser each represent and warrant that no consultant, broker, salesman or finder has been engaged by it in connection with any of the transactions contemplated by this Agreement or, to its knowledge, is in any way connected with any of such transactions other than Grubb & Ellis New York (the "**Broker**").  In the event of any claim for broker's, consultant's or finder's fees or commissions in connection with the negotiation, execution or consummation of this Agreement (other than by Broker), then Purchaser shall indemnify, save harmless and defend Seller from and against such claim if it shall be based upon any statement, representation or agreement made by Purchaser, and Seller shall indemnify, save harmless and defend Purchaser from and against such claim if it shall be based upon any statement, representation or agreement made by Seller.  Seller agrees to pay the commission or other fee due to Broker in connection with this transaction contemplated by this Agreement pursuant to a separate agreement.  The provisions of this Section 16.19 shall survive the Closing or the earlier termination of this Agreement.

SECTION 16.20.    **Not an Offer**.  Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the submission by Purchaser to Seller of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Seller's consideration and not for acceptance and execution, (ii) have no binding force or effect, and (iii) not constitute an offer by Purchaser to Seller for the purchase of the Property or a lease or conveyance of the Property, (c) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof including, but not limited to, the delivery of the Escrow Deposit to Escrow Agent, shall have been fulfilled or waived, and (d) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

SECTION 16.21.    **Failure of Deposit**.  If the payment made on account of the Escrow Deposit is by check, and if such check fails collection in due course or if the Escrow Deposit is not deposited with Escrow Agent pursuant to Section 2.2.2, Seller, at its option, may declare this Agreement null, void and of no force and effect, and may pursue its remedies against Purchaser in any manner permitted by law, such remedies being cumulative.

-42-

*- remainder of page intentionally left blank; signatures follow -*

1330595v.11

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER:

**CABRINI MEDICAL CENTER**

By:_____
   Name:
   Title:

PURCHASER:

**CABRE PARTNERS LLC**

By: _____
   Name:
   Title:

-44-

**EXHIBIT A**

<u>LEGAL</u> <u>DESCRIPTION</u> <u>OF</u> <u>THE</u> <u>LAND</u>

**EXHIBIT B**

SELLER'S TITLE REPORT

**EXHIBIT C**

ESCROW AGREEMENT

## ESCROW AGREEMENT
## (ESCROW DEPOSIT)

Dated:  as of December __, 2009

The parties to this agreement (this **"Escrow Agreement"**) are CABRINI MEDICAL CENTER, a New York not-for-profit hospital, as debtor-in-possession pursuant to the Reorganization Case (as defined in the Agreement (as hereinafter defined)) (**"Seller"**), CABRE PARTNERS LLC, a Delaware limited liability company (**"Purchaser"**), and FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK, a New York corporation (the **"Escrow Agent"**).

Seller and Purchaser have entered into a Contract of Sale dated as of December __, 2009 (the **"Agreement"**), which provides for the sale to Purchaser by Seller of certain land located in New York, New York and other interests related thereto.  Pursuant to Section 2.2.2 of the Agreement, Purchaser is delivering to the Escrow Agent, to be held by it in escrow in accordance with the terms of this Escrow Agreement, a cash deposit in the amount of Eight Million Dollars ($8,000,000.00) (the "**Cash Deposit**").  The Cash Deposit and any interest earned thereon shall be held by the Escrow Agent pursuant to and in accordance with the provisions of this Escrow Agreement and constitute the Escrow Deposit (as such term is defined in the Agreement).  The Cash Deposit (and, if applicable, the Letter of Credit (as hereinafter defined) and any proceeds from any draw thereon), in whatever form invested and reinvested, together with all interest and other amounts from time to time held by the Escrow Agent under this Escrow Agreement, are referred to below as the **"Escrow Deposit"**).

Accordingly, the parties agree as follows:

1.      **Appointment of Escrow Agent**.

Seller and Purchaser appoint First American Title Insurance Company of New York as the Escrow Agent, and First American Title Insurance Company of New York accepts that appointment and agrees to hold and dispose of the Escrow Deposit strictly in accordance with the terms of this Escrow Agreement.  The Escrow Agent acknowledges receipt the Cash Deposit on account of the Escrow Deposit.

2.      **Substitution of Letter of Credit**.

Purchaser shall have the right at any time upon at least five (5) business days notice to Seller to deposit with the Escrow Agent a clean, unconditional and irrevocable letter of credit in an amount equal to **Eight Million Dollars (US $8,000,000.00)** (payable on sight draft) (together with any replacements or substitutes therefor, the "**Letter of Credit**"), naming the Escrow Agent, in trust, as the sole beneficiary thereof, in substitution for the Cash Deposit.  The Letter of

-2-

Credit shall be issued by a commercial bank that (a) is a member of the New York Clearinghouse Association, (b) is not an affiliate of Purchaser, (c) has a long-term senior debt rating by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto, of not less than "A" and (d) has a long-term senior debt rating by Moody's Investor Services, or any successor thereto, of not less than "A2".  The form of the Letter of Credit shall be subject to the approval of Seller, which approval shall not be unreasonably withheld, delayed or conditioned.  Upon the Escrow Agent's receipt of the Letter of Credit and notice from Seller that the form of the Letter of Credit is acceptable, (i) the Letter of Credit, any proceeds from any draw thereon, and any interest earned on such proceeds, shall be held by the Escrow Agent, in trust, pursuant to and in accordance with the provisions of this Escrow Agreement and constitute the Escrow Deposit (as such term is defined in the Agreement) and (ii) the Cash Deposit and any interest earned thereon shall be returned to Purchaser.

3.    **Investment**.

Escrow Agent has been provided with a completed and signed W-9 form concurrently with the execution and delivery of this escrow agreement, and Seller and Purchaser both agree that the form can be used to establish an interest bearing segregated account.  The Cash Deposit (and, if applicable, the proceeds of a draw of the Letter of Credit) shall be deposited by the Escrow Agent in an interest-bearing trust account with (a) J.P. Morgan Chase, N.A., (b) Citibank, N.A., (c) The Bank of New York Mellon or (d) such other bank as the Escrow Agent may select with the prior written approval of each of Purchaser and Seller, which approval of each of Purchaser and Seller shall not be unreasonably withheld, conditioned or delayed.  If the Escrow Deposit is held in the form of cash, the Escrow Agent shall not commingle the Escrow Deposit (or any portion thereof) with any funds of the Escrow Agent or others (other than (i) when the initial funds are received into Escrow Agent's commingled trust account prior to the transfer to the segregated account which shall be transferred to a segregated account within one (1) business day and (ii) when the funds are to be disbursed pursuant to the terms of this escrow agreement, at which time the funds may be held in Escrow Agent's commingled trust account for two (2) business days) and shall upon request advise the parties of the number of the bank account in which the deposit is made.  Any portion of the Escrow Deposit that is at any time held in the Escrow Agent's commingled trust account shall be deemed held in trust for the parties entitled to receive such proceeds under the terms hereof.  If the Escrow Deposit is held in the form of cash, at Purchaser's request, the Escrow Agent shall invest and reinvest the Escrow Deposit in "money market" accounts of banks or trust companies organized in the United States having a minimum net worth of $200 million, in each case with maturity dates not later than 30 days after the date of investment; provided, however, unless Seller otherwise consents, any such "money market" accounts must invest only in U.S. Treasuries or their equivalents.

4.    **Release of Escrow Deposit; Draw on Letter of Credit**.

(a)    The Escrow Agent shall deliver the Escrow Deposit as follows:

(i)    If the Escrow Agent receives written instructions signed by both Seller and Purchaser (or a certified copy of a final order of a court of competent jurisdiction) directing

1330595v.11

delivery of all or part of the Escrow Deposit, the Escrow Agent shall deliver the Escrow Deposit as so directed.

(ii)     If the Escrow Agent receives a written notice signed by either Seller or Purchaser stating that the party who gave the notice is entitled to all or part of the Escrow Deposit, the Escrow Agent shall send a copy of that notice to the other party within three (3) business days of receipt thereof and, unless the Escrow Agent has received a written objection from the other party within seven (7) business days after such delivery by the Escrow Agent of such copy of the notice, the Escrow Agent shall deliver the Escrow Deposit in accordance with the notice.  If the Escrow Agent receives a written objection from the other party during such 7-business day period, the Escrow Agent shall send a copy of the written objection to the party who gave the notice within three (3) business days of receipt thereof and shall not deliver any portion of the Escrow Deposit until it shall have received written instructions signed by each of Seller and Purchaser or a certified copy of a final order of a court of competent jurisdiction directing delivery of the Escrow Deposit, and the Escrow Agent shall then deliver the Escrow Deposit as so directed.

(iii)    If the Escrow Agent receives conflicting instructions from Seller and Purchaser regarding delivery of the Escrow Deposit, it shall send a copy of the instructions from each party to the other within three (3) business days of receipt thereof and shall not deliver any portion of the Escrow Deposit until it shall have received written instructions signed by each of Seller and Purchaser or a certified copy of a final order of a court of competent jurisdiction directing delivery of the Escrow Deposit, and the Escrow Agent shall then deliver the Escrow Deposit as so directed.

(b)     The Escrow Agent may at any time commence an action in the nature of interpleader or other legal proceedings and may deposit the Escrow Deposit with the clerk of a court of competent jurisdiction.

(c)     Upon any delivery or deposit of the Escrow Deposit as provided in this Section 4, the Escrow Agent shall be released and discharged from any further obligation under this Escrow Agreement.

(d)     If, at the time a party becomes entitled to the Escrow Deposit, the Escrow Agent holds, as part of the Escrow Deposit, an investment that has not matured, that party shall have the option (exercisable by notice to the Escrow Agent) to either (i) compel delivery of the investment (if assignable) and bear the risk of loss of interest on the investment or the cost of arranging for the sale or repurchase of the investment or (ii) permit the Escrow Agent to retain the investment until it matures and to deliver such portion of the Escrow Deposit so retained to the party entitled to the Escrow Deposit upon maturity of such investment.

(e)     In connection with any delivery of the Escrow Deposit (or any portion thereof), as permitted hereunder, to Seller at any time that the Escrow Agent holds the Letter of Credit as the Escrow Deposit (or any portion thereof), the parties agree that the Escrow Agent shall have the right to (i) draw on the Letter of Credit prior to such delivery of the Escrow Deposit (or

-4-

applicable portion thereof) and shall deliver the Escrow Deposit (or applicable portion thereof) as cash to Seller and/or (ii) if the entire Escrow Deposit is being delivered to Seller, transfer the Letter of Credit, as the beneficiary of the Letter of Credit, to Seller, in which event Seller shall have the right to draw on the Letter of Credit.

(f)      Purchaser shall cause the Letter of Credit to remain valid and effective at all times that the Escrow Deposit is held in the form of the Letter of Credit, unless and other than to the extent that the Letter of Credit is drawn upon by the Escrow Agent (or Seller in the event that the Letter of Credit has been delivered to Seller in accordance with the terms of this Escrow Agreement).  If the Escrow Deposit is held in the form of the Letter of Credit, the Escrow Agent shall draw in full or in part upon the Letter of Credit, without notice to Purchaser:  (i) if Escrow Agent has not received (after notice from Seller), at least ten (10) days prior to the date on which the then outstanding Letter of Credit is scheduled to expire, a renewal or replacement Letter of Credit that satisfies all requirements of Section 2.2.2 of the Agreement and the provisions of this Section 4(f); (ii) if, upon a transfer of the Escrow Deposit by the Escrow Agent to any successor escrow agent hereunder (**"Transferee"**) in connection with any resignation by the Escrow Agent pursuant to Section 7, the Escrow Agent or its Transferee has not been delivered, for any reason, either an endorsement to the Letter of Credit by the issuing financial institution evidencing such Transferee as the new beneficiary thereunder or a replacement Letter of Credit naming such Transferee as beneficiary thereunder; (iii) if, in connection with a transfer of the Letter of Credit to a Transferee, Purchaser fails to pay any transfer fee due in connection with transferring the Letter of Credit to such Transferee; or (iv) if the Escrow Agent has not received a replacement Letter of Credit that satisfies all requirements of Section 2.2.2 of the Agreement and the provisions of this Section 4(f) within (1) ten (10) business days after written notice from Seller to Purchaser and Escrow Agent that the financial institution issuing the Letter of Credit ceases to meet the rating requirement set forth in Section 2.2.2 of the Agreement, or (2) three (3) business days after written notice from Seller to Purchaser and Escrow Agent that the financial institution issuing the Letter of Credit has been acquired by the Federal Deposit Insurance Corporation.

5.      **Concerning Escrow Agent**.

(a)      The Escrow Agent shall not have any liability to any of the parties to this Escrow Agreement or to any third party arising out of its services as the Escrow Agent under this Escrow Agreement, except for damages directly resulting from the Escrow Agent's gross negligence or willful misconduct.  Without limiting the generality of the preceding sentence, in no event shall the Escrow Agent have any liability arising out of losses resulting from its investment or reinvestment of the Escrow Deposit in accordance with the terms of this Escrow Agreement, including, but not limited to, any loss of principal or failure to earn interest on the Escrow Deposit, any claim that a higher rate of return could have been obtained, or any loss of principal or interest resulting from any delay in the investment or reinvestment of the Escrow Deposit or the repurchase or sale of any certificate of deposit or other investment.

(b)      Seller and Purchaser jointly and severally shall indemnify the Escrow Agent and hold it harmless against any loss, liability, damage or expense (including reasonable attorneys'

-5-

fees) that the Escrow Agent may incur as a result of acting as escrow agent under this Escrow Agreement, except for any loss, liability, damage or expense arising from its own gross negligence or willful misconduct. For this purpose, the term "attorneys' fees" includes fees payable to any counsel retained by the Escrow Agent in connection with its services under this Escrow Agreement.

(c)    The Escrow Agent shall be entitled to rely upon any judgment, notice, instrument or other writing delivered to it under this Escrow Agreement without being required to determine the authenticity of, or the correctness of any fact stated in, that document (and irrespective of any facts the Escrow Agent may know or be deemed to know in any other capacity, other than any facts of which the attorneys or employees of the Escrow Agent actually handling the matters hereunder have actual knowledge). The Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or receipt or advice or make any statement or execute any document in connection with this Escrow Agreement has been duly authorized to do so.

(d)    The Escrow Agent shall have no duties or responsibilities except those expressly set forth in this Escrow Agreement. The Escrow Agent shall not have any obligations arising out of or be bound by the provisions of any other agreement, written or oral, including, but not limited to, the Agreement.

(e)    The party (i.e., Seller or Purchaser, as the case may be) entitled to receive the Escrow Deposit shall report as taxable income any taxable income resulting from the investment of the Escrow Deposit. If the Escrow Deposit is held in a money market account, the account in which the Escrow Deposit is held will indicate the name (which is Cabre Partners LLC) and/or Federal I.D. number (which is 32-0296754) of the party under whose name the account is opened (i.e., Purchaser).

(f)    All of the Escrow Agent's rights of indemnification provided for in this Escrow Agreement shall survive the resignation of the Escrow Agent, its replacement by a successor Escrow Agent, its delivery or deposit of the Escrow Deposit in accordance with this Escrow Agreement, the termination of this Escrow Agreement, and any other event that occurs after the date hereof.

(g)    The Escrow Agent shall have no responsibility with respect to the sufficiency of the arrangements contemplated by this Escrow Agreement to accomplish the intentions of the parties.

6.    **Representations**.

Seller and Purchaser each represents and warrants to the Escrow Agent that it has full power and authority to enter into and perform this Escrow Agreement; that the execution and delivery of this Escrow Agreement was duly authorized by all necessary corporate or other action; and that this Escrow Agreement is enforceable against it in accordance with its terms.

-6-

7.    **Resignation; Successor Escrow Agent**.

The Escrow Agent (and any successor escrow agent) may at any time resign as such upon 60 days prior notice to each of the other parties.  Upon receipt of a notice of resignation, each of the other parties shall use their best efforts to select a successor agent within 30 days, but if within that 30 day period the Escrow Agent has not received a notice signed by both of them appointing a successor escrow agent and setting forth its name and address, the Escrow Agent may (but shall not be obligated to) select on their behalf any nationally recognized title insurance company authorized to do business in the State of New York or, if such a title insurance company will not so act as successor hereunder to the Escrow Agent, a bank or trust company, other than any lending institution making or holding a loan secured by the Property (as defined in the Agreement), to act as successor escrow agent, for such compensation as such title company, bank or trust company, as the case may be, customarily charges and on such terms and conditions not inconsistent with this Escrow Agreement as such title company or such bank or trust company, as the case may be, reasonably requires.  A successor escrow agent selected by the resigning Escrow Agent may become the Escrow Agent by confirming in writing its acceptance of the position.  Seller and Purchaser shall sign such other documents as the successor escrow agent reasonably requests in connection with its appointment, and each of them hereby irrevocably appoints the Escrow Agent as its attorney-in-fact to sign all such documents in its name and place.  The Escrow Agent may deliver the Escrow Deposit to the successor escrow agent selected pursuant to this provision and, upon such delivery, the successor escrow agent shall become the Escrow Agent for all purposes under this Escrow Agreement and shall have all of the rights and obligations of the Escrow Agent under this Escrow Agreement and the resigning Escrow Agent shall have no further responsibilities or obligations under this Escrow Agreement.

8.    **Notices**.

All notices, elections and other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) personally delivered with proof of delivery (or attempted delivery) thereof to the individual or individuals specified below, or (ii) sent by nationally recognized commercial overnight or next business day courier, with proof of delivery (or attempted delivery) thereof or (iii) sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the respective parties as follows:

If to Seller, to it at:

> Cabrini Medical Center
> 227 East 19th Street
> New York, NY 10003
> Attention: Ms. Diane Kniejski
> Telephone No. (212) 995-6156

> With a copy to:

1330595v.11

Garfunkel, Wild & Travis, P.C.
111 Great Neck Road
Great Neck, New York  11021
Attention: Burton S. Weston, Esq.
Telephone No: 516-393-2588

and

Togut, Segal & Segal, LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Attention: Frank A. Oswald, Esq.
Telephone No. 212-594-5000

If to Purchaser, to it at:

Cabre Partners LLC
c/o J.D. Carlisle LLC
352 Park Avenue South
15th Floor
New York, New York 10010
Attention:  Mr. Jules Demchick / Mr. Evan Stein
Telephone No. (212) 481-8200

With a copy to:

Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Attention:  Perry A. Cacace, Esq.
Telephone No. (212) 969-3000

If to Escrow Agent, to it at:

First American Title Insurance Company of New York
633 Third Avnue
New York, New York 10017
Attention:  Jeff Mitzner
Telephone No. (212) 850-0629

or to such other address or addresses or party or parties as Seller, Purchaser or the Escrow Agent
may have furnished to all of the other parties hereto in writing in accordance herewith, except
that notices of change of address or addresses shall only be effective upon receipt.  Notices sent
in accordance with the terms of this Section 8 shall be deemed given, served and received when

-8-

actually delivered (or when delivery is rejected).

     9.    **Miscellaneous**.

    (a)    The Escrow Agent shall serve under this Escrow Agreement without fee.

    (b)    If any provision of this Escrow Agreement is determined by any court of competent jurisdiction to be invalid or unenforceable in any jurisdiction the remaining provisions of this Escrow Agreement shall not be affected thereby, and the invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable that provision in any other jurisdiction. It is understood, however, that the parties intend each provision of this Escrow Agreement to be valid and enforceable and each of them waives all rights to object to any provision of this Escrow Agreement.

    (c)    This Escrow Agreement shall be binding upon and inure solely to the benefit of the parties and their respective successors and permitted assigns, and shall not be enforceable by or inure to the benefit of any third party. No party may assign its rights or obligations under this Escrow Agreement or any interest in the Escrow Deposit without the written consent of the other party (except in connection with a transfer by Purchaser of its interest in the Agreement in accordance with the terms of the Agreement), and any other purported assignment shall be void. In no event shall the Escrow Agent be required to act upon, or be bound by, any notice, instruction, objection or other communication given by a person other than, nor shall the Escrow Agent be required to deliver the Escrow Deposit to any person other than, Seller or Purchaser.

    (d)    This Escrow Agreement shall be governed by and construed in accordance with the law of the State of New York applicable to agreements made and to be performed in New York, without regard to conflict of laws principles.

    (e)    The United States Bankruptcy Court for the Southern District of New York shall have exclusive jurisdiction over the parties (and the subject matter) with respect to any dispute or controversy arising under or in connection with this Escrow Agreement. A summons or complaint or other process in any such action or proceeding served by mail in accordance with Section 8 of this Escrow Agreement or in such other manner as may be permitted by law shall be valid and sufficient service.

    (f)    This Escrow Agreement contains a complete statement of all of the arrangements between the Escrow Agent and Seller and Purchaser with respect to its subject matter and cannot be changed or terminated orally. Any waiver, amendment, modification or termination of this Escrow Agreement or any provisions hereof must be in writing.

    (g)    This Escrow Agreement is being entered into in order to implement certain provisions of the Agreement and shall not amend, modify or supersede the Agreement (or any other agreement entered into in connection therewith) or act as a waiver of any rights, obligations or remedies set forth therein; provided, however, the Escrow Agent may rely solely on upon the terms of this Agreement in performing its duties hereunder.

1330595v.11

(h)    This Escrow Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

(i)    The section headings used herein are for convenience of reference only and shall not affect the construction or interpretation of this Escrow Agreement.

[END OF TEXT – SIGNATURES ON NEXT PAGE]

1330595v.11

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement on the date first set forth above.

**SELLER:**

**CABRINI MEDICAL CENTER**

By: _____
　　　Name:
　　　Title:

**PURCHASER:**

**CABRE PARTNERS LLC**

By: _____
　　　Name:
　　　Title:

**ESCROW AGENT:**

**FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK**

By: _____
　　　Name:
　　　Title:

-11-

**EXHIBIT D**

<u>FORM</u> <u>OF</u> <u>DEED</u>

-12-

## EXHIBIT E

<u>FORM OF BILL OF SALE</u>

1330595v.11

**EXHIBIT F**

FORM OF ASSIGNMENT AND ASSUMPTION

1330595v.11

**EXHIBIT G**

FORM OF BIDDING PROCEDURES ORDER

-15-

1330595v.11

# EXHIBIT H

## FORM OF SALE ORDER

1330595v.11

## EXHIBIT I

### RIGHTS AND REMEDIES FOR SELLER'S
### INABILITY TO DELIVER VACANT POSSESSION

The parties acknowledge and agree that the Premises are to be delivered to Purchaser at Closing vacant and free of all Tenancies pursuant to the provisions of Sections 3.1 and 3.2.1 of this Agreement.  Seller shall give notice to Purchaser that the Premises are vacant and free of all Tenancies promptly after the Premises become vacant and free of all Tenancies. Notwithstanding anything to the contrary contained herein, in the event Seller is unable to deliver possession of the Premises vacant and free of all Tenancies by the then Scheduled Closing Date, Seller shall have the right, upon prior notice to Purchaser given at least two (2) Business Days prior to the then Scheduled Closing Date, to adjourn the Closing to the date that is twenty (20) Business Days after the Premises are vacant and free of all Tenancies (to be designated by Seller in accordance with the last sentence of this paragraph once Seller anticipates the specific date upon which Seller will be able to deliver the Premises to Purchaser vacant and free of all Tenancies), provided, however, that Seller shall not have the right to adjourn the Closing to a date that is later than the date that is fourteen (14) months after the date upon which the Bankruptcy Court issues the Sale Order or the Confirmation Order as the case may be (such date that is fourteen (14) months after the date upon which the Bankruptcy Court issues the Sale Order or the Confirmation Order, as the case may be, is referred to herein as the "**Outside Vacancy Date**").  If the Premises are not vacant and free of all Tenancies on or before the Outside Vacancy Date, Purchaser shall have the right to terminate this Agreement by notice to Seller delivered at any time after the Outside Vacancy Date and prior to the date upon which Seller shall have given notice to Purchaser that the Premises are vacant and free of all Tenancies. If Purchaser so terminates this Agreement, the Agreement shall be of no further force and effect and neither of the parties hereto shall have any rights or obligations to the other hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Purchaser shall receive a return of the Escrow Deposit upon such termination and payment of the Break-Up Fee in accordance with Section 15.2.3.  Once Seller anticipates that Seller will be able to deliver the Premises to Purchaser vacant and free of all Tenancies, Seller shall have the right, from time to time, to designate the Scheduled Closing Date upon not less than ten (10) Business Days notice to Purchaser, provided, however, that Purchaser shall have the right to adjourn such Scheduled Closing Date, upon notice to Seller in accordance with the provisions of Article 8, for a period or periods not to exceed sixty (60) days from the later of (i) the date that the Premises are vacant and free of all Tenancies, and (ii) the date that Seller gives notice thereof to Purchaser.

If, on or before the date that is four (4) months after the date upon which the Bankruptcy Court issues the Sale Order or the Confirmation Order, as the case may be, (i) Seller has not entered into an agreement with GPDDC, L.L.C., a tenant in the Premises, to surrender and vacate the space in the Premises occupied by GPDDC, L.L.C. and to terminate its lease thereof on or before the Outside Vacancy Date, and (ii) GPDDC, L.L.C. has not entered into a lease of space in another building to replace its space in the Premises, then Purchaser agrees to offer to GPDDC, L.L.C., for a period of sixty (60) days, an option to lease space in a building owned by an

-17-

affiliate of Purchaser and located at 352 Park Avenue South, New York, New York.  The substantive business terms of such offer to lease shall be:  (a) approximately 12,000 rentable square feet of space in such building, (b) a ten (10) year term, (c) basic rent equal to $41.00 per rentable square foot for the first five years of the term and $46.00 per rentable square foot for the last five years of the term, and (d) GPDDC, L.L.C. shall be responsible for payment and performance of the build-out of such space.  If GPDDC, L.L.C. does not accept such offer within such sixty (60) day period, Purchaser may rescind the same and this Agreement shall continue in full force and effect upon and subject to the terms hereof.  Seller shall, upon request, keep Purchaser apprised of the status of Seller's negotiations with GPDDC, L.L.C. related to the vacancy of its space in the Premises.  Seller agrees that Purchaser's obligations pursuant to this paragraph shall not constitute a material obligation within the meaning of Sections 6.3.1(c) or 11.1(b) of this Agreement.

The terms of this Exhibit I shall survive the termination of this Agreement.

-18-

## **SCHEDULE 2.2.2**

## ESCROW AGENTS WIRE INSTRUCTIONS

**SCHEDULE 3.3.1**

CERTAIN PERMITTED EXCEPTIONS

1.      Covenants and Restrictions set forth in Liber 504 Cp. 626, Liber 550 Cp. 370, Liber 562 Cp. 226, Liber 619 Cp. 677, Liber 669 Cp. 563, Liber 702 Cp. 226 and Liber 93 Section 3 Cp. 174.

2.      Terms, covenants and conditions contained in Declaration made by Columbus Hospital dated May 19, 1970 and recorded May 21, 1970 in Reel 173 page 1975.

3.      Corrective Declaration made by Columbus Hospital dated January 28, 1971 and recorded March 1, 1971 in Reel 197 page 807.

4.      Zoning Lot Certification dated May 9, 2005 and recorded May 26, 2005 as CRFN 2005000307518.

5.      Zoning Lot Description and Ownership Statement made by Columbus Hospital dated May 16, 2005 and recorded May 26, 2005 as CRFN 2005000307519.

1330595v.11

## SCHEDULE 7.2.2

### SERVICE CONTRACTS

| Name of Contract | Other Contracting Party | Termination Date | Payment Amount |
|---|---|---|---|
| Pest Management Services | Star Environmental Inc.<br>5004 Kings Highway<br>Brooklyn, NY 11234 | Month-to-month, with 30-day notice to terminate | $425/month |
| Waste Disposal | Century Waste Services LLC<br>623 Dowd Avenue<br>Elizabeth, NJ 07201 | Unknown (only have purchase order) | $1,500/month |
| Full Service Preventative Maintenance Agreement | New York Elevator (k/n/a Thyssen Krupp Elevator)<br>519 Eighth Avenue<br>12th Floor<br>New York, NY 10018 | January 2013 (with automatic 5 year renewal) | $11,900/month |

-3-

**SCHEDULE 7.2.6**

<u>TENANCIES</u>

1.      GPDDC, LLC

2.      Jeffrey Lucey, MD and Marina Auerbach, MD

3.      Howard Bruckner, MD

4.      Howard W. Bruckner MD Laboratory for Cancer Research

5.      Gramercy Park Medical Group

1330595v.11

## SCHEDULE 7.2.8

## SELLER'S INSURANCE

| Policy Number | Insurance Company | Term | Expiration Date | Type of Coverage | Annual Premium |
|---|---|---|---|---|---|
| 01WEFZ6620 | The Hartford Insurance Company | 1 YR | 2/6/2010 | Workers' Compensation | $45,083.00 |
| 00XYF0902001 | Excess and Surplus of New England, LLC | 1 YR | 2/11/2010 | Directors & Officers Liability | $68,815.00 |
| | National Benefit Life Insurance Company | 6 MO | 12/31/2009 | NYS Disability | $1,315.80 |
| APP58845104 | Underwriters at Lloyd's London LoVullo Associates, Inc. | 1 YR | 12/16/2009 | Property (excess) | $19,560.60 |
| APP58395104 | Scottsdale Insurance Company LoVullo Associates, Inc. | 1 YR | 12/16/2009 | General Liability | $88,842.00 |
| AAP58162104 | Great American Insurance Co. LoVullo Associates, Inc. | 1 YR | 12/16/2009 | Property | $132,365.00 |
| CPP6186904 | Chubb Group of Insurance Companies, Inc. | 1 YR | 12/16/2009 | Property (Boiler and Machinery) | $7,170.00 |

1330595v.11