UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                         :

In re:                             :         Chapter 11
                                           :         Case No. 09-14398 (AJG)

CABRINI MEDICAL CENTER,         :
                                         :

                    Debtor.       :
                                         :
-------------------------------------------------------------x

# DISCLOSURE STATEMENT RELATING TO
# PLAN OF LIQUIDATION OF CABRINI MEDICAL CENTER

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN PROPO-NENTS' PLAN OF LIQUIDATION. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "BANK-RUPTCY COURT"). THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. APPROVAL OF THIS DIS-CLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WILL NOT CONSTI-TUTE ENDORSEMENT OF THE PLAN. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT.**

---

TOGUT, SEGAL & SEGAL LLP
Attorneys for the Debtor
  and Debtor in Possession
Co-Proponent of the
  Plan of Liquidation
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Attn: Frank A. Oswald
       Howard P. Magaliff

ALSTON & BIRD LLP
Attorneys for the Official Committee
  of Unsecured Creditors
Co-Proponent of the
  Plan of Liquidation
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Attn: Martin G. Bunin
       Craig E. Freeman

Dated: New York, New York
       December 21, 2010

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................................................. 1
I.  INTRODUCTION ........................................................................................................ 2
II.  EVENTS LEADING TO THE CHAPTER 11 CASE ................................................ 7
III.  ACTIVITIES DURING THE CHAPTER 11 CASE ................................................. 14
IV.  SUMMARY OF THE PLAN ..................................................................................... 23
V.  EFFECT OF THE PLAN ON CLAIMS,
    INTERESTS AND CAUSES OF ACTION .............................................................. 37
VI.  EXECUTORY CONTRACTS ................................................................................... 40
VII.  CONDITIONS TO CONFIRMATION
    AND OCCURRENCE OF EFFECTIVE DATE ....................................................... 41
VIII.  CONFIRMABILITY AND SEVERABILITY
    OF A PLAN AND CRAMDOWN ............................................................................ 42
IX.  ADMINISTRATIVE PROVISIONS ........................................................................ 42
X.  ESTIMATED DISTRIBUTIONS ............................................................................. 46
XI.  VOTING REQUIREMENTS, ACCEPTANCE,
    CONFIRMATION AND CONSUMMATION OF THE PLAN ......................... 46
XII.  CERTAIN RISK FACTORS TO BE CONSIDERED ............................................. 50
XIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....... 50
XIV.  ALTERNATIVES TO CONFIRMATION OF THE PLAN ................................... 52
XV.  ALTERNATIVE PLANS OF REORGANIZATION ............................................. 52
XVI.  CONFIRMATION HEARING ................................................................................. 52
XVII.  CONCLUSION .......................................................................................................... 54

## PRELIMINARY STATEMENT

**THIS DISCLOSURE STATEMENT RELATES TO THE PLAN OF LIQUIDATION OF CABRINI MEDICAL CENTER AND HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CABRINI MEDICAL CENTER ARE THE PROPONENTS OF THE PLAN. THE PLAN PROVIDES FOR THE PROPOSED METHOD OF LIQUIDATION OF THE ASSETS OF THE DEBTOR AND THE DISTRIBUTIONS CREDITORS OF THE DEBTOR WOULD RECEIVE IN THE DEBTOR'S CHAPTER 11 CASE.**

_____

**NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE DEBTOR REGARDING THE PLAN PROPONENTS' PLAN OF LIQUIDATION OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

_____

**THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ABOUT WHETHER TO ACCEPT OR REJECT THE PLAN. ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (WHICH IS ANNEXED AS EXHIBIT 1), OTHER EXHIBITS, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THOSE ACCOMPANYING OR REFERENCED IN THIS DISCLOSURE STATEMENT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE PLAN PROPONENTS FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.**

_____

**THE DEBTOR AND THE CREDITORS' COMMITTEE HAVE JOINTLY PROPOSED THE PLAN, AND URGE ALL HOLDERS OF CLAIMS IN CLASS 3-A AND CLASS 4 TO VOTE TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY 5:00 P.M. (EASTERN TIME) ON [_____, 2011].**

_____

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

––––––––––––––––

[THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN. HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMEN-DATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN.]

––––––––––––––––

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), OR ANY SIMILAR PUBLIC GOVERNMENTAL OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE INFORMATION CONTAINED HEREIN, OR THE MERITS OF THE PLAN.

––––––––––––––––

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN UPON HOLDERS OF CLAIMS AGAINST THE DEBTORS. THIS DISCLOSURE SHALL BE CONSIDERED TO BE A SETTLEMENT DOCUMENT PURSUANT TO FEDERAL RULE OF EVIDENCE 408.

––––––––––––––––

ALL CAPITALIZED TERMS AND PHRASES USED IN THIS DISCLOSURE STATEMENT AND NOT OTHERWISE DEFINED HEREIN WILL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.


I.    <u>INTRODUCTION</u>

Cabrini Medical Center ("<u>Cabrini</u>" or the "<u>Debtor</u>"), debtor and debtor in possession in Case Number 09-14398 (AJG) (the "<u>Chapter 11 Case</u>") pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), filed a plan of liquidation, dated December 21,

2010 (as may be further amended from time to time, the "Plan"), a copy of which is annexed as Exhibit 1.  The Debtor is distributing this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to provide the Debtor's creditors with adequate information so that they can make an informed judgment about whether to vote to accept or reject the Plan.  The Debtor and the Official Committee of Unsecured Creditors (the "Creditors' Committee") have jointly proposed the Plan.  Please read this Disclosure Statement and the Plan carefully and follow the instructions set forth below to vote on the Plan.

A.     Explanation of Chapter 11

Pursuant to chapter 11 of the Bankruptcy Code, a debtor may reorganize or wind up its affairs for its benefit and the benefit of its creditors.  In a chapter 11 case, the debtor typically remains in control of the estate as the "debtor in possession."  Upon filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor.  The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims against the debtor that arose prior to the commencement of the chapter 11 case.

The provisions of the Bankruptcy Code are designed to encourage the parties in interest in a chapter 11 proceeding to negotiate the terms of a plan of reorganization or liquidation so that it may be confirmed.  A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and interests in a debtor.  After the chapter 11 plan has been filed, the holders of claims against and/or interests in a debtor, whose claims or interests are impaired under the plan, may vote to accept or reject the plan.  Section 1125 of the Bankruptcy Code requires that before soliciting acceptances of the proposed plan, a debtor must prepare a disclosure statement containing adequate information of such kind, and in such detail, as to enable a hypothetical reasonable investor to make an informed judgment about the plan.  The Bankruptcy Court has determined that this Disclosure Statement meets that test.

B.     Preliminary Statement and Summary of Recoveries

On July 9, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues in the management and possession of its property as debtor in possession.  No trustee or examiner has been appointed for the Debtor.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors to represent the interests of creditors in the case.  On July 20, 2009, the United States Trustee appointed the Creditors' Committee.  The Creditors' Committee retained Alston & Bird, LLP as its counsel and CBIZ Accounting, Tax & Advisory of New York, LLC and CBIZ, Inc. as its financial advisors.

The Debtor and the Creditors' Committee have negotiated and filed the Plan. The primary objective of the Plan is to provide a mechanism for completing the liquidation of the Debtor's remaining assets, including causes of action, if any, held by,

or in favor of, the Debtor, reconciling and fixing the claims asserted against the Debtor and distributing the net liquidation proceeds in conformity with the distribution scheme provided by the Bankruptcy Code. As described below, the Debtor' real property, which represented the majority of the Debtor's assets, was sold to S.K.I. Realty, Inc. (the "Purchaser") pursuant to an Order of the Bankruptcy Court dated February 11, 2010 (as may be amended, the "Sale Order"). The sale (the "Sale") was consummated on October 14, 2010 (the "Sale Date"). Certain assets of the Debtor are excluded from the Sale, including, but not limited to, any remaining accounts receivable, furniture, fixtures and equipment ("FF&E") and causes of actions under Chapter 5 of the Bankruptcy Code.

Before the Petition Date, the Debtor had ceased operations as a healthcare provider in accordance with the Berger Commission recommendations and requirements described more fully below. Because the Plan is a plan of liquidation, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive a discharge, and will not engage in business after a Final Decree has been entered and its Chapter 11 Case is closed. All membership interests in the Debtor will be canceled and, because the Allowed Claims of general unsecured creditors will not be paid in full, no distributions will be made under the Plan on account of Membership Interests.

The table below summarizes the treatment for creditors of Cabrini under the Plan. For a complete explanation, please refer to the discussion in Article IV, Section B of this Disclosure Statement, entitled "Summary of Classification and Treatment of Claims Under the Plan" and to the Plan itself.[1]

| Class | Description | Treatment if Claim Allowed | Estimated Recovery if Claim Allowed |
|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired | 100% |
| Unclassified | Priority Tax Claims | Unimpaired | 100% |
| Class 1-A | Secured Claims | Unimpaired | 100% |
| Class 1-B | Undersecured Claims | Impaired | 18-25% |
| Class 2 | Priority Claims | Unimpaired | 100% |

---

[1]  Membership Interests are addressed in Section 6.18 of the Plan and Article IV.E.10 of this Disclosure Statement.

| Class | Description | Treatment if Claim Allowed | Estimated Recovery if Claim Allowed |
|-------|-------------|----------------------------|-------------------------------------|
| Class 3-A | General Unsecured Claims | Impaired | 18-25%[2] |
| Class 3-B | MSSH Subordinated Claim | Impaired | 40.385% of Available Settlement Cash |
| Class 4 | Litigation Claims | Impaired | Varies depending on available insurance for each year and the election of treatment by the claimant as described in Section III.M of this Disclosure Statement. |
| Class 5 | Membership Interests | Impaired | None |

The Plan is the product of negotiations between the Debtor and the Creditors' Committee, as co-proponents of the Plan. The MSSH Entities, as the largest pre-petition secured and unsecured creditors, negotiated with the Debtor and the Committee concerning major components of the Plan, particularly as it pertains to the allocation of the Sale Proceeds and distributions to secured creditors. The Debtor has approved the Plan and the transactions contemplated thereby, and recommends that all creditors whose votes are being solicited submit ballots to accept the Plan. In addition, the Creditors' Committee, as co-proponent of the Plan, urges creditors entitled to vote to accept the Plan.

C.    Who is Entitled to Vote on the Plan

Only impaired classes receiving a distribution under the Plan are entitled to vote. Holders of Undersecured Claims (Class 1-B), General Unsecured Claims (Class 3-A Claims), MSSH Subordinated Claim (Class 3-B) and Litigation Claims (Class 4 Claims) are the only Classes of creditors entitled to vote on the Plan. Holders of Membership Interests (Class 5) are not entitled to vote because no distributions will be paid under the Plan on account of those interests.

---

[2]    The Debtor currently estimates that approximately $30.4-$31.6 million could be available to satisfy Administrative Claims, Priority Tax Claims, Class 1-A Secured Claims not previously paid pursuant to Court order and Class 2 Priority Claims, which the Debtor estimates should provide Class 1-B Undersecured Claims and Class 3-A General Unsecured Claims with a recovery in the range of **18-25%**. To the extent insurance is not available to satisfy a Class 4 Litigation Claim, the Claim will be afforded the treatment of a Class 3-A General Unsecured Claim unless the holder of a timely or deemed timely filed proof of claim has elected the Stay Modification Option under the Claims Resolution Process. These estimates are based upon the Debtor's records and review of claims filed prior to the Bar Date (as defined herein). All claims have not yet been reconciled and administrative expenses will continue to be incurred until the Debtor's case is fully administered and its wind-down complete. Accordingly, the final distributions may vary from these estimates.

D.    Notice to Creditors

1.    Purpose of Disclosure Statement.  This Disclosure Statement is being transmitted to, all creditors and membership interest holders.  The purpose of this Disclosure Statement is to provide creditors with information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises creditors of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.  All creditors are encouraged to read this Disclosure Statement and its exhibits carefully and in their entirety before deciding to vote either to accept or reject the Plan.

2.    Information Contained in this Disclosure Statement.  This Disclosure Statement is the only document authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement, and no Person has been authorized by the Bankruptcy Court or the Plan Proponents to use or disclose any information concerning the Debtor other than the information contained herein.  Other than as explicitly set forth in this Disclosure Statement, you should not rely upon any information relating to the Debtor, its estate, the value of its assets, the nature or amounts of its liabilities, its creditors' Claims, or the amount or value of any distributions to be made under the Plan.  All financial information and historical information contained in this Disclosure Statement has been provided by the Debtor, and has been relied upon by the Creditors' Committee as a joint proponent of the Plan.  This Disclosure Statement is accurate to the best of the Plan Proponents' knowledge, information and belief.  The Plan Proponents have endeavored to make this Disclosure Statement as clear and comprehensive as possible to furnish creditors with adequate information.

E.    Disclosure Statement Enclosures

Accompanying this Disclosure Statement are the following enclosures:

1.    Disclosure Statement Approval Order.  A copy of the order of the Bankruptcy Court dated _____, 2011, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, and scheduling the hearing to consider, and the deadline for objecting to, confirmation of the Plan (the "Disclosure Statement Approval Order").

2.    Notice of Confirmation Hearing.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the hearing to confirm the Plan, and the deadline for filing objections to confirmation of the Plan (the "Notice of Confirmation Hearing").

3.    Ballots.  A ballot for voting to accept or reject the Plan, if you are entitled to vote, and a return envelope.

F. Summary of Voting Procedures

1. Vote Solicitation and Deadline. To be counted, your vote, must be received, pursuant to the following instructions, by the Debtor's voting agent at the following address, before 5:00 p.m. (Eastern Time) on _____, 2011 (the "Voting Deadline"): Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Secundo, California 90245.

**IF YOU HOLD A GENERAL UNSECURED CLAIM OR A LITIGATION CLAIM ENTITLED TO VOTE:**

Please complete the information requested on the applicable Ballot; sign, date and indicate your vote on the Ballot; and return the completed Ballot in the envelope provided so that it is actually received by the voting agent before the Voting Deadline.

**IF YOU ARE A HOLDER OF A GENERAL UNSECURED CLAIM OR LITIGATION CLAIM ENTITLED TO VOTE AND YOU HAVE RETURNED YOUR BALLOT, BUT FAILED TO INDICATE ON YOUR BALLOT WHETHER YOU ACCEPT OR REJECT THE PLAN, SUCH BALLOT WILL BE COUNTED AS AN ACCEPTANCE OF THE PLAN.**

2. Acceptance of the Plan. Under the Bankruptcy Code, an impaired class of claims entitled to vote has accepted the Plan, if, of those voting, the holders of two-thirds (⅔) in dollar amount, and more than one-half (½) in number, of claims accept.

3. Hearing on Confirmation of Plan. The Bankruptcy Court has scheduled a hearing to consider confirmation (*i.e.*, approval) of the Plan on _____, 2011 at 9:30 a.m. (Eastern Time), in Courtroom 523 of the United States Bankruptcy Court, One Bowling Green, New York, New York. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or by the Debtor filing a notice of adjournment.

## II. EVENTS LEADING TO THE CHAPTER 11 CASE

A. The Business and History of the Debtor

Founded in 1892 by Saint Frances Xavier Cabrini, and up until early 2008, the Debtor operated an acute care voluntary hospital on East 19th Street in Manhattan. The Debtor is sponsored by the Provincial of the Missionary Sisters of the Sacred Heart of Jesus, Stella Maris Province (or its canonical successor), a religious institute of women of the Roman Catholic Church. Originally known as Columbus Hospital, in the early 1970's Cabrini merged with the Italian Hospital and changed its name to Cabrini Medical Center. In accordance with the dictates of the "Berger Commission," more fully described below, Cabrini ceased operating as a hospital in March 2008.

Cabrini's campus, situated on the east side Gramercy Park section of Manhattan, is comprised of five buildings (known as the A, B, C, D and E Buildings) located

through the block from East 19th to East 20th Streets between Second and Third Avenues (the "Property"), forming four tax lots. Two of the buildings were used for clinical care while the remaining buildings were used primarily for hospital administration. Historically, Cabrini offered inpatient medical/surgical, psychiatric and rehabilitation services and was a state-designated AIDS center. While its emergency department, outpatient clinics and hospice facilities were well-utilized, Cabrini suffered a significant decline in inpatient treatment due to a regional over-concentration of medical/surgical beds and a lack of tertiary and quaternary services. As was true of many urban hospitals in the greater New York area, besides decreased utilization, Cabrini was beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, an increase in managed care penetration at lower rates, and a change in case mix.

Cabrini was a member of The Mount Sinai Health System, an affiliate of Mount Sinai School of Medicine and an associate member of the Catholic Health Care Network (the "Network"). Cabrini's affiliation with the Mount Sinai School of Medicine enabled Cabrini to establish and maintain a fully accredited graduate medical education program (the "GME Program"). Cabrini's GME Program was fully approved by the Accreditation Council for Graduate Medical Education. In 1980, recognizing the need for special care for individuals with advanced illness, Cabrini established a hospice program (the "Hospice") that has served as a world renowned model for home and hospital-based hospice care.

The Debtor's revenues in 2008 totaled approximately $40 million and expenses aggregated $51 million for an operating loss of approximately $11 million. In 2007, the Debtor had an operating loss of approximately $13 million on revenues of more than $143 million.

As of May 31, 2009, the net book value (cost less depreciation) of the Debtor's assets was approximately $46 million and liabilities totaled approximately $167 million.

Since the Petition Date, and in light of the cessation of hospital operations, Cabrini employs only two people on a part-time basis; a Chief Financial Officer and a Chief Operating Officer. The Board of Trustees for Cabrini consists of seven (7) members.

B.        Berger Commission Mandate and Cabrini's Response

On November 28, 2006, the New York State Commission on Health Care Facilities in the 21st Century (the "Berger Commission"), which was created to review and make recommendations to strengthen New York State's acute and long term health care delivery systems, issued its report which, among other things, recommended the orderly closure of Cabrini. The Berger Commission concluded that Cabrini constituted "excess capacity" in the system whose patients could be absorbed by surrounding area hospitals. The Berger Commission recommendations became legal mandates in New York on January 1, 2007, and were given a June 30, 2008 deadline for implementation.

Simultaneously with the Berger Commission report and mandate, on December 31, 2006, the New York State Department of Health (the "DOH") issued approval of a 58-bed inpatient psychiatry unit at Cabrini for the frail geriatric patient. The first

inpatients were admitted in January 2007. As discussed below, the unit closed in February 2008 along with all of Cabrini's remaining hospital units.

Cabrini responded to the Berger Commission mandate with a proposal and request for HEAL IV funding (the "Grant Proposal") from New York State (the "State"). Pursuant to the Grant Proposal, Cabrini proposed converting to a multipurpose ambulatory care complex, including an ambulatory surgical center ("ASC") in Cabrini's operating suite and a diagnostic and treatment center ("DTC"), with the remainder of the facility to be sold or leased to other providers of health care services, including a lease to Calvary Hospital of 60,000 square feet to establish a satellite 69 bed palliative end of life inpatient care center. The Grant Proposal also provided for the sale of the Hospice program and Buildings C, D and E and the refinancing of the mortgages for Buildings A and B. Cabrini anticipated that the combination of HEAL IV funding and the initiatives contemplated to be taken under the Grant Proposal would result in a financially viable entity that could adequately address its financial obligations while continuing to provide Catholic healthcare services to the community.

On September 28, 2007, the State awarded Cabrini $14,000,000 in HEAL IV funding (the "HEAL Grant"), approximately half of the funding requested to close inpatient units and reconfigure the facility pursuant to the Grant Proposal. As explained below, the lack of adequate funding made it difficult, if not impossible, for Cabrini to close in a proper and orderly fashion.

Due to patient volume decline in the inpatient detoxification unit, all remaining patients in this unit were discharged effective November 9, 2007.

During January and February 2008, Cabrini executed several changes related to patient care services to implement its plan to close by June 30, 2008.

In February 2008, Cabrini submitted its Certificate of Need application for the DTC and ASC with a plan to transition to an ambulatory health care center using the existing outpatient programs as a building block. By March 9, 2008 all of Cabrini's medical surgical and critical care units had closed and no inpatients remained in these units.

On March 12, 2008, contrary to the June 30, 2008 Berger Commission deadline for Cabrini's closure, the DOH ordered the immediate closure of Cabrini's emergency department, which triggered a huge workforce reduction and an abrupt cessation in revenue.

Cabrini immediately initiated discussions with potential buyers of the Hospice program including Visiting Nurse Service, Hospice of New York and St. Vincent's Catholic Medical Center ("SVCMC"). Pax Christi Hospice, Inc. ("Pax Christi"), an affiliate of SVCMC, assumed operation of the Cabrini Hospice program effective March 17, 2008 pursuant to an Asset Purchase Agreement of the same date and continued to maintain inpatient services at the Cabrini main campus for the Hospice through November 2009.

C.     <u>Events After Hospital Closure and Wind-Down of Operations</u>

While Cabrini had hoped to maintain some of its operations in the form of the DTC, ASC and Hospice, by May 2008 all of Cabrini's remaining outpatient services were closed or had ceased admissions, including: radiation therapy; hyperbaric medicine; ambulatory surgery; primary care clinics; the wound healing center; infusion/transfusion services; and outpatient mental health clinics.

On May 13, 2008, SVCMC received emergency approval from the DOH to relocate 100 medical surgical beds and 24 rehabilitation beds temporarily to Cabrini as a result of a fire at SVCMC's facilities, which required the provision of support services including facilities, security, all life safety measures, environmental services, and administration. SVCMC acute patients remained at Cabrini through August 29, 2008.

D.     <u>Remaining Operations</u>

As discussed above, from July 2007 through early 2008, substantial ongoing full time employee reductions and other cost cutting measures occurred as services at Cabrini were discontinued. As of the date the Petition Date there were approximately five tenants that leased space from the Debtor.

E.     <u>Potential SVCMC Transaction Prior to Petition Date</u>

In July 2008, Cabrini entered into negotiations with SVCMC to sell or lease all or a substantial portion of the Debtor's A and B Buildings under a "triple net" lease or sale transaction (the "<u>SVCMC Transaction</u>") with an option for SVCMC to purchase the C, D and E Buildings. The SVCMC Transaction was particularly appealing because it would continue a 100+ year history of providing Catholic healthcare services at the Debtor's locale.

Cabrini anticipated that its existing leases and other receivables, including reimbursements from Medicaid on account of certain appeals, combined with the SVCMC Transaction, would generate revenues sufficient to service and otherwise retire existing debt over a period of time and provide Cabrini with time to formulate a long term plan for the C, D and E Buildings. In sum, the SVCMC Transaction was expected to be the foundation for a new Cabrini that could continue its more than 100 year healthcare presence in the Gramercy Park community. Unfortunately, the SVCMC Transaction could not be consummated.

F.     <u>Significant Pre-Petition Secured Debt</u>

1.     <u>Sun Life Mortgage</u>

As of the Petition Date, the Property was encumbered by two cross-collateralized mortgages, dated August 8, 2008 held by the Sun Life Assurance Company of Canada ("<u>Sun Life</u>") in the aggregate original principal amount of $36 million, comprised of a mortgage in the principal amount of $21,500,000 encumbering the A and B Buildings and a mortgage in the principal amount of $14,500,000 encumbering the C, D and E Buildings (together, the "<u>Sun Life Mortgages</u>").

The Sun Life Mortgages substituted for a pre-existing Sun Life mortgage, dated July 29, 2005, which as of August 8, 2008 had a principal balance of $29,791,609.20 and outstanding interest in the amount of $148,122.90 (as of July 31, 2008). The Sun Life Mortgages included new money of $6,208,390.80. Proceeds of the Sun Life Mortgages in the amount of $6,315,219.60 were applied as a pre-payment through August 2010 (the first 24 months of debt service).

As a result of the pre-payments, as of the Petition Date, Sun Life held approximately $3,420,744 of pre-payment funds net of the July 1, 2009 principal and interest payment. The monthly principal and interest payment that Sun Life credited against the Debtor's obligations from the pre-paid funds through August 2010 was $263,134.15.

As of the Petition Date, approximately $35,146,000 in principal was owing to Sun Life under the Sun Life Mortgages.

### 2. MSSH-IL Indebtedness

Missionary Sisters of the Sacred Heart, a not-for-profit corporation organized under the laws of the State of Illinois ("MSSH-IL"), has a long history of providing financing to Cabrini dating back to before 1983. The existing loans from MSSH-IL, described below, represent, in large part, refinancing of pre-existing indebtedness.

The A, B and C Buildings are encumbered by a subordinate mortgage and security agreement, dated as of July 27, 2005 (the "MSSH-IL Mortgage"), held by MSSH-IL. The MSSH-IL Mortgage is subordinate, in whole or in part, in right of payment to the Sun Life Mortgages and the East Nineteenth Loan (as defined below). As of the Petition Date, there was due and owing on the MSSH-IL Mortgage, inclusive of accrued interest, approximately $33,033,478. The leases, rents and other interests related to the A, B and C Buildings also are subject to certain security interests held by MSSH-IL. As discussed below, the Creditors' Committee challenged the MSSH-IL Mortgage and related claims through the Challenge Litigation. The claims of MSSH-IL, including right to payment under the MSSH-IL Mortgage, have been resolved by Final Order of the Bankruptcy Court in the form of the Settlement Order annexed to the Plan as Exhibit 1.

### 3. MSSH-NY Indebtedness

Like MSSH-IL, Missionary Sisters of the Sacred Heart – New York ("MSSH-NY") has a long history of providing financing to Cabrini. The existing loans from MSSH-NY, are described below.

Also encumbering the A, B and C Buildings is a subordinate mortgage, dated July 27, 2005, which is held by MSSH-NY (the "MSSH-NY Mortgage"). Right to payment under the MSSH-NY Mortgage is *pari passu* with the MSSH-IL Mortgage and is also subordinate, in whole or in part, in right of payment to the Sun Life Mortgages and the East Nineteenth Loan. As of the Petition Date, there was due and owing on the MSSH-NY Mortgage, inclusive of accrued interest, approximately $18,739,814. The leases, rents and other interests related to the A, B and C Buildings also are subject to certain security interests held by MSSH-NY. As discussed below, the Creditors'

Committee also challenged the MSSH-NY Mortgage and related claims through the Challenge Litigation. The claims of MSSH-NY, including right to payment under the MSSH-NY Mortgage, have been resolved by Final Order of the Bankruptcy Court in the form of the Settlement Order annexed to the Plan as Exhibit 1.

       4.      SVCMC East Nineteenth Street Mortgage

In connection with the SVCMC Transaction, on July 28, 2008 Cabrini entered into a subordinate $4 million mortgage loan agreement evidenced by a promissory note of the same date, with an affiliate of St. Vincent's Catholic Medical Center, East Nineteenth Street LLC ("East Nineteenth Street") to fund its operating budget expenditures (the "East Nineteenth Loan") while the SVCMC Transaction was being negotiated and consummated.  Interest on the East Nineteenth Loan is calculated at 4% per annum and the original maturity date was October 31, 2008.

As of the Petition Date, the East Nineteenth Loan was secured by, among other things, a mortgage on each of the Buildings subordinate to the Sun Life Mortgages, the MSSH-IL Mortgage, the MSSH-NY Mortgage, and the 1199 Mortgage and Judgments (as defined below).  As of the Petition Date, the principal amount owed under the East Nineteenth Loan was $4,000,000, plus accrued interest.

       5.      Local 1199 SEIU

Based on a Confession of Judgment executed on January 28, 2008 in favor of Local 1199 of the Service Employees International Union, Cabrini is indebted to Local 1199 for contributions owed to the 1199 SEIU National Benefit Fund (the "Benefit Fund") aggregating approximately $9.6 million, of which $4,903,306.79 is principal and the balance is accrued interest and costs.  As of the Petition Date, Cabrini's obligation to Local 1199 was secured by a mortgage lien (the "1199 Mortgage") covering the A and B Buildings, dated December 4, 2006, in the principal amount of $6,531,049.54.

Local 1199 was also the beneficiary of certain recorded judgments, which judgments were part of the obligations addressed in a confession of judgment. Pursuant to a confession of judgment, $4,039,032.04 of HEAL IV funds received from New York State was assigned and subsequently paid to the Benefit Fund.  The confession of judgment further provided for the payment of $2,700,000 from the proceeds of the sale of Buildings C, D, and E.  The Confession of Judgment was recorded in June 2009.  Pursuant to a Stipulation to be entered into with Local 1199, the Confession of Judgment will be vacated because it was recorded during the 90 days before the Petition Date.

As of the Petition Date, Cabrini owed Local 1199 the remaining principal balance of approximately $100,000 and over $5,000,000 in accrued interest, which is secured by a mortgage.  The 1199 Mortgage is subordinate to the Sun Life Mortgages pursuant to a subordination agreement between Sun Life and Local 1199, dated August 8, 2008.

       6.      New York City Water Board

By agreement dated August 4, 2008 (the "Water Payment Agreement"), Cabrini and the New York City Water Board ("Water Board") settled all past due water and

sewage charges billed on or before July 16, 2008 for $3,382,370.21 (exclusive of interest and charges) to be paid $500,000 upon execution of the Water Payment Agreement and the balance in 60 equal monthly payments of $59,833.26, including interest at 9% per annum, until the debt is satisfied. Cabrini's obligations under the Water Payment Agreement are secured by a statutory lien on the Property. As of the Petition Date, approximately $2,230,000, plus interest, remained due and owing under the Water Payment Agreement.

7.    United States of America Settlement

On or about March 27, 2007, Cabrini entered into an agreement with the United States Attorney for the Southern District of New York to settle litigation (the "U.S. Litigation") relating to alleged Medicaid overbilling (the "U.S. Settlement"), pursuant to which the Debtor agreed to pay $3.4 million (the "Settlement Amount") in full and final settlement of the Government's purported claims. As security for the payment of the Settlement Amount, Cabrini granted the Government a security interest in the A and B Buildings, which was recorded on or about April 27, 2007. As of the Petition Date, approximately $2,500,000 is owing to the Government under the U.S. Settlement.

8.    Intercreditor Agreement

On July 28, 2008, MSSH-IL, MSSH-NY and East Nineteenth Street entered into an intercreditor agreement (the "Intercreditor Agreement") to address their rights with regard to their respective loans to Cabrini. Specifically, East Nineteenth Street agreed to act as servicing agent for the loans made to Cabrini by MSSH-IL and MSSH-NY, as well as the East Nineteenth Loan, to collect and remit payments to each party to the Intercreditor Agreement in accordance with the priorities thereunder, which provide for the subordination of the MSSH-IL Mortgage and the MSSH-NY Mortgage to the East Nineteenth Loan with respect to the last $4,000,000 due to MSSH-IL and MSSH-NY under their applicable mortgages.

9.    Other Judgments, Liens and Security Interests

In addition to the secured claims described above, there are a number of judgments that have been entered against the Debtor and mechanic's liens that have been recorded against the Debtor's property that have not been satisfied in full. The Debtor estimates that less than $42,500 in mechanic's liens held by (a) Terjesen Associates Architects PC and (b) Alliance & Son Construction Corp. remain outstanding as of the Petition Date. The Debtor estimates that the principal amount owed on the judgments is approximately $2 million to $2.3 million. The judgments were recorded by (a) the Estate of Jack Rodgon (James DiGiacomo), on account of a medical malpractice settlement, (b) John Reilly, the Relator in the U.S. Litigation, (c) Med-One Capital Funding LLC, and (d) the Commissioner of Labor of State of New York on account of unpaid unemployment taxes.

# III. ACTIVITIES DURING THE CHAPTER 11 CASE

A.    Filing.  On July 9, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").  The Honorable Arthur J. Gonzalez has presided over the chapter 11 case since the Petition Date.

B.    Administration of the Case.  After the Petition Date, and in accordance with sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continued to operate its business and manage its properties as debtor in possession.  As of the date of this Disclosure Statement, no trustee or examiner has been appointed in the chapter 11 case, nor has any motion for a trustee or examiner been made.

C.    Bankruptcy Court First Day Orders.  On July 9, 2009, the Bankruptcy Court entered a number of orders granting the Debtor various forms of interim relief. In particular, the Debtor obtained orders, among others:

1.    authorizing the Debtor to maintain existing bank accounts and business forms;

2.    authorizing an extension of the Debtor's time to file schedules of assets and liabilities and statement of financial affairs;

3.    authorizing the Debtor to pay pre-petition payroll and related employee benefits;  and

4.    authorizing the Debtor to continue workers' compensation programs and insurance policies and pay obligations owing thereunder.

D.    Additional Orders Entered During the First Month of Bankruptcy Case. On July 29, 2009 the Bankruptcy Court entered orders that (i) prohibited utilities from terminating service and established procedures for requests for additional adequate protection;  and (ii) authorized the employment of professionals utilized in the ordinary course of business.

E.    Appointment of Creditors' Committee.  On July 20, 2009, the United States Trustee for the Southern District of New York appointed the following creditors to the Creditors' Committee:  (i) Shore Pharmaceutical Providers, Inc, (ii) Consolidated Edison Company of New York, Inc., (iii) New York State Nurses Association, (iv) A. Kingsbury Co., Inc., and (v) Owens & Minor.

F.    Retention and Compensation of Professionals

1.    Bankruptcy and Special Counsel.  On July 29, 2009, the Bankruptcy Court entered a final order authorizing the Debtor to retain Togut, Segal & Segal LLP ("TS&S") as bankruptcy counsel to the Debtor and the law firm of Garfunkel, Wild & Travis, P.C. ("GWT") as special corporate, regulatory and litigation counsel to the Debtor.  In January 2010, GWT changed its name to Garfunkel Wild, P.C.

2.	Sales Consultants.  On July 29, 2009, the Bankruptcy Court entered a final order authorizing the Debtor to retain Grubb & Ellis New York, Inc. ("G&E") as its real estate broker.

3.	Auditors.  The Debtor retained BDO Seidman, LLP ("BDO") as its auditor, which was approved by Order of the Bankruptcy Court on October 8, 2009.

4.	Claims and Noticing Agent.  Because of the large number of creditors in the Chapter 11 Case, on July 9, 2009, the Debtor obtained Bankruptcy Court approval to have Kurtzman Carson Consultants, LLC ("KCC") appointed as the official claims agent for the Clerk of the Bankruptcy Court.  The services performed and to be performed by KCC include: (a) distribution of notices required to be sent to parties in interest, (b) receipt, maintenance, docketing and administration of the proofs of claims filed in the chapter 11 case, (c) tabulation of acceptances and rejections of the Plan, and (d) provision of other administrative services that the Debtor may require.

5.	Professionals Retained by the Creditors' Committee.  The Creditors' Committee retained Alston & Bird LLP ("A&B") as its legal advisor and CBIZ Accounting Tax & Advisory of New York, LLC and CBIZ, Inc. (together, "CBIZ") as its financial advisor.  A final Order approving the retention of A&B was entered on September 9, 2009 and a final Order approving the retention of CBIZ was entered on January 26, 2010.

G.	Post-Petition Financing

1.	The DIP Loan

In connection with financing the administration of the Chapter 11 Case, the preservation of the Debtor's assets and funding the Debtor's expenses during the marketing and sale process, the Debtor negotiated the terms of and prepared a motion (the "DIP Motion") for approval of a post-petition financing agreement (as amended, the "DIP Agreement") with MSSH-IL.

On the Petition Date, the Debtor sought authority to obtain post-petition financing and authority to use cash collateral.  On July 31, 2009, the Bankruptcy Court entered an interim order authorizing the Debtor's use of cash collateral and authority to borrow up to $2.3 million under a post-petition financing agreement with MSSH-IL (the "DIP Lender").  On November 4, 2009, the Court entered a final order (the "DIP Order") continuing the Debtor's use of cash collateral and approving the Debtor's borrowing of up to $5 million under the DIP Financing Agreement.

Pursuant to the DIP Order, and subject only to liens held by the New York City Water Board and a carve-out for professionals, the DIP Lender was granted first priority priming liens on Buildings C, D, and E, and a secured senior priority lien on Buildings A and B subject and subordinate only to the of Sun Life Mortgages.  Under the DIP Order, the Debtor also granted certain replacement liens to the following entities to protect their prepetition security rights:  The New York City Water Board, Sun Life, East Nineteenth Street, MSSH-NY and Local 1199 (collectively, the "Prepetition Secured Lenders").  The DIP Order provided, among other things, that the liens provided in the DIP Order could not be subordinated to any other lien.

As of the Petition Date, in the aggregate, approximately $105 million of liens were asserted against the Debtor's property. Under the DIP Order, the Debtor acknowledged its indebtedness to Sun Life, the DIP Lender and MSSH-NY under their respective prepetition loan documents and the Creditors' Committee was granted, until October 28, 2009, the authority to challenge the validity of such liens. The Creditors' Committee also was granted, through November 27, 2009, the right to challenge the validity of the remaining Prepetition Secured Lenders' liens. On or about October 28, 2009, the Creditors' Committee commenced an adversary proceeding and filed a complaint challenging the more than $51 million of pre-petition liens asserted by the DIP Lender and MSSH-NY. The Creditors' Committee has not filed a challenge action to any other secured claims/liens.

Pursuant to the DIP Order, unless earlier terminated, the Debtor's post-petition financing facility was to expire on February 28, 2010 and an event of default would occur if the Debtor did not obtain orders of the Court approving (a) a sale process and bidding procedures by December 10, 2009, and/or (b) a sale transaction or other disposition of the Debtor's real property by January 15, 2010.

In connection with the approval of the bidding procedures for the APA, and to secure the break-up fee authorized to paid to Cabre under the terms set forth in the APA, Cabre was granted a first super priority lien on certain of the Debtor's property, superior to liens held by all other entities other than certain statutory liens and second priority liens on certain other assets. In addition, the DIP Order was amended to extend the deadlines for the Bankruptcy Court to approve (a) a sale process and bidding procedures to January 8, 2010 and (b) a sale transaction or other disposition of the Debtor's assets to February 15, 2010.

On March 11, 2010, the Court "so-ordered" a stipulation between the Debtor and the DIP Lender, whereby the Debtor was authorized to borrow an additional $1.403 million pursuant to the DIP Agreement through May 31, 2010. The termination date under the DIP Agreement was extended to May 31, 2010. On July 7, 2010, the Court "so-ordered" a second stipulation between the Debtor and the DIP Lender, whereby the Debtor was authorized to borrow an additional $1.973 million pursuant to the DIP Agreement through September 17, 2010. The termination date under the DIP Agreement was also extended to September 17, 2010.

The DIP Order provided comfort to the Debtor, its remaining employees, lessees and other Chapter 11 service providers that sufficient funds were available to pay ongoing obligations pending the closing of the Sale. The DIP Loan was paid in full on October 22, 2010.

H.    Marketing and Sale of the Property

1.    Sale to S.K.I. Realty, Inc.

Following an extensive marketing effort coordinated by G&E, the Debtor, in consultation with the Creditors' Committee and the MSSH Entities, negotiated the terms of an asset purchase agreement (the "Cabre APA") with Cabre Partners, LLC ("Cabre"). On December 4, 2009, the Debtor filed a motion, pursuant to sections 105 and 363 of the Bankruptcy Code, seeking authorization to sell substantially all of its real

estate and related assets to Cabre for cash equal to (a) $80 million (the "Base Price"), subject to various adjustments, free and clear of all liens, claims and encumbrances, pursuant to the terms of the Cabre APA, dated December 2009, subject to higher and better offers. Pursuant to the Cabre APA, the Debtors were required to deliver vacant possession. In addition, the Cabre APA provided that if the Assets were sold to another party, Cabre would receive a $3 million break-up fee at closing. The break-up fee was secured by priming liens on the C, D and E Buildings, and liens on the A and B Buildings subordinate only to the Sun Life liens.

Limited objections to the proposed sale were filed by Sun Life, John Reilly, Philips Medical Systems, and several tenants who would be required to move upon closing (to satisfy the condition that the premises be delivered vacant).

Following modifications to the terms of a break-up fee to address issues raised by, among others, Sun Life, and agreements resolving the other objections, on December 30, 2009, the Bankruptcy Court entered an Order establishing, among other things, procedures for noticing of the sale and bidding procedures to potential purchasers. In compliance with the bidding procedures Order, the Debtor coordinated with KCC, the Debtor's claims and noticing agent, to serve notice of the sale, the auction, the sale hearing and related matters upon all known creditors and parties in interest and to all potential entities that had expressed an interest in acquiring the Debtor's assets. The Debtor also caused notice of the auction and sale hearing to be published in *The New York Times* and *Crain's Business New York*.

The Debtor received one qualified bid from S.K.I. Realty, Inc. ("S.K.I. Realty"), an affiliate of Memorial Sloan Kettering Cancer Center, for $83.1 million. On January 28, 2010, an auction was held. S.K.I. Realty was deemed the successful bidder with an all-cash bid of $83.1 million.

On February 11, 2010, the Bankruptcy Court approved the Sale and authorized the Debtor to consummate the transaction with S.K.I. Realty subject to satisfaction of closing conditions, including vacant possession.

2.  Tenant Settlements. As stated, it was a condition to closing the sale with both Cabre and S.K.I. Realty that the Debtor deliver the Buildings vacant. As of the Petition Date, the Debtor had nine tenants including SVCMC, which operated the Pax Christi hospice. SVCMC unilaterally closed the hospice and vacated the premises in November 2009. After the Debtor informed the remaining tenants that the property would likely be sold free and clear of their tenancies, four of them vacated their respective leased premises. The remaining tenants – GPDDC, Gramercy Park Medical Group, Howard W. Bruckner, M.D., P.C., and Dr. Marina Auerbach – asserted that because the Debtor was seeking to sell the property free and clear of their leasehold interests under section 363(f) without rejecting the leases under section 365, they were entitled to adequate protection as a result of being compelled to vacate. The Debtor, in consultation with Creditors' Committee and MSSH Entities, negotiated lease surrender agreements with these tenants, who agreed to waive all rights and claims against the Debtor in exchange for a settlement payment or an offset against unpaid rent. The Bankruptcy Court approved all of these settlements.

3.    _Sale of FF&E_.  Pursuant to an order of the Bankruptcy Court, the Debtor engaged Great American to market and sell its FF&E located on the Property. The sale was a tremendous success, generating gross sales of $590,088.  Following payment of the costs of sale and the amount due Great American, the Debtor netted $480,532 for the benefit of the estate.  Any FF&E not sold will become property of S.K.I. Realty under the terms of an asset purchase agreement (the "_S.K.I. APA_"), thereby avoiding the costs to the Debtor to remove same.

I.    Creditor's Committee Litigation Against the MSSH Entities

On or about October 28, 2009, the Creditors' Committee commenced an adversary proceeding (the "Challenge Litigation") by filing a complaint (the "Challenge Complaint") against MSSH-NY and the DIP Lender seeking, among other things, to (a) recharacterize the prepetition secured debt owed to MSSH-NY and the DIP Lender as capital contributions or grants, (b) equitably subordinate prepetition secured and unsecured debt owed to MSSH-NY and the DIP Lender, and (c) avoid prepetition transfers and obligations, including mortgages granted to MSSH-NY and the DIP Lender as fraudulent conveyances or preferential transfers under chapter 5 of the Bankruptcy Code.

In accordance with the Settlement Order (as defined in the Plan and attached as Exhibit 1 thereto) entered by the Bankruptcy Court on November 19, 2010, the Creditors' Committee and the MSSH Entities settled the Challenge Litigation.  As set forth in the Settlement Order, the MSSH Entities agreed to accept (a) an allowed secured claim in the amount of $6,562,500, and (b) an allowed subordinated secured claim equal to 40.385% of the Available Settlement Cash less $6,762,500.  The Class 3-A General Unsecured Creditors, as agreed by the Creditors' Committee, will receive a distribution equal to the amount of 59.615% of the Available Settlement Cash, less $650,000.  The actual amount of distributions to the Class 3-A creditors will be determined based on the claims administration/claims resolution process in the case. _See_ discussion in Section IV.B of this Disclosure Statement.

The Settlement Order is expressly incorporated into the Plan in its entirety, including the stipulation annexed as exhibit A thereto and definitions therein.

J.    Executory Contracts and Unexpired Leases

By Order of the Bankruptcy Court, dated July 29, 2009, the Debtor obtained authority to reject substantially all of its executory contracts.  The Debtor concluded that the contracts had no value because the Debtor ceased its hospital operations, and the costs to maintain the contracts until they could be sold or assigned, would be significantly greater than any potential value that might be realized.  By rejecting the contracts, the Debtor was able to avoid accruing additional administrative expenses.  Certain other contracts and unexpired leases remained in place subject to termination by their own terms and a final determination of whether such contracts would be assumed and assigned as part of the Sale to S.K.I. Realty.

Prior to the Petition Date, the MSSH Entities, as landlord, and the Debtor, as tenant, were parties to certain leases of residential real property, which residential real property the Debtor then subleased or licensed to certain individuals (the "Residen-

tial Lease Relationships"). The Debtor intends to reject any unexpired Residential Lease Relationships in accordance with section 365 of the Bankruptcy Code.

K.    Remaining Employees

As of the Petition Date, the Debtor's only employees were (a) Diane Kniejski, the Debtor's Chief Operating Officer and (b) Monica Terrano, the Debtor's Chief Financial Officer, each of who had been employed by the Debtor for many years. Ms. Kniejski and Ms. Terrano have managed the day-to-day operations of the Debtor and have assisted the Debtor in winding down its affairs.

Each of Ms. Kniejski and Ms. Terrano were parties to Pre-Petition Date employment agreements, which expired by their terms on December 31, 2009. The Debtor negotiated amended employment agreements with them for their continued services in 2010, which were approved by Order of the Bankruptcy Court dated September 1, 2010.

L.    Bar Date For Filing Pre-Petition Proofs of Claims

The Debtor filed its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs on August 24, 2009. By an Order dated September 22, 2009 (the "Bar Date Order") the Bankruptcy Court fixed November 20, 2009 as the date by which most proofs of claims for prepetition claims had to be filed against the Debtor.[3] Under the Bar Date Order and the Plan, unless otherwise ordered by the Bankruptcy Court, any person or entity that was required to file a timely proof of claim and failed to do so on or before the Bar Date will not be entitled with respect to such claim to receive any payment or distribution of property from the Debtor, its successors or assigns, and will be forever barred from asserting such claims against the Debtor's Estate.

M.    Pre-Petition Date Litigation Claims and Insurance

The Debtor was party to several malpractice and personal injury insurance policies and programs prior to January 1, 2005. Specifically, the Debtor had a "claims made" policy with Physicians' Reciprocal Insurance covering malpractice claims based on claims made between January 1, 2002 and December 31, 2004. The policy provided coverage of $1 million per occurrence and $2 million aggregate, per year inclusive of defense costs and related administrative expenses. The Debtor was self insured for arising on or after January 1, 2005.

Prior to the Petition Date, the Debtor was named as defendant or co-defendant in a number of pending court actions based upon Litigation Claims (the "Court Actions"). To date, Litigation Claims relating to 30 cases have been asserted against the Debtor and its estate. Three claims for indemnification have also been filed against the Debtor in connection with the Court Actions. Litigation Claims filed in the case aggregate approximately $103.1 million, plus unliquidated amounts.

---

[3]    Governmental units had until January 5, 2010 to file proofs of claim against the Debtor.

The Debtor filed a motion in the Chapter 11 Case to approve and implement a mediation program (the "Claims Resolution Process") to liquidate in a systematic manner certain medical malpractice personal injury Claims for which proofs of claim were timely filed against the Debtor. Under the Claims Resolution Process, all Litigation Claims were referred to mediation. A Litigation Claimant could elect under the Stay Modification Option to litigate his or her Litigation Claims in a non-bankruptcy forum provided he or she agreed to limit any recovery to available insurance. Litigation Claims that are not settled through the Claims Resolution Process may be liquidated in the District Court. On December 15, 2010, the Court entered an Order approving the Claims Resolution Process.

To date the Debtor has consented to lift the automatic stay with one claimant that agreed to limit its recovery to available insurance.

N.      Collective Bargaining Agreements

As of the Petition Date, the Debtor was not a party to any collective bargaining agreement. The Debtor's collective bargaining agreement with Local 1199, expired on April 30, 2009, and its collective bargaining agreement with New York State Nurses Association expired on January 1, 2008.

O.      Objections to Claims

More than $138 million in asserted face amount of claims were timely filed against the Debtor including Litigation Claims. It appears that many of these claims are grossly overstated or classified incorrectly. As described above, the Debtor has permitted certain holder(s) of personal injury and medical malpractice claims to proceed solely against insurance. The Debtor also has filed objections to certain claims that were erroneously filed as secured claims.

The Debtor continues to review and analyze all claims and will be filing objections to such claims where appropriate. Upon the Effective Date, the Plan Administrator will continue to review and analyze the filed claims as required and file objections to claims where appropriate.

P.      Records Retention Storage

In consultation with Special Counsel, the Debtor solicited proposals from outside records retention vendors. After reviewing the proposals with the Creditors' Committee and MSSH Entities, and further negotiations, the Debtor entered into a records storage and custody agreement on August 30,2010 with Med-Rex LLC for the transfer and custody of patient records. The Debtor believes that it has complied with applicable nonbankruptcy law in connection with its records retention program.

Q.      Medicare Isuses

The Debtor is continuing to close out Medicare audits for all open years, which include responding to questions from Medicare during the audit process, providing documentation to avoid or minimize audit adjustments, and pursuing any re-opening requests that might be required as part of the close out process. Based on the

current status of the Medicare audits, the Debtor estimates the following reimbursements/liabilities for the open years:

> 2004 – approximately $900,000 reimbursement, which is being held by Medicare to develop a program to compute cost outliers.
>
> 2005 – approximately $250,000 reimbursement; Medicare and the Debtor are investigating certain set-off issues raised by Medicare.
>
> 2006 – approximately $300,000 liability based on completed audits.
>
> 2007/2008 – audits recently commenced to determine reimbursement/liability.

R.    <u>Allocation Motion and Distributions Prior to the Effective Date</u>

As discussed above, prior to the Effective Date, substantially all of the Debtor's Assets will have been liquidated. On September 27, 2010, the Debtor filed a motion to allocate the Sale Proceeds among the five Buildings and approve distributions to secured creditors in the order of their priority in each Building. Sun Life filed a limited objection to the Allocation Motion with respect to the proposed escrowing of certain expenses and a prepayment premium totaling over $5 million (the "Prepayment Premium") and, in response, the Committee, the MSSH Entities, East Nineteenth Street and the 1199 Entities (the "Objecting Parties") all objected to the payment of the Prepayment Premium. Pursuant to the Order of the Bankruptcy Court dated November 4, 2010, Sun Life has received a payment in the amount of $34,239,989.90, consisting of principal in the amount of $33,899,989.64, and interest and expenses in the amount of $340,002.26. Additionally, Sun Life and the Debtor agreed that the $1,227,559.00 being held in escrow for real estate taxes associated with the Sun Life mortgages would be applied to the amount to be held in escrow for the "Sun Life Prepayment Premium" reducing the amount from $5,443,870.73 to $4,216,311.73 (the "**Prepayment Escrow**") and allowing an additional $1,227,559.00 to flow to junior secured creditors.

The Bankruptcy Court entered the Allocation Order (as defined in the Plan) on November 19, 2010. Pursuant to the Allocation Order, the Sale Proceeds were allocated as follows: Buildings A and B – 75.63%; Building C – 10.89%; Building D – 9.17%; and Building E – 4.31%. Payments to administrative and secured creditors were approved in the following amounts:

| | |
|---|---|
| Break-Up Fee | $3,090,246.57 |
| DIP Loan | $6,495,497.03 |
| Grubb & Ellis Broker Commission | $1,246,500.00 |
| GPDDC, L.L.C. | $2,200,000.00 |

| | |
|---|---:|
| Gramercy Park Medical Group | $100,000.00 |
| Marina Auerbach, M.D. | $21,000.00 |
| NYC Water Board | $1,873,181.50 |
| Sun Life | $34,239,989.90 |
| MSSH Entities (per settlement) | $6,562,500.00 |
| John Reilly | $115,464.90 |
| NYS Commissioner of Labor | $335,084.46 |
| 1199 SEIU | $294,457.60 |
| US DOJ | $2,655,828.00 |
| East Nineteenth Street LLC | $1,386,317.95 |

Sale Proceeds that were not distributed following closing will be distributed on the Plan's Effective Date.

In an attempt to resolve the objections to the Prepayment Premium, Sun Life and the Objecting Parties entered into settlement negotiations. The result of these negotiations is a settlement stipulation and order (the "Stipulation") that provides for Sun Life to receive allowed payment of its Prepayment Premium in the amount of $1,760,010.10, while the remaining monies placed in the Prepayment Premium Escrow will be returned to the estate and distributed accordingly. Notably, a motion requesting approval of the Stipulation has been filed and is scheduled to be heard on January 19, 2011.

S.     Avoidance Actions

The Debtor, together with the Creditors' Committee's advisors, will be conducting an analysis of potential avoidance actions that are available to the Debtor under Chapter 5 of the Bankruptcy Code or otherwise. Where appropriate, the Debtor, by the Plan Administrator, will commence actions to recover avoidable pre-petition transfers (or achieve potential Claim reductions under section 502(d) of the Bankruptcy Code). The Debtor's recoveries from these avoidance actions may increase cash available for the benefit of the Debtor's unsecured creditors.

A non-exhaustive list setting forth a schedule of persons or entities that received payments in excess of $5,000 during the 90 days prior to the Petition Date is attached as Exhibit 2. Payments made during the 90 days prior to the Petition Date may be subject to preference actions.

# IV. SUMMARY OF THE PLAN

### A. Overview of the Plan

If the Plan is confirmed by the Bankruptcy Court and consummated, holders of Claims will receive the distributions described below. Upon the Effective Date, the treatment of each class of Claims under the Plan will be binding upon the Debtor, all holders of Claims, and all Persons whether or not such Persons are to receive any payments or other distributions under the Plan and whether or not such Persons have voted to accept the Plan.

### B. Summary of Classification and Treatment of Claims Under the Plan

Claims are divided into seven Classes under the Plan, and the proposed treatment of Claims varies among Classes. Administrative Claims and Priority Tax Claims are not classified. The Plan contains (i) two Classes of unimpaired Claims, which consist of Secured Claims and Priority Claims (Classes 1-A and 2), (ii) four Classes of impaired Claims (Class 1-B Undersecured Claims, Class 3-A General Unsecured Claims, Class 3-B MSSH Subordinated Claim, and Class 4 Litigation Claims), and one Class of Membership Interests (Class 5). The meaning of "Impairment" and the consequences of having an impaired claim in connection with voting on the Plan are set forth in herein.

The following section briefly summarizes the classification and treatment of Claims under the Plan.

*Unclassified Claims*

1. **General**. Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtor are not classified for purposes of voting on, or receiving distributions under, the Plan, and the holders of such unclassified Claims are thus not entitled to vote to accept or reject the Plan. All such Claims are instead treated separately in accordance with Article IV of the Plan and the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

2. **Administrative Claims**. An Administrative Claim is defined in the Plan and means any Claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses incurred by the Debtor after the Petition Date of preserving the Estate or operating the business of the Debtor, (b) Professional Fee Claims, (c) U.S. Trustee fees, and (d) any Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court. The Debtor estimates that the amount of accrued but unpaid Administrative Claims will be approximately $246,000 (excluding Professional Fee Claims).

Subject to the Bar Date and other provisions in the Plan and except to the extent the Debtor, or the Plan Administrator, as applicable, and the holder of an Allowed Administrative Claim agree to different and less favorable treatment, the Plan Administrator shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Administrative Claim, Cash, in an amount equal to such Allowed

Administrative Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that is 30 calendar days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable. Allowed Administrative Claims (other than Professional Fee Claims) shall be paid (i) first, from the funds in the Administrative Claims Fund, and (ii) second, from Available Cash.

3.    Administrative Bar Date

(a)    General Provisions. Except as provided below for (1) Professionals requesting compensation or reimbursement for Professional Fee Claims, and (2) U.S. Trustee Fees, requests for payment of Administrative Claims, must be Filed no later than 30 days after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. **Holders of Administrative Claims who are required to file a request for payment of such Claims and who do not file such requests by the applicable Bar Date, shall be forever barred from asserting such Claims against the Debtor, the Plan Administrator or their respective property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Claim.**

(b)    Professionals. All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other entity for making a substantial contribution in the Chapter 11 Case) shall file an application for final allowance of compensation and reimbursement of expenses no later than 45 days after the Effective Date. Objections to applications of Professionals or other entities for compensation or reimbursement of expenses must be filed no later than 60days after the Effective Date. All compensation and reimbursement of expenses allowed by the Bankruptcy Court shall be paid to the applicable Professional or other entities requesting compensation or reimbursement of Professional Fee Claims by the Plan Administrator immediately thereafter. Each Professional or other Person that intends to seek payment for compensation or reimbursement of expenses from the Debtor shall provide the Debtor with a statement, by no later than the Confirmation Date, of the amount of estimated unpaid fees and expenses accrued by such Professional up to the date of such statement, the amount of fees and expenses that each such Professional expects to incur from such date through the Effective Date, and the amount of fees and expenses that each such professional expects to incur from such date in connection with the preparation and prosecution of each such professional's final fee application. The Debtor estimates that the amount of accrued but unpaid Professional Fee Claims as of December 1, 2010 is approximately $600,000.

(c)    U.S. Trustee Fees. The Debtor or the Plan Administrator, as the case may be, shall pay all U.S. Trustee Fees, in accordance with the terms of the Plan, until such time as the Bankruptcy Court enters a final decree closing the Debtor's Chapter 11 Case.

(d)    Priority Tax Claims. Priority Tax Claims are claims of a kind specified in section 507(a)(8) of the Bankruptcy Code. Except to the extent the Debtor, or the Plan Administrator, as applicable, and the holder of an Allowed Priority Tax

Claim agree to a different treatment, the Plan Administrator, at its sole option, shall pay, in full satisfaction and release of such Claim, to each holder of a Priority Tax Claim, (a) Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that is 30 calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. The Debtor estimates that the amount of accrued but unpaid Priority Tax Claims is approximately $2.2 million.

*Classified Claims*

1.    <u>Class 1-A: Secured Claims</u>. Secured Claims consist of any Claim secured by a Lien on any Asset of the Debtor, or right of setoff, which Lien or right of setoff, as the case may be, is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value, pursuant to section 506(a) of the Bankruptcy Code, of any interest of the holder of the Claim in property of the Estate securing such Claim. Holders of Allowed Claims in Class 1-A are not Impaired under the Plan. Each holder of an Allowed Secured Claim is conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

Provided that the holder of a Class 1-A Claim was not paid upon closing with the Purchaser of the Debtor's Assets as provided in the Allocation Order, on the later of (i) the Effective Date and (ii) for Claims in Class 1-A that were Disputed Claims on the Effective Date and have thereafter become Allowed Secured Claims, the Distribution Date immediately following the date upon which such Claims became Allowed Secured Claims, or as soon thereafter as is practicable, holders of each such Allowed Secured Claim shall receive (i) Cash in an amount not to exceed the amount of such Allowed Secured Claim, or (ii) such other treatment as may be agreed upon by the Plan Administrator and the holder of an Allowed Secured Claim, or as may otherwise be provided in the Bankruptcy Code provided that the holder of such Allowed Secured Claim will not receive more than the value of the Collateral securing such Claim.

To the extent that the value of the Collateral securing each Allowed Secured Claim is less than the amount of such Allowed Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under the Plan as a Class 1-B Undersecured Claim.

The Debtor estimates the total amount of Allowed Claims in Class 1-A to be approximately $38,418,400 to $43,837,900.

2.    <u>Class 1-B: Undersecured Claims</u>. Undersecured Claims are Claims where the Claim is Secured and either (a) the value of the Collateral securing the Claim is less than the Allowed Amount of the Claim, or (b) based upon the Allocation Order, there are no Sale Proceeds available for payment of the Claim. Class 1-B Claims shall receive distributions as authorized by the Allocation Order, and the balance, which has been reclassified by the Allocation Order, shall be included in Class 3-A for distribution purposes. The Debtor estimates the total amount of Allowed Claims in Class 1-B to be approximately $59,232,074, of which $30,192,790.65 represents the MSSH Mortgage Lien

Value (as defined in the Settlement Order) to be paid under the Allocation Order. The balance of approximately $29,039,313 shall receive distributions in Class 3-A.

        3.    <u>Class 2:  Priority Claims</u>. Priority Claims consist of any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim, or (b) a Priority Tax Claim. Holders of Allowed Claims in Class 2 are not Impaired under the Plan. Each holder of an Allowed Priority Claim is conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

        Each holder of an Allowed Priority Claim shall receive Cash in an amount equal to the amount of such Allowed Priority Claim first from the Administrative Claims Fund to the extent funds remain after payment of Allowed Administrative Claims and second from Available Cash on the later of (i) the Effective Date, or (ii) for Claims in Class 2 that were Disputed Claims and have become Allowed Priority Claims, the Distribution Date immediately following the date upon which such Claims became Allowed Priority Claims, or as soon thereafter as is practicable.

        The Debtor estimates the total amount of Allowed Claims in Class 2 to be approximately $1.2 million.

        4.    <u>Class 3-A:  General Unsecured Claims</u>. General Unsecured Claims consist of any Claim that is not an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, a Secured Claim, a Priority Claim, a MSSH Subordinated Claim, or a Litigation Claim. Holders of Claims in Class 3-A are Impaired. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan. On the Effective Date, or as soon thereafter as reasonably practicable, but in no event earlier than the Administrative Claims Bar Date established in the Confirmation Order, each holder of an Allowed General Unsecured Claim shall receive, on account of its Allowed General Unsecured Claim, its Ratable Share of the portion of Available Settlement Cash to be distributed to General Unsecured Creditors in accordance with the terms of the Settlement Order. Ratable Shares of Available Cash in respect of Disputed General Unsecured Claims shall be held in the Disputed Claims Reserve Account pursuant to the Plan until such time as the disputes have been resolved.

        Notwithstanding any other provision of the Plan, holders of Allowed General Unsecured Claims shall not be entitled to receive any payment of Cash on account of Allowed General Unsecured Claims until the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Claims have received payment in full on account of such Allowed Claims or such Allowed Claims have been reserved for in accordance with the Plan, and any Disputed Claims have been reserved for in accordance with the Plan.

        The Debtor estimates the total amount of Allowed Claims in Class 3-A to be approximately $60 million to $80 million

        5.    <u>Class 3-B:  MSSH Subordinated Claim</u>. The MSSH Subordinated Claim is defined in the Settlement Order, but generally consists of the reduced and subordinated secured claim of the MSSH Entities which the MSSH Entities agreed to

accept as part of the Settlement Order. The MSSH Subordinated Claim is the only claim in Class 3-B and it is Impaired. As such, MSSH -IL, as beneficial holder of the MSSH Subordinated Claim, is entitled to vote to accept or reject the Plan. On the Effective Date, or as soon thereafter as reasonably practicable, but in no event earlier than the Administrative Claims Bar Date established in the Confirmation Order, MSSH-IL shall receive payment of the MSSH Subordinated Claim (as defined in the Settlement Order) in an amount equal to its portion of Available Settlement Cash in accordance with the terms of the Settlement Order.

Notwithstanding any other provision of this Plan, MSSH-IL shall not be entitled to receive any payment of Cash on account of the MSSH Subordinated Claim until the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Claims have received payment in full on account of such Allowed Claims or such Allowed Claims or Disputed Claims within such categories (but not including Class 3-A or 4) have been reserved for in accordance with this Plan.

6.  <u>Class 4: Litigation Claims</u>. Litigation Claims consist of pre-petition Claims relating to hospital or medical malpractice or personal injury and wrongful death claims.

(a)  <u>Class 4 Treatment</u>

(i)  If a Litigation Claimant elected the Stay Modification Option in the Claims Resolution Process, then that Litigation Claimant shall not receive a Distribution from the Debtor and shall only be entitled to recovery from available insurance proceeds. If the holder of a Class 4 Litigation Claim elects the Stay Modification Option, the election will be binding on the holder regardless of whether Class 4 accepts the Plan, provided that the Plan is confirmed and the Effective Date occurs.

(ii)  If a Litigation Claimant did not elect the Stay Modification Option, then if the amount of a timely filed Litigation Claim was fixed through the Claims Resolution Process, the Litigation Claim shall be reclassified as a Class 3-A General Unsecured Claim and receive the same treatment as other holders of Class 3-A General Unsecured Claims.

(iii)  If a Litigation Claimant did not elect the Stay Modification Option and did not settle the Claim in the Claims Resolution Process, then the Claim may, at the Debtor's option, be estimated in the District Court. If the Claim is estimated in an amount greater than zero ($0.00), it shall be included in Class 3-A for Distribution purposes.

Nothing in the Plan shall alter, modify, limit or impair the provisions of any "So Ordered" stipulations and orders lifting the automatic stay, resolving Litigation Claims and limiting recoveries to available insurance, which will remain in full force and effect and control the disposition of the Litigation Claims subject to those stipulations.

(b)  <u>Class 4 Impairment</u>. Holders of Litigation Claims in Class 4 are Impaired under the Plan and entitled to vote.

7. <u>Class 5: Membership Interests</u>. All membership interest in the Debtor will be canceled as of the Effective Date. Holders of interests will not receive any distributions under the Plan. These holders are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, and are not entitled to vote.

C. <u>Implementation of Plan</u>. The Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in the Plan and in the Confirmation Order.

1. <u>Funding for the Plan</u>. The Plan will be funded from the proceeds received from the sale of the Debtor's Assets.

2. <u>Vesting of Assets in the Debtor</u>. As of the Effective Date, pursuant to the provisions of section 1141(b) and (c) of the Bankruptcy Code, all Assets shall vest in the Debtor free and clear of all Claims, liens, encumbrances, charges, Membership Interests and other interests, except as otherwise expressly provided in the Plan or the Confirmation Order, and subject to the terms and conditions of the Plan and the Confirmation Order.

3. <u>Continuing Existence</u>. From and after the Effective Date, the Debtor shall continue in existence for the purposes of (i) winding up its affairs as expeditiously as reasonably possible, (ii) liquidating any remaining Assets as expeditiously as reasonably possible, (iii) enforcing and prosecuting claims, interests, rights and privileges of the Debtor, including, without limitation, the prosecution of Causes of Action, (iv) resolving Disputed Claims, (v) administering the Plan, (vi) filing appropriate tax returns and (vii) performing all such other acts and conditioning required by and consistent with consummation of the terms of the Plan.

4. <u>Closing of the Chapter 11 Case</u>. When all Disputed Claims filed against the Debtor have become Allowed Claims or have been disallowed, and all Assets have been liquidated and converted into Cash (other than those Assets abandoned), and such Cash has been distributed in accordance with the Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5. <u>Corporate Action</u>. The Plan will be administered by the Plan Administrator and all actions taken under the Plan in the name of the Debtor shall be taken through the Plan Administrator. Upon the distribution of all Assets pursuant to the Plan and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith, *provided, however*, that the Debtor may, but will not be required to, take appropriate action to dissolve under applicable law.

6. <u>Winding Down Affairs</u>. Following the Effective Date, the Debtor shall not engage in any business or take any actions, except those necessary to consummate the Plan and wind down its affairs. On and after the Effective Date, the Plan Administrator may, in the name of the Debtor and in consultation with the

Creditors' Committee, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions imposed by the Plan or the Confirmation Order.

   7. <u>Powers and Duties of the Plan Administrator</u>.  The Plan Administrator will act for the Debtor in a fiduciary capacity as applicable to a board of directors or trustees, subject to the provisions of the Plan.  The powers and duties of the Plan Administrator shall include, without the necessity of a further order of the Bankruptcy Court:

   (a) investing Cash in accordance with section 345 of the Bankruptcy Code, and withdrawing and making Distributions of Cash to holders of Allowed Claims and paying taxes and other obligations owed by the Debtor or incurred by the Plan Administrator, from the Expense Reserve, the Administrative Claims Fund, and Available Cash in accordance with the Plan;

   (b) subject to the approval of the Creditors' Committee (which shall not be unreasonably withheld), engaging attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities;

   (c) executing and delivering all documents, and taking all actions, necessary to consummate the Plan and wind up the Debtor's business;

   (d) coordinating the turnover of property, if any, subject to rejected executory contracts or abandonment or liquidation of any retained assets;

   (e) coordinating the collection of outstanding accounts receivable;

   (f) coordinating the storage and maintenance of the Debtor's books and records to the extent not transferred pursuant to the Sale;

   (g) overseeing compliance with the Debtor's accounting, finance and reporting obligations;

   (h) preparing monthly operating reports and financial statements and United States Trustee quarterly reports;

   (i) overseeing the filing of final tax returns, audits, and other corporate dissolution documents if required;

   (j) performing any additional corporate actions as necessary to carry out the wind up and liquidation of the Debtor;

   (k) regularly communicating with and responding to inquiries from the Creditors' Committee;

(l)     providing to the Creditors' Committee with regular cash budgets, information on all disbursements on a weekly basis, if requested by the Creditors' Committee, and copies of bank statement on a monthly basis;

(m)     subject to the approval of the Creditors' Committee (which shall not be unreasonably withheld), paying the fees and expenses of the attorneys, consultants, agents, employees and professional persons engaged by the Debtor, the Plan Administrator and the Creditors' Committee and to pay all other expenses for winding up the affairs of the Debtor in accordance with a wind up budget, or as otherwise agreed to by the Plan Administrator, and in the event of a dispute that cannot be resolved, the parties shall seek to resolve such dispute in the Bankruptcy Court;

(n)     subject to the approval of the Creditors' Committee (which shall not be unreasonably withheld), disposing of, and delivering title to others of, or otherwise realizing the value of all the remaining Assets;

(o)     subject to the approval of the Creditors' Committee (which shall not be unreasonably withheld), objecting to, compromising and settling Claims;

(p)     acting on behalf of the Debtor in all adversary proceedings and contested matters (including, without limitation, any Causes of Action), then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere, and, subject to the approval of the Creditors' Committee (which shall not be unreasonably withheld), to settle, retain, enforce, dispute or adjust any claim and otherwise pursue actions involving Assets of the Debtor that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise waived or relinquished in the Plan;

(q)     implementing and/or enforcing all provisions of the Plan; and

(r)     such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Bankruptcy Court Order or as may be needed or appropriate to carry out the provisions of the Plan.

8.     <u>Appointment of the Plan Administrator</u>.  The Confirmation Order shall provide for the appointment of Monica Terrano, the Debtor's current Chief Financial Officer, as the Plan Administrator.  The compensation for the Plan Administrator shall be $125 per hour.  The Plan Administrator shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code.

D.     <u>Distributions to Holders of Claims</u>

1.     <u>Estimation of Claims</u>.  The Plan Administrator may, at any time, request that the Bankruptcy Court (or the District Court with respect to Litigation Claims) estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject to estimation under section 502(c) of the Bankruptcy Code and for

which the Debtor may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court (or the District Court with respect to Litigation Claims) will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim. If the Bankruptcy Court (or the District Court with respect to Litigation Claims) estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court (or the District Court with respect to Litigation Claims). The foregoing objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated by the Bankruptcy Court (or the District Court with respect to Litigation Claims) and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court, or the District Court, as applicable.

2.      No Recourse.  Notwithstanding that the allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtor, the Estate, the Plan Administrator, the Creditors' Committee or any of their respective professionals, consultants, officers, directors or members or their successors or assigns, or any of their respective property.  Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS IF THE ESTIMATION IS MADE SOLELY FOR THE PURPOSE OF ESTIMATING A MAXIMUM LIABILITY FOR RESERVE PURPOSES, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

3.      Resolution of Disputed Claims.  No Distribution or payment shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.  No Distribution or payment shall be made to any holder of an Allowed Claim who is also a potential defendant in an avoidance action under chapter 5 of the Bankruptcy Code until a decision is made by the Plan Administrator not to commence the potential avoidance action, or, if the potential avoidance action is commenced by the Plan Administrator, until resolution of such avoidance action.  Notwithstanding this paragraph, the Distribution to a potential defendant or the lack of any objection filed to such Allowed Claim on the basis of such potential avoidance action, shall not constitute a waiver of any rights of the Debtor or the Plan Administrator, as the case may be.  For purposes of the Plan, such Distribution or payment on account of such Allowed Claim shall be held in the Disputed Claims Reserve Account as if it were a Disputed Claim.

4.      Objections to Claims.  Unless otherwise ordered by the Bankruptcy Court, on and after the Effective Date, the Plan Administrator shall have the exclusive right to make, file and prosecute objections to and settle, compromise or otherwise

resolve Disputed Claims, except that as to applications for allowances of Professional Fee Claims, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest.  Subject to further extension by the Bankruptcy Court, the Plan Administrator shall file and serve a copy of each objection upon the holder of the Claim to which an objection is made on or before the latest to occur of:  (i) 120 days after the Effective Date, (ii) 30 days after a request for payment or proof of claim is timely Filed and properly served upon the Plan Administrator, and (iii) such other date as may be fixed by the Bankruptcy Court either before or after the expiration of such time periods.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if made (A) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004;  (B) by first-class mail, postage prepaid, on the signatory of the proof of claim or other representative identified in the proof of claim or any attachment thereto at the address of the creditor set forth therein;  or (C) by first-class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Case.  From and after the Effective Date, the Plan Administrator, in consultation with, and subject to the approval of, the Creditors' Committee, may settle or compromise any Disputed Claim or avoidance action under chapter 5 of the Bankruptcy Code pursuant to the terms of the Plan without further order of the Bankruptcy Court.

5.      Distributions when a Disputed Claim Becomes an Allowed Claim. On the next Distribution Date following the time upon which a Disputed Claim is ultimately Allowed, holders of such Claims shall receive from the applicable Disputed Claims Reserve Account any amounts held in such Disputed Claims Reserve Account attributable to the Allowed amount of such Claim, as set forth in the Plan.  Any Cash Distributions held in the applicable Disputed Claims Reserve Account for the benefit of a holder of a Disputed Claim, which is subsequently disallowed, in whole or in part, shall be distributed on the next Distribution Date, on a Ratable basis to holders of Allowed Class 3-A and Class 3-B Claims in accordance with the Settlement Order and to any applicable Disputed Claims Reserve Account on account of any Disputed Claims as if such amounts had been distributed on the Effective Date.

6.      Resolution of Disputed Litigation Claims.  All holders of timely filed (or deemed timely filed) Litigation Claims that have not been disallowed, expunged or waived against the Debtor and that have not been fixed in the Claims Resolution Process shall be deemed Allowed Litigation Claims for voting purposes only and shall be entitled to one vote in the amount of $1.00 on account of such Litigation Claim.  For all other purposes under the Plan, all Litigation Claims not previously Allowed shall be considered to be Disputed Claims as of the Effective Date such that no objection to a Litigation Claim must be filed.  The Plan Administrator shall have the exclusive right to make, file, and prosecute objections to Litigation Claims. Notwithstanding the Claims Resolution Process, the Bankruptcy Court shall have the jurisdiction to hear and rule on objections to Litigation Claims based on (i) timeliness of the proof of claim, (ii) failure to prosecute, (iii) failure to mediate in accordance with the Claims Resolution Process, (iv) whether a proof of claim set forth sufficient facts necessary to be *prima facie* valid, or (v) other non-merit based objections.

7.      Distributions on Account of Allowed Class 3-A and Class 3-B Claims.  To the extent funds are available, on each Distribution Date, the Plan Administrator shall make Distributions of Available Cash to holders of Allowed

Class 3-A and Class 3-B Claims in accordance with the Plan. Any Distributions made to holders of Allowed Class 3-A Claims shall be made on a Ratable basis.

8. <u>Distributions on Account of Allowed Class 4 Claims</u>. Distributions to holders of Litigation Claims shall be made from (a) available insurance proceeds if the Litigation Claimant elected the Stay Modification Option, or (b) from the GUC Portion of Available Settlement Cash on a Ratable basis with other Class 3-A Claims.

9. <u>Disputed Claims Reserve Account</u>

(a) <u>Establishment of Disputed Claims Reserve Account</u>. On the Effective Date, and in conjunction with making all Distributions required to be made on the Effective Date, the Debtor shall establish and fund the Disputed Claims Reserve Accounts, which shall be administered by the Plan Administrator.

(b) <u>Duties in Connection with Disputed Claims</u>. The Plan Administrator, in consultation with the Creditors' Committee, shall (i) hold in reserve, for the benefit of Disputed Claims, Cash in an amount required by Order of the Bankruptcy Court or the District Court, if applicable, (including any Order estimating the maximum liability of a Disputed Claim) or, in the absence of such Order, Cash equal to the distributions that would have been made to the holder of such Disputed Claim, if it were an Allowed Claim in a liquidated amount, if any, on the Effective Date, or as otherwise estimated by the Plan Administrator after consultation with the Creditors' Committee, (ii) object to, settle or otherwise resolve Disputed Claims, (iii) make Distributions to holders of Disputed Claims that subsequently become Allowed Claims in accordance with the Plan, and (iv) distribute any remaining assets of the Disputed Claims Reserve Accounts, after resolving all Disputed Claims, to holders of Allowed Class 3-A and Class 3-B Claims in accordance with the Plan.

(c) <u>Transfer of Distributions to Disputed Claim Reserve Accounts</u>. On and after the Effective Date, any Distributions that would otherwise be made to the holders of Disputed Claims shall be transferred to the applicable Disputed Claims Reserve Account. Payments shall be made from the applicable Disputed Claims Reserve Account to the holder of an Allowed Claim, which was previously a Disputed Claim, upon the first Distribution Date immediately following the date upon which such Claim became an Allowed Claim.

E. <u>Miscellaneous Distribution Provisions</u>

1. <u>Method of Cash Distributions</u>. All Distributions of Cash shall be made by the Plan Administrator or a duly-appointed disbursing agent to the holders of Allowed Claims entitled to receive Cash under the Plan. Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator; *provided, however*, that cash payments made to foreign creditors, if any, holding Allowed Claims may be (but are not required to be) paid, at the option of the Plan Administrator in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

2.      <u>Distributions on Non-Business Days</u>.  Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

3.      <u>Accrual of Postpetition Interest</u>.  Unless otherwise provided for in the Plan or the Bankruptcy Code, no holder of a pre-petition Allowed Claim shall be entitled to the accrual of post-petition interest on account of such Claim.

4.      <u>No Distribution in Excess of Allowed Amount of Claim</u>.  Notwithstanding anything to the contrary herein or in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

5.      <u>De Minimis Distributions</u>.  Notwithstanding anything to the contrary contained herein or in the Plan, if the amount of Cash to be distributed to the holder of an Allowed Claim is less than $25, the Plan Administrator may hold the Cash Distributions to be made to such holder until the aggregate amount of Cash to be distributed to such holder is in an amount equal to or greater than $25, if the Plan Administrator determines that the cost to distribute such Cash is unreasonable in relation to the amount of Cash to be distributed.  Notwithstanding the preceding sentence, if the amount of Cash Distribution to such holder never aggregates to more than $25, then on the final Distribution Date, the Plan Administrator shall distribute such Cash to the holder entitled thereto.

6.      <u>Allocation of Payments</u>.  Amounts paid to holders of Allowed Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess allocated to interest that has accrued on such Claims but remains unpaid.

7.      <u>Setoffs</u>.  The Plan Administrator is authorized, pursuant to and to the extent permitted by applicable law, to set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Plan Administrator may hold against the holder of such Allowed Claim; *provided that* the Plan Administrator gives the holder of such Allowed Claim notice of the proposed setoff and the holder of such Allowed Claim does not object to the proposed setoff within 30 days.  If an objection is timely raised to a proposed setoff, the Plan Administrator may seek relief from the Bankruptcy Court to effectuate the setoff.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Plan Administrator of any such claims, rights and Causes of Action that the Debtor may have against such holder.

8.      <u>Unclaimed Property</u>

(a)      Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be made at the Distribution Address unless the Debtor and/or the Plan Administrator, as the case may be, have been notified in writing of a change of address.  If any Distribution to any holder of an Allowed Claim is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Plan Administrator is notified of such holder's then current address, at

which time all eligible missed Distributions shall be made to such holder, without interest. All demands for undeliverable Distributions shall be made on or before 120 days after the date such undeliverable Distribution was initially made. Thereafter, the amount represented by such undeliverable Distribution shall irrevocably revert to the Debtor and be treated as Available Cash. Any Claim in respect of such undeliverable Distribution shall be discharged and forever barred from assertion against the Debtor and its property or the Plan Administrator.

(b)     Checks issued by the Plan Administrator in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be in writing and be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued and such request must be accompanied by delivery of the original check. Any such written claim in respect of such a voided check must be received by the Plan Administrator on or before one hundred twenty (120) days after the expiration of the sixty (60) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtor and be treated as Available Cash. Any Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtor and its property or the Plan Administrator.

9.     <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or transfer of any lease or sublease, the delivery, making, filing, or recording of any deed or other instrument of transfer, or the issuance, transfer, or exchange of any security, under the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan or the Sale Order, shall not be subject to any stamp, real estate transfer, mortgage, recording or other similar tax.

10.     <u>Cancellation of Membership Interests</u>. As of the Effective Date, by virtue of the Plan and in all events without any action on the part of the holders thereof, to the extent not previously cancelled, all Membership Interests issued and outstanding shall be cancelled and retired and no consideration will be paid or delivered with respect thereto.

11.     <u>Cancellation of Unsecured Notes and Agreements</u>

(a)     On the Effective Date, except as otherwise provided for in the Plan, any note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor (the "<u>Instruments</u>") will be deemed cancelled and of no further force or effect without any further action on the part of the Bankruptcy Court, or any Person including, but not limited to, governmental agencies. The holders of such cancelled Instruments will have no claims against the Debtor for payment of such Instruments, except for the rights provided pursuant to the Plan.

(b)     Following the Effective Date, holders of any Instrument of the Debtor will receive from the Plan Administrator, specific instructions regarding the time and manner in which such Instruments are to be surrendered, if requested by the Plan Administrator. Any Instrument that is lost, stolen, mutilated or destroyed, shall be

deemed surrendered when the holder of a Claim based thereon delivers to the applicable agent or the Plan Administrator (i) evidence satisfactory to the agent or the Plan Administrator of the loss, theft, mutilation or destruction of such instrument or certificate, and (ii) such security or indemnity as may be required by the agent or the Plan Administrator to hold each of them harmless with respect thereto.

12. <u>Record Date for Distributions to Holders of Claims</u>. As of the close of business on the Confirmation Date, there shall be no further changes in the record holders of the Claims for purposes of the Distribution of Available Cash. The Debtor and the Plan Administrator shall have no obligation to recognize any transfer of Claims occurring after the Confirmation Date.

13. <u>Disputed Payments</u>. If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Plan Administrator may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account to be held in trust for the benefit of such holder and such Distribution shall not constitute property of the Debtor and its Estate. Such Distribution shall be held in escrow until the disposition thereof shall be determined by order of the Bankruptcy Court or other court of competent jurisdiction or by written agreement signed by all of the interested parties to such dispute.

14. <u>Withholding Taxes</u>. The Plan Administrator shall not be required to withhold taxes or comply with any applicable reporting requirements. The recipients of Distributions will be required to comply with all applicable laws and regulations concerning the reporting and taxing of the Distributions. If requested by the recipient of a Distribution, the Plan Administrator will issue an IRS Form 1099.

15. <u>Resignation of Trustees and Officers</u>. Upon the Effective Date of the Plan, the Debtor's Board of Trustees and officers shall be deemed to have resigned.

16. <u>Resignation, Death or Removal of Plan Administrator</u>. The Plan Administrator may resign at any time upon not less than thirty (30) days' written notice to the Creditors' Committee. The Plan Administrator may be removed at any time by the Creditors' Committee for cause upon application to the Bankruptcy Court on five (5) days' written notice to the United States Trustee and the Plan Administrator and his counsel. If the Plan Administrator resigns, is removed, dies or is incapacitated, the Creditors' Committee shall designate another Person to become the Plan Administrator and thereupon the successor Plan Administrator, without further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. No successor Plan Administrator hereunder shall have any liability or responsibility for the acts or omissions of his or her predecessors.

17. <u>No Agency Relationship</u>. The Plan Administrator shall not be deemed to be the agent for any of the holders of Claims in connection with the funds held or distributed pursuant to the Plan. The Plan Administrator shall not be liable for any mistake of fact or law or error of judgment or any act or omission of any kind unless arising from gross negligence, willful misconduct or breach of fiduciary duty. The Plan Administrator shall be indemnified and held harmless, including the cost of defending such claims and attorneys' fees in seeking indemnification, by the Estate against any and all claims arising out of his or her duties under the Plan, except to the

extent his or her actions constitute gross negligence, willful misconduct or breach of fiduciary duty. The Plan Administrator may conclusively rely, and shall be fully protected personally in acting upon any statement, instrument, opinion, report, notice, request, consent, order, or other instrument or document which he or she believes to be genuine and to have been signed or presented by the proper party or parties. The Plan Administrator may rely upon information previously generated by the Debtor and such additional information provided to him or her by former employees of the Debtor.

18. <u>Plan Administrator's Bond</u>. The Plan Administrator shall, in his or her own discretion or upon request of the Creditor's Committee, obtain and maintain a bond in an amount equal to one hundred ten percent (110%) of Available Cash.

## V.    EFFECT OF THE PLAN ON CLAIMS, INTERESTS AND CAUSES OF ACTION

A. <u>Jurisdiction of Bankruptcy Court.</u> Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor and its Estate. Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Article XI of the Plan and as specified in the Confirmation Order.

B. <u>Binding Effect</u>. Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtor who held such Claim at any time during the Chapter 11 Case and its successors and assigns, whether or not the Claim of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

C. <u>Term of Injunctions or Stays</u>. Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

D. <u>Retention of Rights and Causes of Action</u>. All present or future rights, claims or Causes of Action against any Person that existed and have not been released on or prior to the Effective Date are preserved for the Debtor and its Estate. On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, the Debtor shall have possession and control of, and shall retain and have the right to enforce and pursue, any and all present or future rights, claims or Causes of Action, against any Person and with respect to any rights of the Debtor that arose before or after the Petition Date. The Debtor and its Estate have, retain, reserve, and shall be entitled to assert and pursue all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses, and all legal and equitable rights of the Debtor not expressly released under the Plan may be asserted after the Confirmation Date. The Plan Administrator may abandon, settle or release any or all such claims, rights or Causes of Action, as it deems appropriate subject to the approval of the Creditors' Committee (which shall not be unreasonably withheld), without further Order of the Bankruptcy Court. In pursuing any claim, right or Cause of Action, the Plan Administrator, as the representative of the Estate, shall be entitled to the extensions provided under section 108 of the Bankruptcy Code. Except as otherwise provided in the Plan, all Causes of Action shall survive

confirmation and the commencement or prosecution of Causes of Action shall not be barred or limited by any estoppel, whether judicial, equitable or otherwise.

In reviewing this Disclosure Statement and the Plan, and in determining whether to vote for or against the Plan, creditors (including parties who received payments or transfers from the Debtor within 90 days prior to the Petition Date and insiders who received payments or transfers from the Debtor within one year before the Petition Date) and other parties should consider that Causes of Action may exist against them, that, except as otherwise set forth in the Plan, the Plan preserves all Causes of Action, and that the Plan authorizes the Plan Administrator to prosecute same. If the Plan Administrator does not prosecute a Cause of Action, the Creditors' Committee shall be authorized, upon consent of the Plan Administrator, to prosecute such Cause of Action on behalf of the Debtor. If the Plan Administrator does not consent to the Creditors' Committee prosecuting a Cause of Action, the Creditors' Committee may seek authority from the Bankruptcy Court to prosecute such Cause of Action.

E.     Injunction

1.     Satisfaction of Claims.  The treatment to be provided for Allowed Claims shall be in full satisfaction, settlement and release of those Claims.

2.     Scope of Injunction.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold a Claim are permanently enjoined from taking any of the following actions against the Debtor, the Plan Administrator, the Creditors' Committee, the MSSH Entities, or any present and former directors, officers, trustees, agents, attorneys, advisors, members or employees of the Debtor, the Creditors' Committee, the MSSH Entities, or the Plan Administrator, or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim:  (1) commencing or continuing in any manner any action or other proceeding with respect to a Claim against the Debtor or based upon a theory which arises out of such holder's Claim against the Debtor;  (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to a Claim against the Debtor;  (3) creating, perfecting or enforcing any lien or encumbrance with respect to a Claim against the Debtor;  (4) asserting a setoff, right of subrogation or recoupment of any kind with respect to a Claim against the Debtor, the assets or other property of the Estate;  and (5) commencing or continuing any action that does not comply with or is inconsistent with this Plan.  Nothing shall preclude the holder of a Claim from pursuing any applicable insurance after the Chapter 11 Case is closed, from seeking discovery in actions against third parties or from pursuing third-party insurance that does not cover Claims against the Debtor.  For the avoidance of doubt, nothing in the Injunction shall limit the rights of a holder of a Claim to enforce the terms of the Plan.

3.     Release of Collateral.  Except as expressly provided otherwise in the Plan, unless a holder of a Secured Claim receives a return of its Collateral in respect of such Claim under the Plan:  (i) each holder of;  (A) an Allowed Secured Claim;  and/or (B) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtor any and all property that secures or purportedly secures such Claim;  and (y) execute such documents and instruments as the Plan Administrator requires to evidence such claimant's release of such property;  and (ii) on

the Effective Date, all claims, rights, title and interest in such property shall revert to the Debtor, free and clear of all Claims, including (without limitation) Liens, charges, pledges, encumbrances and/or security interests of any kind. No Distribution under the Plan shall be made to or on behalf of any holder of such Claim unless and until such holder executes and delivers to the Plan Administrator such release of Liens. Any such holder that fails to execute and deliver such release of Liens within 60 days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder. Notwithstanding the immediately preceding sentence, a holder of a Disputed Claim shall not be required to execute and deliver such release of Liens until the time such Claim is Allowed or Disallowed.

4. <u>Cause of Action Injunction</u>. On and after the Effective Date, all Persons other than the Plan Administrator and the Creditors' Committee will be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of, or respecting any, claim, debt, right or Cause of Action that the Plan Administrator and/or Creditors' Committee retains authority to pursue in accordance with the Plan.

F. <u>Preservation and Application of Insurance</u>. The provisions of the Plan shall not diminish or impair in any manner the enforceability of coverage of any insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims (including Litigation Claims) against the Debtor, any directors, trustees or officers of the Debtor, or any other Person, including without limitation, the D&O Insurance. All of the Debtor's insurance policies and the proceeds thereof shall be available to holders of Litigation Claims alleging medical malpractice or personal injury to the extent such insurance policies cover such Litigation Claims. Such insurance policies and proceeds thereof shall also be available to holders of Litigation Claims for the purpose of satisfying Litigation Claims estimated pursuant to section 502(c) of the Bankruptcy Code or in accordance with the Plan.

G. **Exculpation. Except as otherwise set forth in the Plan, none of the Debtor, the Creditors' Committee, the individual members of the Creditors' Committee (acting in their capacity as members of the Creditors' Committee), the Plan Administrator, their respective current or former members, directors, officers, trustees, employees, agents (acting in such capacity), advisors or representatives of any professional employed by any of them shall have or incur any liability to any Person or entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, the administration of the Plan or property to be distributed pursuant to the Plan, and actions taken or omitted to be taken in connection with the Chapter 11 Case or the operations, monitoring or administration of the Debtor during the Chapter 11 Case, and the Plan Administrator shall have no liability for any action taken or omitted to be taken in connection with or related to the winding down and post-confirmation administration of the Estate, except for (i) intentional fraud, gross negligence or willful misconduct, and (ii) solely in the case of attorneys, to the extent that such exculpation would violate any applicable professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct.**

H.  Compromise of Controversies.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtor.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.

I.  Post-Confirmation Activity.  As of the Effective Date, the Plan Administrator may conclude the winding up of the Debtor's affairs without supervision of the Bankruptcy Court, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Plan Administrator may pay any charges it incurs for taxes, professional fees, disbursements, expenses or related support services after the Effective Date without application to and approval of the Bankruptcy Court.

J.  Preservation of Avoidance Actions.  Notwithstanding anything in the Plan to the contrary, all of the Debtor's avoidance actions under chapter 5 of the Bankruptcy Code are preserved for the Debtor and its Estate and may be pursued by the Debtor through the Plan Administrator.

## VI.  EXECUTORY CONTRACTS

A.  Executory Contracts and Unexpired Leases.  To the extent not previously rejected, on the Confirmation Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtor entered into prior to the Petition Date that have not previously been assumed or rejected, and that are not being assumed and assigned to the Purchaser of the Debtor's Assets, shall be deemed rejected by the Debtor pursuant to the provisions of section 365 of the Bankruptcy Code.

B.  Cure.  At the election of the Debtor, any monetary defaults, if any, under each executory contract and unexpired lease to be assumed and assigned to the Purchaser shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways:  (a) by payment of the default amount in Cash on the Effective Date;  or (b) on such other terms as agreed to by the non-debtor party to such executory contract or unexpired lease and the Purchaser.  If there is a dispute regarding:  (i) the amount of any cure payments;  (ii) the ability of the Purchaser to provide adequate assurance of future performance under the contract or lease to be assumed;  or (iii) any other matter pertaining to assumption, then the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption.  The Debtor believes that there are no cure amounts that will need to be paid in connection with executory contracts and unexpired leases, if any, to be assumed.

C.     Rejection Damages Bar Date.  If the rejection by the Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease, results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor or its property or the Plan Administrator unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon the Debtor and/or Plan Administrator, as applicable, not later than thirty (30) days after the date of service of notice of entry of the Confirmation Order, or such other period set by the Bankruptcy Court.

D.     Effect of Post-Confirmation Rejection.  The entry by the Bankruptcy Court on or after the Confirmation Date of an Order authorizing the rejection of an executory contract or unexpired lease of the Debtor entered into prior to the Petition Date shall result in such rejection being a pre-petition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

## VII.    CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE

A.     Conditions to Confirmation.  The Plan may not be confirmed unless the Confirmation Order is entered in a form reasonably acceptable to the Plan Proponents.

B.     Conditions to Occurrence of Effective Date.  The Effective Date for the Plan may not occur unless each of the conditions set forth below is satisfied.  Any one or more of the following conditions may be waived in whole or in part at any time upon consent by all Plan Proponents:

1.     The Confirmation Order is a Final Order.

2.     The Confirmation Order shall provide for the injunctions and ex-culpation of the Persons provided for in Article VII of the Plan.

3.     Monica Terrano shall have been appointed as the Plan Administra-tor and shall have accepted to act in such capacity in accordance with the terms and conditions of the Plan.

C.     Effect of Nonoccurrence of the Conditions to Occurrence of Effective Date.  If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the date which is no later than the first Business Day after ninety (90) days after the Confirmation Order is entered, or by such later date as is approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by any party in interest made before the time that each of the conditions has been satisfied or duly waived, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to occurrence of the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to Section IX.C of the Plan, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against the Debtor;  or (b) prejudice in any manner the rights of the Debtor or of any other party in interest.

# VIII.  CONFIRMABILITY AND SEVERABILITY OF A PLAN AND CRAMDOWN

A.      Confirmability and Severability of a Plan.  Subject to Section X.A of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan.  If the Plan Proponents revoke or withdraw from the Plan then nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, or to prejudice in any manner the rights of the Plan Proponents or any persons in any further proceedings involving the Plan Proponents.  A determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect the Plan Proponents' ability to modify the Plan to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.  Each provision of the Plan shall be considered separable and, if for any reason any provision or provisions therein are determined to be invalid and contrary to any existing or future law, the balance of the Plan shall be given effect without relation to the invalid provision, to the extent it can be done without causing a material change in the Plan.

B.      Cram-down.  The Plan Proponents shall have the right to request the Bankruptcy Court to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.


# IX.   ADMINISTRATIVE PROVISIONS

A.      Retention of Jurisdiction.  Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction for all purposes permitted under applicable law, including, without limitation, the following purposes:

(i)      To determine any motion, adversary proceeding, avoidance action, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(ii)     To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(iii)    To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(iv)    To hear and determine objections to the allowance of Claims, whether filed, asserted or made before or after the Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of Disputed Claims, in whole or in part;

(v)     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(vi)      To enter, implement, or enforce such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(vii)     To issue injunctions, enter and implement other Orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other Order of the Bankruptcy Court;

(viii)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any Order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)     To hear and determine all Professional Fee Claims;

(x)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or any transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(xi)     To take any action and issue such Orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth herein or in the Plan, or to maintain the integrity of the Plan following consummation;

(xii)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xiii)   To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xiv)   To enter a final decree closing the Chapter 11 Case;

(xv)    To recover all assets of the Debtor and property of the Estate, wherever located;

(xvi)   To hear and determine any matters for which jurisdiction was retained by the Bankruptcy Court pursuant to prior Orders;  and

(xvii)  To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code, title 28 of the United States Code and other applicable law.

B.     <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under the Plan shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law of New York.

C.     <u>Continuing Effect of Sale Order</u>.  Notwithstanding anything in the Plan to the contrary, the Sale Order, the Asset Purchase Agreement, and related documents shall not be modified, limited or amended by the Plan.

D.     <u>Effectuating Documents, Further Transactions</u>.  The Debtor or the Plan Administrator, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

E.     <u>Waiver of Bankruptcy Rules 3020(e) and 7062</u>.  The Plan Proponents may request that the Confirmation Order include (i) a finding that Bankruptcy Rule 7062 shall not apply to the Confirmation Order;  and (ii) authorization for the Debtor to consummate the Plan immediately after entry of the Confirmation Order.

F.     <u>No Admissions</u>.  Notwithstanding anything herein or in the Plan to the contrary, nothing contained in the Plan or in this Disclosure Statement shall be deemed as an admission by any Person with respect to any matter set forth herein.

G.     <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date.  Any statutory fees accruing after the Confirmation Date shall be paid in accordance with Article IV of the Plan.

H.     <u>Continuation of Creditors' Committee</u>.  The Creditors' Committee shall continue to exist after the Effective Date for the purposes specified in the Plan.  In addition, the Creditors' Committee shall continue to exist until all distributions have been made to holders of Class 3-A Claims and Class 3-B Claims pursuant to the Plan and the entry of a final decree closing the Debtor's Chapter 11 case.  Upon completion of its duties under the Plan, the Creditors' Committee shall be dissolved and disbanded, at which time the individual members of the Creditors' Committee shall be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Case.

I.     <u>Appointment of MSSH Entities to the Creditors' Committee</u>.  On the Effective Date the MSSH Entities shall be entitled to appoint three voting Creditors' Committee members to serve on the Creditors' Committee post Effective Date.

J.     <u>Resignation and Vacancy on the Creditors' Committee</u>.  If any creditor represented on the Creditors' Committee assigns its Claim or releases the Debtors from the payment of the balance of its Claim, the member of the Creditors' Committee representing that creditor will be deemed to have resigned from the Creditors' Committee.  In the event that a vacancy occurs on the Creditors' Committee by reason of the death or resignation of a member, then with respect to any vacancy thereby created, the remaining members of the Creditors' Committee may (i) fill the vacancy

with the representative of another holder of an Allowed Class 3-A Claim, or (ii) reduce the size of the Creditors' Committee to the number of the remaining Creditors' Committee members.  If the Creditors' Committee members elect the latter, then no Creditors' Committee vacancy shall be deemed to exist.  The Creditors' Committee shall function whether or not a vacancy exists.  In any event, no Person may be designated to serve on the Creditors' Committee without notice having been given to the Plan Administrator.

      K.    <u>Creditors' Committee's Professionals</u>.  Subsequent to the Effective Date, the Creditors' Committee shall have the power and authority to utilize the services of its counsel and financial advisor as necessary to perform the duties of the Creditors' Committee and to authorize and direct such Persons to act on behalf of the Creditors' Committee in connection with any matter requiring its attention or action.  The Debtor and its Estate shall be responsible for the payment of all reasonable and necessary fees and expenses incurred in connection therewith.  Such compensation shall not be subject to the approval of the Bankruptcy Court and shall be paid by the Plan Administrator in the ordinary course of business.

      L.    <u>Disposal of Books and Records</u>.  The Debtor's rights to seek authorization from the Bankruptcy Court for the destruction of books and records, including patient medical and billing records, prior to the expiration of any statutory period to maintain such records will be preserved.  A description of how records currently are being stored is described in Section III.P of this Disclosure Statement.

      M.    <u>Amendments</u>

      1.    <u>Pre-confirmation Amendment</u>.  The Plan Proponents may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements of section 1125 of the Bankruptcy Code, among others.

      2.    <u>Post-confirmation Amendment Not Requiring Resolicitation</u>.  After the entry of the Confirmation Order, the Plan Proponents may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that:  (i) the Plan Proponents obtain approval of the Bankruptcy Court for such modification, after notice and a hearing;  and (ii) such modification shall not materially and adversely affect the interests, rights, treatment, or Distributions of any Class under the Plan.

      3.    <u>Post-confirmation Amendment Requiring Resolicitation</u>.  After the Confirmation Date and before the Effective Date of the Plan, the Plan Proponents may modify the Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a class of Claims provided that:  (i) the Plan, as modified, meets applicable Bankruptcy Code requirements;  (ii) the Plan Proponents obtain Bankruptcy Court approval for such modification, after notice to all creditors entitled to receive notice pursuant to the Bankruptcy Code and the Bankruptcy Rules and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims voting in each class affected by such modification;

and (iv) the Plan Proponents comply with section 1125 of the Bankruptcy Code with respect to the Plan as modified.

N. <u>Successors and Assigns</u>. The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor or assign of such Person.

O. <u>Confirmation Order and Plan Control</u>. To the extent the Confirmation Order and/or the Plan is inconsistent with this Disclosure Statement, any other agreement entered into between the Debtor and any third party, the Plan controls the Disclosure Statement and any such agreements and the Confirmation Order controls the Plan.

## X.    **ESTIMATED DISTRIBUTIONS**

The Debtor estimates that approximately $30.4-31.6 million could be available to satisfy Allowed Administrative Claims, Priority Tax Claims, Class 1-A Secured Claims (to the extent not previously paid pursuant to a Court Order), Class 1-B Undersecured Claims, Class 2 Priority Claims, Class 3-A General Unsecured Claims, and Class 3-B MSSH Subordinated Claim. Allowed Claims in Class 4 will receive payment from insurance or as a Class 3-A General Unsecured Claim as applicable. No Distributions will be made to satisfy Class 5 Membership Interests.

This estimate does not include any potential recoveries from Causes of Action that may be pursued in the future by the Plan Administrator or the Creditors' Committee. The likely proceeds of the Causes of Action are uncertain and highly speculative at this point. Accordingly, the Debtor is unable to project what recovery may be realized through the prosecution of the Causes of Action.

The Debtor cannot reasonably estimate the amount that will ultimately be available to satisfy Claims if the Plan is confirmed, but the Debtor will have sufficient assets to satisfy Allowed Administrative Claims, Priority Tax Claims, Class 1 Priority Claims, and Class 2 Secured Claims and make a distribution on account of Class 3-A General Unsecured Claims, Class 3-B MSSH Subordinated Claim, and Class 4 Litigation Claims.

## XI.    **VOTING REQUIREMENTS, ACCEPTANCE, CONFIRMATION AND CONSUMMATION OF THE PLAN**

A. <u>General</u>

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtor, including that: (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with the applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents comply with the applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the

Plan has been accepted by the requisite votes of holders of Claims, except to the extent that "cram-down" is available under section 1129(b) of the Bankruptcy Code (*see* discussion on "Cram-down," Section F below); (vii) the Plan is feasible and confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor, unless such liquidation is proposed under the Plan; (viii) the Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan (*see* Section H below entitled "Best Interests of Creditors"); (ix) all fees and expenses payable under 28 U.S.C. § 1930 (relating to bankruptcy fees payable to the clerk of the Bankruptcy Court and U.S. Trustee Fees) have been paid or the Plan provides for the payment of such fees on the Effective Date; (x) if applicable, the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to confirmation of the Plan pursuant to section 1114 of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits; and (xi) the Plan Proponents must have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor or as successor to the Debtor under the Plan, and the appointment to or continuance in such office by such individual must be consistent with public policy.

The Plan Proponents believe that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code. Certain of these requirements are discussed in more detail below.

B.    Eligibility to Vote

Pursuant to the Bankruptcy Code, only classes of claims against or interests of a debtor that are "impaired" (within the meaning of section 1124 of the Bankruptcy Code) under the terms and provisions of a plan of reorganization or liquidation are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of claims and interests that are not impaired are not entitled to vote on a plan and, under section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted a plan. Therefore, the votes of holders of such unimpaired classes are not being solicited. In addition, under section 1126(g), classes of impaired claims and interests that receive no distributions under a plan are deemed to have rejected the plan and the votes of such holders will not be solicited. See "Summary of Classification and Treatment of Claims under the Plan" for a summary of the classification and treatment of Claims under the Plan, as well as a designation of whether each Class is impaired or unimpaired.

Under the Plan, holders of Allowed Class 1-B Undersecured Claims, Class 3-A General Unsecured Claims, Class 3-B MSSH Subordinated Claim and Class 4 Litigation Claims are impaired and entitled to vote to accept or reject the plan. Any Claim in a Class entitled to vote as to which an objection has been filed and has not been withdrawn or dismissed prior to the Confirmation Hearing is not entitled to vote unless the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a) and upon application of the holder whose Claim has been objected to, temporarily allows the

Claim in an amount that the Bankruptcy Court deems proper solely for the purpose of accepting or rejecting the Plan. Claims filed after the deadline to file proofs, unless deemed timely filed by the Bankruptcy Court, also are not entitled to vote.

      C.      <u>Estimation and Temporary Allowance of Claims</u>

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting and other purposes. The Debtor or holders of particular Claims may seek an order of the Bankruptcy Court temporarily allowing, for voting purposes only, certain Disputed Claims.

For purposes of calculating acceptances and rejections to the Plan, each holder of a Litigation Claim entitled to vote whose Claim has not been fixed in the Claims Resolution Process as of the Voting Deadline shall be entitled to one vote in the amount of $1.00 for voting purposes only.

      D.      <u>Transmission of Ballots</u>

All record holders of undisputed Class 1-B, Class 3-A and Class 3-B Claims (including any Claims that are temporarily Allowed for voting purposes) as of the date the Disclosure Statement Order was entered by the Bankruptcy Court are entitled to vote to accept or reject the Plan and may do so by completing the appropriate ballot which is enclosed with this Disclosure Statement. All holders of Litigation Claims for which a proof of claim was timely or deemed timely filed, for which claims against the estate have not been waived, will be entitled to vote to accept or reject the Plan. In most cases, each ballot has been encoded with the amount of your Claim for voting purposes (if your Claim is a Disputed Claim, this amount may not be the amount ultimately allowed for purposes of distributions under the Plan) and the Class to which your Claim relates. PLEASE CAREFULLY FOLLOW THE INSTRUCTIONS ACCOMPANYING THE ENCLOSED BALLOT, AS DESCRIBED IN THE INTRODUCTION OF THIS DISCLOSURE STATEMENT.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN, AND RETURN EACH BALLOT THAT YOU RECEIVE.**

      E.      <u>Acceptance Requirements</u>

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class who actually vote for acceptance or rejection of a plan. The vote of a holder of a claim may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The holders of Class 1-B Undersecured Claims, Class 3-A General Unsecured Claims, Class 3-B MSSH Subordinated Claim and Class 4 Litigation Claims are "impaired" under the Plan, and the Debtor is soliciting acceptances for the Plan from the holders of Allowed Claims in Class 3-A, Class 3-B and Class 4. Classes 1-A and 2 are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan. Class 5 is impaired and deemed to reject the Plan.

F.      <u>Confirmation Without Acceptance of All Impaired Classes ("Cram-down")</u>

If a plan otherwise satisfies the Bankruptcy Code's requirements for confirmation, but one or more classes of Claims votes to reject the Plan, a debtor has the right to seek confirmation of its plan under the "cram-down" provisions of the Bankruptcy Code. At least one impaired Class of Claims (excluding the votes of insiders), must accept the Plan and all other requirements of section 1129(a) of the Bankruptcy Code must be satisfied.

The Bankruptcy Court must also find that, as to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the dissenting class will receive value relatively equal to the value given to all other similarly situated classes. A plan is "fair and equitable" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or interests.

1.      If a class of secured claims rejects a plan, the plan may still be confirmed if the plan provides (a) for each holder of a claim in the rejecting class to retain the liens securing that claim whether or not the property subject to those liens is retained by the debtors or transferred to another entity, to the extent of the allowed amount of the claims, and that each holder of a claim in the rejecting class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, equal to at least the value of the holder's interest in the estate's interest in such property; or (b) that each holder of a claim in the rejecting class realize the indubitable equivalent of that claim.

2.      If a class of unsecured claims rejects a plan, the plan may still be confirmed as long as the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (b) that the holder of any claim or any interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

Under the Plan, no holder in a Class of Claims is to receive Cash or other property in excess of the full amount of its Allowed Claim. Moreover, no claim or interest that is junior to the holders of General Unsecured Claims or Litigation Claims will receive any distribution under the Plan. Accordingly, the Plan Proponents believe that the Plan does not discriminate unfairly as to any impaired Class of Claims and is fair and equitable with respect to each such Class under section 1129(b) of the Bankruptcy Code.

G.     Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11), which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless the Plan provides for the liquidation of the Debtor. Since the Plan provides for the liquidation of the Debtor, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtor will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Plan Administrator to liquidate the Debtor's remaining assets. The Plan Proponents believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

H.     Best Interests of Creditors

To confirm the Plan over the objections of dissenting holders of impaired Claims, the Bankruptcy Court must also independently determine that the Plan is in the "best interests" of all dissenting holders of Claims impaired under the Plan. Under the "best interests" test, the Bankruptcy Court must find that the Plan provides to each dissenting holder of an impaired Claim a recovery of a value at least equal to the value, as of the Effective Date, of the distribution that each such holder would receive were the Debtor liquidated under chapter 7 of the Bankruptcy Code. In this case, liquidation under chapter 7 of the Bankruptcy Code would only increase administrative costs in the form of statutory chapter 7 trustee's fees and other professional fees. Thus, the Plan Proponents believe the Plan is in the best interest of creditors and all creditors are receiving value greater than or at least equal to the value, as of the Effective Date, of the distribution that each such holder would receive were the Debtor liquidated under chapter 7 of the Bankruptcy Code. Attached as <u>Exhibit 3</u> is a liquidation analysis.

## XII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The recovery projections included in this Disclosure Statement are dependent upon certain matters, most of which are beyond the control of the Plan Administrator and some of which may well not materialize. Unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual recoveries. Therefore, the actual recoveries achieved by the Plan Administrator may vary from the projected recoveries included herein. These variations may be material. The holder of an impaired Claim should consider carefully these risk factors as well as all of the other information contained in this Disclosure Statement, including the Plan and other Exhibits, before deciding whether to vote to accept or reject the Plan.

## XIII.   <u>CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN</u>

The following discussion summarizes certain of the material federal income tax consequences expected to result from the implementation of the Plan. This summary does not address the federal income tax consequences to holders whose

claims are entitled to payment in full in Cash under the Plan (*e.g.*, holders of Allowed Administrative Claims, Secured Claims and Priority Claims). This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"). There can be no assurance that the IRS will not take a contrary view, and no ruling from the IRS has been or will be sought. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to, among others, the Debtor and the holders of Claims.

The following summary is for general information only. The federal income tax consequences of the Plan are complex and subject to significant uncertainties. This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the federal income tax consequences of the Plan. This summary also does not purport to address the federal income tax consequences of the Plan to taxpayers subject to special treatment under the federal income tax laws, such as broker-dealers, tax exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and non-resident alien individuals.

**EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POTENTIAL FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**IRS Circular 230 Notice: To ensure compliance with requirements imposed by the IRS in Circular 230, you are hereby informed that (i) any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Code, (ii) the advice is written to support the promotion or marketing of the transactions or matters addressed in the Disclosure Statement, and (iii) each holder of a Claim should seek advice based on its particular circumstances from an independent tax advisor.**

A.      Federal Income Tax Consequences to the Debtor

The Debtor is exempt from federal income tax pursuant to Section 501 of the Code. Accordingly, the Debtor does not believe that the implementation of the Plan, including the extinguishment of the Debtor's outstanding indebtedness pursuant to the Plan, will result in any material tax liability to the Debtor.

B.      Withholding and Reporting

The Plan Administrator will not withhold taxes or comply with any applicable reporting requirements, and will issue an IRS Form 1099 to the recipient of a Distribution if requested.

# XIV. ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Plan Proponents believe that the Plan affords the holders of Claims the potential for the greatest realization on the Debtor's Assets and, thus, is in the best interests of such holders. If the Plan is not confirmed, however, the alternative would be the liquidation of the Debtor's remaining Assets and distribution to creditors under chapter 7. The Plan Proponents believe that the Plan is better for creditors than a chapter 7 liquidation.

# XV. ALTERNATIVE PLANS OF REORGANIZATION

If the Plan is not confirmed, the Debtor or any other party in interest in the Chapter 11 Cases could propose a different plan or plans. Since substantially all of the Debtor's assets have been sold and the Plan is a plan of liquidation, the Plan Proponents do not believe that an alternative plan could provide greater recoveries than those provided in the Plan. Moreover, the filing of alternative plans would result in additional costs in administering the Chapter 11 Case and significant delays in making distributions.

# XVI. CONFIRMATION HEARING

By order of the Bankruptcy Court dated _____, 2011, the Confirmation Hearing has been scheduled for _____, 2011 at 9:30 a.m. (Eastern Time), before the Honorable Arthur J. Gonzalez, in the United States Bankruptcy Court for the Southern District of New York. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing. Any objection to confirmation must be made in writing, filed with the Clerk of the Bankruptcy Court and served upon the following parties, together with proof of service thereof, so as to be ACTUALLY RECEIVED on or before _____, 2011 at 5:00 p.m. (Eastern Time):

For the Debtor:

Cabrini Medical Center
P.O. Box 10
Maspeth, New York 11378
Attn: Monica Terrano

with copies to:

TOGUT, SEGAL & SEGAL LLP
Attorneys for the Debtor
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone:    (212) 594-5000
Facsimile:    (212) 967-4258
Attn:   Frank A. Oswald, Esq.
        James Lee, Esq.

For the Creditors' Committee:

ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
Telephone:    (212) 210-9400
Facsimile:    (212) 210-9444
Attn:   Martin G. Bunin, Esq.
        Craig E. Freeman, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

## XVII. CONCLUSION

The Plan Proponents submit that the plan complies in all respects with chapter 11 of the Bankruptcy Code and the Plan Proponents recommend to holders of Claims who are entitled to vote on the plan that they vote to accept the plan. The Plan Proponents remind such holders that, to be counted, each ballot, signed and marked to indicate the holder's vote, must be actually received by no later than 5:00 p.m. (Eastern Time) on [_____,] 2011, at the following address: Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

Dated:      New York, New York
             December 21, 2010

Respectfully Submitted,

CABRINI MEDICAL CENTER
Debtor and Debtor in Possession

By:      /s/ Monica Terrano
         Name: Monica Terrano
         Title: Chief Financial Officer


OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:      /s/ Leon Z. Mener
         Name: Consolidated Edison Company
                 of New York, Inc.
         Title: Chairman of the Creditors' Committee
         By:     Leon Z. Mener


TOGUT, SEGAL & SEGAL LLP
Attorneys for the Debtor


By: /s/ Frank A. Oswald
      FRANK A. OSWALD
      A Member of the Firm


ALSTON & BIRD LLP
Attorneys for the Creditors' Committee


By: /s/ Martin G. Bunin
      Martin G. Bunin, Esq.
      Craig E. Freeman, Esq.