UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                       :

In re:                                        :      Chapter 11

CABRINI MEDICAL CENTER,      :      Case No. 09-14398 (AJG)

                        Debtor.     :

-----------------------------------------------------------x

## OBJECTION OF MANNUCIO MANNUCI, ANGELO TARANTA, GUIDO PADULA AND DILVA SALVIONI TO THE DEBTOR'S PROPOSED DISCLOSURE STATEMENT

Mannucio Mannuci, M.D. ("Dr. Mannucci"), Angelo Taranta, M.D. ("Dr. Taranta"), Guido Padula, M.D. ("Dr. Padula"), and Dilva Salvioni[1] ("Ms. Salvioni") (collectively, the "Mannucci Parties"), each a creditor of Cabrini Medical Center ("Cabrini" or "the Debtor") and a party in interest in these proceedings, submits this Objection to the Disclosure Statement Relating to the Plan of Liquidation of Cabrini Medical Center (the "Objection") and respectfully states as follows:

## INTRODUCTION

1. The proposed Chapter 11 Plan of Liquidation of Cabrini (the "Plan") described in the Disclosure Statement Relating to the Plan (the "Disclosure Statement") is deficient and flawed.

2. Each of the Mannucci Parties is party to one or more deferred compensation agreements (the "Deferred Compensation Agreements") with Cabrini.

---

[1] Ms. Salvioni is the widow of Daniele Salvioni, M.D. ("Dr. Salvioni") who was deceased in November 2007. Dr. Salvioni was an employee of Cabrini and a participant in a deferred compensation plan with Cabrini, as further described below.

Each of the Deferred Compensation Agreements is an "employee pension benefit plan" as defined by ERISA (the "Deferred Compensation Plans"). See 29 U.S.C. 1002.

3. The Plan and the Disclosure Statement include as property of the Debtor's estate $2,956,174 that was improperly taken from the Mannucci Parties' Deferred Compensation Plans, when in fact such sums are property of the Mannucci Parties and are excluded from the property of the estate under §541(d) and/or §541(b)(7) of the Bankruptcy Code.

4. The Plan described in the Disclosure Statement also purports to limit the ability of creditors – including the Mannucci Parties – to seek redress from "any present and former directors, officers, trustees, agents, attorneys, advisors, members or employees of the Debtor" in any proceeding "based upon a theory which arises out of such holder's Claim against the Debtor." See Disclosure Statement (V)(E)(2), p. 38.

5. The Mannucci Parties currently have an action pending against the Missionary Sisters of the Sacred Heart of Jesus (the "MSSHJ") in New York State Supreme Court for violations of ERISA and New York common law, misappropriation, and conversion, based on the same facts that underlie the Mannucci Parties' claims against the Debtor.

6. The Mannucci Parties are also contemplating filing additional claims against the Debtor's plan fiduciaries – as defined by ERISA – in connection

with the Deferred Compensation Plans. Such claims also arise from the same facts that underlie the Mannucci Parties' claims against the Debtor.

7. The injunction sought by the Debtor described in paragraph 4 is based on a settlement agreement between the MSSHJ and Official Committee of Unsecured Creditors of Cabrini (the "Creditors Committee"). The Mannucci Parties were not party to the settlement between the MSSHJ and the Creditors Committee and there is no basis for limiting the liabilities of any parties (other than the Debtor).

## THE MANNUCCI PARTIES

8. Dr. Mannucio Mannuci resides at 21 East 90th Street, #6A, New York, New York 10128.

9. Dr. Angelo Taranta resides at 100 Bay Place #2111, Oakland, California 94610.

10. Dr. Guido Padula resides at 115 Brightwater Court, # 6B, Brooklyn, New York 11253.

11. Mrs. Dilva Salvioni, widow of Dr. Daniele Salvioni, resides at Via S. Andrea in Campiglia 2, Figline Valdarno, Firenze, Italy 50063.

## BACKGROUND

12. The Mannucci Parties are three physicians now in their 80s, and the widow of another physician, all of whom dedicated their lives and careers to medicine, primarily at Cabrini. Cabrini was founded by, sponsored, run and staffed by the MSSHJ.

13. In or about January 1967, Cabrini (then known as Columbus Hospital) set up the first Deferred Compensation Plan for Dr. Padula (the "First Padula Plan"). Under the terms of the First Padula Plan, Cabrini was obligated to pay $3,000 per year into an account at Irving Trust Company for Dr. Padula, as part of his annual compensation, where the funds would be invested and all dividends and other earnings would be reinvested. The First Padula Plan directed that distributions to Dr. Padula or his designated beneficiary would begin upon termination of Dr. Padula's employment with Cabrini for any reason.

14. In or about April 1975, Cabrini set up a second Deferred Compensation Plan for Dr. Padula (the "Second Padula Plan"), the terms of which were similar to the First Padula Plan.

15. According to Cabrini's records, Dr. Padula retired from Cabrini in 1980.

16. In or about December 1975, Cabrini set up a Deferred Compensation Plan for Dr. Taranta (the "Taranta Plan"). Pursuant to the Taranta Plan, Cabrini was obligated to pay $13,880 into an account for Dr. Taranta, as part of his annual compensation, that would invest in mutual fund shares of New York Venture Fund, Inc. (with all distributions and dividends to be reinvested). The Taranta Plan directed that distributions to Dr. Taranta or his designated beneficiary would begin upon termination of Dr. Taranta's employment with Cabrini for any reason.

17. According to Cabrini's records, Dr. Taranta retired from Cabrini in 1995.

18. In or about December 1973, Cabrini (then known as Columbus Hospital) set up the first Deferred Compensation Plan for Dr. Salvioni (the "First Salvioni Plan"). Under the terms of the First Salvioni Plan, Cabrini was obligated to pay $14,000 per year into an account to invest in mutual fund shares for Dr. Salvioni, as part of his annual compensation (with all dividends and other earnings to be reinvested). The First Salvioni Plan directed that distributions to Dr. Salvioni or his designated beneficiary would begin upon termination of Dr. Salvioni's employment with Cabrini.

19. In or about August 1978, Cabrini set up a second Deferred Compensation Plan for Dr. Salvioni (the "Second Salvioni Plan"), the terms of which were similar to the First Salvioni Plan.

20. On September 17, 1997, Dr. Salvioni designated in writing that his wife, Dilva Salvioni, be his principal beneficiary in his Deferred Compensation Plans. He designated his children as secondary beneficiaries. According to Cabrini's records, Dr. Salvioni retired from Cabrini in 1980. Dr. Salvioni died in November 2007.

21. In the mid-1970s, Cabrini set up a Deferred Compensation Plan for Dr. Mannucci (the "Mannucci Plan"). On information and belief, pursuant to the Mannucci Plan, each year, Cabrini was obligated to pay certain amounts into an account for Dr. Mannucci, as part of his annual compensation, which would be

5

invested in New York Venture Fund, Inc. The Mannucci Plan directed that distributions to Dr. Mannucci or his designated beneficiary would begin upon termination of Dr. Mannucci's employment with Cabrini.

22. According to Cabrini's records, Dr. Mannucci retired from Cabrini in 2000.

23. Over the decades that the Mannucci Parties had worked for Cabrini, and the years since they had each retired, the Deferred Compensation Plans increased in value based on the annual contributions, plus accrued interest and any reinvested dividends. As of October 2006, the Deferred Compensation Plans totaled:

| | |
|---|---|
| Mannucci Plan | $735,440.77 |
| Taranta Plan | $1,238,567.84 |
| Salvioni Plan | $598,683.80 |
| Padula Plan | $256,930.00 |

24. On November 16, 2006 – only ten days before the Berger Commission issued its formal report recommending that the State of New York ensure that Cabrini be shut down – Cabrini sent a letter to the Mannucci Parties informing them that due to a "major restructuring project intended to reverse the effects of several years of operating losses" money would be "temporarily" moved "from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the

deferred compensation investment account during 2007." Each of the letters sent to each of the Mannucci Parties was substantially similar. See the Affidavit of Jason Snyder, Esq. (the "Snyder Aff."), filed contemporaneously with this Objection, at ¶ 5.

25. In total, $2,103,424 was improperly removed from the Mannucci Parties' Deferred Compensation Plans pursuant to the November 16 letter.

26. On November 26, 2006, the Berger Commission issued its formal report recommending that Cabrini be closed in an orderly fashion. On December 6, 2006 New York's Governor issued written approval of the Berger Commission's recommendations, and on January 1, 2007 the Berger Commission's recommendations became law and the New York Commissioner of Health was ordered to close Cabrini.

27. In each of April 2007 and June 2007, Cabrini took additional hundreds of thousands of dollars from the Mannucci Parties' Deferred Compensation Plans, this time without even notifying the Mannucci Parties.

28. After the June 2007 improper taking from the Mannucci Parties' Deferred Compensation Plans, the accounts were completely wiped out. In total, $2,956,176 was improperly taken from the Mannucci Parties' Deferred Compensation Plans. No amounts were ever replaced, nor were any further payments made to the Mannucci Parties in respect of their Deferred Compensation Plans.

29. On information and belief, at the time Cabrini sent the November 16 letter to the Mannucci Parties, Cabrini knew that the Berger Commission would recommend the closure of Cabrini. On further information and belief, each report of the Independent Auditors of Cabrini from 2001 through 2007 (the last year for which a report was issued prior to Cabrini filing for bankruptcy) contained a going concern qualification.

30. Therefore, on information and belief, at each time Cabrini improperly took assets from the Mannucci Parties' Deferred Compensation Plans, Cabrini had no intention of repaying such funds and had no reasonable expectation that it would ever be able to repay such money.

31. On July 9, 2009, Cabrini Medical Center (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

32. On December 21, 2010, the Debtor filed a plan of liquidation (the "Plan") and a disclosure statement with respect to the Plan.

33. On November 19, 2009, each of the Mannucci Parties filed a proof of claim with the Court. Each proof of claim stated that the basis for the claim was an attached Complaint – filed in the Supreme Court of the State of New York – that asserted the Mannucci Parties' entitlement under ERISA to monies that were improperly taken from the Mannucci Parties' Deferred Compensation Plans. See the Snyder Aff. at ¶ 7.

## OBJECTION

I. THE DISCLOSURE STATEMENT OVERSTATES THE DEBTOR'S ASSETS THAT ARE SUBJECT TO DISTRIBUTION TO THE DEBTOR'S CREDITORS

34. The Disclosure Statement should not be approved because it vastly overstates the amount of assets in the Debtor's estate that are subject to distribution to the Debtor's creditors.

35. Pursuant to Section 541(b)(7) of the Bankruptcy Code, deferred compensations plans are not property of a debtor's estate:

> Property of the estate does not include any amount
>
> (A) withheld by an employer from the wages of employees for payment as contributions . . . to (I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . .
>
> (B) received by an employer from employees for payment as contributions . . . to (I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . .

11 U.S.C. 541(b)(7)(A)(i)(I) and 11 U.S.C. 541(b)(7)(B)(i)(I).

36. Title I of ERISA defines an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan" and defines an "employee pension benefit plan" as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

29 U.S.C. 1002.

37. The Mannucci Parties' Deferred Compensation Plans are "employee pension benefit plans" under Title I of ERISA and are therefore not property of the Debtor's estate. The assets that were improperly taken from the Deferred Compensation Plans are therefore property of the Mannucci Parties and not available for distribution to the Debtor's creditors.

38. Alternatively, Pursuant to Section 1103 of ERISA, the assets of a qualified ERISA plan – including the Deferred Compensation Plans – are held in trust for the benefit of the plan's participants and are not available for the employer's creditors.

39. Pursuant to Section 541(d) of the Bankruptcy Code,

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. 541(d).

40. "[U]nder Section 541(d), property held in trust for another is "not property of the bankruptcy estate because the debtor does not have an equitable interest in it." In re Taub, 427 B.R. 208, 220 (Bkrtcy. E.D.N.Y. 2010) (citing In re Braniff Intern. Airlines, Inc., 164 B.R. 820, 825 (Bkrtcy. E.D.N.Y. 1994). See also Begier v. I.R.S., 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'")

41. The Second Circuit has taken this idea even further, holding that

> Where the debtor's "conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions." ... Indeed, the Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition...."

In re Howard's Appliance Corp., 874 F.2d 88, 93 (2nd Cir. 1989) (quoting U.S. v. Whiting Pools, Inc., 462 U.S. 198, 205 (1983))

42. This Court has similarly held that "any right to proceeds or profits from this property [in which the debtor held only legal title] would be excluded from his estate by 11 U.S.C. § 541(d) because he does not hold the equitable interest in the property." In re Altchek, 124 B.R. 944, 958 (Bkrtcy. S.D.N.Y. 1991).

43. Therefore, because the Debtor does not have an equitable interest in Deferred Compensation Plans which the Debtor was required to hold in trust for the Mannucci Parties, the assets that were part of the Deferred Compensation Plans are not property of the Debtor's estate and are not available to satisfy the claims of the Debtor's creditors.

## II. THERE ARE NO "UNUSUAL CIRCUMSTANCES" THAT WOULD JUSTIFY AN INJUNCTION BARRING ANY ACTION AGAINST THE MSSHJ AND ANY FORMER EMPLOYEES OF CABRINI

44. On October 28, 2009, the Official Committee of Unsecured Creditors of Cabrini (the "Creditors Committee") filed an adversary complaint against the Missionary Sisters of the Sacred Heart, Illinois ("MSSH-IL") and the MSSHJ.

45. The Creditors Committee alleged that in the year prior to the Debtor's bankruptcy filing, at least $1.3 million in avoidable transfers were made to MSSH-IL and MSSHJ. The Creditors Committee further alleged that monies provided to the Debtor by MSSH-IL and MSSHJ and characterized as loans were in actuality capital contributions or grants, and that the bankruptcy claims of MSSH-IL and MSSHJ should be equitably subordinated to the general unsecured creditors.

46. On November 19, 2010, the Court approved a settlement between the Creditors Committee, MSSH-IL, and MSSHJ. The Mannucci Parties were not a party to that settlement agreement.

47. As part of the settlement agreement, the Creditors Committee agreed to support the inclusion in the Plan of an injunction preventing any creditors paid under the Plan from pursuing claims against MSSH-IL and MSSHJ "that arise out of the creditors' dealings with the Debtor." See 09-01639-ajg, Docket No. 11 at 9

48. The provision in the Disclosure Statement describing the injunction sought by MSSH-IL and MSSHJ in the Plan purports to enjoin anyone

holding a claim from commencing or continuing any proceeding based upon "a theory which arises out of such holder's Claim against the Debtor." See Disclosure Statement at (V)(E)(2). The injunction purports to cover not only the Debtor, the MSSH-IL, and MSSHJ, but also their current and former employees, officers, and directors.

49. "The Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan" In re Dow Corning Corp., 280 F.3d 648, 656 (6th Cir. 2002). Although the Court has broad authority to take appropriate equitable measures to facilitate a reorganization, enjoining a non-consenting creditor's claim against a non-debtor "is a dramatic measure to be used cautiously" and is only appropriate "in unusual circumstances." In re Dow Corning Corp., 280 F.3d at 658. See also In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2nd Cir. 1992); MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 93 (2nd Cir. 1988).

50. There are seven factors that many bankruptcy courts use to determine whether the required "unusual circumstances" are present and whether the court may enjoin a non-consenting creditor's claims against a non-debtor:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution

13

claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions

In re Dow Corning Corp., 280 F.3d at 658

51. None of the seven factors used by courts deciding whether to enjoin a non-consenting creditor's claims against a non-debtor are present in this case.

52. The Mannucci Parties have a pending action against the MSSHJ in New York State Supreme Court, alleging violations of ERISA and New York common law, misappropriation, and conversion. The Mannucci Parties are also contemplating an action against the plan fiduciaries of their Deferred Compensation Plans. On information and belief, each of the plan fiduciaries is a present or former employee, officer, or director of the Debtor.

## RELIEF REQUESTED

53. In light of the foregoing, the Mannucci Parties respectfully request the following relief:

- In Section X of the Disclosure Statement, at page 46, "[t]he Debtor estimates that approximately $30.4 – 31.6 million could be available to satisfy" various claims against the Debtor. As described herein, such amount is inflated by the assets of the Deferred Compensation Plans – $2,956,176 in total – that were co-mingled with the Debtor's general assets. Section X should be

revised to reduce the estimated amount available for distribution by the value of the Deferred Compensation Plans. The revised Section X should read: "[t]he Debtor estimates that approximately $27.4 – 28.6 million could be available to satisfy . . ."

- Section (V)(E)(2) of the Disclosure Statement, at page 38, describes the scope of the injunction sought against "all Persons that hold a Claim." As described herein, such an injunction may act to prevent the Mannucci Parties from maintaining its action against the MSSHJ and may act to prevent the Mannucci Parties from commencing an action against the plan fiduciaries for the Deferred Compensation Plans. Such an injunction protecting non-Debtors is inappropriate in this case and should not be made part of the Plan. Accordingly, the Mannucci Parties respectfully request that the following changes be made to Section (V)(E)(2) of the Disclosure Statement:

> <u>Scope of Injunction</u>. Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold a Claim are permanently enjoined from taking any of the following actions against the Debtor, the Plan Administrator <u>(acting in her role as Plan Administrator)</u>, or the Creditors' Committee, ~~the MSSH Entities, or any present and former directors, officers, trustees, agents, attorneys, advisors, members or employees of the Debtor, or the Creditors' Committee, the MSSH Entities, or the Plan Administrator,~~ or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim: (1) commencing or continuing in any manner any action or other proceeding with respect to a Claim against the Debtor ~~or based upon a theory which arises out of such holder's Claim against the Debtor~~; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to a Claim against the Debtor; (3) creating, perfecting or enforcing any lien or encumbrance with respect to a Claim

15

against the Debtor; (4) asserting a setoff, right of subrogation or recoupment of any kind with respect to a Claim against the Debtor, the assets or other property of the Estate; and (5) commencing or continuing any action that does not comply with or is inconsistent with this Plan. Nothing shall preclude the holder of a Claim from pursuing any applicable insurance after the Chapter 11 Case is closed, from seeking discovery in actions against third parties or from pursuing third-party insurance that does not cover Claims against the Debtor. For the avoidance of doubt, nothing in the Injunction shall limit the rights of a holder of a Claim to enforce the terms of the Plan.

## CONCLUSION

54. In light of the identified deficiencies in the disclosures made in the Disclosure Statement, the Mannucci Parties respectfully request the Court to make the requested changes to the Disclosure Statement.

Dated: New York, New York
January 19, 2011

PADUANO & WEINTRAUB LLP

BY: _/s/ Katherine B. Harrison_
Leonard Weintraub
Katherine B. Harrison
Jason Snyder

1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)

Attorneys for Plaintiffs