Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
James J. Lee

*Bankruptcy Counsel for the
 Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
In re:                                                      :     Chapter 11
                                                            :     Case No. 09-14398 (AJG)
CABRINI MEDICAL CENTER,                                     :
                                                            :
                        Debtor.                             :
                                                            :
------------------------------------------------------------x

### DEBTOR'S MOTION FOR ORDER PURSUANT TO
### 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 CLASSIFYING
### AND FIXING CLAIMS FILED BY THE MANNUCCI PARTIES

### [CLAIM NOS. 388, 389, 390 and 391]

TO THE HONORABLE ARTHUR J. GONZALEZ,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

    Cabrini Medical Center ("Cabrini" or the "Debtor"), as debtor and debtor in possession, by its attorneys Togut, Segal & Segal LLP, respectfully submits this motion (the "Motion") for an order pursuant to section 502 of title 11, United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") classifying and fixing as general unsecured claims, in the amounts scheduled by the Debtor, the claims filed by the Mannucci Parties (as defined below). In support of this Motion, the Debtor states:

## JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The predicates for the relief requested are section 502 of the Bankruptcy Code and Bankruptcy Rule 3007.

## BACKGROUND

3. On July 9, 2009 (the "Petition Date"), the Debtor commenced a case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed. On July 20, 2009, the United States Trustee appointed a committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee").

4. On August 24, 2009, the Debtor filed its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules"), with the Court. On September 22, 2009, this Court entered an Order fixing November 20, 2009 as the deadline to file claims against the Debtor's estate that arose prior to the Filing Date (the "Claims Bar Date"). The Debtor caused written notice of the Claims Bar Date to be mailed to the Debtor's known creditors. In addition, the Debtor caused notice of the Claims Bar Date to be published in *The New York Times*, National Edition on October 20, 2009.

5. On January 27, 2011, following a hearing on notice, the Court entered an Order (the "Disclosure Statement Approval Order"), *inter alia*, approving the Debtor's *First Amended Disclosure Statement Relating to the First Amended Joint Plan of Liquidation of Cabrini Medical Center*. Pursuant to the Disclosure Statement Approval Order,

2

the Court scheduled a confirmation hearing on March 30, 2011, and authorized the Debtor to mail the approved Disclosure Statement, the proposed Plan, a ballot to creditors entitled to vote, and notice of the confirmation hearing to all creditors and parties in interest.

## THE MANNUCCI PARTIES

6. The Mannucci Parties are three retired doctors formerly employed by the Debtor, Mannuccio Mannucci ("Mannucci"), Angelo Taranta ("Taranta") and Guido Padula ("Padula"), and Dilva Salvioni, the widow of a fourth retired doctor, Daniele Salvioni (Drs. Mannucci, Taranta, Padula and Salvioni are collectively referred to as the "Doctors"). During their employment, each of the Doctors entered into a separate deferred compensation agreement with Cabrini (individually a "Deferred Compensation Agreement" and collectively the "Deferred Compensation Agreements"), which specified their entitlements. A copy of one Deferred Compensation Agreement is attached as Exhibit 1.[1]

7. Pursuant to the terms of the Deferred Compensation Agreements, Cabrini purchased various mutual funds for the Doctors' benefit upon retirement. The mutual funds were to be held in accounts in Cabrini's name (the "Deferred Compensation Accounts").

8. In August 2008, the Mannucci Parties commenced an action in the New York Supreme Court against the Debtor, the Missionary Sisters of the Sacred Heart, a not-for-profit corporation organized in the State of New York ("MSSH"), and Merrill Lynch alleging that the Deferred Compensation Agreements were qualified ER-

---

[1] Exhibit 1 is representative. The Deferred Compensation Agreements, which are attached as exhibits to the *Affidavit of Jason Snyder in Support of the Mannucci Parties' Opposition to the Debtor's Proposed Disclosure Statement* [Docket # 542], have identical language.

3

ISA plans, and that the Debtor, MSSH and Merrill Lynch were liable to the Mannucci Parties for damages arising from ERISA violations and under common law breach of contract theories.[2] Specifically, the Mannucci Parties alleged that the Debtor wrongfully transferred funds belonging to the Doctors out of the Deferred Compensation Accounts, and contended that MSSH was liable as Cabrini's alter ego because, *inter alia*, MSSH was a member of Cabrini with the ability to elect officers and directors of the Debtor.

9. On January 4, 2011, the Supreme Court dismissed the claims asserted against MSSH in the Amended Complaint. The claims against Merrill Lynch were voluntarily dismissed with prejudice by the Mannucci Parties prior to decision on the pending motions to dismiss by Merrill Lynch. The claims against MSSH were dismissed without prejudice to re-plead against MSSH and name Cabrini as a necessary party since no alter-ego or piercing remedy is available under New York State law where there is no underlying liability established against the allegedly controlled corporation (here, Cabrini).[3]

### THE BANKRUPTCY CLAIMS

10. The Mannucci Parties filed the following proofs of claim in Cabrini's chapter 11 case:

    a.    Claim # 388, in the amount of $771,843 filed by Dr. Mannucci Mannucci.[4]

---

[2] The automatic stay on the Petition Date precluded continuation of the lawsuit against the Debtor, and after the initial complaint was dismissed without prejudice to re-plead as to MSSH and Merrill Lynch, the Mannucci Parties subsequently filed an amended complaint in March 2010 naming only MSSH and Merrill Lynch (the "Amended Complaint"). A copy of the Amended Complaint is attached as Exhibit 2.

[3] The Mannucci Parties have filed a motion to lift the automatic stay for the purpose of naming the Debtor in a new complaint to comply with the Supreme Court order. That motion is returnable on February 16.

[4] Cabrini identified Dr. Mannucci in its Schedule F as having a disputed litigation claim in the amount of $664,036.47.

4

  b. Claim # 389, in the amount of $1,298,724 filed by Dr. Angelo Taranta.[5]

  c. Claim # 390, in the amount of $619,645 filed by Dilva Salvioni.[6]

  d. Claim # 391, in the amount of $265,962 filed by Dr. Guido Padula.[7]

  11. The Mannucci Parties attached the original complaint filed against Cabrini, MSSH and Merrill Lynch to their proofs of claim as the documentary basis for those claims. That complaint asserted that prior to the Petition Date, the Debtor withdrew the funds in the Deferred Compensation Accounts, and failed to replace those funds as allegedly promised.

  12. The Mannucci Parties' proofs of claim are asserted as general unsecured claims. Nowhere in the claims or the complaint attached thereto do the Mannucci Parties assert any kind of trust claim. Nonetheless, the Mannucci Parties filed an objection to the Debtor's Disclosure Statement in which they asserted that the Deferred Compensation Agreements are "employee pension benefits plans" under ERISA, and therefore the funds in those plans were held in trust for the benefit of the plan participants and not property of the Debtor's estate.[8] [*See* Docket # 541].[9]

---

[5] Cabrini identified Dr. Taranta in its Schedule F as having a disputed litigation claim in the amount of $1,117,614.95.

[6] Cabrini identified Dr. Salvioni in its Schedule F as having a disputed litigation claim in the amount of $536,211.51.

[7] Cabrini identified Dr. Padula in its Schedule F as having a disputed litigation claim in the amount of $230,199.28.

[8] *See* ¶¶ 32-33 *infra.*, discussing why the Mannucci Parties cannot now amend their claims.

[9] The objection to the Disclosure Statement was resolved consensually by adding additional language to the Disclosure Statement.

13. The Mannucci Parties' characterization of their claims as constructive trust claims is factually and legally incorrect. As shown below they are in all respects general unsecured claims. Accordingly, they must be classified as such for all purposes in the case, including voting and distribution. The Debtor seeks an order classifying the claims as unsecured, and fixing them in the amounts scheduled by the Debtor as follows:

| Claimant | Claim No. | Claim Amount | Scheduled Amount |
|---|---|---|---|
| Mannuccio Mannucci | 388 | $771,843.00 | $664,036.47 |
| Angelo Taranta | 389 | $1,298,724.00 | $1,117,614.95 |
| Dilva Salvioni | 390 | $619,645.00 | $536,211.51 |
| Guido Padula | 391 | $265,962.00 | $230,199.28 |

**BASIS FOR RELIEF REQUESTED**

**A.** **The Standard for Objections**

14. Section 502(a) of the Bankruptcy Code provides, in pertinent part, that:

> A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

11 U.S.C. § 502(a).

Bankruptcy Rule 3007(a) provides:

> An objection to the allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the

6

> claimant, the debtor or debtor in possession and the trustee at least 30 days prior to the hearing. If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.

Fed. R. Bankr. Pro. 3007(a).

15. As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under Bankruptcy Code § 502(a). *See In re Vanegas*, 290 B.R. 190, 193 (Bankr. D. Conn. 2003); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, n.13 (Bankr. S.D.N.Y. 2000). To receive the benefit of *prima facie* validity, however, "the proof of claim must 'set forth facts necessary to support the claim.'" *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988).

16. A party objecting to the claim must only provide evidence sufficient to negate the *prima facie* validity of the claim by refuting one or more of the facts in the filed claim. *In re Waterman Steamship Corp.*, 200 B.R. 770 (Bankr. S.D.N.Y. 1996). Once this occurs, the ultimate burden of persuasion shifts back to the claimant. *Id.; see also In re St. Johnsbury Trucking Co.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997). The claimant must prove the claim, not sit back while the objector attempts to disprove it. *In re Bennett*, 83 B.R. 248, 252 (Bankr. S.D.N.Y. 1988).

B. **The Funds in the Deferred Compensation Plans Were Cabrini's**

17. The language in the Deferred Compensation Agreements explicitly refutes the Mannucci Parties' allegations. Each Deferred Compensation Agreement states:

> "The Corporation [Cabrini] will purchase **in the name of the Corporation**, mutual funds shares … in accordance with the terms of an Accumulation Plan of such mutual funds which provides for the automatic reinvestment in additional shares of said Fund of all dividends and distributions (both from income and capital appreciation) which may accrue there-

7

from. **Employee shall have no right in such mutual funds shares, which shall be the absolute property of the Corporation.**" *See* Exhibit 1, at ¶ 3 (emphasis added).

18. The Deferred Compensation Agreements do <u>not</u> contain any language stating, suggesting or implying that the mutual funds are to be held in trust for the benefit of the Doctors. The only rights the Doctors have are to (i) designate beneficiaries to receive distributions (¶ 4), (ii) choose cash or mutual fund shares as the method of distribution (¶ 7), and (iii) agree jointly with the Debtor to substitute investments (¶ 8).

19. Existing case law and relevant statutes make clear that the funds in the Deferred Compensation Accounts were Cabrini's property, and as such subject to the claims of general creditors. *See In re Downey Regional Medical Center-Hospital, Inc.*, 2010 WL 5059586 (9th Cir. BAP Cal. 2010). *See also*, *In re The Colonial Bancgroup, Inc.*, 436 B.R. 695 (Bankr. M.D.Ala. 2010); *In re Silicon Graphics, Inc.*, 363 B.R. 690 (Bankr. S.D.N.Y. 2007). The Deferred Compensation Agreements are either not covered by ERISA or are so-called "top hat plans" under ERISA.[10]

20. The Deferred Compensation Agreements were individually negotiated by the Doctors and do not apply to any specific category of employees or management, nor do they include standard ERISA terms such as specifying eligibility rules, claims procedures or a plan administrator that are indicative of an employee benefits plan covered by ERISA. *See Eckardt v. Wiebel Tool Co., Inc.*, 965 F. Supp. 357 (E.D.N.Y.

---

[10] A top hat plan is defined as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-1145." *Patrick Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283 (2d. Cir. 2000).

1997).  Thus, they are not ERISA plans.  Even if the Court concludes that the Deferred Compensation Agreements are covered by ERISA, they are "top hat plans" set up for a special group of employees, for which ERISA's protections are not generally applicable.  *Gallione v. Flaherty*, 70 F3d 724 (2nd Cir. 1995).  In that event, the Mannucci Parties' rights under the agreements are governed by contract law, rather than trust or fiduciary principles under ERISA.  Their only entitlement is what is granted to them by the terms of the Deferred Compensation Agreements.  *See Eastman Kodak Company v. Bayer Corp.*, 369 F.Supp.2d 473, 478 (S.D.N.Y. 2005), citing *Pereira v. Cogan*, 200 F. Supp.2d 367, 375 (S.D.N.Y. 2002).

21.  *In re Downey Regional Medical Center-Hospital, Inc.* is particularly instructive.  In *Downey Regional Medical*, the American Hospital Association ("AHA") established a Master Compensation Deferral Plan (the "Plan"), through which participating members and organizations could provide retirement benefits to their officers and employees.  Under its terms, participants could defer a portion of their compensation in return for future benefits provided through the Plan.  The deferred compensation would remain part of the *employer's* unrestricted assets and would not be held in trust.  The Plan expressly provided that "all amounts of compensation deferred under this Plan, all property and rights which may be purchased by the Employer with such amounts and all income attributable to such amounts, property or rights to property shall remain the sole property and rights of the Employer without being restricted by the provisions of this Plan, subject only to the claims of the Employer's general creditors."  The Plan further provided that the employer's obligations were "purely contractual" and not funded or secured in any way.  The Plan authorized the AHA to invest the funds in an annuity (issued by Aetna Life Insurance and Annuity) from which bene-

9

fits could be paid. However, the investment was solely for the employer's convenience and remained the sole property of the employer at all times.

22. Downey Regional Medical Center ("Downey") adopted the Plan and established a deferred compensation plan for its employees. In September 2009, Downey filed for chapter 11 protection. A participant in the plan filed claims against the estate asserting ownership in various retirement accounts held by Downey, including the annuity account funded by the deferred compensation. Downey asserted that the funds held in the account were property of its bankruptcy estate and subject to the claims of its general creditors.

23. Subsequently, Downey moved for the approval of a stipulation that sought the turnover of the funds in the deferred compensation plan to its estate. Notwithstanding the filing of an objection by the participant, the bankruptcy court approved the stipulation on the basis that the funds were not excluded from property of Downey's bankruptcy estate under section 541(b)(7) and that deferral of compensation is not the equivalent of having funds withheld from one's wages as required for the proper application of section 541(b)(7). The court also found that the deferred compensation plan was not subject to ERISA.

24. On appeal, the Bankruptcy Appellate Panel ("BAP") affirmed that the deferred compensation plan was an unfunded "top hat" plan. Noting that the annuity account was held in Downey's name and the plan documents plainly provided that compensation deferred under the plan would remain part of Downey's unrestricted assets and its sole property, the court concluded that the participant held no interest in the account under section 541(b)(7) of the Bankruptcy Code. The BAP noted that courts that have considered this issue have uniformly concluded that an agreement to defer income was qualitatively different from the type of "withholding" contem-

plated in § 541(b)(7).  *Downey Regional Medical*, 2010 WL 5059586, *8, citing *In re The Colonial BancGroup, Inc., supra*.  The BAP further concluded that unlike income that is "withheld," an employee deferring compensation has no present entitlement to the deferred income.   To the contrary, a "deferral" implies an agreement to receive income in the future with no past or present right to possession.  *Downey Regional Medical*, 2010 WL 5059586, *8, citing *Schroeder v. New Century Holdings (In re New Century Holdings, Inc.)*, 387 B.R. 95, 114 (Bankr. D.Del. 2008). *See also*, *Synovus Trust Co. v. Bill Heard Enters., Inc. (In re Bill Heard Enters., Inc.)*, 419 B.R. 858, 867-68 (Bankr. N.D. Ala. 2009).

    25. The court in the *Colonial BancGroup* case reached a similar result.  There, the debtor filed a motion for authority to exercise ownership rights over assets contained in a deferred compensation plan established for its key executives, which allowed the executives to defer taxation on a portion of their earnings.  The court found that based on the language of the deferred compensation plan, the plan was a "top hat" plan and any contributions made to the plan were property of the bankruptcy estate and subject to claims of debtor's creditors.  The court noted that the plan specified that the participants would have no legal or equitable rights, interests or claims in any property or assets of the company and would merely have a right to file a claim under the plan for payment of benefits.  The plan also provided that it would be "an unfunded and unsecured promise" to pay money in the future.  Based on the participants' lack of ownership in the funds as well as policy concerns expressed by the court that should the funds be removed from the reach of general unsecured creditors that the very purpose, structure and function of a top hat plan would be averted, the court held that the amounts in the plan would remain general assets of the debtor subject to the claims of its creditors.

26. The underlying facts of the foregoing cases are analogous to those at hand. The Deferred Compensation Agreements executed by the Mannucci Parties were clearly designed to benefit key employees and entitled the participants to defer income that they (or a designated beneficiary) could receive at a future date. By their very language, Cabrini's Deferred Compensation Agreements constitute "top hat" plans. They were "unfunded" within the meaning of ERISA – they specified that the mutual funds would be purchased in the name of Cabrini and would be the absolute property of Cabrini, and the Doctors had no rights in the mutual fund shares. *See Demery v. Extebank Deferred Compensation Plan*, 216 F.3d at 287. Accordingly, the proceeds contained therein were at all times Cabrini's property. Cabrini did nothing that violated ERISA or any other statute.

C. **There is No Trust**

27. Assuming the Mannucci Parties could overcome the very steep hurdles and obtain permission to amend their proofs of claim, they still would not be able to establish any kind of a trust relationship. First, there is no express trust. An express trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." *In re Ames Department Stores, Inc.*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002), aff'd, *LFD Operating, Inc. v. Ames Dept. Stores, Inc.*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), aff'd, *In re Ames Dept. Stores, Inc.*, 144 Fed.Appx. 900 (2nd Cir. 2002), citing RESTATEMENT (SECOND) OF TRUSTS § 2 (1959). Generally, four elements comprise an express trust: (i) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (iv) the actual delivery of the fund or other property,

12

or the legal assignment thereof to the trustee, with the intention of passing legal title thereto to him or her as trustee. *Ames Department Stores*, 274 B.R. at 623. None of the elements of an express trust are present. The language of the Deferred Compensation Agreements is crystal clear. In New York, if there is no distinct trust fund but merely a general obligation to ultimately pay a sum of money, then there is no trust, but only a debt. *Ames Department Stores*, 274 B.R. at 624, citing *Petition of Travers,* 32 N.Y.S.2d 742, 743, 177 Misc. 1044, 1046 (Sup.Ct. Kings Co.1941).

28. <u>Second</u>, there is no constructive trust. In New York, a party seeking to impose a constructive trust must ordinarily establish four elements: (i) a confidential or fiduciary relationship; (ii) a promise, express or implied; (iii) a transfer made in reliance on that promise; and (iv) unjust enrichment. *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 353 (2d Cir.1992); *Ames Department Stores*, 274 B.R. at 625. Courts have additionally required that the claimant establish proof of a *res* to which the constructive trust could attach. *Beekman Paper Co., Inc. v. St. Theresa Properties, Inc. (In re St. Theresa Properties, Inc.),* 152 B.R. 852, 857 (Bankr.S.D.N.Y.1993).

29. The Mannucci Parties' constructive trust claims must also fail under this analysis, for several reasons. There was no transfer of the Doctors' property; Cabrini did not withhold any portion of their compensation and divert it to the Deferred Compensation Agreements. Rather, Cabrini was contractually obligated to purchase mutual funds with Cabrini's own money. Moreover, the language of the contracts is clear that the funds at all times belonged to Cabrini.

30. In addition, there is no *res* to which the constructive trust could attach. According to the Mannucci Parties, Cabrini took the money from the Deferred Compensation Accounts between November 2006 and mid-2007. Cabrini did not seg-

regate those funds. To the contrary, the Mannucci Parties allege that Cabrini informed them in a letter that it was moving the funds into Cabrini's own general operating account because Cabrini "was in desperate need of working capital to maintain its operations." *See* complaint attached to proofs of claim, at ¶ 51. This hardly establishes the necessary *res*, as those funds were long ago spent for Cabrini's operations.

31. In short, as noted by this Court in *Ames Department Stores*, if there is no trust but only a general obligation to pay money, a debtor-creditor relationship exists. That is exactly what is present here. As a result, the Mannucci Parties simply hold general unsecured claims for breach of the Deferred Compensation Agreements and nothing more.

C. **The Mannucci Parties Cannot Amend Their Claims**

32. The Mannucci Parties have indicated that they may seek to amend their claims to assert constructive trust. The decision to allow the amendment of a claim is committed to the discretion of the bankruptcy judge. *In re Enron Corp.,* 298 B.R. 513, 520 (Bankr. S.D.N.Y. 2003). A claimant may amend a timely claim after the bar date to correct defects of form, provide more detailed allegations of fact relating to the timely claim, or plead a new theory of recovery under the facts set forth in the timely claim. *Integrated Resources, Inc. v. Ameritrust Co. N.A. (In re Integrated Resources, Inc.),* 157 B.R. 66, 70 (S.D.N.Y.1993). The claimant may not, "through the guise of an amendment, circumvent the bar date by asserting a new claim.*" In re Asia Global Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005).

33. The Debtor submits that the Mannucci Parties would be time barred from amending their proofs of claim to expressly assert a constructive trust claim, which would be a completely new claim. As noted *supra*, the bar date has passed. In *In re Black & Geddes, Inc.*, 30 B.R. 389 (Bankr. S.D.N.Y. 1983), *aff'd*, 58 B.R. 547

14

(S.D.N.Y. 1983), a creditor filed a general unsecured claim against the chapter 11 debtor. After the case converted to chapter 7 and the bar date had passed, the creditor asserted a constructive trust claim. The bankruptcy court dismissed the claim as untimely. On appeal, the district court affirmed because there was a real potential of prejudice to priority creditors if the late claims were allowed. The court explained that, "[i]n approving claims and distributions, trustees and judges should not feel hindered by nagging suspicions that latent claims could materialize at any time prior to a final *pro rata* distribution to unsecured creditors." 58 B.R. at 553. The court ruled that "[a]mendments are not allowed to assert new causes of action when prejudice would result." *Id. Cf. In re Asia Global Crossing*, 324 B.R. at 508 (original and amended claims arose from different sets of facts and required different proof); *In re McBride,* 337 B.R 451 (Bankr. N.D.N.Y. 2006) (creditor's attempt to change the status of its claim from secured to unsecured after the bar date was not a valid amendment of the claim).

### RESERVATION OF RIGHTS

34. The Debtor expressly reserves the right to object to any other claims (whether filed or not) that may be asserted by any of the Mannucci Parties. Should this objection be denied or dismissed, the Debtor reserves the right to further object to the classification of the Mannucci Parties' claims on any other grounds the Debtor discovers during the pendency of this case.

### NOTICE

35. The Debtor has given notice of the relief requested herein by service of a copy of this Motion and the notice of hearing by regular, United States mail not less than 30 days prior to the hearing, upon: (i) counsel to the Mannucci Parties; (ii) counsel to the Committee; (iii) all parties having filed a notice of appearance; and

(iv) the United States Trustee. The Debtor submits that no other or further notice of this Motion is necessary or required.

**WHEREFORE,** the Debtor respectfully requests entry of an Order, substantially in the form annexed as <u>Exhibit 3</u>, classifying the Mannucci Parties' claims as general unsecured claims for all purposes in this chapter 11 case, based upon a finding of breach of the terms of the Deferred Compensation Agreements, and fixing those claims in the scheduled amounts, together with such other and further relief as the Court considers appropriate.

Dated: New York, New York
February 4, 2011

TOGUT, SEGAL & SEGAL LLP
Attorneys for the Debtor and
Debtor in Possession
By:

/s/ Frank A. Oswald
FRANK A. OSWALD
A Member of the Firm
One Penn Plaza, Suite 3335
New York, New York 10019
(212) 594-5000