UNITED STATES BANKRUPTCY COURT          HEARING DATE: March 9, 2011
SOUTHERN DISTRICT OF NEW YORK           TIME: 9:30 A.M.
-------------------------------------------------------------x
                                        :
In re:                                  :       Chapter 11
                                        :
CABRINI MEDICAL CENTER,                 :       Case No. 09-14398 (AJG)
                                        :
                        Debtor.         :
                                        :
-------------------------------------------------------------x

# THE DOCTORS' RESPONSE TO DEBTOR'S MOTION
# FOR ORDER PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007
# CLASSIFYING AND FIXING CLAIMS FILED BY THE MANNUCCI PARTIES

Leonard Weintraub
Katherine Harrison
Jason Snyder
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020

March 2, 2011

Attorneys for
Mannuccio Mannucci, M.D.
Angelo Taranta, M.D.
Guido Padula, M.D. and
Mrs. Dilva Salvioni

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................iii

PRELIMINARY STATEMENT .......................................................... 1

STATEMENT OF FACTS ............................................................... 3

    The Deferred Compensation Plans.............................................. 3

    The Doctors Become Vested in the Deferred Compensation Accounts......... 7

    Cabrini Loots the Doctors' Plans' Assets ..................................... 8

    State Court Procedural History ............................................... 10

    Cabrini Files for Bankruptcy................................................... 12

ARGUMENT ........................................................................... 13

    I. The Funds in the Deferred Compensation Plans Were the Doctors'......... 13

        A. The Bankruptcy Code Excludes Deferred Compensation from a Debtor's Estate ..................................................... 13

        B. The Plans Are Employee Pension Benefit Plans And Are Not Part of the Debtor's Bankruptcy Estate .......................................... 14

            1. The Doctors' Plans Were Funded ..................................... 16

            2. Even If the Plans Were Originally Unfunded, They Clearly Were Funded As Of 1998................................................ 24

            3. The Doctors Were Not A Select Group Of Management Or Highly Compensated Employees ....................................... 26

            4.The Doctors Did Not Have Sufficient Influence To Negotiate Compensation Agreements That Protected Their Interests .. 28

    II. Alternatively, The Debtor Is Holding The Plan Assets In Trust............... 29

    III. Cabrini Waived Any Right It May Have Had in the Plans..................... 35

    IV. If Necessary, The Doctors Should Be  Permitted To Amend Their Proof Of Claim............................................................... 35

CONCLUSION......................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Brigham & Women's Physicians Org.,*
467 F. Supp. 2d 136 (D. Mass. 2006) ............................................................ 14

*Begier v. I.R.S.,*
496 U.S. 53 (1990) .................................................................................... 30

*Bigda v. Fischbach Corp.,*
898 F.Supp. 1004 (S.D.N.Y. 1995) .........................................................15, 28

*Butner v. United States,*
440 U.S. 48 (1979) ................................................................................... 30

*Carrabba v. Randalls Food Markets, Inc.,*
38 F. Supp. 2d 468, 478 (N.D. Tex. 1999) ................................................... 14

*Colarusso v. Transcapital Fiscal Sys., Inc.,*
227 F. Supp. 2d 243 (D.N.J. 20020 ........................................ 15n, 20-21, 21n

*Conrady v. Buhre,*
148 A.D. 776 (2d Dep't 1912) .................................................................34n

*Corwin v. Kaufman,*
37 A.D.2d 838 (2d Dep't 1971) ...............................................................34n

*Counihan v. All State Insurance Co.,*
194 F.3d 357 (2d Cir. 1999) ..................................................................... 31

*Deal v. Kegler Brown Hill & Ritter Co. L.P.A.,*
551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) ................................................. 14

*Demery v. Extebank Deferred Compensation Plan (B),*
216 F.3d 283 (2nd Cir. 2000).................................................. 14-16, 26, 27, 28

*Dice v. Inwood Hills Condominium,*
237 A.D.2d 403 (2nd Dept. 1997) .............................................................. 35

*Donovan v. Mazzola,*
716 F.2d 1226 (9th Cir.1983) ................................................................... 29

Duggan v. Hobbs,
99 F.3d 307 (9th Cir.1996) ........................................................ 26

Eckardt v. Wiebel Tool Co., Inc.,
965 F. Supp. 357 (E.D.N.Y. 1997) ............................................. 15n

Feinberg v. Katz,
2002 WL 1751135 (S.D.N.Y. 2002) ........................................... 34

Grimo v. Blue Cross/Blue Shield,
34 F.3d 148 (2d Cir.1994) ........................................................ 15n

Guiragoss v. Khoury,
444 F. Supp. 2d 649 (E.D. Va. 2006) .................................... 14n, 17

Hadden v. Consolidated Edison Co. of N.Y.,
45 N.Y.2d 466 ........................................................................ 35

Holloman v. Mail-Well Corporation,
443 F.3d 832 (11th Cir. 2006) ................................................. 26

In re Altchek,
124 B.R. 944 (Bkrtcy. S.D.N.Y. 1991) ..................................... 30

In re Ames Dep't Stores, Inc.,
274 B.R. 600 (Bankr. S.D.N.Y. 2002) ....................................... 31

In re Black & Geddes, Inc.,
30 B.R. 389 (Bankr. S.D.N.Y. 1983 ......................................... 37

In re Braniff Intern. Airlines, Inc.,
164 B.R. 820 (Bkrtcy. E.D.N.Y. 1994) ...................................... 30

In re Colonial Bancgroup
436 B.R. at 704 ............................................................ 18, 19, 26

In re Downey Regional Medical Center-Hospital, Inc.
441 B.R. 120 (9th Cir. 2010) ............................................. 17, 19

In re Enron Corp.,
298 B.R. 513 (Bankr. S.D.N.Y. 1993) ................................. 35, 36

In re First Central Financial Corp.,
377 F.3d 209 (2nd Cir. 2004) .................................................. 31

In re Flanagan,
503 F.3d 171 (2nd Cir. 2007) ..................................................... 30

In re Howard's Appliance Corp.,
874 F.2d 88 (2nd Cir. 1989) ...................................................... 30

In re Montagne,
421 B.R. 65 (Bkrtcy. D. Vt. 2009) .............................................. 36

In re New Century Holdings, Inc.,
387 B.R. 95 (Bkrtcy. D. Del. 2008) .......................................14, 25

In re Silicon Graphics, Inc.,
363 B.R. 690 (Bkrtcy. S.D.N.Y. 2007)......................................... 19

In re Taub,
427 B.R. 208 (Bkrtcy. E.D.N.Y. 2010)........................................ 30

In re Telephone Co. of Cent. Florida,
308 B.R. 579 (Bkrtcy. M.D. Fla. 2004) ....................................... 36

In re: Koreag,
961 F.2d 341 (2d Cir. 1992) ...................................................... 31

Integrated Resources, Inc. v. Ameritrust Co. N.A. (In re Integrated Resources, Inc.),
157 B.R. 66 (S.D.N.Y.1993) ...................................................... 36

Lee v. Wright,
108 A.D.2d 678 .......................................................................... 35

Liss v. Smith,
991 F.Supp. 278 (S.D.N.Y. 1998)............................................... 29

MacDonald v. Summit Orthopedics, Ltd.,
681 F. Supp. 2d 1019 (D. Minn. 2010) ...................................... 27

Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of
Contemporary Dance, Inc.,
24 F. Supp. 2d 567 (2002) ........................................................ 33

Miller v. Heller,
915 F. Supp. 651 (S.D.N.Y. 1996)............................................... 16

Nishman v. De Marco,
76 A.D.2d 360 (2d Dep't 1980) ................................................34n

Nissho Iwai American Corporation v. Siedler,
No. 94 Civ. 513, 1995 WL 555699 (S.D.N.Y. Sept. 18, 1995) ........................ 34

P & D Cards & Gifts v. Matejka,
150 A.D.2d 660 ................................................................. 35

Rogers v. Rogers,
63 N.Y.2d 582 (1984) .......................................................... 33

Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.),
89 F.3d 143 (3d Cir.1996) ..................................................... 26

Simonds v. Simonds,
45 N.Y.2d 233 (1978)........................................................31, 33

Tate v. Chiquita Brands Intern. Inc.,
2009 WL 2431283, (S.D. Ohio 2009) ............................................ 27

TSS-Seedman's, Inc. v. Elota Realty Co.,
72 N.Y.2d 1024................................................................. 35

U.S. v. Whiting Pools, Inc.,
462 U.S. 198 (1983)........................................................... 30

United States v. Coluccio,
51 F.3d 337 (2d Cir.1995) .................................................... 31

Wilde v. Wilde,
576 F. Supp. 2d 595 (S.D.N.Y. 2008) ...................................... 33, 34n

Wood v. Cross Props., Inc.,
5 A.D.2d 853 (2d Dep't 1958) .................................................34n

**Statutes**

11 USC 541 ...............................................................13, 29, 30

29 USC § 1002 .............................................................14, 16

29 USC § 1003 ................................................................ 15

29 USC §1051 ................................................................ 14n, 15, 26

29 USC §1081 ................................................................ 14n, 15, 26

29 USC §1101 ................................................................ 14n, 15, 26

29 USC §1024 ...................................................................... 16

**Regulations**

Treasury Regulation § 1.451-2(a) ............................................ 22

Mannuccio Mannucci, M.D., Angelo Taranta, M.D., Guido Padula, M.D., and Mrs. Dilva Salvioni, the widow of Daniele Salvioni, M.D. (collectively, the "Doctors"), respectfully submit this Response to the Debtor's Motion for an Order Classifying and Fixing the Claims Filed by the Doctors.

## PRELIMINARY STATEMENT

The four Doctors dedicated their lives and careers to medicine, practicing primarily at Cabrini Medical Center ("Cabrini" or "Debtor"). From the late 1960s through the 1970s, Cabrini entered into a series of deferred compensation agreements with the Doctors, pursuant to which Cabrini withheld some of the Doctors' compensation, to be paid after the Doctors' retirement from Cabrini. Cabrini opened up separate brokerage accounts for each of the Doctors, and annually placed the Doctors' deferred compensation into such accounts (which were transferred to Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") in or about 1998). After the Doctors retired from Cabrini, the hospital made yearly distribution payments to the Doctors from their respective Merrill Lynch accounts, pursuant to the deferred compensation agreements. But in 2006, Cabrini improperly removed assets from the Doctors' deferred compensation accounts at Merrill Lynch – on a purportedly "temporarily" basis – into the hospital's general operating account. Not only was the money never returned to the Doctors' accounts, but in 2007 Cabrini improperly removed the rest of the money from the Doctors' deferred compensation accounts at Merrill Lynch.

Three of the Doctors are now in their 80s, and one died in 2007.  The money that they had set aside for their retirement is no longer available to them.  Cabrini, now in bankruptcy, claims that the assets in the Doctors' Merrill Lynch accounts never belonged to the Doctors, and that any money remaining in the Debtor's estate should go to satisfy other creditors.  But it is clear that the assets in the Doctors' Merrill Lynch accounts were the assets of the Doctors, not Cabrini.

In any event, according to the governing plan documents, at the time the Doctors retired – before the Doctors' Merrill Lynch accounts were looted by Cabrini – the Doctors were permitted to withdraw such amounts, making it clear that the assets were solely the property of the Doctors.

The Doctors are beneficiaries of an ERISA pension benefit plan, whose assets are excluded from the Debtor's bankruptcy estate and not available to satisfy the Debtor's creditors.   But even if the Court finds that the Doctors' deferred compensation plans are not excluded from the Debtor's estate as ERISA pension benefit plans, the Doctor's assets are still excluded from the Debtor's estate.  Cabrini set aside the assets for the Doctors, promising to pay the Doctors after their retirement.   The Doctors agreed to have their compensation deferred, believing that the money would be in their accounts when they retired.  The Debtor therefore merely holds the assets in a constructive trust for the Doctors, and would be unjustly enriched if the Doctors' assets became assets of the bankruptcy estate.  The Doctors therefore respectfully request that the Court order the Debtor to pay to the Doctors the amounts improperly taken from the Doctors' Merrill Lynch

accounts. Alternatively, if the Court is not yet prepared to so order, the Doctors respectfully request an opportunity to conduct expedited discovery in preparation for a future hearing at which the Court will fix and classify the Doctors' claims.

## STATEMENT OF FACTS

### The Deferred Compensation Plans

In or about January 1967, Cabrini (then known as Columbus Hospital) set up the first Deferred Compensation Plan for Dr. Padula (the "First Padula Plan")[1]. Under the terms of the First Padula Plan, Cabrini paid $3,000 per year into an account for Dr. Padula, as part of his annual compensation, where the funds would be invested and all dividends and other earnings would be reinvested. The First Padula Plan directed that distributions to Dr. Padula or his designated beneficiary would begin upon termination of Dr. Padula's employment with Cabrini for any reason.

In or about April 1975, Cabrini set up a second Deferred Compensation Plan for Dr. Padula (the "Second Padula Plan").

According to Cabrini's records, Dr. Padula retired from Cabrini in 1980.

Cabrini paid Dr. Padula's deferred compensation into an account in Dr. Padula's name, through the time of Dr. Padula's retirement from Cabrini. In or

---

[1] All of the Doctors' Deferred Compensation Plans that Cabrini and the Doctors have been able to locate are attached as <u>Exhibit A</u> to the Affidavit of Katherine B. Harrison, sworn to on March 2, 2011 (the "Harrison Aff.").

about 1998, the assets in Dr. Padula's deferred compensation account were transferred to an account in Dr. Padula's name at Merrill Lynch.

In or about December 1975, Cabrini set up a Deferred Compensation Plan for Dr. Taranta (the "Taranta Plan"). Pursuant to the Taranta Plan, Cabrini paid $13,880 into an account for Dr. Taranta, as part of his annual compensation, where the funds would be invested and all dividends and other earnings would be reinvested. The Taranta Plan directed that distributions to Dr. Taranta or his designated beneficiary would begin upon termination of Dr. Taranta's employment with Cabrini for any reason.

According to Cabrini's records, Dr. Taranta retired from Cabrini in 1995.

Cabrini annually paid Dr. Taranta's deferred compensation into an account in Dr. Taranta's name, through the time of Dr. Taranta's retirement from Cabrini. In or about 1998, the assets in Dr. Taranta's deferred compensation account were transferred to an account in Dr. Taranta's name at Merrill Lynch.

In or about December 1973, Cabrini (then known as Columbus Hospital) set up the first Deferred Compensation Plan for Dr. Salvioni (the "First Salvioni Plan"). Under the terms of the First Salvioni Plan, Cabrini paid $14,000 per year into an account for Dr. Salvioni, as part of his annual compensation, where the funds would be invested and all dividends and other earnings would be reinvested. The First Salvioni Plan directed that distributions to Dr. Salvioni or his

designated beneficiary would begin upon termination of Dr. Salvioni's employment with Cabrini.

In or about August 1978, Cabrini set up a second Deferred Compensation Plan for Dr. Salvioni (the "Second Salvioni Plan"). On September 17, 1997, Dr. Salvioni designated in writing that his wife, Dilva Salvioni, be his principal beneficiary in his Deferred Compensation Plans. He designated his children as secondary beneficiaries. According to Cabrini's records, Dr. Salvioni retired from Cabrini in 1980. Dr. Salvioni died in November 2007.

Cabrini annually paid Dr. Salvioni's deferred compensation into an account in Dr. Salvioni's name, through the time of Dr. Salvioni's retirement from Cabrini. In or about 1998, the assets in Dr. Salvioni's deferred compensation account were transferred to an account in Dr. Salvioni's name at Merrill Lynch.

In the mid-1970s, Cabrini set up a Deferred Compensation Plan for Dr. Mannucci (the "Mannucci Plan"). On information and belief, pursuant to the Mannucci Plan, each year, Cabrini paid certain amounts into an account for Dr. Mannucci, as part of his annual compensation, where the funds would be invested and all dividends and other earnings would be reinvested. The Mannucci Plan directed that distributions to Dr. Mannucci or his designated beneficiary would begin upon termination of Dr. Mannucci's employment with Cabrini.

According to Cabrini's records, Dr. Mannucci retired from Cabrini in 2000.

Cabrini annually paid Dr. Mannucci's deferred compensation into an account in Dr. Mannucci's name, through the time of Dr. Mannucci's retirement from Cabrini. In or about 1998, the assets in Dr. Mannucci's deferred compensation account were transferred to an account in Dr. Mannucci's name at Merrill Lynch.

Each of the Deferred Compensation Agreements states that the benefits conferred by the Plan are non-forfeitable to the employee. Each of the Deferred Compensation Agreements states:

> Neither Employee nor his beneficiary shall have any right to commute, sell, assign, transfer or otherwise convey the right to receive any payments hereunder, which payments and the rights thereto are expressly declared to be non-assignable, non-transferable, and non-forfeitable, nor shall any interest of Employee herein be liable to any claim of any creditor or subject to any judicial process involving Employee.

See Exhibit A to the Harrison Aff.

Each Deferred Compensation Agreement further states that "no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee." Exhibit A to the Harrison Aff. at ¶ 11.

**The Doctors Become Vested in the Deferred Compensation Accounts**

In April 1997, Cabrini addressed identical letters to each of the Doctors, alerting them to a "tax problem under the deferred compensation arrangement covering you and about a half-dozen other former employees." The letter advised the Doctors that "under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment." See Harrison Aff. ¶ 32, Exhibit E.

In or about 1998, Cabrini moved the Plans' assets to individual accounts at Merrill Lynch, one for each of the Doctors, in the name of each respective Doctor. From that point on, each of the Doctors received monthly account statements and year-end statements directly from Merrill Lynch. See Harrison Aff. Exhibit B. Each Doctor received a separate Merrill Lynch account statement, sent to his home address, with the notation "FAO[2] Dr. [his name]." For example, Dr. Mannucci received Merrill Lynch account statements addressed "FAO Dr. Mannucci." See Affidavit of Mannuccio Mannucci, M.D., sworn to on February 28, 2011 (the "Mannucci Aff.") a ¶10, Exhibit A. Thus, for close to ten years, Merrill Lynch sent monthly account statements to each Doctor, setting forth the current amounts in the Doctors' accounts. Nowhere in the statement does it say that these assets are assets of Cabrini, or that these assets have not vested, or that the Doctors have no right to such assets. See Harrison Aff. Exhibit B.

---

[2] "FAO" stands for "for the account of."

Over the decades that the Doctors had worked for Cabrini, and the years since they had each retired, the Doctors' deferred compensation plans increased in value based on the annual contributions, plus accrued interest and any reinvested dividends. As of October 2006, the deferred compensation in the Doctors' Merrill Lynch accounts totaled:

| | |
|---|---|
| Mannucci Plan | $735,440.77 |
| Taranta Plan | $1,238,567.84 |
| Salvioni Plan | $598,683.80 |
| Padula Plan | $256,930.00 |

**Cabrini Loots the Doctors' Plans' Assets**

On November 16, 2006 – only ten days before the Berger Commission issued its formal report recommending that the State of New York ensure that Cabrini be shut down – Cabrini sent a letter to the Doctors informing them that due to a "major restructuring project intended to reverse the effects of several years of operating losses" money would be "temporarily" moved "from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007." Each of the letters sent to each of the Doctors was substantially similar. See Mannucci Aff. at ¶¶ 14 – 17.

At that time, almost two million dollars was improperly removed from the Doctors' Merrill Lynch accounts.

On November 26, 2006, the Berger Commission issued its formal report recommending that Cabrini be closed in an orderly fashion. On December 6, 2006 New York's Governor issued written approval of the Berger Commission's recommendations, and on January 1, 2007 the Berger Commission's recommendations became law and the New York Commissioner of Health was ordered to close Cabrini.

In each of April 2007 and June 2007, Cabrini took additional hundreds of thousands of dollars from the Doctors' Merrill Lynch accounts, this time without even notifying the Doctors.

After the June 2007 improper looting of the Doctors' Merrill Lynch accounts, the accounts were completely wiped out. In total, $2,956,176 was improperly taken from the Doctors' Merrill Lynch accounts. See Harrison Aff. ¶ 30, Exhibit D.[3] Cabrini never replaced any of the deferred compensation funds nor did it make any further yearly distributions to the Doctors in respect of their deferred compensation plans.

On information and belief, at the time Cabrini sent the November 16, 2006 letter to the Doctors, Cabrini knew that the Berger Commission would recommend the closure of Cabrini. On further information and belief, each report

_____

[3] The Debtor's Scheduled Amounts for the Doctor's claims (see Debtor's Motion ¶ 13) are factually incorrect. As the Harrison Aff. establishes, Cabrini's attorneys stated the full amounts that Cabrini took from the Doctors' accounts in a letter dated October 23, 2007. Harrison Aff. Exhibit E. These accord with the Doctors' claim amounts.

of the Independent Auditors of Cabrini from 2001 through 2007 (the last year for which a report was issued prior to Cabrini filing for bankruptcy) contained a going concern qualification.

Therefore, on information and belief, at each time Cabrini improperly took assets from the Doctors' Merrill Lynch accounts, Cabrini had no intention of repaying such funds and had no reasonable expectation that it would ever be able to repay such money.

**State Court Procedural History**

On August 8, 2008, the Doctors filed a complaint (the "Original Complaint") against Cabrini, the Missionary Sisters for the Sacred Heart of Jesus ("MSSHJ"), and Merrill Lynch in New York State Supreme Court (the "NY Court"). The Original Complaint asserted claims under ERISA and New York common law to recover the deferred compensation benefits looted by Cabrini and the MSSHJ. The Original Complaint also asserted claims against Merrill Lynch for breach of fiduciary duty, breach of contract, and fraud.

On July 9, 2009, Cabrini filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (Case No. 09-14398).

On November 14, 2009, the NY Court, ruling on separate motions to dismiss the Original Complaint filed by each of (i) Cabrini and the MSSHJ and (ii) Merrill Lynch, recognized that Cabrini was protected by bankruptcy stay. The NY Court therefore dismissed the claims against the MSSHJ without prejudice, finding

that the MSSHJ, as a member of a non-profit corporation (Cabrini), could not be held liable for acts committed by Cabrini until after a judgment is entered against Cabrini. The NY Court instructed the Doctors that if the Doctors intended to assert claims against the MSSHJ under an "alter ego" or "piercing the corporate veil" theory, the Doctors should file an amended complaint. The NY Court also dismissed the claims for breach of fiduciary duty and breach of contract against Merrill Lynch, and dismissed without prejudice the claims against Merrill Lynch for fraud.

The Doctors filed an amended complaint against the MSSHJ and Merrill Lynch on March 1, 2010 (the "Amended Complaint"). In compliance with the bankruptcy stay, the Amended Complaint did not name Cabrini. In compliance with the NY Court's order, the Amended Complaint asserted claims against the MSSHJ as an alter ego of Cabrini, responsible for Cabrini's looting of the Doctor's Merrill Lynch accounts. The Amended Complaint also asserted fraud claims against Merrill Lynch, for its behavior in connection with the Doctors' Merrill Lynch accounts.

After the MSSHJ and Merrill Lynch again each filed a motion to dismiss, the Doctors voluntarily discontinued their action against Merrill Lynch. On January 5, 2011, the NY Court ruled that the Doctors could not assert claims against the MSSHJ under an alter ego theory without also naming Cabrini. The NY Court therefore dismissed the claims against the MSSHJ, again without prejudice and with leave to replead. Because the bankruptcy stay prevented the Doctors

from naming Cabrini in any action in the NY Court, the Doctors moved this Court to lift the bankruptcy stay to allow the Doctors to name Cabrini in their complaint, and requested that the NY Court extend the time for the Doctors to file an amended complaint until after this Court rules on the Doctors' motion to lift the stay. The NY Court agreed to stay the Doctors' time to file an amended complaint in NY Court until this Court rules on the motion to lift the stay.

On February 2, 2011, the Doctors filed a notice of appeal with the NY Court, informing the court that the Doctors were appealing the NY Court's January 5, 2011 ruling.

## Cabrini Files for Bankruptcy

On July 9, 2009, Cabrini Medical Center (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

On December 21, 2010, the Debtor filed a plan of liquidation (the "Chapter 11 Plan") and a disclosure statement with respect to the Chapter 11 Plan.

On November 19, 2009, each of the Doctors filed a proof of claim with the Court (the "Proofs of Claim"). Each Proof of Claim stated that the basis for the claim was an attached Amended Complaint – filed in the Supreme Court of the State of New York – that asserted the Doctors' entitlement under ERISA to monies that were improperly taken from the Doctors' Merrill Lynch accounts. See the Harrison Aff. at ¶ 35, Exhibit F.

## ARGUMENT

### I. The Funds in the Deferred Compensation Plans Were the Doctors'

The money taken by the Debtor from the Doctors' Merrill Lynch accounts did not belong to the Debtor. The money is not now an asset of the Debtor's bankruptcy estate. The money is not available to the Debtor's creditors. The money was taken from, and belongs to, the Doctors, and cannot be used by the Debtor to satisfy its obligations to other creditors.

### A. The Bankruptcy Code Excludes Deferred Compensation from a Debtor's Estate

Pursuant to Section 541(b)(7) of the Bankruptcy Code, deferred compensations plans are not property of a debtor's estate:

> Property of the estate does not include any amount
>
> (A) withheld by an employer from the wages of employees for payment as contributions . . . to (I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . .
>
> (B) received by an employer from employees for payment as contributions . . . to (I) an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . .

11 U.S.C. 541(b)(7)(A)(i)(I) and 11 U.S.C. 541(b)(7)(B)(i)(I).

Title I of ERISA defines an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan" and defines an "employee pension benefit plan" as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms

or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

29 U.S.C. § 1002.

### B. The Plans Are Employee Pension Benefit Plans And Are Not Part of the Debtor's Bankruptcy Estate

The Doctors' deferred compensation plans (the "Plans") are employee pension benefit plans, as defined by Title I of ERISA. Therefore the Plans are excluded from the Debtor's estate, unless the Debtor can prove that the Plans are "top hat plans,"[4] which are excluded from some of the relevant ERISA provisions.

Debtor has the burden of demonstrating top hat plan status. See In re New Century Holdings, Inc., 387 B.R. 95, 110 (Bankr. D. Del. 2008); Deal v. Kegler Brown Hill & Ritter Co. L.P.A., 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) ("The burden is on Defendant to show that the ... Plan is a top hat plan"); Carrabba v. Randalls Food Markets, Inc., 38 F. Supp. 2d 468, 478 (N.D. Tex. 1999) (imposing the burden on the party asserting that the plan qualified as a top hat plan); Alexander v. Brigham & Women's Physicians Org., 467 F. Supp. 2d 136, 142 (D. Mass. 2006).

ERISA applies to any employee benefit plan, other than listed exceptions. See Demery v. Extebank Deferred Compensation, 216 F.3d 283, 287

---

[4] "[T]he term "top hat" does not appear anywhere in the statute. Instead it is a colloquial term used to refer to certain unfunded plans specially exempted from ERISA's participation, vesting, funding, and fiduciary requirements." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(10). Guiragoss v. Khoury, 444 F. Supp. 2d 649, 658 (E.D. Va. 2006)

(2d Cir. 2000); 29 USC §§ 1003, 1051, 1081, and 1101.[5] One of the listed exceptions, known as a top hat plan, is defined as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Demery 216 F.3d at 287; 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

There are three inquiries courts make to determine whether an ERISA employee pension benefit plan is a "top hat plan": (1) whether the plan is unfunded; (2) whether the plan is maintained primarily for a select group of management or highly compensated employees, and (3) whether the employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply. See Demery 216 F.3d at 287 – 89; Bigda v. Fischbach Corp., 898 F.Supp. 1004, 1015 (S.D.N.Y. 1995) ("Top hat plans, which are a type of employee benefit plan for high-ranking employees, are

_____

[5] The Debtor asserts that the Plans are not ERISA plans because they do not apply to any specific category of employees or management and do not include standard ERISA terms or name a plan administrator. See Debtor's Motion at ¶ 20 (citing to Eckardt v. Wiebel Tool Co., Inc., 965 F. Supp. 357, 363 (E.D.N.Y. 1997)). But Eckardt says that "[t]he courts will find that an ERISA plan exists where a reasonable person can "ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedure for receiving benefits." Eckardt 965 F. Supp. at 362 (quoting Grimo v. Blue Cross/Blue Shield, 34 F.3d 148, 151 (2d Cir.1994)). Each of those elements is clearly ascertainable from the plain language of the Deferred Compensation Agreements. See Harrison Aff., Exhibit A. The Debtor likely breached its fiduciary duty in not specifying procedures, or appointing a plan administrator. See Colarusso v. Transcapital Fiscal Sys., Inc., 227 F. Supp. 2d 243, 252 (D.N.J. 2002). But the Debtor's negligence should not provide it with a shield to now claim that the Doctors' Plans are not ERISA plans. Id. ("it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards.")

exempted from all substantive provisions on the assumption that these employees have enough power to negotiate adequate plans for themselves and need only the information and enforcement protections of ERISA.").

Top hat plans are exempt from ERISA's participation and vesting provisions, its funding provisions, and its fiduciary responsibility provisions, but top hat plans are not exempt from ERISA's reporting and disclosure provisions or administration and enforcement provisions. Demery 216 F.3d at 287.[6]

## 1. The Doctors' Plans Were Funded

There is no definition for a "funded" top hat plan in ERISA. "Nonetheless, the Court has two sources to which it may look for guidance in determining whether the plan in this case is funded: the limited case law addressing the question and Opinion Letters issued by the Department of Labor." Miller v. Heller, 915 F. Supp. 651, 656 (S.D.N.Y. 1996)

According to the Department of Labor, "any determination of the "unfunded" status of a "top hat" or "excess benefit" plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law." Miller v. Heller, 915 F. Supp. at 658. The Department of Labor has also indicated, "through advisory opinion letters entitled to Skidmore deference, that courts should look to whether a particular plan satisfies Congress' underlying objective when it authorized exemptions for top hat

---

[6] Regardless whether the Doctors' Plans are considered top hat plans, the Debtor was required to comply with ERISA's reporting and disclosure provisions and administration and enforcement provisions. On information and belief, Cabrini did neither. The Doctors did not receive a summary plan description (29 U.S.C.A. § 1022), nor did the Doctors ever receive an annual report for their Plans. (29 U.S.C.A. § 1024(b)(3)), although they did receive account statements from Merrill Lynch.

plans." <u>Guiragoss v. Khoury</u>, 444 F. Supp. 2d at 658 – 59.  Determining whether a plan satisfies Congress' underlying objective requires the courts to consider "whether the employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply." <u>Id</u>.

The "limited case law" that has addressed the question of whether deferred compensation plans are funded is more instructive.  The case law indicates that when an employer intends to create a top hat plan, it typically uses very specific language to do so.  In fact, in all the cases cited by the Debtor for the proposition that the Plans at issue here are top hat plans, the courts relied heavily on the fact that the plans at issue were replete with language indicating that the employee had no claim on the plan assets.

In <u>In re Downey Regional Medical Center-Hospital, Inc.</u> – the case that the Debtor found "particularly instructive" – the Ninth Circuit held that the plan in question was a top hat plan by relying on language in the plans stating that the deferred compensation would "remain part of the participating employer's unrestricted assets" and "would not be held in trust."  441 B.R. 120, 123 (9th Cir. 2010).  The deferred compensation plans in <u>In re Downey</u> further stated that the employer's obligations were "purely contractual" and not "funded or secured in any way." <u>Id</u>. 441 B.R. at 123

In another case cited by the Debtor, <u>In re The Colonial Bancgroup, Inc.</u>, the Bankruptcy Court for the Middle District of Alabama relied on similar

language to find that the deferred compensation plan at issue was a top hat plan. In re The Colonial BancGroup, Inc., 436 B.R. 695 (Bkrtcy. M.D. Ala. 2010). That plan stated that its assets will not "avoid claims of employer's general creditors in bankruptcy." Id. 436 B.R. at 699. A memorandum describing the Colonial Bancgroup plan contained a paragraph titled "Substantial Risk of Forfeiture" that explained that the employee "would be a general creditor of the Bank with respect to collecting your money in the unlikely event that the Bank goes into bankruptcy or has other severe financial problems." Id. The Colonial Bancgroup plan also contained a paragraph titled "Unsecured General Creditor" that stated:

> Except as provided in Section 10, Participants and their beneficiaries, heirs, successors, and assigns shall have no legal or equitable rights, interest, or claims in any property or assets of the Company. Except as provided in Section 9, the assets of the Company shall not be held under any trust for the benefit of Participants, their beneficiaries, heirs, successors, or assigns, or held in any way as collateral security for the fulfilling of the obligations of the Company under this Plan. Any and all Company assets shall be, and remain, the general, unpledged, unrestricted assets of the Company. The company's obligation under the Plan shall be an unfunded and unsecured promise of the Company to pay money in the future.

Id. 436 B.R. at 700.

Finally, several years after the creation of the plan in Colonial Bancgroup, the employer distributed a brochure containing the following language:

> The 401(k) Plan is a funded "qualified" plan. The Deferred Compensation Plan is a "non-qualified" plan. These plans are subject to different IRS rules. Amounts deferred under the Non-Qualified Plan cannot actually be set aside for each participant as they are under the 401(k) Plan. Amounts deferred under the Non-Qualified Plan must be made available to pay the

employer's creditors in the unlikely event of bankruptcy or insolvency.

Id. at 436 B.R. 701.

Here, unlike in In re Downey or in Colonial Bancgroup, the Plans did not contain any language indicating that they were unfunded or purely contractual. The Plans did not say that the Doctors' assets would be available to Cabrini's general creditors in bankruptcy or that the Doctors would be general creditors with regard to their deferred compensation. To the contrary, the Plans state that none of the Doctors' interest in the Plan shall be "liable to any claim of any creditor." See Exhibit A to the Harrison Aff. at ¶ 11.

Similarly, in another case cited by the Debtor, In re Silicon Graphics, Inc., the court found an unfunded top hat plan because

> The Plan also repeatedly states that it is governed by ERISA. See Plan, at 2, ¶ 10; Art. VI.B. The Trust Agreement also states that the Plan is an unfunded Plan that provides deferred compensation to a select group of employees for purposes of ERISA. See Complaint, Ex. A. The Plan also provides that "the Company shall pay all of the accrued benefits from its general assets;" see Plan, ¶ 4 that "the assets of the trust shall at all times be subject to the claims of general creditors of the company," and that "the existence of the Trust shall not alter the characterization of the Plan as 'unfunded' for purposes of [ERISA]." See Plan, at I, ¶ 9, 10. Lastly, Article VI of the Plan provides that "statements to Participants are for reporting purposes only, and no allocation, valuation or statement shall vest any right or title in any part of the Trust Fund, nor require any segregation of Trust assets, except as specifically provided in this Plan."

In re Silicon Graphics, Inc., 363 B.R. 690, 697 (Bkrtcy. S.D.N.Y. 2007).

The case of Colarusso v. Transcapital Fiscal Systems, Inc., 227 F. Supp. 2d 243 (D.N.J. 2002) – not cited by the Debtor – is perhaps more instructive. In Colarusso, the employer had purchased an insurance policy for the benefit of employee Colarusso. The employer would pay the premiums for a period of time, after which ownership of the policy would transfer to Colarusso. The employer eventually ran into financial difficulties, stopped making premium payments on the insurance policy, and finally cashed in the insurance policies, keeping the cash. When Colarusso sued to recover the value of the insurance policy, the employer argued that the insurance policy was not an ERISA plan, and that even if it was an ERISA plan, it was a top hat plan exempt from many of ERISA's requirements. The employer – like the Debtor in the case presently before the Court – pointed to other cases where courts had found a plan to be unfunded, and then tried to draw an analogy between those cases and the Colarusso case. The court rejected the employer's argument, finding that the cases cited by the employer all had plans that repeatedly stated that all plan assets were general, unpledged, unrestricted assets of the employer. "Based on that language, the court concluded that instead of providing the employee with any rights in the insurance policy, the cash value of the policy became a general, unpledged, unrestricted asset of the employer and those assets in turn would be used to fund the employee's plan." Colarusso 227 F. Supp. 2d at 254. The Colarusso court,

however, found that because no similar language was found in Colarusso's plan, the comparison to the other cases was "unpersuasive." Id. at 254 – 255.[7]

Similarly in this case, the Debtor cannot point to any language in the Plans that the compensation deferred by the Doctors is a general, unpledged, unrestricted asset of the Debtor. In fact, the Debtor's course of conduct indicated that the Debtor believed the Plans were funded.

On April 8, 1997, the Debtor wrote a letter to each of the Doctors, advising them of "a tax problem under the deferred compensation arrangement covering you and about a half-dozen other former employees." See Harrison Aff. at ¶ 32. The letter asserted that the deferred compensation agreements require payment to the Doctors

> as soon as practicable following your termination of employment. These payments are to be made in either a lump sum or installment payments as the Administration of the Medical Center may determine. For reasons which are not clear, the required payments were not begun immediately following your termination of employment.

Exhibit E to the Harrison Aff. at p. 1.

The April 8, 1997 letter clearly indicates that at least as of that date, the Doctors were vested in their Plans, and that any assets in the accounts were their property, not property of the Debtor's estate. That is why the Debtor

---

[7] According to the Colarusso court: "Defendant maintains that because Transcapital retained ownership of the insurance policy and the benefits, all funding was from the general assets of Transcapital and Plaintiff had no rights in the Plan. However, Defendant cites no language and this Court finds no language in the agreement, funding plan or SPD suggesting that the cash value would be a general asset of Transcapital. Rather, it is undisputed that the cash value of the program was to be owned by Plaintiff upon entering the Plan. Furthermore, at the end of ten years, Plaintiff was to receive ownership of the policy itself, not merely some payment from Transcapital out of general corporate assets." Colarusso 227 F. Supp. 2d at 255.

asserted that "under the tax rules governing deferred compensation arrangements, the IRS can argue that you were taxable on the full amount of your deferred compensation account in the year you terminated employment." Id. (emphasis added).

Presumably, the letter was referring to Internal Revenue Code Section 451 – which states that "The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer" – and Treasury Regulation § 1.451-2(a), which states that income "is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of the intention to withdraw had been given." When the Doctors retired, the assets in the Plans became property of the Doctors, if the assets were not already the Doctors' property. That is why Cabrini was compelled to write April 8, 1997 letter. The fact that Cabrini then put the assets into Merrill Lynch accounts in the names of the respective Doctors shows Cabrini's acknowledgment of the Doctors' ownership of those assets.

In or around 1998, the Debtor moved the Plan assets to Merrill Lynch. A separate account was set up for each Doctor, with each account containing the deferred compensation attributable to that particular Doctor. Each Doctor received monthly account statements from Merrill Lynch that indicated the account belonged to the doctor. Setting up a separate account for each of the Doctors,

with each account containing the full amount owed to the respective Doctor pursuant to the Plan, is a clear indication that the accounts were funded at that time.

On November 16, 2006, Robert Chaloner, President and CEO of the Debtor, wrote a letter to the Doctors. Chaloner wrote that the hospital was "in desperate need of working capital" until a "major restructuring project" turns the company around. See Mannucci Aff. at ¶ 14 – 16, Exhibit C. Only ten days later, the Berger Commission issued its formal report recommending that the State of New York ensure that Cabrini be shut down. On information and belief Chaloner and the Debtor were aware that Cabrini would be shut down at the time of the November 16, 2006 letter. Nevertheless, Chaloner wrote that money would be "temporarily" moved "from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007." It is clear from Chaloner's letter that the Debtor considered the deferred compensation accounts to be property of the Doctors, and not part of the Debtor's general operating account. Mannucci Aff., Exhibit C.

Finally, the Doctors received regular statements from Merrill Lynch for close to a ten year period – the last institution at which the deferred compensation accounts were held – with the Doctors' names on the statements and other

indications that the accounts belonged to the Doctors.  <u>See</u> Mannucci Aff. at ¶ 10,

<u>Exhibit A</u>; Harrison Aff. at ¶ 20 – 25, <u>Exhibit B</u>.

These facts, taken together, prove that the deferred compensation accounts were funded and that the assets in those accounts belonged to the Doctors, not to Cabrini.

> ## 2.    Even If the Plans Were Originally Unfunded, They Clearly Were Funded As Of 1998

Regardless of whether the Plans were funded as of the day they were created, it is clear that the Plans were funded at least as of 1998.

The Debtor asserts that the language in the Plans proves that the funds in the Plans were property of the Debtor.  Each Plan states

> "The Corporation [Cabrini] will purchase in the name of the Corporation, mutual funds shares … in accordance with the terms of an Accumulation Plan of such mutual funds which provides for the automatic reinvestment in additional shares of said Fund of all dividends and distributions (both from income and capital appreciation) which may accrue therefrom. Employee shall have no right in such mutual funds shares, which shall be the absolute property of the Corporation."

<u>See</u> Debtor's Motion at ¶ 17.

The language quoted by the Debtor merely states that mutual fund shares may be purchased in Cabrini's name and that the employee does not have any right in those particular shares.  The language does not address the fact that the cash those mutual fund shares represent was property of the Doctors and that while the Doctors might not have a right to the mutual fund shares themselves, they do have a right to the money represented by those shares.  In fact, this is

consistent with the Plans, which provide that the mutual fund shares are merely the "measured base for the determination of" the amounts of an employee's benefits.  See <u>Exhibit A</u> to the Harrison Aff. at ¶ 8.

But even if the Debtor's reading of that provision is correct, the Court must look at the reality of the situation, not just the language of the agreements. In other words, the Plans may have permitted Cabrini to buy and hold mutual fund shares in its own name, and Cabrini may or may not have in fact done so for the first 20 or so years after the Plans were established.  But by 1997 and 1998, the Plans were certainly funded.  <u>First</u>, as each doctor retired, he became fully vested in the Plan and entitled to withdraw his money, in either a lump sum or in installments. See <u>Exhibit A</u> to the Harrison Aff. at ¶ 5 – 6.  <u>See also</u> <u>In re New Century Holdings, Inc.</u>, 387 B.R. 95, 109 (Bkrtcy. D. Del. 2008) (when assets are made available to an employee without substantial restrictions on the employee's control over the assets, the employee is in constructive receipt of the assets) <u>Second</u>, on April 8, 1997 Cabrini sent a letter to the doctors advising them of a tax problem under the Plans, acknowledging that the doctors were entitled to withdraw the money from their accounts and were potentially taxable on the full amount of the deferred compensation accounts.  <u>Finally</u>, in or about 1998, Cabrini moved the deferred compensation accounts to Merrill Lynch, setting up individual accounts in the name of each doctor to which the doctors could look for payment of their deferred compensation.

Therefore, even if the Debtor is correct that the accounts were initially unfunded when they were established, it is clear that as of 1997 or 1998 – and certainly as of the time the Debtor filed for bankruptcy – the Plans were funded and the doctors had a proprietary interest in the funds in the accounts.

3. **The Doctors Were Not A Select Group Of Management Or Highly Compensated Employees**

"To determine whether the participants of an employee benefit plan are 'a select group of management or highly compensated employees,' 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1), we require the district court to conduct a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction." Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 288 (2nd Cir. 2000) (citing Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir.1996) (holding that the "select group" requirement includes "more than a mere statistical analysis"); and Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 148 (3d Cir.1996) (considering "both quantitative and qualitative restrictions"))

Top hat plans are "excluded from many individual ERISA provisions on the basic assumption that high-level employees are in a 'strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees.'" In re Colonial Bancgroup 436 B.R. at 704 (quoting Holloman v. Mail-Well Corporation, 443 F.3d 832, 837 (11th Cir. 2006)).

The Doctors were not high level employees in a strong bargaining position with their employers. They were not key executives or sophisticated

management employees. The Doctors were doctors who also served as department heads, or assistant department heads. They took on some new administrative duties, but were neither a "select group" nor "highly compensated," either compared to the other doctors and employees at Cabrini or compared to doctors practicing at other hospitals.

In any event, it would be inappropriate for the Court to decide the question of whether the Doctors were a select group, or were highly compensated, without conducting fact finding on the issue. See, e.g., Demery, 216 F.3d at 287-88; Tate v. Chiquita Brands Intern. Inc., 2009 WL 2431283, *6 (S.D. Ohio 2009)("the Court finds that it is not appropriate to make a determination of the nature of the Plans, before the facts are developed and properly before the Court for consideration."); MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019 (D. Minn. 2010) (top hat determination cannot be determined on a motion to dismiss).

To the extent that the Court views this issue as potentially dispositive, the Doctors respectfully request expedited discovery on this and other issues so that the parties may present the Court with sufficient facts for the Court to make its determination on the question.

### 4. The Doctors Did Not Have
   Sufficient Influence To Negotiate Compensation
   Agreements That Protected Their Interests

"Top hat plans, which are a type of employee benefit plan for high-ranking employees, are exempted from all substantive provisions on the assumption that these employees have enough power to negotiate adequate plans for themselves and need only the information and enforcement protections of ERISA." Bigda v. Fischbach Corp., 898 F.Supp. 1004, 1015 (S.D.N.Y. 1995). That is why one of the factors considered by a court deciding the status of a deferred compensation plan is whether the employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests. Demery 216 F.3d at 287.

This inquiry, like the inquiry into the status of the employees that are the beneficiaries of the deferred compensation plans, is necessarily fact-specific. The Doctors contend that they did not have any influence over the management of Cabrini, nor did they have the ability to negotiate compensation agreements to protect their own interests.

According to Dr. Mannucci, "Cabrini never involved me in any negotiations whatsoever concerning the terms of my Deferred Compensation Plan. It was a Plan established entirely by Cabrini. I believe the same was trus for all of the Mannucci Parties; Cabrini designed the Deferred Compensation Plans that it offered to us." See Mannucci Aff. at ¶ 7

The Debtor's Motion offers no factual support for the proposition that the Doctors had sufficient influence or bargaining power.

To the extent that the Court views this issue as potentially dispositive, the Doctors respectfully request expedited discovery on this and other issues so that the parties may present the Court with sufficient facts for the Court to make its determination on the question.

## II.    Alternatively, The Debtor Is Holding The Plan Assets In Trust

Alternatively, if the Court does not find that the Plan assets are excluded from the Debtor's estate as ERISA pension benefit plans, then the Doctors respectfully request the Court find that the Debtor is holding the Plan assets in trust for the Doctors.

"Where there has been a breach of fiduciary duty, ERISA grants to the courts broad authority to fashion remedies for redressing the interests of participants and beneficiaries." Liss v. Smith, 991 F.Supp. 278, 312 (S.D.N.Y. 1998) (quoting Donovan v. Mazzola, 716 F.2d 1226, 1235 (9th Cir.1983)).

Pursuant to Section 541(d) of the Bankruptcy Code,

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. 541(d).

"[U]nder Section 541(d), property held in trust for another is "not property of the bankruptcy estate because the debtor does not have an equitable

interest in it." In re Taub, 427 B.R. 208, 220 (Bkrtcy. E.D.N.Y. 2010) (citing In re Braniff Intern. Airlines, Inc., 164 B.R. 820, 825 (Bkrtcy. E.D.N.Y. 1994). See also Begier v. I.R.S., 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'")

> The Second Circuit has taken this idea even further, holding that
>
> Where the debtor's "conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions." ... Indeed, the Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition...."

In re Howard's Appliance Corp., 874 F.2d 88, 93 (2nd Cir. 1989) (quoting U.S. v. Whiting Pools, Inc., 462 U.S. 198, 205 (1983)).

This Court has similarly held that "any right to proceeds or profits from this property [in which the debtor held only legal title] would be excluded from his estate by 11 U.S.C. § 541(d) because he does not hold the equitable interest in the property." In re Altchek, 124 B.R. 944, 958 (Bkrtcy. S.D.N.Y. 1991).

"The question of whether the imposition of a constructive trust is appropriate in a particular set of circumstances is governed, in the first instance, by state law." In re Flanagan, 503 F.3d 171, 181 (2nd Cir. 2007); Butner v. United States, 440 U.S. 48, 54-55 (1979). Under New York law, four elements are generally required for the establishment of a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the

subject res made in reliance on that promise; and (4) unjust enrichment." In re First Central Financial Corp., 377 F.3d 209, 212 (2nd Cir. 2004) (quoting United States v. Coluccio, 51 F.3d 337, 340 (2d Cir.1995)). See also In re Ames Dep't Stores, Inc., 274 B.R. 600, 625 (Bankr. S.D.N.Y. 2002) ("the facts need not satisfy every element in all cases"); In re: Koreag, 961 F.2d 341, 352 (2d Cir. 1992) (New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment; and can impose such trust in the absence of a fiduciary relationship); Counihan v. All State Insurance Co., 194 F.3d 357, 361 (2d Cir. 1999) (constructive trust's main "purpose is to prevent unjust enrichment" including where it "does not implicate the performance of a wrongful act.") The fourth element is the most important since "the purpose of the constructive trust is prevention of unjust enrichment." In re First Central Financial Corp., 377 F.3d at 212 (quoting Simonds v. Simonds, 45 N.Y.2d 233, 242 (1978)).

There is clearly a fiduciary relationship between the Debtor and the Doctors in connection with the ERISA Plans. The Debtor made a promise to the Doctors that it would make certain payments under the Plans upon the Doctors' retirement. Based on that promise, the Doctors transferred a portion of their wages to the Debtor to defer receipt of the income. The Debtor put the Doctor's deferred compensation into Merrill Lynch brokerage accounts in the Doctors' names. As a result of the Debtor clearing out the Doctors' accounts, the Debtor was unjustly enriched at the expense of the Doctors.

Debtor makes several incorrect assertions in support of its argument that there is no constructive trust. Debtor claims that it did not withhold any portion of the Doctors' compensation for the deferred compensation accounts, but rather the Debtor was contractually obligated to purchase mutual funds with Debtor's own money. <u>See</u> Debtor's Motion at ¶ 29. But this assertion puts more weight on the form of the transaction. In reality, the Doctors gave up some amount of current income to receive that compensation upon retirement. If there was no deferred compensation, presumably the Doctors would have enjoyed higher income at the time the compensation was being deferred. The bottom line is that compensation was not paid to the Doctors but was instead paid into the deferred compensation accounts.

The Debtor also asserts that there can be no constructive trust because the Doctors cannot establish proof of a res to which the constructive trust could attach. <u>See</u> Debtor's Motion at ¶¶ 28, 30. Debtor's support for its assertion is that the Doctors' "funds were long ago spent for Cabrini's operations." But it would be inequitable for the Court to refuse to find a constructive trust because the Debtor claims it has already spent the funds it improperly took from the Doctors' accounts. There is money in the Debtor's accounts. Essentially, the Debtor is saying that it spent the funds that are owed to the Doctors, and that the money in the Debtor's accounts is different money.

It is true that under New York law, the party seeking to impose a constructive trust generally must "trace one's equitable interest to identifiable

property in the hands of the purported constructive trustee." Wilde v. Wilde, 576 F. Supp. 2d 595, 605 (S.D.N.Y. 2008) (quoting Rogers v. Rogers, 63 N.Y.2d 582, 586 (1984)). But "in view of equity's goal of softening where appropriate the harsh consequences of legal formalisms, in limited situations the tracing requirement may be relaxed." Wilde, 576 F. Supp. 2d at 605 (quoting Rogers, 63 N.Y.2d at 586. For example, tracing requirements are often relaxed where a fiduciary has breached his duty. Wilde, 576 F. Supp. 2d at 605. See also, Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 224 F. Supp. 2d 567, 609-12 (2002), aff'd in relevant part, 380 F.3d 624, 646 (2d Cir. 2004); Simonds v. Simonds, 45 N.Y.2d 233, 240 (1978).

Further, the tracing requirement for the finding of a constructive trust does not require that the money taken from the Doctors be in a separate, identifiable account. The Debtor asserts that there is no res on which a constructive trust can attach because "Cabrini did not segregate" the funds it took from the Doctors' accounts. See Debtor's Motion at ¶ 30. But the Debtor's position merely rewards the Debtor's bad behavior – under the Debtor's analysis, the bankruptcy estate and the other creditors would benefit from the fact that Cabrini spent the money taken from the Doctors, rather than just putting that money in a segregated account. That is not the purpose of the tracing requirement.

Rather, claims on a constructive trust "do not require an allegation that specific funds are presently held in a separate account." Feinberg v. Katz,

2002 WL 1751135, 16 (S.D.N.Y. 2002). The only requirement is that the money be "specifically identifiable." Id. Money can be specifically identifiable if it is in a segregated account (i.e., if one can identify where the money is today), but it can also be specifically identifiable if the Doctors can specifically identify the money that was taken from them (i.e., the exact money that was taken from the Doctors). For example, see Nissho Iwai American Corporation v. Siedler, No. 94 Civ. 513, 1995 WL 555699, *3 (S.D.N.Y. Sept. 18, 1995). The plaintiff brought claims alleging that the defendants engaged in a false billing scheme to embezzle nearly $1,000,000 from the plaintiff. The plaintiff submitted evidence of the specific amounts of the 31 checks defendants caused Nissho to issue in their false billing scheme. Id. at *17. The Court found that the embezzled money was specifically identifiable – even though the money was not held in a segregated, identifiable account – because the plaintiff was able to identify the specific checks it issued to defendant.

If, however, the Court views this issue as dispositive and the Court requires the Doctors to identify the current location of the money taken from the Merrill Lynch accounts, then the Doctors must be given an opportunity to conduct discovery and an equitable accounting[8] in order to determine if the funds taken

---

[8] The purpose of an equitable accounting is to require a fiduciary to show what he did with the principal's property. Wilde, 576 F. Supp. 2d at 607. "An equitable accounting requires two steps. First, upon a showing that an accounting is warranted, an interlocutory decree is issued requiring the fiduciary to make an accounting." Id. at 608. See also, Wood v. Cross Props., Inc., 5 A.D.2d 853, 853 (2d Dep't 1958). "Once the accounting is made, a second hearing is held to establish the final amounts owed to the principal." Wilde, 576 F. Supp. 2d at 608. See also, Nishman v. De Marco, 76 A.D.2d 360, 367 (2d Dep't 1980); Corwin v. Kaufman, 37 A.D.2d 838, 838 (2d Dep't 1971); Conrady v. Buhre, 148 A.D. 776, 777 (2d Dep't 1912).

from the Doctors' deferred compensation accounts are traceable to identifiable property of the Debtor.

## III.   Cabrini Waived Any Right It May Have Had in the Plans

"[W]aiver is the voluntary abandonment or relinquishment of a known right, which, except for such waiver, the party would have enjoyed." Dice v. Inwood Hills Condominium, 237 A.D.2d 403, 404 (2nd Dept. 1997)(quoting P & D Cards & Gifts v. Matejka, 150 A.D.2d 660, 662). Waiver may be effected by an explicit agreement or "by such conduct or failure to act as to evince an intent not to claim the purported advantage." Dice, 237 A.D.2d at 404 (quoting Hadden v. Consolidated Edison Co. of N.Y., 45 N.Y.2d 466, 469). Even the existence of a non-waiver clause in an agreement does not preclude waiver of any other clause in the agreement. See TSS-Seedman's, Inc. v. Elota Realty Co., 72 N.Y.2d 1024,; P & D Cards & Gifts v. Matejka, supra; Lee v. Wright, 108 A.D.2d 678.

By depositing the Doctors' deferred compensation in Merrill Lynch accounts in the Doctors' names, Cabrini acknowledged that the Merrill Lynch accounts belonged to the Doctors. Cabrini thereby waived any right to argue now that the assets in the Merrill Lynch accounts belonged to Cabrini.

## IV.   If Necessary, The Doctors Should Be
## Permitted To Amend Their Proof Of Claim

The decision to allow an amendment to a proof of claim is at the discretion of the bankruptcy judge. In re Enron Corp., 298 B.R. 513, 520 (Bankr. S.D.N.Y. 1993). "Although amendments to proofs of claim should in the absence of contrary equitable considerations or prejudice to the opposing party be freely

permitted, such amendments are not automatic ..." In re Montagne, 421 B.R. 65, 81 (Bkrtcy. D. Vt. 2009) (quoting In re Enron Corp., 298 B.R. at 520). A claimant may amend a timely claim after the bar date to correct defects of form, provide more detailed allegations of fact relating to the timely claim, or plead a new theory of recovery under the facts set forth in the timely claim. Integrated Resources, Inc. v. Ameritrust Co. N.A. (In re Integrated Resources, Inc.), 157 B.R. 66, 70 (S.D.N.Y.1993).

The Debtor is incorrect that there are "very steep hurdles" to amend the Proofs of Claim. See Debtor's Motion at ¶ 27. The Debtor is also incorrect in its assertion that a constructive trust claim would be a new claim. The Doctors put the Debtor on notice to the underlying facts of the case when the Doctors attached a copy of the Complaint to the Proofs of Claim. The Proofs of Claim asserted claims for the same amount of money the Doctors are now seeking. Any additional details that come to light in this Court are merely more detailed allegations relating to the timely Proofs of Claim or new theories of recovery under the same set of facts set forth in the timely Proofs of Claim. "If the initial claim gives adequate notice of the existence and nature of the claim, and the creditor's intent to hold the estate liable, the amended claim should be allowed." In re Telephone Co. of Cent. Florida, 308 B.R. 579, 582 (Bkrtcy. M.D. Fla. 2004) (allowing amendment of a proof of claim even though the amended claim was for an amount more than $2 million in excess of the original claim). See also In re Montagne, 421 B.R. 65, 81 (Bkrtcy. D. Vt. 2009) (allowing amendment of a proof of claim because there

were ten months of litigation in state court, and the proof of claim was timely filed, so the debtor and trustee clearly had adequate notice of the existence and nature of the creditor's claim).

Courts consider the following five equitable factors in determining whether to allow an amendment:

> (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

Integrated Resources, Inc., 157 B.R. at 72.

In the case presently before this Court, there would be no prejudice to any opposing party, because no payment has yet been made in respect of any creditor claims. There is no allegation – even by the Debtor – of bad faith or dilatory behavior on the part of the Doctors. If the Court does not find that the Doctors owned the funds in the Merrill Lynch accounts, but finds that an amendment to the Proofs of Claim is required to assert a constructive trust and does not allow such amendment, then the other creditors would receive a windfall in the amount that was taken from the Doctors' Merrill Lynch accounts. Therefore, because the Doctors satisfy the factors considered by the Court in such a situation, amendment of the Proofs of Claim should be permitted, if necessary for the Doctors to assert a claim for a constructive trust.

The Debtor cites In re Black & Geddes, Inc., 30 B.R. 389 (Bankr. S.D.N.Y. 1983) in support of its assertion that a constructive trust is a "completely

new claim." See Debtor's Motion at ¶ 33. But in In re Black & Geddes, the reason the bankruptcy court dismissed the claim as untimely, and the reason the district court found there was a real potential of prejudice to other creditors, is because the trustee in that case had already made payments to other creditors when the creditor made its constructive trust claim.

"Subsequent to the last day to file claims, the Trustee has made at least two distributions to creditors. Those distributions necessarily were premised on the amount that Trustee had on hand and the known claims and rights of creditors." In re Black & Geddes, Inc., 30 B.R. at 391. On information and belief, no distributions have yet been made to the Debtor's creditors – at least none that were premised on the amount that Trustee had on hand and the known claims and rights of creditors – in this case. In addition, because the Doctors insisted on giving notice to all creditors of its claim in the Debtor's Disclosure Statement Related to the Plan of Liquidation, all creditors were placed on notice of this. Therefore, no creditor would be prejudiced if the Doctors amended their Proofs of Claim to assert a constructive trust. The Doctors do not believe such amendment is necessary, because the Plans are excluded from the property of the Debtor's estate pursuant to Section 541(b)(7) of the Bankruptcy Code. If, however, the Court does not find that the Plans are excluded pursuant to Section 541(b)(7), then the Doctors alternatively assert that the Plans' assets constitute a constructive trust for the benefit of the Doctors and assert that any necessary amendment to their Proofs of Claim are not prejudicial and should be permitted.

## CONCLUSION

For the reasons set forth above, the Doctors respectfully request the Court enter an order classifying and fixing the Doctors' claims as ERISA deferred compensation excluded from the Debtor's estate. In the alternative, the Doctors respectfully request the opportunity to conduct expedited discovery in preparation for a future hearing at which the Court will fix and classify the Doctors' claims.

Dated: New York, New York
       March 2, 2011

PADUANO & WEINTRAUB LLP

BY: _Katherine B. Harrison_

Leonard Weintraub
Katherine B. Harrison
Jason Snyder
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)

Attorneys for the Doctors