UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
: 
In re: : Chapter 11
:
CABRINI MEDICAL CENTER, : Case No. 09-14398 (AJG)
:
Debtor. :
:
------------------------------------------------------------x

## OBJECTION OF MANNUCCIO MANNUCCI, ANGELO TARANTA, GUIDO PADULA AND DILVA SALVIONI TO CONFIRMATION OF THE DEBTOR'S PLAN

Mannuccio Mannucci, M.D., Angelo Taranta, M.D., Guido Padula, M.D. and Dilva Salvioni[1] (collectively, the "Doctors"), creditors of Cabrini Medical Center ("Cabrini" or "the Debtor") and parties in interest in these proceedings, respectfully submit this Objection to Confirmation of the First Amended Plan of Liquidation of Cabrini Medical Center, dated January 25, 2011 (the "Plan") and respectfully state as follows:

### INTRODUCTION

1. Each of the Doctors is party to one or more deferred compensation agreements (the "Deferred Compensation Agreements") with Cabrini. Each of the Deferred Compensation Agreements is an "employee pension benefit plan" as defined by ERISA (the "Deferred Compensation Plans"). See 29 U.S.C. 1002.

---

[1] Mrs. Salvioni is the widow of Daniele Salvioni, M.D. ("Dr. Salvioni") who died in November 2007. Dr. Salvioni was an employee of Cabrini and a participant in a deferred compensation plan with Cabrini, as further described below.

2. The Doctors' Deferred Compensation Plans are excluded from the property of the estate under §541(d) and/or §541(b)(7) of the Bankruptcy Code. Nevertheless, the Doctors each filed proofs of claims with the Debtor.

3. The Doctors currently have an action pending against the Missionary Sisters of the Sacred Heart of Jesus (the "MSSHJ") in New York State Supreme Court for violations of ERISA and New York common law, misappropriation, and conversion, based on the same facts that underlie the Doctors' claims against the Debtor, titled <u>Mannuccio Mannucci, et al. v. The Missionary Sisters of the Sacred Heart of Jesus and Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, No. 602284/08 (S.Ct.N.Y.Cty.) (the "New York State Action"). (<u>See</u> <u>Exhibit A</u> to the Affidavit of Katherine B. Harrison, sworn to on March 16, 2011, (the "Harrison Aff.") submitted herewith.)

4. The New York State Supreme Court held that the Debtor was a necessary party to the New York State Action and on December 16, 2010 (amended on January 4, 2011) dismissed the New York State Action without prejudice, giving the Doctors 30 days to file an amended pleading.

5. On January 26, 2011, the Doctors filed a motion with the Court seeking relief from the bankruptcy stay to pursue their claims against the Debtor in the New York State Action. That motion is pending.

6. On February 2, 2011, the New York Court granted the Doctors additional time to file an amended complaint in the New York State Action, until

ten days after this Court renders a decision on the Doctors' Motion for Relief from the Bankruptcy Stay.

7. The Plan purports to limit the ability of creditors – including the Doctors – to seek redress from "the MSSH Entities, or any present and former directors, officers, trustees, agents, attorneys, advisors, members or employees of the Debtor, . . . [or] the MSSH Entities" in any proceeding "based upon a theory which arises out of such holder's Claim against the Debtor" (the "Injunction"). See Plan, (VII)(E)(2), p. 27.

8. The Injunction is based on a settlement agreement between the MSSHJ and Official Committee of Unsecured Creditors of Cabrini (the "Creditors Committee"). The Doctors were not party to the settlement between the MSSHJ and the Creditors Committee and there is no basis for limiting the liabilities of any parties (other than the Debtor).

9. On January 19, 2011, the Doctors filed an Objection to the Disclosure Statement Relating to the Plan in which the Doctors objected to, among other things, the proposed Injunction.

10. On February 4, 2011, the Debtor filed a Motion for an Order Classifying and Fixing the Claims filed by the Doctors.

11. On March 2, 2011, the Doctors filed a Response to the Debtor's Motion for an Order Classifying and Fixing the Claims. That motion is pending.

## THE DOCTORS

12. Dr. Mannuccio Mannucci resides at 21 East 90th Street, #6A, New York, New York 10128.

13. Dr. Angelo Taranta resides at 100 Bay Place, #2111, Oakland, California 94610.

14. Dr. Guido Padula resides at 115 Brightwater Court, # 6B, Brooklyn, New York 11253.

15. Mrs. Dilva Salvioni, widow of Dr. Daniele Salvioni, resides at Via S. Andrea in Campiglia 2, Figline Valdarno, Firenze, Italy 50063.

## BACKGROUND

16. The Doctors are three physicians now in their 80s, and the widow of another physician, all of whom dedicated their lives and careers to medicine, primarily at Cabrini. (Harrison Aff. ¶ 2)

17. In or about January 1967, Cabrini (then known as Columbus Hospital) set up the first Deferred Compensation Plan for Dr. Padula (the "First Padula Plan").[2] Under the terms of the First Padula Plan, Cabrini was obligated to pay $3,000 per year into an account at Irving Trust Company for Dr. Padula, as part of his annual compensation, where the funds would be invested and all dividends and other earnings would be reinvested. The First Padula Plan directed that distributions to Dr. Padula or his designated beneficiary would begin upon

---

[2] All of the Doctors' Deferred Compensation Plans that Cabrini and the Doctors have been able to locate are attached as Exhibit B to the Harrison Aff.

4

termination of Dr. Padula's employment with Cabrini for any reason. (Harrison Aff. ¶ 7)

18. In or about April 1975, Cabrini set up a second Deferred Compensation Plan for Dr. Padula (the "Second Padula Plan"), the terms of which were similar to the First Padula Plan. (Harrison Aff. ¶ 8)

19. According to Cabrini's records, Dr. Padula retired from Cabrini in 1980. (Harrison Aff. ¶ 9)

20. In or about December 1975, Cabrini set up a Deferred Compensation Plan for Dr. Taranta (the "Taranta Plan"). Pursuant to the Taranta Plan, Cabrini was obligated to pay $13,880 into an account for Dr. Taranta, as part of his annual compensation, that would invest in mutual fund shares of New York Venture Fund, Inc. (with all distributions and dividends to be reinvested). The Taranta Plan directed that distributions to Dr. Taranta or his designated beneficiary would begin upon termination of Dr. Taranta's employment with Cabrini for any reason. (Harrison Aff. ¶ 10)

21. According to Cabrini's records, Dr. Taranta retired from Cabrini in 1995. (Harrison Aff. ¶ 12)

22. In or about December 1973, Cabrini (then known as Columbus Hospital) set up the first Deferred Compensation Plan for Dr. Salvioni (the "First Salvioni Plan"). Under the terms of the First Salvioni Plan, Cabrini was obligated to pay $14,000 per year into an account to invest in mutual fund shares for Dr. Salvioni, as part of his annual compensation (with all dividends and other earnings

to be reinvested). The First Salvioni Plan directed that distributions to Dr. Salvioni or his designated beneficiary would begin upon termination of Dr. Salvioni's employment with Cabrini. (Harrison Aff. ¶ 14)

23. In or about August 1978, Cabrini set up a second Deferred Compensation Plan for Dr. Salvioni (the "Second Salvioni Plan"), the terms of which were similar to the First Salvioni Plan. (Harrison Aff. ¶ 15)

24. On September 17, 1997, Dr. Salvioni designated in writing that his wife, Dilva Salvioni, be his principal beneficiary in his Deferred Compensation Plans. He designated his children as secondary beneficiaries. According to Cabrini's records, Dr. Salvioni retired from Cabrini in 1980. Dr. Salvioni died in November 2007. (Harrison Aff. ¶¶ 16-17)

25. In the mid-1970s, Cabrini set up a Deferred Compensation Plan for Dr. Mannucci (the "Mannucci Plan"). On information and belief, pursuant to the Mannucci Plan, each year, Cabrini was obligated to pay certain amounts into an account for Dr. Mannucci, as part of his annual compensation, which would be invested in New York Venture Fund, Inc. The Mannucci Plan directed that distributions to Dr. Mannucci or his designated beneficiary would begin upon termination of Dr. Mannucci's employment with Cabrini. (Harrison Aff. ¶ 18)

26. According to Cabrini's records, Dr. Mannucci retired from Cabrini in 2000. (Harrison Aff. ¶ 19)

27. Over the decades that the Doctors had worked for Cabrini, and the years since they had each retired, the Deferred Compensation Plans increased

in value based on the annual contributions, plus accrued interest and any reinvested dividends. As of October 2006, the Deferred Compensation Plans totaled:

| | |
|---|---|
| Mannucci Plan | $735,440.77 |
| Taranta Plan | $1,238,567.84 |
| Salvioni Plan | $598,683.80 |
| Padula Plan | $256,930.00 |

28. On November 16, 2006 – only ten days before the Berger Commission issued its formal report recommending that the State of New York ensure that Cabrini be shut down – Cabrini sent a letter to the Doctors informing them that due to a "major restructuring project intended to reverse the effects of several years of operating losses" money would be "temporarily" moved "from the deferred compensation investment account designated for your benefit into the Medical Center's general operating account. It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007." Each of the letters sent to each of the Doctors was substantially similar. (See Harrison Aff. at ¶¶ 21-22 and Exhibit C.)

29. On November 26, 2006, the Berger Commission issued its formal report recommending that Cabrini be closed in an orderly fashion. On December 6, 2006 New York's Governor issued written approval of the Berger Commission's recommendations, and on January 1, 2007 the Berger Commission's

recommendations became law and the New York Commissioner of Health was ordered to close Cabrini.

30. In each of April 2007 and June 2007, Cabrini took additional hundreds of thousands of dollars from the Doctors' Deferred Compensation Plans, this time without even notifying the Doctors.

31. After the June 2007 improper taking from the Doctors' Deferred Compensation Plans, the accounts were completely wiped out. In total, $2,956,176 was improperly taken from the Doctors' Deferred Compensation Plans. (See Harrison Aff. ¶ 25 and Exhibit D) No amounts were ever replaced, nor were any further payments made to the Doctors in respect of their Deferred Compensation Plans. (Harrison Aff. ¶ 26)

32. On information and belief, at the time Cabrini sent the November 16 letter to the Doctors, Cabrini knew that the Berger Commission would recommend the closure of Cabrini. On further information and belief, each report of the Independent Auditors of Cabrini from 2001 through 2007 (the last year for which a report was issued prior to Cabrini filing for bankruptcy) contained a going concern qualification.

33. Therefore, on information and belief, at each time Cabrini improperly took assets from the Doctors' Deferred Compensation Plans, Cabrini had no intention of repaying such funds and had no reasonable expectation that it would ever be able to repay such money.

34. On July 9, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

35. On November 19, 2009, each of the Doctors filed a proof of claim with the Court. Each proof of claim stated that the basis for the claim was an attached complaint from the New York State Action – which asserted the Doctors' entitlement under ERISA to monies that were improperly taken from the Doctors' Deferred Compensation Plans. (Harrison Aff. ¶ 27)

36. On December 21, 2010, the Debtor filed the Plan and a disclosure statement with respect to the Plan.

## OBJECTION

### THERE ARE NO "UNUSUAL CIRCUMSTANCES" THAT WOULD JUSTIFY AN INJUNCTION BARRING ANY ACTION AGAINST THE MSSHJ AND ANY FORMER EMPLOYEES OF CABRINI

37. On October 28, 2009, the Official Committee of Unsecured Creditors of Cabrini (the "Creditors Committee") filed an adversary complaint against the Missionary Sisters of the Sacred Heart, Illinois ("MSSH-IL") and the MSSHJ.

38. The Creditors Committee alleged that in the year prior to the Debtor's bankruptcy filing, at least $1.3 million in avoidable transfers were made to MSSH-IL and MSSHJ. The Creditors Committee further alleged that monies provided to the Debtor by MSSH-IL and MSSHJ and characterized as loans were in

actuality capital contributions or grants, and that the bankruptcy claims of MSSH-IL and MSSHJ should be equitably subordinated to the general unsecured creditors.

39. On November 19, 2010, the Court approved a settlement between the Creditors Committee, MSSH-IL, and MSSHJ. The Doctors were not a party to that settlement agreement.

40. As part of the settlement agreement, the Creditors Committee agreed to support the inclusion in the Plan of an injunction preventing any creditors paid under the Plan from pursuing claims against MSSH-IL and MSSHJ "that arise out of the creditors' dealings with the Debtor." See 09-01639-ajg, Docket No. 11 at 9

41. The provision in the Plan describing the Injunction purports to enjoin anyone holding a claim from commencing or continuing any proceeding based upon "a theory which arises out of such holder's Claim against the Debtor." See Plan at (VII)(E)(2), p. 27. The Injunction purports to cover not only the Debtor, the MSSH-IL, and MSSHJ, but also their current and former employees, officers, and directors.

42. "The Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan." In re Dow Corning Corp., 280 F.3d 648, 656 (6th Cir. 2002), cert. denied, 537 U.S. 816, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002). Although the Court has broad authority to take appropriate equitable measures to facilitate a reorganization, enjoining a non-consenting creditor's claim

against a non-debtor "is a dramatic measure to be used cautiously" and is only appropriate "in unusual circumstances." In re Dow Corning Corp., 280 F.3d at 658. See also In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2nd Cir. 1992); cert. dismissed, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 93 (2nd Cir. 1988); cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988).

43. There are seven factors that many bankruptcy courts use to determine whether the required "unusual circumstances" are present and whether the court may enjoin a non-consenting creditor's claims against a non-debtor:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions

In re Dow Corning Corp., 280 F.3d at 658.

44. None of the seven factors used by courts deciding whether to enjoin a non-consenting creditor's claims against a non-debtor are present in this case.

45. The New York State Action is an action pending action against the MSSHJ in New York State Supreme Court, alleging violations of ERISA and New York common law, misappropriation, and conversion. (Harrison Aff. ¶¶ 3-4 and <u>Exhibit A</u>) The Doctors are also contemplating an action against the plan fiduciaries of their Deferred Compensation Plans. On information and belief, each of the plan fiduciaries is a present or former employee, officer, or director of the Debtor or of the MSSHJ.

46. If the Plan is approved, the Injunction could be used to limit the Doctors' ability to seek relief against the MSSHJ. That outcome would be extremely prejudicial to the Doctors, and, because the MSSHJ is not a Debtor, would not benefit the estate in the least.

## RELIEF REQUESTED

47. In light of the foregoing, the Doctors respectfully object to the confirmation of the Plan. The Doctors respectfully request that the following changes be made to Section (VII)(E)(2) of the Plan:

> <u>Scope of Injunction</u>. Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold a Claim are permanently enjoined from taking any of the following actions against the Debtor, the Plan Administrator <u>(acting in her role as Plan Administrator)</u>, or the Creditors' Committee, ~~the MSSH Entities, or any present and former directors, officers, trustees, agents, attorneys, advisors, members or employees of the Debtor, or the Creditors' Committee, the MSSH Entities, or the Plan Administrator,~~ or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim: (1) commencing or continuing in any manner any action or other proceeding with respect to a Claim against the Debtor ~~or based upon a theory which arises out of such holder's Claim against~~

12

~~the Debtor~~; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to a Claim against the Debtor; (3) creating, perfecting or enforcing any lien or encumbrance with respect to a Claim against the Debtor; (4) asserting a setoff, right of subrogation or recoupment of any kind with respect to a Claim against the Debtor, the assets or other property of the Estate; and (5) commencing or continuing any action that does not comply with or is inconsistent with this Plan. Nothing shall preclude the holder of a Claim from pursuing any applicable insurance after the Chapter 11 Case is closed, from seeking discovery in actions against third parties or from pursuing third-party insurance that does not cover Claims against the Debtor. For the avoidance of doubt, nothing in the Injunction shall limit the rights of a holder of a Claim to enforce the terms of the Plan.

## CONCLUSION

Dated: New York, New York
March 16, 2011

PADUANO & WEINTRAUB LLP

BY: *Katherine B. Harrison* (signature)
Katherine B. Harrison
Jason Snyder

1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)

Attorneys for
Mannuccio Mannucci, M.D.
Angelo Taranta, M.D.
Guido Padula, M.D. and
Dilva Salvioni