UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                       :

In re:                             :       Chapter 11
                                         :

CABRINI MEDICAL CENTER,     :       Case No. 09-14398 (AJG)
                                         :

                 Debtor.    :

                                         :
------------------------------------------------------------x

## AFFIDAVIT OF KATHERINE B. HARRISON IN SUPPORT OF
## THE DOCTORS' OBJECTION TO CONFIRMATION OF THE DEBTOR'S PLAN

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK )

      KATHERINE B. HARRISON, under penalty of perjury, declares:

      1.      I am admitted to practice before this Court and am a member of the firm of Paduano & Weintraub LLP, 1251 Avenue of the Americas, Ninth Floor, New York, New York, 10020, attorneys for Creditors Mannuccio Mannucci, M.D., Angelo Taranta, M.D., Guido Padula, M.D. and Mrs. Dilva Salvioni in the captioned matter ("the Doctors" or the "Mannucci Parties"). I respectfully submit this Affidavit in support of the Doctors' Objection to Confirmation of the First Amended Plan of Liquidation of Cabrini Medical Center, dated January 25, 2011 (the "Debtor's Plan").

      2.      The Doctors are three physicians in their 80s, and the widow of Daniele Salvioni, M.D., who worked for decades at Cabrini Medical Center ("Cabrini" or "Debtor"). The Doctors seek to recover approximately $3,000,000 that Cabrini stole

from their ERISA deferred compensation plan accounts in 2006 and 2007. It is undisputed that Cabrini took the funds at issue.

## INTRODUCTION

3.     Prior to Cabrini's bankruptcy, the Doctors commenced an action in New York State Supreme Court against Cabrini, the Missionary Sisters of the Sacred Heart of Jesus (the "MSSHJ") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), titled <u>Mannuccio Mannucci et al. v. Cabrini Medical Center, The Missionary Sisters of the Sacred Heart of Jesus and Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, No. 602284/08 (S.Ct. N.Y.Cty.) (the "New York State Action").

4.     In the New York State Action, the Doctors allege that the MSSHJ founded, sponsored, ran and staffed Cabrini and that their roles were so intermingled with Cabrini that the MSSHJ were the alter-ego of Cabrini. The Doctors further allege in the New York State Action that the MSSHJ directed Cabrini to misappropriate the deferred compensation funds at issue. The Doctors' Amended Complaint is attached hereto as <u>Exhibit A</u>.

5.     Injunction language in the Debtors' Plan could be interpreted to limit the Doctors' ability to seek relief against the MSSHJ as well as non-bankrupt officers, directors and employees of the Debtor. Because this would work a great injustice on the Doctors, they object to such an injunction, which is not necessary to protect the Debtor.

# THE DEFERRED COMPENSATION PLANS

## Dr. Padula's Deferred Compensation Plans

      6.     In or about January 1967, Cabrini (then known as Columbus Hospital) set up the first deferred compensation plan for Dr. Padula (the "First Padula Plan").

      7.     Under the terms of the First Padula Plan, Cabrini would pay $3,000 per year of "additional compensation" for Dr. Padula into an account at Irving Trust Company where the funds would be invested and all dividends and other earnings would be reinvested. The Plan directed that distributions to Dr. Padula or his designated beneficiary would begin upon termination of Dr. Padula's employment with Cabrini for any reason. The Plan also directed that Cabrini, after consulting with Dr. Padula, adopt a method of distribution of the funds either in a lump sum, ten equal installments, or "life expectancy installments."

      8.     In or about April 1975, Cabrini set up a second deferred compensation plan for Dr. Padula (the "Second Padula Plan"), the terms of which were similar to the First Padula Plan. The Second Padula Plan expressly provided: "During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of [Cabrini]; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee."

      9.     According to Cabrini's records, Dr. Padula retired from Cabrini in 1980.

3

## Dr. Taranta's Deferred Compensation Plan

10.    In or about December 1975, Cabrini set up a deferred compensation plan for Dr. Taranta (the "Taranta Plan"). Pursuant to The Taranta Plan, Cabrini would pay $13,880 in annual compensation for Dr. Taranta into an account that would invest in mutual fund shares of New York Venture Fund, Inc. and all distributions and dividends would be reinvested. The Plan directed that distributions to Dr. Taranta or his designated beneficiary would begin upon termination of Dr. Taranta's employment with Cabrini for any reason. The Plan also directed that Cabrini adopt a method of distribution of the funds either in a lump sum or life expectancy installments calculated by Dr. Taranta's life expectancy at the time of his first distribution with larger payments at the end of his expected years.

11.    The Taranta Plan expressly provided: "During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of [Cabrini]; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee."

12.    According to Cabrini's records, Dr. Taranta retired from Cabrini in 1995.

## Dr. Salvioni's Deferred Compensation Plans

13.    In or about December 1973, Cabrini set up the first deferred compensation plan for Dr. Salvioni (the "First Salvioni Plan").

4

14.     Under the terms of the First Salvioni Plan, Cabrini would use $14,000 per year of additional compensation to Dr. Salvioni to invest in mutual fund shares; all dividends and other earnings would be reinvested.  The Plan directed that distributions to Dr. Salvioni or his designated beneficiary would begin upon termination of Dr. Salvioni's employment with Cabrini.  The Plan also directed that Cabrini adopt a method of distribution of the funds either in a lump sum or life expectancy installments calculated by Dr. Salvioni's life expectancy at the time of his first distribution with larger payments at the end of his expected years.

15.     In or about August 1978, Cabrini set up a second deferred compensation plan for Dr. Salvioni (the "Second Salvioni Plan"), the terms of which were similar to the First Salvioni Plan.  The Second Salvioni Plan expressly provided: "During the lifetime of Employee this Agreement may be amended or terminated, in whole or in part, by the mutual written agreement of Employee and the Board of Directors of [Cabrini]; provided, however, that no amendment or termination shall cause the payment of benefits provided herein to become forfeitable to the Employee."

16.     On September 17, 1997, Dr. Salvioni designated in writing that his wife, Dilva Salvioni, be his principal beneficiary.  Cabrini does not dispute that Mrs. Salvioni is Dr. Salvioni's beneficiary under his Deferred Compensation Plans.

17.     According to Cabrini's records, Dr. Salvioni retired from Cabrini in 1980.

**Dr. Mannucci's Deferred Compensation Plan**

18.    On information and belief, in the mid-1970s, Cabrini set up a deferred compensation plan for Dr. Mannucci (the "Mannucci Plan").  On information and belief, pursuant to the Mannucci Plan, each year, Cabrini paid part of Dr. Mannucci's annual compensation into an account which would be invested in New York Venture Fund, Inc. and the Plan directed that distributions to Dr. Mannucci or his designated beneficiary would begin upon termination of Dr. Mannucci's employment with Cabrini.

19.    According to Cabrini's records, Dr. Mannucci retired from Cabrini in 2000.

20.    All of the Doctors' Deferred Compensation Plan documents that we have been able to locate are attached hereto as Exhibit B.  Several of those plans were signed by the MSSHJ.

## CABRINI'S ADMITTED APPROPRIATION OF THE DOCTORS' DEFERRED COMPENSATION FUNDS

**The November 2006 Chaloner Letter**

21.    In November 2006, without any prior warning, Cabrini sent Dr. Mannucci a letter from Robert Chaloner, Cabrini's then President and CEO, stating that Cabrini was in desperate need of working capital in order to maintain its operations and that, as a result, Cabrini "must temporarily move $486,000 from the deferred compensation investment account designated for your benefit into the Medical Center's

general operating account." That letter, which contained the MSSHJ crest, (the "November 2006 Letter") is attached as Exhibit C hereto.

22.     The November 2006 Letter also stated:

> **It is expected that these funds, along with any interest that would have accrued, will be returned to the deferred compensation investment account during 2007. . . . Please be assured that Cabrini Medical Center is committed to fulfilling its obligation under the Deferred Compensation Agreement with you, including making the 2007 distribution, and will keep you informed of the progress of our efforts to replenish the deferred investment account.** (Exhibit C (emphasis added))

23.     Each of the Doctors received his own virtually identical version of the November 2006 Letter with respect to his own Deferred Compensation Account. (The letters to Dr. Taranta and Dr. Salvioni are also attached at Exhibit C.) At that time, Cabrini withdrew almost $2 million from the Doctors' four Deferred Compensation Accounts at Merrill Lynch.

## The Remaining Funds were Taken in 2007

24.     Thereafter, in 2007, Cabrini withdrew all of the remaining funds from each of the Doctors' Deferred Compensation Accounts at Merrill Lynch.

25.     By letter to me dated October 23, 2007, Cabrini's attorneys confirmed that Cabrini took the following total amounts out of the Doctors' Deferred Compensation Accounts:

Dr. Mannucci:        $771,843.47;

Dr. Padula           $265,962.29

Dr. Salvioni         $619,645.51;

Dr. Taranta        $1,298,724.74.

These amounts total $2,956,176.01.  A copy of that letter is attached hereto as Exhibit
D.

26.    Cabrini also failed thereafter to make the yearly payments to the
Doctors required by the Deferred Compensation Plans for 2006 through 2010.

## THE DOCTORS' PROOFS OF CLAIM

27.    On November 19, 2009, each of the Doctors filed a Proof of Claim
with this Court for the funds taken out of their Deferred Compensation Accounts by
Cabrini in the amounts set forth above in paragraph 30.  Each Proof of Claim stated that
the basis for the Claim was an attached Complaint from the New York State Action.

## CONCLUSION

28.    Based on the facts above and in their Objection, the Doctors
respectfully request that the Court refuse to confirm the Debtor's Plan or change the
Injunction language so as to carve out the MSSHJ and officers, directors and
employees of the Debtor from the scope of the Injunction.

Katherine B. Harrison

Sworn to before me this
16ᵗʰ day of March 2011

Notary Public

JORDAN D. BECKER
Notary Public, State of New York
No. 60-500i332
Qualified in Westchester County
Commission Expires ............ 9/14/14.

8