Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Jonathan P. Ibsen

*Bankruptcy Counsel for the
  Debtor and Debtor in Possession*

HEARING DATE: 3/23/11 AT: 9:30 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
In re:                                              :        Chapter 11
                                                    :        Case No. 09-14398 (AJG)
CABRINI MEDICAL CENTER,                             :
                                                    :
                                   Debtor.          :
                                                    :
-------------------------------------------------------------x

### DEBTOR'S REPLY TO THE MANNUCCI PARTIES' OBJECTION TO THE DEBTOR'S MOTION FOR AN ORDER FIXING CLAIMS FILED BY THE MANNUCCI PARTIES

TO THE HONORABLE ARTHUR J. GONZALEZ,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Cabrini Medical Center ("Cabrini" or the "Debtor"), as debtor and debtor

in possession, by its attorneys Togut, Segal & Segal LLP, respectfully submits this reply

(the "Reply") to the Mannucci Parties'[1] objection (the "Objection") to the Debtor's

motion (the "Claims Motion") for an order, pursuant to section 502 of title 11, United

States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), classifying and fixing as general unsecured claims,

in the amounts scheduled by the Debtor, the Proofs of Claims filed by the Mannucci

Parties.

---

[1] Terms not defined herein have the meanings ascribed to them in the Motion.

## I. **INTRODUCTION**

1.      Cabrini's Motion should be granted because the Mannucci Parties' Claims are nothing more than general unsecured claims arising from Cabrini's breach of its obligations under various Deferred Compensation Agreements.

2.      The Mannucci Parties are three retired doctors formerly employed by the Cabrini; Mannuccio Mannucci ("Mannucci"); Angelo Taranta ("Taranta") and Guido Padula ("Padula"); and Dilva Salvioni, the widow of a fourth retired doctor, Daniele Salvioni ("Salvino" and collectively, the "Doctors").

3.      During their employment, each of the Doctors entered into a separate deferred compensation agreement with Cabrini (individually a "Deferred Compensation Agreement" and collectively the "Deferred Compensation Agreements"), which specified their entitlements.[2]

4.      The factual predicate for the Mannucci Parties' Claims lies in these Deferred Compensation Agreements and the funds which Cabrini was to provide pursuant to their respective terms (the "Funds").

5.      The gravamen of the Mannucci Parties' Objection lies in their arguments that the Funds, expended by Cabrini many years ago, were their property, representing "withholding" or "contributions" to an ERISA plan, and therefore fall within 11 U.S.C. § 541(b)'s exclusions from property of this Bankruptcy Estate, or that Funds were held for the Doctors under a trust or constructive trust theory.  Consequently, the Mannucci Parties contend they are entitled to a dollar-for-dollar return of

---

[2]      The Deferred Compensation Agreements for all of the Claimants except for Mannucci are annexed as Exhibit "A" to the Affidavit of Katherine Harrison in Objection to the Claims Motion (Docket No. 638).

the Funds, from monies which otherwise are to be distributed to creditors under the Debtor's Chapter 11 Plan of Liquidation.

6.      The Objection should be overruled for four independent bases. First, as set forth in the Claims Motion, the plain language of the Deferred Compensation Agreements themselves contradicts the Mannucci Parties' arguments. Simply put, the Deferred Compensation Agreements establish that the Funds were owned by, and therefore are property of, Cabrini. The Deferred Compensation Agreements also establish that the Funds were additional compensation - not "withholdings" or "contributions" from the Doctors - and therefore fall outside the ambit of 11 U.S.C. § 541.

7.       Second, the issues raised by the Mannucci Parties were already briefed, argued, and decided against the Mannucci Parties by the New York Sate Court, and thus the doctrine of collateral estoppel bars the Mannucci Parties from attempting to re-litigate those issues in this Court.

8.      Third, and alternatively, the Deferred Compensation Agreements fall within the "Top Hat" exemption from ERISA, and thereby also fall outside the ambit of 11 U.S.C. §541.

9.      Fourth, and finally, the Mannucci Parties should not be allowed to amend their POCs to include claims based on trust or constructive trust theories as such an amendment is time-barred. Moreover, such claims will necessarily fail. The express language of the Deferred Compensation Agreements establishes that there is no express trust. Likewise, any claims of a constructive trust would fail because there is no *res* to which the trust can attach; the funds to be disbursed under the Plan represent the net proceeds of sale from the Debtor's real estate to which the Mannucci Parties have no direct secured claim.

## II.     BACKGROUND

10.     Prior to the commencement of this Bankruptcy Case, in August 2008, the Mannucci Parties filed a complaint (the "Complaint") in the Supreme Court for the State of New York (the "State Court Action").[3]

11.     The State Court Action named Cabrini, the Missionary Sisters of the Sacred Heart, a New York not-for-profit corporation ("MSSH-NY"), and Merrill Lynch as defendants, and alleged that the Deferred Compensation Agreements were qualified ERISA plans, and that the defendants were liable to the Mannucci Parties for damages arising from ERISA violations and under common law trust and breach of contract theories.  Specifically, the Mannucci Parties alleged that the Debtor wrongfully transferred funds "belonging to" the Doctors out of the Deferred Compensation Accounts, and contended that MSSH-NY was liable as Cabrini's alter ego because, *inter alia*, MSSH-NY was a member of Cabrini with the ability to elect officers and directors of the Debtor.

12.     On July 9, 2009 (the "Petition Date"), the Debtor commenced this Bankruptcy Case under chapter 11 of the Bankruptcy Code.

13.     On September 18, 2009, Merrill Lynch filed its Motion to Dismiss the State Court Action.

14.     On November 14, 2009, the State Court granted Merrill Lynch's motion to dismiss (the "State Court Order"), but allowed the Mannucci Parties the opportunity to replead their fraud claims against Merrill Lynch.  A copy of the State Court Order is annexed hereto as Exhibit "A".

---

[3]     Copies of the State Court Complaint are annexed together with the POCs as Exhibit "F" to the Affidavit of Katherine Harrison in Objection to the Claims Motion (Docket No. 638).

15. On November 19, 2009, the Mannucci Parties each filed the following proofs of claim ("POCs"):

> ➢ Claim # 388, in the amount of $771,843 filed by Mannucci;
>
> ➢ Claim # 389, in the amount of $1,298,724 filed by Taranta;
>
> ➢ Claim # 390, in the amount of $619,645 filed by Salvioni; and
>
> ➢ Claim # 391, in the amount of $265,962 filed by Padula.

16. Each of the POCs annexed a copy of the State Court Complaint as the basis for its respective claim, though nothing on the face of any of the POCs indicated that they were being filed as anything other than general unsecured claims.

17. On December 4, 2009, the Debtor filed a motion (the "Sale Motion") for an order approving, among other things, the sale of its real property and related assets free and clear of liens, claims, encumbrances, and other interests, and the assumption and assignment of executory contracts in connection with the sale.

18. On December 30, 2009 the Court entered the Order (A) Approving (I) Bidding Procedures, (II) the Time, Date, Place and Form of Notice for the Auction and Sale Hearing, and (III) Break-Up Fee, Termination Rights and Related Security Interest, and (B) Establishing the Date and Time for a Sale Hearing With Respect to the Debtor's Real Property and Related Assets (the "Bidding Procedures and Scheduling Order").

19. Pursuant to the Bidding Procedures and Scheduling Order, an auction was held on January 28, 2010, and by Order dated February 11, 2010 (the "Sale Order"), the Court approved the $83.1 million bid of S.K.I. Realty, Inc. (the "Buyer") as the highest and best bid for the Debtor's Assets.

20. On March 1, 2010, the Mannucci Parties filed their Amended Complaint in the State Court Action (the "Amended Complaint"), which replead the fraud

claim against Merrill Lynch. The Amended Complaint did not name Cabrini, as it was filed after the Petition Date, and the Mannucci Parties had not obtained relief from stay to proceed against the Debtor.

21. On September 22, 2010, the Debtor, together with the Creditors' Committee and MSSH-NY, filed a Motion to Approve a settlement among the Debtor, the Creditors' Committee, Missionary Sisters of the Sacred Heart, an Illinois not-for-profit corporation ("MSSH-IL") and MSSH-NY (the "Settlement Motion").

22. On September 27, 2010, the Debtor filed its Motion for an Order Approving the Allocation and Disbursement of Proceeds from the Sale of the Debtor's Real Property and Related Assets to Creditors With Valid Liens, and Reclassifying as Unsecured the claims of the Other Secured Creditors (the "Allocation Motion").

23. On November 4, 2010, the Court entered an Order approving the Allocation Motion (the "Allocation Order").

24. On November 19, 2010, the Court entered an Order approving the Settlement Motion (the "Settlement Order").

25. Just prior to argument on motions to dismiss the Amended Complaint filed by MSSH-NY and Merrill Lynch in the State Court Action, the Mannucci Parties voluntarily dismissed their claims against Merrill Lynch in the State Court Action.

26. On or about January 4, 2011, the State Court dismissed the claims asserted against MSSH-NY in the Amended Complaint without prejudice to re-plead against MSSH-NY and name Cabrini as a necessary party since no alter-ego or piercing remedy is available under New York State law where there is no underlying liability established against the allegedly controlled corporation - Cabrini.

27.     On January 26, 2011, the Mannucci Parties filed a Motion for Relief from Stay (the "Motion for Relief"), requesting the ability to name Cabrini in an amended complaint to be filed in the State Court Action, so as to be able to proceed against MSSH-NY on an alter ego theory of liability.

28.     On February 4, 2011 Cabrini filed the Claims' Motion.  The Claims' Motion asserts that: (1) the monies in the Deferred Compensation Plans were, based on the express language of the Deferred Compensation Agreements, Cabrini's property; (2) the monies were not held in trust; and (3) the Mannucci Parties cannot amend their POCs, after the Court-established Claims Bar Date,  to include any claims for constructive trust.

29.     On February 9, 2011 Cabrini filed its objection to the Motion for Relief, in essence arguing that the issues presently before this Court in the Claims' Motion would be dispositive of the issues which would be before the State Court if the Motion for Relief were granted.

30.     Additionally, on February 9, 2011, MSSH-NY filed its objection to the Motion for Relief, which advanced arguments similar to those of the Debtor.

31.     On March 3, 2011 the Creditors' Committee joined in the Debtors' objection to the Motion for Relief, and the hearing to consider the same is scheduled to be held on March 23, 2011.

32.     On March 3, 2011, the Mannucci Parties filed the Objection.

## III.     ARGUMENT

33.     Through the Objection, the Mannucci Parties improperly attempt to transform what are nothing more than general unsecured claims resulting from breaches of Cabrini's contracts with the Doctors, into claims based on alleged ERISA violations or common law trust claims.  The plain language of the Deferred Compensation

tion Agreements themselves provide sufficient basis for this Court to overrule the Objection, as the Deferred Compensation Agreements clearly establish that the Funds belonged to Cabrini – not the Doctors. *See, In re Metaldyne Corp.*, 409 B.R. 671, 677 (Bankr. S.D.N.Y. 2009)(holding that a written agreement that is complete, clear and unambiguous on its face must be enforced according to the meaning of its terms).

34.     Additionally, as the Mannucci Parties already advanced the same arguments raised in the Objection in the State Court Action, they are estopped from now re-litigating those same facts and issues which were already decided against them.

35.     Alternatively, there are more than sufficient facts in the record upon which this Court can determine that the Mannucci Parties' arguments are meritless and should be overruled as the Deferred Compensation Agreements fall within the "Top Hat" exemption to ERISA.

36.     Finally, the Mannucci Parties should not be allowed to amend their POCs to include claims based on trust or constructive trust theories as such "amendment" is time-barred.  Moreover, even if such amendment were allowed, the trust claims necessarily fail.

      **A.**     **The Plain Language of the Deferred Compensation Agreements Removes Them From The Ambit of 11 U.S.C. § 541.**

37.     The Mannucci Parties' argument that the Deferred Compensation Agreements fall within section 541's exclusions from property of the Debtor's Estate is contradicted by the plain language of the agreements themselves.  Simply put, the Deferred Compensation agreements establish: (1) that the Funds were Cabrini's property; and (2) that the Funds were additional compensation – not "withholdings" or "contributions" from the Doctors and therefore fall outside the ambit of 11 U.S.C. § 541.

38.     As set forth in detail below, the Deferred Compensation agree-
ments are materially similar to each other within their respective years' of execution.
Paragraph 3 of each of the Deferred Compensation Agreements specifically provides
that the Funds are Cabrini's.  Consequently, the plain language of the Deferred Com-
pensation Agreements establishes that the Mannucci Parties' allegations that the Doc-
tors "owned" the Funds are without any merit.

39.     Likewise, the plain language of the Deferred Compensation
Agreements also removes them from the ambit of section 541 of the Bankruptcy Code.

40.     Section 541 (b)(7)(A)(i)(I) of the Bankruptcy Code exempts from
property of the estate, any amount **withheld** by an employer, from the wages of an em-
ployee, for payment as contributions to "an employee benefit plan that is subject to title
I of the Employment Retirement Income Security Act of 1974 or under an employee
benefit plan which is a governmental plan under section 414(d) of the Internal Revenue
Code of 1986."  Likewise, section 541 (b)(7)(B)(i)(I) similarly exempts monies received
by an employer from an employee for payment as a **contribution** to such a plan. *See,* 11
U.S.C. § 541(b)(7) (emphasis added).

41.     Therefore, to fall within the ambit of section 541, any payment
made by an employer to a plan alleged to be excluded from property of the estate must
come from either "withholdings" or "contributions" from an employee.

42.     Here, the plain language of the Deferred Compensation Agree-
ments establishes that the source of the Funds was neither from withholdings nor em-
ployee contributions.

43.     The Objection relies upon the following Deferred Compensation Agreements to support its claims[4]:

> ➢ Salvino dated December 15, 1973;

> ➢ Salvino, dated August 4, 1978;

> ➢ Padula, dated January 1967;

> ➢ Padula, dated April 1, 1975; and

> ➢ Taranta, dated December 15, 1975.

44.     Each of the Deferred Compensation Agreements clearly establishes that the source of the Funds was to be a separate component of each Doctor's overall compensation, separate from the Doctor's annual salary.  (1967 Agreement at ¶¶2-3); (1973 & 1975 Agreements at ¶¶ 1,3); and (1978 Agreement ¶¶ 1,3).  The Funds were to be set aside by Cabrini - not taken from the Doctors' salaries through withholding or contribution.

45.     Accordingly, the plain language of the Deferred Compensation Agreements establishes that they fall outside the ambit of section 541.  As such, the Mannucci Parties' Claims are nothing more than general unsecured claims, which the Debtor acknowledged in its statement of liabilities filed with this Court, albeit in modestly reduced amounts.

---

[4]     No copy of the Mannucci Deferred Compensation Agreement has been supplied, and the Debtor has not been able to locate a copy in its files.

**B.** **The Mannucci Parties' Arguments Are Barred By The Doctrine Of Collateral Estoppel.**

46.     The factual lynchpin to all of the Mannucci Parties' arguments set forth in the Objection lies in its statement that:

> The Money taken by the Debtor from the Merrill Lynch accounts did not belong to the Debtor.  The money is not now an asset of the Debtor's bankruptcy estate.  The money is not available to the Debtor's creditors.  The money was taken and belongs to, the Doctors, and cannot be used by the Debtor to satisfy its obligations to other creditors.

(Objection at pg. 13)

47.     These very same factual issues were before the State Court and decided against the Mannucci Parties.  As such, the Mannucci Parties are barred from advancing their arguments by the doctrine of collateral estoppel, as the factual issues underlying their arguments have already been litigated by, and decided against, the Mannucci Parties.

48.     "Under the doctrine of collateral estoppel-which is also referred to as issue preclusion-an issue of fact or law that has been actually litigated and resolved by a valid final judgment binds the parties in a subsequent action, whether on the same or a different claim."  *In re Ames Department Stores, Inc.*, 2008 WL 7542200 at *9 (S.D.N.Y.) (*citing, Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 233 n. 5, (1998)).

49.     Four criterion are required to establish that a party is estopped from re-litigating an issue:  "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits." *Id.* (*quoting, Boguslavsky v .Kaplan*, 159 F .3d 715, 720 (2d Cir.1998)).

50.     Each of these criterion are satisfied with respect to all of the argu-ments advanced by the Mannucci Parties in the Objection.

51.     The State Court Complaint alleged eight causes of action: (1) viola-tion of rights under the deferred compensation plans; (2) recovery of plan benefits; (3) injunctive relief to enforce terms of the deferred compensation agreements; (4) fraud - against Merrill Lynch only; (5) breach of fiduciary duty - against Merrill Lynch only; (6) breach of contract - against Merrill Lynch only; (7) misappropriation; and (8) con-version.

52.     In the State Court Complaint, the Mannucci Parties alleged that the Deferred Compensation Agreements and the respective accounts set up in accordance with those agreements were "all ERISA benefit plans within the meaning of the stat-ute." (State Court Complaint at ¶ 31). Additionally, the State Court Complaint alleged that the Funds were accumulated through Cabrini's "withholding" monies from the Mannucci Parties annual compensation. (State Court Action at ¶¶ 36-37).

53.     In its Decision and Order dismissing the Complaint in the State Court Action, the State Court dismissed the causes of action for breach of contract and for breach of fiduciary duty, as against Merrill Lynch. (State Court Order at pgs. 9, 12 & 13).[5]

---

[5]     The State Court Order granted the Mannucci Parties leave to replead their cause of action for fraud against Merrill Lynch, and to replead against MSSH-NY, which does not effect the analysis herein with respect to issues decided in connection with the dismissal of the causes of action against Merrill Lynch for breach of contract and breach of fiduciary duty.

54.     In dismissing the breach of contract and breach of fiduciary duty claims against Merrill Lynch, the State Court specifically considered the following arguments and allegations:

> ➤ In November 2006 Cabrini sent a letter to each of the Doctors stating that it temporarily needed to move some of the Funds into its operating account (State Court Order at pg. 3);

> ➤ Cabrini instructed Merrill Lynch to close the accounts and send the funds to Cabrini (State Court Order at pg. 3);

> ➤ The Mannucci Parties allege that the evidence submitted contradicts Merrill Lynch's argument that the Funds in the Merrill Lynch accounts "were solely Cabrini's" (State Court Order at pg. 9);

> ➤ The Mannucci Parties received periodic statements from Merrill Lynch for over ten years (State Court Order at pg. 9);

> ➤ The account documentation included language that "You, the Client, and we, Merrill Lynch . . . " (State Court Order at pg. 10);

> ➤ The Mannucci Parties' argument that there was nothing in the account statements that would indicate that they belonged to anyone other than the Mannucci Parties (State Court Order at pg. 9);

> ➤ The accounts were corporate accounts (State Court Order at pg. 9);

> ➤ Cabrini's tax identification number was listed on each account (State Court Order at pg. 10);

> ➤ The Mannucci Parties' social security numbers were not listed on the accounts (State Court Order at pg. 10);

> ➤ Cabrini's chief executive officer was the only party authorized to give Merrill Lynch instructions (State Court Order at pg. 9);

> ➤ In 2002 the accounts were converted to a type reserved for non-profit organizations (State Court Order at pg. 9); and

> ➤ Cabrini sent Merrill Lynch instructions regarding distributions – which were made to Cabrini (State Court Order at pg. 9).

55. In connection with the State Court Action, Merrill Lynch submitted the Reply Affidavit of Josette L. Greechan in Support of Merrill Lynch's Motion to Dismiss, dated as of December 4, 2008, a copy of which is annexed hereto as Exhibit "B".

56. The State Court Concluded that the Mannucci Parties:

> failed to allege facts sufficient to sustain a claim of breach of contract, as either principals or third-party beneficiaries. Nor do the documents currently support a claim for breach of contract. As such, their breach of contract claim against Merrill Lynch is dismissed.

(State Court Order at pg. 12).

57. In reaching this decision, the Court necessarily considered the central arguments which the Mannucci Parties' rely upon in the Objection:

> ➢ The Merrill Lynch Accounts did not belong to Cabrini; and
>
> ➢ The Funds belonged to the Doctors.

58. Simply put, as the Mannucci Parties could not maintain claims based upon contract or third-party beneficiary status with respect to the Funds against Merrill Lynch in the State Court Action, collateral estoppel bars them from now being able to re-litigate those same issues against Cabrini. In contrast, if in fact, the dismissal was based on a mere pleading defect, the State Court would have granted the Mannucci Parties leave to amend their breach of contract and breach of fiduciary claims against Merrill Lynch - just like it did with their fraud claims.

59. Rather, the State Court specifically held that "Plaintiffs have failed to allege facts sufficient to sustain a claim of breach of contract, **as either principals or third-party beneficiaries**" against Merrill Lynch (State Court Order at pg. 11)(emphasis added).

14

60.     Ownership of the Funds in the Merrill Lynch Accounts was at issue and was actually litigated and decided in the State Court Action (State Court Order at pgs. 9-10 ). Clearly, if the Funds were owned by the Mannucci Parties, they would have sufficiently pleaded a cause of action against Merrill Lynch for breach of contract, or on theory of recovery as an intended third-party beneficiary of those accounts.

61.     Similarly, as the State Court Complaint alleged that the Funds held in the Merrill Lynch Accounts were the product of ERISA Plans, then in reaching its decision on the Mannucci Parties' claims against Merrill Lynch, the State Court necessarily considered and rejected the argument that the Plans were ERISA Plans or were held in trust by Cabrini for the Doctors. Otherwise, the State Court could not have reached the conclusion that the Mannucci Parties were not third-party beneficiaries of the Merrill Lynch Accounts.

62.     Consequently, the very factual issues that the Mannucci Parties' assert as a basis that the Funds are not property of this Bankruptcy Estate were the identical factual issues before the State Court, and were actually litigated and decided against the Mannucci Parties in the State Court Action. They were necessary to support the State Court Order, and were actively litigated by the Mannucci Parties.

63.     As such, the Mannucci Parties are now barred from re-litigating those issues, and the Motion should therefore be granted.

**C.     Alternatively, This Court Can Determine From The Record That The Deferred Compensation Plans Fall Within The "Top Hat" Exemption To ERISA.**

64.     As set forth in the Claims' Motion, even if this Court were to find that the Deferred Compensation Agreements satisfy the "withholding" or "contribution" elements of 11 U.S.C. § 541(b), they fall within the "Top Hat" exemptions to ER-

ISA, and therefore section 541's exclusions from property of the estate are still inapplicable.

65.    A "Top Hat" plan is defined as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-1145."  *Patrick Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283 (2d. Cir. 2000).

66.    In determining whether a plan qualifies under the "Top Hat" exception," the Second Circuit has applied a two-prong test based on the statutory definition of the exception.  *See, Demery*, 216 F.3d 283.  The test looks to: (1) whether the plan was unfunded;  and (2) whether the plan was "maintained primarily for a select group of management or highly compensated employees." *Id.* [6]

67.    Moreover, a court need not conduct an evidentiary hearing into the issues surrounding determination of whether a plan falls within the "Top Hat" exception.  *See, id.* (determining that a plan fell within the "Top Hat" exemption through a summary judgment motion).

68.    Here, the Deferred Compensation Plans satisfy both elements of the "Top Hat" exemption.

---

[6]    The Mannucci Parties mistakenly interpret the *Demery* test as having three components. (Objection at pg. 15).

### i. The Deferred Compensation Agreements were unfunded.

69. In determining whether a plan is "funded", a court must ask whether "the beneficiary [can] establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation[.]" *Demery*, 216 F.3d at 287.

70. The language in the Deferred Compensation Agreements explicitly refutes the Mannucci Parties' allegations that the "funding" element is satisfied.

71. The 1967 Agreement expressly states that:

> ➤ The deferred compensation account is the property of Cabrini (1967 Agreement at ¶ 3); and

> ➤ The employee's interest shall not be subject to any garnishment, attachment, execution or levy, by the employee's creditors (1967 Agreement at ¶ 3).

72. The 1973 and 1975 Agreements are identical to each other and similarly provide that:

> ➤ The mutual fund shares purchased pursuant to the agreement are the absolute property of Cabrini (1973/1975 Agreements at ¶ 3); and

> ➤ The employee's interest shall not be subject to any creditor or judicial process involving employee (1973/1975 Agreements at ¶9).

73. The 1978 Agreement although structurally different from the 1973/1975 Agreements, contains materially the same representations.

74. Notably, the Deferred Compensation Agreements do <u>not</u> contain any language stating, suggesting or implying that the mutual funds are to be held in trust by Cabrini for the benefit of the Doctors. The only rights the Doctors have are to (i) designate beneficiaries to receive distributions (¶ 4), (ii) choose cash or mutual fund

shares as the method of distribution (¶ 7), and (iii) agree jointly with the Cabrini to substitute investments (¶ 8).

75.    As such, the plain language of the Deferred Compensation Agreements prevents the Doctors from being able to assert any rights beyond those of a general unsecured creditor.

76.    In their Objection, the Mannucci Parties improperly attempt to distinguish the Deferred Compensation Agreements from those found by various courts to fall within the "Top Hat" exemption by focusing on form over substance.

77.    For example, the Objection attempts to distinguish *In re Downey*, 441 B.R. 120 (9th Cir. 2010) by arguing that the *Downey* plan contained the following representations, and which are absent from the Deferred Compensation Agreements, including that:

> ➢ The deferred compensation would remain part of the participating employer's unrestricted assets;
>
> ➢ Would not be held in trust; and
>
> ➢ The employer's obligations were purely contractual and unsecured.  (Objection at pg. 17).

78.    Likewise, the Objection focuses on the presence of express language in the cases of *In re Colonial Bancgroup,*  436 B.R. 695 (Bankr. M.D. Ala. 2010); and *In re Silicon Graphics, Inc.* 363 B.R. 690 (Bankr. S.D.N.Y. 2007) as providing that the funds would be available to the general creditors of the employer, and that an absence of such language negates "Top Hat" status.  (Objection at pg. 19).

79.    However, the meanings of these very provisions examined by the *Downey, Colonial*, and *Silicon Graphics* Courts are subsumed within the language of each of the Deferred Compensation Agreements.

80. Each of the Deferred Compensation Agreements provides that:

> ➢ The Funds are to remain the property of Cabrini; and

> ➢ The funds would not be subject to any action by the Doctors' creditors.

81. The combined effect of these two clauses conveys the same meaning as those clauses relied upon by the *Downey, Colonial,* and *Silicon Graphics* Courts - and supports the conclusion that the Deferred Compensation Plans were "unfunded" because the Doctors cannot establish, through the plan documents, a legal right any greater than that of an unsecured creditor to the Funds. The provision which states that the funds would not be subject to any action by the Doctors' creditors establishes without a doubt that it was the intent of the parties that the Mannucci Parties would not have a legal right in the Funds greater than that of an unsecured creditor. If it was intended that the Mannucci Parties would have a superior interest, then the funds would have been an identifiable asset of the Doctors that necessarily would have been available to satisfy the claims of the Doctors' creditors.

82. Likewise, the Mannucci Parties' argument that the April 8, 1997 letter to the Doctors regarding a potential "tax issue" (the "Tax Letter")[7] regarding the Deferred Compensation Agreements does not establish that they were "funded." (Objection at pgs 21-22). Nothing in the Tax Letter suggests that the alleged "tax issue" would give the Mannucci Parties any legal right in the Funds any greater than that of any other unsecured creditor of Cabrini. Rather, the Tax Letter merely was alerting the Doctors to potential issues and potential arguments that the IRS might assert regarding the Deferred Compensation Agreements' tax treatment. The Tax Letter also clearly states that

---

[7]      Copies of the Tax Letter are annexed as Exhibit "E" to the Affidavit of Katherine Harrison in Objection to the Claims Motion (Docket No. 638).

any decision with regard to how Cabrini would proceed vis-à-vis the "tax issue" would be made by Cabrini. The obvious implication of that statement is that Cabrini had the ability to make the decision in its sole discretion because the underlying funds belonged to Cabrini.

83. Similarly, the Mannucci Parties' reliance on the November 16, 2006 correspondence from Robert Chaloner (the "November 16 Correspondence")[8] advising the Doctors that Cabrini was using a portion of the Funds from the Merrill Lynch accounts for general operations is misplaced as the November 16 Correspondence fails to establish that the Deferred Compensation Agreements were "funded."

84. In fact, the November 16 Correspondence establishes that Cabrini could, and did, use the Merrill Lynch accounts at its discretion and without the consent of the Doctors. As such, it proves that the Doctors had no ownership or other rights in the Funds greater than that of an unsecured creditor. Cabrini, not the Doctors, owned the Funds and controlled the Merrill Lynch accounts.

85. Accordingly, based upon the above, the evidence in the record establishes that the Deferred Compensation Agreements were "unfunded."

  **ii. The Deferred Compensation Agreements were maintained primarily for a select group of management or highly compensated employees.**

86. The record before this Court likewise provides a sufficient basis to support the conclusion that the Deferred Compensations also satisfy the second prong of the requisite "Top Hat" analysis, namely that the Deferred Compensation Agreements were for a select group of management – the Doctors.

---

[8]   Copies of the November 16 Correspondence are annexed as Exhibit "C" to the Affidavit of Katherine Harrison in Objection to the Claims Motion (Docket No. 638).

87.     In order to determine that the participants of an employee benefit plan are "a select group of management or highly compensated employees," the Second Circuit requires a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction. *Demery*, at 288 (citations omitted).

88.     However, in *Demery,* the Court found that despite the fact that neither party had conducted discovery, the District Court did not err in finding the plan qualified as "Top Hat" plan. *Id*. at 286 (granting summary judgment without allowing further discovery").

89.     The *Demery* Court considered the entire body of employees that the plan was offered to. "All participants were selected officers of the bank, were in management positions, and were highly compensated in comparison to bank employees at large." *Id*. at 289.

90.     As such, the *Demery* Court concluded that the plan at issue was a "Top Hat" plan as a matter of law.

91.     Again, in this case, the plain language of the Deferred Compensation Agreements is dispositive.  The Deferred Compensation Agreements themselves establish that the Mannucci Parties were a select group of management.  In addition, the Tax Letter indicates that only "about a half dozen" Cabrini employees had deferred compensation agreements similar to the Deferred Compensation Agreements.

92.     Each of the Taranta, Padula and Salvino Agreements indicate that the respective Doctor was either a department head or assistant department head. Moreover, doctors, in general, are traditionally the highest paid workers at a hospital, and department heads traditionally are paid more.  This was the case at Cabrini as well.

93.     Accordingly, the Deferred Compensation Agreements establish that the Doctors were in management positions, and were highly compensated in com-

parison to Cabrini's employees at large. Indeed, the Doctors were merely a small subset of all doctors on staff at Cabrini, thus further identifying the Doctors as a select group.

94.    Finally, while the Mannucci Parties allege that a finding of "influence" is its own requisite prong under the *Demery* analysis (Objection at pg. 15), such is not the case.

95.    "The Mannucci parties cite *Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1015 (S.D.N.Y. 1995) for the proposition that "sufficient influence within the company to negotiate compensation" is an important avenue of analysis. (Objection at pg. 15). However, the *Bigda* court referenced negotiating leverage in its dicta.

96.    In contrast, while the *Demery* Court noted that the employee's ability to negotiate is an important component of "Top Hat" plans, it did not require that such determination was on equal footing with the enumerated "two-prong" test. *See, Demery*, 216 F.3d at 289.

97.    In *Demery*, the record was silent as to the parties' ability to negotiate the plan. The court concluded that the employees did not proffer substantial direct or circumstantial evidence that would suggest an absence of bargaining power sufficient to raise a question of fact on this issue. *Id*. at 290. As such, the plan fell within the "Top Hat" exception

98.    Likewise, here, based upon the fact that each of the Doctors held senior positions, and the deferred compensation was substantial in comparison to earnings of the general hospital workers, it can be inferred that the Doctors had sufficient bargaining power with respect to the Deferred Compensation Agreements.

99.    Moreover, just like in *Demery*, the Mannucci Parties have not proffered any direct or indirect evidence that would suggest the absence of bargaining power.

100.     Consequently, the Deferred Compensation Agreements satisfy both prongs of the "Top Hat" exemption to ERISA.  As such, they fall outside the ambit of section 541's exclusions from property of the estate.

**D.     The Mannucci Parties should not be allowed to amend their POCs to include claims based on trust or constructive trust theories.**

101.     The Mannucci Parties' arguments in the Objection based on trust or constructive trust theories (Objection at pg. 29) put the "cart before the horse" as they pre-suppose that the POCs could be amended to include those claims.  They can't.  Moreover, even if the POCs could be amended, any claims based on a trust recovery will necessarily fail.

102.     As set forth in detail in the Claims' Motion, a claimant may not, "through the guise of an amendment, circumvent the bar date by asserting a new claim." *In re Asia Global Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005). *See also, In re Orion Refining Corp.*, 317 B.R. 660 (Bankr. D. Del. 2004) ("While bankruptcy courts allow post-bar date amendments to claim amounts, they do not allow post-bar amendments to change status of claim.").

103.     The POCs were filed as nothing more than general unsecured claims.  The bar date has passed.  The amendment sought by the Mannucci Parties would change the status of the claim, and as such, would thereby impermissibly constitute filing a late and new claim.  Such amendment would also prejudice the remaining creditor body.

104.     "Amendments are not allowed to assert new causes of action when prejudice would result." *In re Black & Geddes, Inc.*, 30 B.R. 389 (Bankr. S.D.N.Y. 1983), *af-*

*f'd*, 58 B.R. 547, 553 (S.D.N.Y. 1983)(prohibiting a late amendment of a claim which changed the claim's status from unsecured to secured).

105.     On the Petition Date, Cabrini had only $227,101 in cash.  (Schedule A, Docket no. 84).  This Chapter 11 case was funded by a debtor-in-possession loan provided by MSSH-IL and approved by this Court, and which was repaid pursuant to the allocation motion and the terms of the loan documents.  As such, the remaining funds available to pay creditors under the Plan come from the proceeds of the Sale Motion.

106.     The compromise set forth in the Settlement Motion and Settlement Order resulted in MSSH-IL and MSSH-NY (collectively, the "MSSH Entities") compromising their secured claims exceeding $50 million against the Debtor's property.  This compromise resulted in MSSH Entities agreeing to an allowed secured claim in the amount of $6,562,500 and allowed subordinated secured claim, which resulted in a sharing of available cash between the MSSH Entities and the general unsecured creditors as follows:

➢ General Unsecured Creditors:     59.615%;

➢ MSSH Entities:                            40.385%.

107.     Absent the agreement approved by the Settlement Order, there would have been no funds for the general unsecured creditors over and above the MSSH Entities secured claims absent an adverse decision against the MSSH Entities in the Creditors' Committee's Adversary Proceeding.

108.     An essential element of the agreement was the expectation that the available settlement monies would amount to $26 million.

109.     If the Mannucci Parties are allowed to amend their claim, and if they were successful in establishing a claim for trust, or constructive trust, the MSSH Entities and the general unsecured creditors will be prejudiced in that there will be $3 million less settlement cash available for distribution, representing more than a 10% reduction.  Additionally, had any of the settling parties known at the time that the Mannucci Claims were being asserted, in essence, as secured claims against the Sale Proceeds - they may not have reached the same agreement.

110.     Consequently, the Mannucci Parties should not be allowed to amend their POCs as such amendment is late, would amount to a new claim, and would prejudice the remaining creditor body.

111.     Nevertheless, even if the Mannucci Parties were allowed to amend their POCs, they cannot prevail on any claims of trust or constructive trust.

112.     As set forth in detail in the Claims Motion, the express language of the Deferred Compensation Agreements establishes that there is no distinct trust fund but merely a general obligation to ultimately pay a sum of money.  Such obligation is not trust, but only a debt.  See, *In re Ames Department Stores, Inc.*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002), *aff'd*, *LFD Operating, Inc. v. Ames Dept. Stores, Inc.*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, *In re Ames Dept. Stores, Inc.*, 144 Fed.Appx. 900 (2nd Cir. 2002).

113.     Likewise, as set forth in detail in the Claims' Motion, the Mannucci Parties cannot prevail on the theory of a constructive trust.  In addition to establishing the requisite establish four elements:  (i) a confidential or fiduciary relationship;  (ii) a promise, express or implied;  (iii) a transfer made in reliance on that promise;  and (iv) unjust enrichment, the claimant must also establish that there is a *res* to which the trust

could attach. *See, Beekman Paper Co., Inc. v. St. Theresa Properties, Inc. (In re St. Theresa Properties, Inc.)*, 152 B.R. 852, 857 (Bankr.S.D.N.Y.1993).

114.    On the Petition Date, the Debtor had only $221,101 – as such – there is no *res* for the purported constructive trust to attach.

## IV.    <u>CONCLUSION</u>

115.    Based upon the foregoing, the Debtor respectfully requests that this Court overrule the Objection, enter an Order granting the Claims' Motion and granting any further relief as is just and proper.

Dated:    New York, New York          CABRINI MEDICAL CENTER
          March 21, 2011               Debtor and Debtor in Possession
                                      By its Attorneys:
                                      TOGUT, SEGAL & SEGAL LLP
                                      By:

                                    /s/ Frank A. Oswald_____
                                    FRANK A.  OSWALD
                                    A Member of the Firm
                                    One Penn Plaza, Suite 3335
                                    New York, New York 10019
                                    (212) 594-5000