<pre>
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2
                                    .   Chapter 11
3    IN RE:                         .
                                    .   Case No. 09-14398 (AJG)
4    CABRINI MEDICAL CENTER,        .
                                    .   New York, New York
5              Debtor.              .   Wednesday, March 23, 2011
     . . . . . . . . . . . . . . .      11:26 a.m.
6
          TRANSCRIPT OF MOTION BY MANNUCCIO MANNUCCI, MD, ET AL, FOR
7                            RELIEF FROM STAY
       MOTION BY DEBTOR CLASSIFYING AND FIXING CLAIMS FILED BY THE
8                            MANNUCCI PARTIES
                 BEFORE THE HONORABLE ARTHUR J. GONZALEZ
9                    UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:

11   For the Debtor:              Frank A. Oswald, Esq.
                                  TOGUT, SEGAL & SEGAL, LLP
12                                One Penn Plaza
                                  New York, New York 10110
13
     For the U.S. Trustee:        Andrea B. Schwartz, Esq.
14                                OFFICE OF THE U.S. TRUSTEE
                                  U.S. DEPARTMENT OF JUSTICE
15                                33 Whitehall Street, 21st Floor
                                  New York, New York  10004
16

17

18

19   (Appearances Continued)

20   Audio Operator:             Electronically Recorded
                                 by S. Hibbert, ECRO
21
     Transcription Company:      Rand Reporting & Transcription, LLC
22                               80 Broad Street, Fifth Floor
                                 New York, New York 10004
23                               (212) 504-2919
                                 www.randreporting.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
</pre>

```
 1    APPEARANCES:

 2    For Mannuccio Mannucci,
      MD, et al:                   Katherine B. Harrison, Esq.
 3                                 Jason Snyder, Esq.
                                   PADUANO & WEINTRAUB, LLP
 4                                 1251 Avenue of the Americas
                                   9th Floor
 5                                 New York, New York 10020

 6    For Missionary Sisters of
      the Sacred Heart, NY:        Sean C. Southard, Esq.
 7                                 KLESTADT & WINTERS, LLP
                                   570 Seventh Avenue, 17th Floor
 8                                 New York, New York  10018

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings commence at 11:26 a.m.)

2    THE COURT:  All right.  There are -- let me see.

3    There are two motions.

4    MR. OSWALD:  Good morning, Your Honor.

5    THE COURT:  Go ahead.

6    MR. OSWALD:  Your Honor, Frank Oswald and my colleague

7    Jonathan Ibsen for Cabrini Medical Center, the debtors here.

8    You're right, we do have two matters on; they both relate to

9    the same creditor parties, named the "Mannucci Parties," four

10   former doctors at the hospital that were parties to deferred

11   compensation agreements with Cabrini.

12   We have, firstly, Your Honor, the debtor's objection

13   to the claims filed by the Mannucci Parties, and then we also

14   have a motion by them to lift the stay, in order to name

15   Cabrini in a pending state court action, which involves the

16   same issue, the same set of facts; and that is, in a nutshell,

17   whether or not funds that had been set aside in accounts at

18   Merrill Lynch pursuant to these deferred compensation

19   agreements with the doctors were in fact funds and property of

20   Cabrini or the property of the Mannucci Parties.

21   And as set forth in the claim objection, the proof of

22   claim on its face simply attached the complaint from the state

23   court action, and some of the bases that were made clear to us

24   in connection with approval of the debtor's disclosure

25   statement back in January; in particular, a claim of

constructive trust or other trust claim, was disconcerting to

us, and that's why we brought on this claim motion at this

time.

We did deal with that particular issue, the allegation

that these were potentially Mannucci Party funds, to resolve

the objection for disclosure statement purposes and put in some

language in the disclosure statement indicating that they had

that -- they were making that claim.  But nowhere on the face

of the claim, nor in the complaint, was that allegation made.

As counsel, I think, also had indicated on the record

of the disclosure statement hearing, the litigation in state

court proceeded as against the two non-debtor entities:  One,

Merrill Lynch, who's custodian of the accounts; and secondly,

the Missionary Sisters, in their capacity as sponsors for the

hospital.

Our contention in both papers, Your Honor -- and I'll

deal with the motion to lift-stay; my colleague Mr. Ibsen can

deal with the claim objection on the merits.  But our position

in a nutshell on the lift-stay, Your Honor, is that expending

debtor time and resources to litigate or to otherwise be a

party would be wasteful; that this Court has jurisdiction over

the proofs of claim; that this Court can and should determine

whether or not the funds were Cabrini's property or not.  If

the Court was to determine that these funds were Cabrini's

property and not the Mannuccis' property, then we think the

1   issue goes away in its entirety with respect to the priority of

2   the claim and/or this contention that there's property of non-

3   debtor parties.

4         There is still the ancillary issue, although I don't

5   think -- it will not hold up plan confirmation or anything of

6   that nature.  There is a discrepancy as to claim amounts.  I

7   believe that that discrepancy is due to the fact that the

8   Mannucci Parties are using some earlier balances.  These funds

9   were in mutual fund accounts, Your Honor, so necessarily those

10   funds balances vary day to day, month to month.  And the

11   amounts that were scheduled for the Mannucci Parties as general

12   unsecured claims were the amounts as of the time that those

13   accounts were closed, and the funds transferred to Cabrini.

14         So that's the overlay of the two motions before you.

15   And I don't know on the merits whether or not you had a

16   preference as to which one to take.  It seemed to me that, if

17   we're going to deal with issues and questions as to the claim

18   motion, that would probably enlighten everybody as to where

19   we're going to go on the lift-stay motion, but of course that's

20   entirely up to Your Honor.

21         THE COURT:  Well, let me hear from the other side,

22   just as to their general view of both motions.  Just stand at

23   the podium or use the microphone at the table.  You need to be

24   in contact on a microphone.

25         MS. HARRISON:  This is the money from four doctors'

1 deferred compensation plans.  It has always been the doctors'

2 position in the New York State litigation against Cabrini and

3 the Missionary Sisters, which was started in 2008, as well as

4 the proof of claim in this case; timely filed, which attached

5 that complaint, that the doctors owned the money in their

6 deferred compensation plans, so --

7         THE COURT:  All right.  Let me understand something

8 from a tax --

9         MS. HARRISON:  -- there's no issue of surprise here.

10         THE COURT:  Just a minute.  Just -- I'm speaking.

11         MS. HARRISON:  Sorry.

12         THE COURT:  Thank you.

13         If it is the doctors' money, what does that mean from

14 the deferred compensation?  They've already received the

15 compensation as a tax matter?

16         MS. HARRISON:  They were supposed to have received --

17         THE COURT:  No, you're not addressing the question.  I

18 interrupted you for that purpose, to get you to focus on the

19 issue.

20         To the extent this money belongs to the doctors, and

21 in your view, if I understand it correctly, always belonged to

22 the doctors at the point of setting up these accounts or some

23 time even before that, does it mean, as a tax consequence,

24 they've received the income as of that time?

25         MS. HARRISON:  I am not a tax expert, but I believe --

1    THE COURT:  Well, I think you have -- my view is, is

2    somebody should consult one.  Because the theory that you're

3    articulating, at least it seems to me could have serious

4    ramifications from a tax standpoint.

5    MS. HARRISON:  I agree, Your Honor, and I think that's

6    why it's important for the Court to look at what we have

7    submitted as Exhibit E to the Harrison affidavit.  This is the

8    letter written by Cabrini in April 1997, that we call the

9    "Cabrini Tax Problem Letter," in which that's exactly what

10   Cabrini said, ah-hah, there's a tax problem here, we should

11   have reported this as income to you the minute you retired.

12   Because at that point, essentially, the reason why we should

13   have reported it was because it was yours.  And what I'm saying

14   is exactly what Your Honor is saying.  That's an admission by

15   Cabrini that the money was theirs at that point.

16   THE COURT:  But also, it triggers a tax consequence

17   for your clients dating back to that date, in terms of their

18   income.

19   MS. HARRISON:  That may well be, Your Honor.

20   THE COURT:  All right.

21   MS. HARRISON:  And as I have said, I am not a tax

22   lawyer, but that -- I accept that that may well be the case.

23   THE COURT:  All right.  And then the other -- the

24   question I have for you, if I understand the issues, all of

25   these issues about whose money it is is before the state court

1    --

2            MS. HARRISON:  Correct.

3            THE COURT:  -- in a proceeding.

4            MS. HARRISON:  And has been.

5            THE COURT:  All right.  It's before the state court.

6            And it's before me, at least -- not the issue

7    involving any of the other defendants, but the issue involving

8    Cabrini is before me in a form of a proof of claim.  You filed

9    a proof of claim asserting that these funds belong to your

10   clients.

11           MS. HARRISON:  Correct.

12           THE COURT:  If I were to adjudicate that issue and

13   determine the funds do not belong to your clients, what happens

14   to the state court litigation?  I mean, obviously, you would

15   have your appellate rights, I'm not saying -- but a finding

16   that the funds do not belong to your clients and belong to

17   Cabrini, what then happens to the balance of the state court

18   litigation with respect to the other defendants?

19           MS. HARRISON:  I believe that we have still a viable

20   action in the state court against the Sisters for breach of the

21   ERISA plan for failure to pay benefits, for failure to provide

22   benefits.  In other words, Cabrini may have owned the funds,

23   but they breached their obligation to make the distributions

24   that were owed under the plan documents to the doctors.  And I

25   don't think -- it seems to --

1    THE COURT:  And that you would have to pursue the

2  piercing of corporate veil --

3    MS. HARRISON:  Correct.

4    THE COURT:  -- to reach the other defendants.

5    MS. HARRISON:  Correct.  But may I be heard on the

6  argument that the money did belong to the doctors.

7    THE COURT:  No, I understand.

8    MS. HARRISON:  Okay.

9    THE COURT:  No, I don't think it's a simple case, one

10  way or the other.

11    And just, as you're going to prepare to respond to

12  that, if it does belong to the doctors, what then happens in

13  the state court?  If I were to find that it does belong to the

14  doctors, what happens?

15    MS. HARRISON:  I think the money should come off the

16  top in this court.  If the doctors can -- and I believe they

17  should -- get full relief here, we don't need anything to

18  happen in the state court.  We don't --

19    THE COURT:  In order to achieve that, what would you

20  have to prove here, other than -- assume the funds belong to

21  the doctors and Cabrini spent the funds.  Under what legal

22  theory could you then get the existing funds?  I'm assuming

23  they're not the same funds.

24    MS. HARRISON:  We have admissions by Cabrini in

25  several different documents that the funds were taken, and we

1　have exact amounts and admissions by Cabrini of the funds that

2　were taken, which I believe under the case law is sufficient

3　for tracing purposes.  We have specific dollar amounts, such

4　that we should be able to get those amounts back in a legal

5　ruling by Your Honor.

6　　　　　THE COURT:  And what's the theory on which you prevail

7　in that?

8　　　　　MS. HARRISON:  Under the -- some of the case law falls

9　under the constructive trust tracing type cases within the

10　Second Circuit, and I believe those cases are cited in our

11　brief.

12　　　　　THE COURT:  And stand for the proposition that the

13　assumption is that the money that went out first was not their

14　money, and the money that remained with the debtor would belong

15　to the party asserting a constructive trust?

16　　　　　MS. HARRISON:  Correct.

17　　　　　The other thing that I think we can make use of is the

18　Howard's Appliance case has very -- which is a Second Circuit

19　case -- has very good language about how, but for the actions

20　of the debtor in moving the inventory, which is what prevented

21　the trustee from perfecting the security interest, which is

22　similar to our situation.  But for Cabrini having gone in and

23　wrongfully taking that money, it would still be sitting in

24　those Merrill Lynch accounts, and we would know exactly where

25　that money is, and we could go get it.

1          And so to punish us for our inability to trace that

2    money now because Cabrini went in early and took that money,

3    this is the perversion of justice.  And we know that under the

4    rubric of the constructive trust cases, and also under Your

5    Honor's broad discretionary areas, unjust enrichment principles

6    allow you to compensate for that.

7          THE COURT:  And in order to prevail -- let's go back

8    to ERISA -- what would you have to show in order to prevail

9    under ERISA that this money would be treated as your money, or

10   that there's some trust analysis?

11         MS. HARRISON:  We have plan documents, we have plans

12   that are ERISA plan documents, which is relatively easy.  We

13   have plans that talk about benefits and what should be done

14   with them, how they should be administered.  We have a plan

15   that was funded.  They have not cited any of these so-called

16   "top hat" cases; are all totally distinguishable because they

17   involved very specific, concrete language about how in the

18   plans the funds were to be general assets of the company,

19   subject to all the creditors of the company.  We have nothing

20   like that here.

21         So we have funded, segregated deferred compensation

22   plan accounts here.  We'll be meaning to show that, and we can

23   show that.  So we have ERISA plans, funded.  And we need to

24   show, and have shown through Cabrini admissions, the funds were

25   taken.

1    THE COURT:  And just it may be in your papers, but

2  what is your response to the objection to the claim?  You know,

3  I know you disagree, but procedurally I'm trying to understand

4  how you are approaching this case.

5    MS. HARRISON:  With respect to which objection?

6    THE COURT:  Well, the objections that are before me

7  today, I guess at least in part, is that the funds don't belong

8  to the doctors; they belong to Cabrini.  So you're

9  acknowledging that's going to be adjudicated before me, and you

10 want the stay left in for purposes of adjudicating the issue of

11 alter ego?  I'm not sure how you're approaching this litigation

12 in state court and the claim litigation before me.

13    MS. HARRISON:  I think -- I think we're all here in a

14 bit --

15    THE COURT:  Just make -- speak louder --

16    MS. HARRISON:  I'm sorry.

17    THE COURT:  -- or closer to the microphone.

18    MS. HARRISON:  We are in a bit of a gray area here.

19 We're all here asking for alternatives.

20    If Your Honor will make a full adjudication of who

21 owned benefits, if Your Honor rules that my clients owned all

22 the benefits and is satisfied that there is no tracing problem

23 that will stop the estate from simply paying out the money that

24 was taken from our clients, then I don't need you to lift the

25 stay because I don't need to go back to state court.

1    THE COURT:  Uh-huh.

2    MS. HARRISON:  However, if Your Honor makes some

3 ruling short of that, then I do need to go back to state court

4 because I have the potential there to pursue an alter ego

5 ruling in which I could potentially recover a hundred percent.

6    THE COURT:  All right.  I understand.

7    All right.  It seems to me that, without delving too

8 deeply into the lift-stay, that it's really premature at this

9 time to lift the stay if this Court is going to adjudicate the

10 threshold issue as to whose money is it or whose money was it

11 and whether or not it can be traced, if it's determined to be

12 the doctors' money.

13    MS. HARRISON:  That may be correct, Your Honor.

14    THE COURT:  And in that vein, where are you in the

15 adjudication of that claim?  You're here today, I know,

16 opposing the debtor's objection to the claim.  Is it your view

17 that I can rule on the legal issues without any discovery at

18 this point that are presented -- that are put at issue by the

19 objection to the claim?  Is it all legal argument as far as

20 you're concerned right now?

21    MS. HARRISON:  We believe that you can find in our

22 favor based on the factual evidence that we have put before

23 you.  We have undisputed affidavit evidence submitted by Dr.

24 Mannucci, and we have admissions that I have submitted under my

25 affidavit in the form of Cabrini business records and letters,

1   authored by Cabrini and/or their attorneys.

2            On the other hand, with respect to a finding in the

3   debtor's favor as to top hat status, depending on what facts

4   Your Honor might find, I would press for a factual hearing on

5   some of that because I think that there might be facts that we

6   would want to explore with respect to that.  But I do think

7   that Your Honor could find that the plans were funded without

8   recourse from our facts.

9            THE COURT:  Say that again, that were funded without?

10  I couldn't hear the last part of what you said.

11           MS. HARRISON:  Without recourse to additional facts.

12           THE COURT:  All right.  Thank you.

13           Let me just hear back from the debtor with respect to

14  the objection to claim.

15           MR. OSWALD:  Your Honor, if I may just again, an

16  overview, and then Mr. Ibsen can deal with any specific

17  questions.

18           We certainly agree, and we think the record before you

19  now is sufficient to make the determination.

20           THE COURT:  Just speak louder.

21           MR. OSWALD:  We believe the record before you now is

22  sufficient to make the determination on whose property this is.

23  We continue to believe, if you make that determination --

24           THE COURT:  Now in order to make that determination, I

25  have to find that this is not covered by ERISA.

1    MR. OSWALD:  Or more specifically, it would be under

2  the top hat --

3    THE COURT:  Right.

4    MR. OSWALD:  -- exception.

5    THE COURT:  And so you think, as a matter of law, the

6  facts presented -- under the facts, as they exist in the

7  pleadings, that I'll presume are not in dispute, you think

8  there could be a finding that this is a top hat plan.

9    MR. OSWALD:  We do not believe there are any material

10  facts in dispute for you to make that determination.

11    THE COURT:  And that's under the theory that there are

12  three elements of the top hat --

13    MR. OSWALD:  Yes.

14    THE COURT:  -- criteria, and you'd have to meet all

15  three.  Oh, am I addressing this question to the --

16    MR. OSWALD:  I think in terms of -- again, we raise

17  this issue in our papers.  I'm somewhat familiar, but Mr. Ibsen

18  is certainly more familiar, in terms of whether it's two or

19  three.  If you want to address, he can deal with the --

20    THE COURT:  No, but just give me --

21    MR. OSWALD:  We do raise a distinction as to whether

22  we believe it's two criteria, that the third mentioning some

23  dicta in the case --

24    THE COURT:  So where do you differ with these

25  criteria, as opposed to your view and a doctor's view?

1    MR. OSWALD:  I'll defer to Mr. Ibsen on that piece of

2  ...

3    MR. IBSEN:  Thank you, Your Honor.  Jonathan Ibsen,

4  Togut Segal, for Cabrini Medical Center.

5    Specifically addressing the question you just posed to

6  Mr. Oswald, we don't -- there's really no difference.  What it

7  is, is Cabrini, the debtors, are applying strictly the test

8  adopted in this jurisdiction by the <u>Demery</u> case.

9    THE COURT:  All right.  Just speak louder.

10    MR. IBSEN:  I'm sorry, Your Honor.  The debtors are

11  specifically following the controlling case law in this

12  jurisdiction that was adopted by the case, the <u>Demery</u> case,

13  cited in our papers.  That provides for a two-part analysis for

14  the top hat exemption, Your Honor.

15    And we would -- I would agree with Mr. Oswald's

16  position that there re no material facts at issue; this Court

17  can make its decision right on the papers, right what's before

18  it today, that the deferred compensation agreements fall within

19  the top hat exemption to ERISA.

20    The Mannucci Parties' objection, really, at the heart

21  of it is that they're arguing that the funds that were subject

22  to those agreements --

23    THE COURT:  Let's just stick with the top hat.  Where

24  do you differ with the doctors as to what their view of the

25  facts are or the law is with respect to top hat?

1    MR. IBSEN:  We differ on the point of law, in that the

2   doctors are interpreting the test as having three distinct

3   prongs.  Under Demery, Your Honor, there are two prongs:  The

4   funding prong, which Ms. Harrison has conceded can be decided

5   based on the facts here, Your Honor; and then the second prong,

6   which looks to whether or not the plans were offered to a

7   select group of management or highly compensated individuals.

8        The doctors read in a third prong of an element of

9   control in bargaining power; however, the Demery Court did not

10  enumerate that as an additional prong.  That's where we differ.

11  In Demery, the Court really, in dicta, looked at control as a

12  part of the analysis, but not on the same and equal footing as

13  the other two prongs.  So that's our legal difference, Your

14  Honor.

15        Our factual difference is Cabrini -- and Cabrini

16  relies specifically on the plain language of the deferred

17  compensation agreements themselves.  Your Honor, it's clear

18  there.  Although they are -- over a course of years, they all

19  contain the same material representations.  Each one of them

20  says the funds subject to the deferred compensation agreements

21  are Cabrini's.  Each one of them says that those funds cannot

22  be reached by the individual doctors' creditors.  That fits

23  right within the first prong, the funding part of the test of

24  top hat.

25        In funding, the real central element, as expressed by

1   the <u>Demery</u> Court, looks to whether or not the individual

2   creditor asserting the ERISA status could maintain a claim

3   superior to that of the general unsecured -- of the unsecured

4   creditors of the employer.  The plain language of the deferred

5   compensation agreements themselves, Your Honor, show that the

6   doctors can't reach that.

7           THE COURT:  Well, but assume that's accurate, but the

8   doctors are not found -- or the debtor doesn't establish the

9   other prong or -- even if it's two prongs.  What's the

10  consequence of that?  Assuming you establish that the plan is

11  clear that the accounts do not belong to the doctors, but

12  nonetheless they're not top hat employees.  What's the

13  consequence?

14          MR. IBSEN:  Well, Your Honor, actually, we'd have to

15  back up one point before that, would be that they couldn't even

16  meet the other first requirement under Section 541, which is

17  where the ERISA exception comes from, in that the documents

18  themselves specifically provide and eliminate their ability to

19  satisfy the prong of Section 541, that requires that the funds

20  came into the plan either through employee withholding or

21  contribution.  The plain language of the deferred comp

22  agreements themselves provides that these funds are being set

23  aside by Cabrini; they're being put there -- that -- by the

24  hospital itself, not through withholding, not through

25  contribution.  So you wouldn't even need to get to the second -

1    - to the top hat analysis.

2          THE COURT:  Let me stop you there.  Here's what -- the

3    way I want to approach this now, now that I understand it

4    better.

5          With respect to the lift-stay, I'm going to deny that

6    without prejudice because I'm willing to adjudicate this

7    threshold issue first.  And then whatever that determination is

8    leads you to the significance or the steps that you need to

9    take next, both sides.

10         But with that, I don't want to hear extensive argument

11   on it today because I'm not really prepared to hear it.  I'm

12   going to have you come back next week and then argue this

13   objection to claim from beginning to end, both sides.  But I

14   think I now have a much better understanding of what I need to

15   focus on between now and then to be better prepared for the

16   argument.

17         Today is the 23rd.  Come back on the 30th at ten

18   o'clock.

19         Yes?

20         MR. OSWALD:  Your Honor, I'll just note, we are on for

21   confirmation the 30th, as well.

22         THE COURT:  All right.

23         MR. OSWALD:  We're on for plan confirmation the 30th.

24         THE COURT:  All right.

25         MR. OSWALD:  I think it may be a 9:30 start, but we'll

1  be back here next week.

2      THE COURT:  All right.  Well, that's -- excuse me.

3      MR. OSWALD:  I can confirm that time start with your

4  chambers.

5      MS. HARRISON:  Your Honor.

6      THE COURT:  Go ahead.  Use the microphone.

7      MS. HARRISON:  Your Honor, may I ask, rather than

8  denying the motion to lift the stay with prejudice, our state

9  court pleading is triggered by any decision you make on the

10  motion to lift the stay.  In other words, we have to replead as

11  soon as you make any ruling on the motion to lift the stay.

12  Could I ask that, rather than denying it without prejudice,

13  that you simply hold it in abeyance?

14      THE COURT:  I will do that as long as you're willing

15  to waive any restriction upon the Court for a ruling on the

16  motion.

17      MS. HARRISON:  We will.

18      THE COURT:  All right.  So you work out a document,

19  you file a document that waives any rights you have to require

20  a ruling within a specific period of time.

21      MS. HARRISON:  We will, Your Honor.

22      THE COURT:  All right.  Now let's go back to the

23  hearing.

24      You have confirmation on the 30th.

25      MR. OSWALD:  It's 9:30, Your Honor.

1    THE COURT:  At 9:30.

2    MR. OSWALD:  Next Wednesday.

3    THE COURT:  And how long -- this is directed to Mr.

4  Oswald.  How long do you think confirmation is going to take?

5    MR. OSWALD:  Your Honor, the only issue for

6  confirmation to deal with is the Mannucci Parties' objection as

7  to the scope of the injunction provision, that was referenced

8  as part of their disclosure statement objection.  That's been

9  carried over in a new filing, but that's the objection.  The

10  other -- the plan has been overwhelmingly accepted by the

11  creditor body.  We will submit an 1129 declaration.  So I think

12  the confirmation piece should really be relatively quick,

13  probably fifteen, twenty minutes.

14    All right.  And then my next part of the question is -

15  - and you may have said this as you rose the first time -- what

16  happens to confirmation if I were to rule in favor of the

17  doctors, what's the consequence?

18    MR. OSWALD:  Your Honor, as a consequence, if you were

19  to issue a final order, or we would have a final order from a

20  court, what would happen is, we have in the disclosure

21  statement, as I said, disclosed that they've taken this

22  position.  If the result is that, as Ms. Harrison said, $3

23  million has to come off the top, then $3 million will be

24  segregated from --

25    THE COURT:  All right.  So it doesn't -- you can still

1   confirm the case.  That was really the heart of my question.

2               MR. OSWALD:  Absolutely.  Yes.

3               THE COURT:  All right.  Well, put this argument on for

4   the 30th.  I think we should do the confirmation on the 30th,

5   address it, move forward on that; and then, following that,

6   have the argument on this.  So subject to adjustments in our

7   calendar and whatever else I may have, this would be --

8   confirmation would be next to last, and this argument would be

9   last.

10              MR. OSWALD:  That's fine, Your Honor.

11              THE COURT:  All right?  So whether it starts at 9:30,

12  10:30, 11 o'clock, I'll let that play itself out when I look at

13  the calendar.

14              MR. OSWALD:  That's fine, Your Honor.

15              THE COURT:  All right?  And just submit something with

16  respect to the lift-stay, so we don't get caught up in any

17  confusion about when the Court needs to rule on that.

18              MS. HARRISON:  Very good.

19              MR. OSWALD:  Thank you, Your Honor.

20              THE COURT:  All right?  Thank you all.

21              MR. IBSEN:  Thank you, Your Honor.

22              MS. HARRISON:  Thank you, Your Honor.

23              MR. OSWALD:  Thank you, Your Honor.

24          (Proceedings concluded at 11:56 a.m.)

25                          * * * * *

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____                    March 24, 2011

Coleen Rand, AAERT Cert. No.

Certified Court Transcriptionist/Agency Director

Rand Reporting & Transcription, LLC