UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————
                                                        :
In re                                                   :          Chapter 11
                                                        :
CABRINI MEDICAL CENTER,                                 :          Case No. 09-14398 (ALG)
                                                        :          Confirmed Case
                              Debtor.                   :
——————————————————————————:


## MEMORANDUM OF DECISION DENYING RENEWED
## MOTION FOR RELIEF FROM AUTOMATIC STAY


A P P E A R A N C E S :

TOGUT, SEGAL & SEGAL LLP
*Attorneys for the Debtor*
By:     Frank A. Oswald, Esq.
           Jonathan P. Ibsen, Esq.
One Penn Plaza, Suite 3335
New York, New York 10119

PADUANO & WEINTRAUB LLP
*Attorneys for the Mannucci Parties*
By:     Katherine B. Harrison, Esq.
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020

KLESTADT & WINTERS
*Attorneys for Missionary Sisters*
   *of the Sacred Heart (New York)*
By:     Sean C. Southard, Esq.
           Brendan M Scott, Esq.
570 Seventh Avenue, 17th Floor
New York, New York 10018


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

In this matter, four of the Debtor's creditors request that the automatic stay be lifted in order to allow them to name the Debtor as a defendant in a state-court action seeking recovery from the Missionary Sisters of the Sacred Heart of Jesus (the "NY Missionary Sisters"), which allegedly controlled the Debtor. In that state-court action, the creditors allege that the Debtor wrongfully converted funds that were held for them and that the NY Missionary Sisters should be found liable for their damages on an alter ego theory. The creditors assert that they are not seeking any recovery from the Debtor but are required to name it as a defendant because the state court has ruled that the Debtor is a necessary party to that proceeding.

In prior proceedings involving these four creditors, this Court has determined that the creditors hold general unsecured claims for breach of contract as of the date of the bankruptcy petition. In light of the allegations of the state-court complaint, which specify no direct or particularized injury to the plaintiffs from the conduct of the NY Missionary Sisters, the alter ego causes of action at issue belong to the Debtor's estate and can only be pursued by the trustee or other entity authorized to assert estate-owned causes of action. Further, the causes of action at issue could not be abandoned to the creditors because they were settled in the context of an agreement that funded the debtor's plan of reorganization – a settlement agreement that was noticed to the creditors and to which the creditors did not object. The Court, therefore, must deny the motion to lift the stay as it seeks to pursue causes of action that have been settled and released.

*FACTS*

The dispute underlying this renewed lift-stay motion concerns certain deferred compensation agreements (the "Deferred Compensation Plans") that were entered into by Cabrini Medical Center ("Cabrini" or the "Debtor") and four doctors it formerly employed, all of whom subsequently retired, two in 1980, one in 1995 and the other in 2000. Cabrini filed a chapter 11 petition under title 11 of the United States Code (the "Bankruptcy Code") on July 9, 2009 (the "Petition Date"), and on July 20, 2009 an Official Committee of Unsecured Creditors (the "Creditors' Committee") was formed. On the Petition Date, an action commenced by three of the retired doctors, as well as the widow of a fourth doctor (collectively, referred to as the "Mannucci Parties"), was pending in New York Supreme Court against Cabrini and other named defendants. In that action, the Mannucci Parties alleged that they were wrongfully deprived of certain compensation payments due under their Deferred Compensation Plans. The Mannucci Parties also filed proofs of claims in the Debtor's bankruptcy case on based upon the relief sought in that action.

*Background*

The background facts are not substantially in dispute for purposes of this motion. Cabrini[1] is a domestic not-for-profit corporation organized under the law of New York that was licensed to operate a hospital by the New York Department of Health but in March 2008 ceased hospital operations.[2] As a not-for-profit hospital, Cabrini did not have any equity security

---

[1]Originally known as Columbus Hospital, Cabrini merged with the Italian Hospital and changed its name to Cabrini Medical Center.

[2]The New York State Commission on Health Care Facilities in the 21st Century (commonly referred to as the "Berger Commission"), which was created to review the healthcare capacity and resources in the state, issued a report on November 28, 2006, in which it recommended, among other things, the orderly closing of Cabrini.

3

holders; however, it was sponsored by the Stella Maris Province of the Missionary Sisters of the

Sacred Heart of Jesus, a religious institute of women of the Roman Catholic Church engaged in

religious, charitable and educational activities.  To further the purposes of this organization,

corporations had been organized under the laws of several states, including one in Illinois (the

"Illinois Missionary Sisters"), and one in New York (the NY Missionary Sisters, and together

with the Illinois Missionary Sisters, the "Missionary Entities").  The state-court complaint filed

by the Mannucci Parties, as amended (the "State Court Complaint"), asserts that the NY

Missionary Sisters appointed and controlled the board of trustees of Cabrini, and that "the

Missionary Sisters and Cabrini are inextricably intertwined."  *State Court Complaint* at ¶ 25,

*Mannucci v. Missionary Sisters of the Sacred Heart of Jesus*, No. 602284-08 (N.Y. Sup. Ct. Mar.

1, 2010), ECF No. 41.

       At the time of its bankruptcy filing in 2009, the Debtor's most valuable assets were its

real property holdings in the Gramercy section of Manhattan, which interests were sold during

the course of the bankruptcy case to fund in part the Debtor's plan of reorganization.  As of the

Petition Date, after the claim of the first mortgage lien holder against the real property, the

second and third largest secured claims were held by the Missionary Entities.  The Illinois

Missionary Sisters had secured claims against the Debtor of over $30 million, and the secured

claims of the NY Missionary Sisters totaled $18.74 million; both claims were collateralized by

mortgages on Cabrini's real and other property.  In addition, the Missionary Entities held

combined general unsecured claims against the Debtor of approximately $7.2 million.

Moreover, the Illinois Missionary Sisters provided post-petition financing for the Debtor, and the

Missionary Entities allowed the Debtor to use their cash collateral pursuant to §§ 363(c)(2) and

4

363(e) of the Bankruptcy Code.[3]  In an Interim Order, dated July 30, 2009 (the "Financing

Order"), which authorized, among other things, the post-petition financing and Debtor's use of

cash collateral, the Debtor agreed, among other things, not to challenge the liens of the

Missionary Entities, but it granted the Creditors' Committee and all other parties in interest

standing and authority for 90 days to file, on behalf of the estate, a challenge to the liens or

"otherwise [assert] any claims or causes of action" against the Missionary Entities.[4]

*Settlement with the Missionary Sisters*

Thereafter, the Creditors' Committee filed a complaint in the Bankruptcy Court seeking,

among other things, to recharacterize the Missionary Entities' secured and unsecured claims as

contributions or grants, and to subordinate those claims to the claims of general unsecured

creditors, as well as to set aside the related mortgages as fraudulent conveyances.[5]  The

complaint filed by the Creditors' Committee contains many of the same allegations concerning

the control exerted by the NY Missionary Sisters over Cabrini that the Mannucci Parties make in

their state-court complaint.[6]  The Missionary Entities opposed the relief and, ultimately, after the

---

[3] Section 363(c)(2) of the Bankruptcy Code provides, in relevant part, that a trustee may not use, sell or lease cash collateral unless –
  (A) each entity that has an interest in such collateral consents; or
  (B) the court, after notice and an hearing, authorizes such use, sale or lease in accordance with the provisions of this section.
In addition, Section 363(e) of the Bankruptcy Code provides that the use of cash collateral may be prohibited or conditioned as necessary to provide adequate protection to an entity that has an interest in the collateral.

[4] The challenge period with respect to commencement of claims against certain other secured creditors was 120 days.

[5] Although authorized to do so, the Mannucci Parties did not file a similar complaint.

[6] For example, the complaint filed by the Creditors' Committee includes allegations that the NY Missionary Sisters effectively appointed Cabrini's board of trustees or were ex-officio trustees (¶¶ 169, 184); that the NY Missionary Sisters abused their insider status and power to force Cabrini to take certain actions (¶ 170); that the New York Missionary Sisters effectively controlled Cabrini and used this control to their advantage (¶¶ 176, 188): that the NY Missionary Sisters abused their position as an insider to the detriment of Cabrini's other creditors (¶¶ 282, 312);

5

sale of the Debtor's real property, a settlement was reached that provided for the Missionary
Entities to transfer a portion of their secured claim for the benefit of unsecured creditors.

A motion (the "Settlement Motion"), dated September 22, 2010 [Docket Entry No.
(hereinafter Doc. #) 423], was filed seeking approval of the settlement (the "Settlement
Agreement") among the Creditors' Committee, the Missionary Entities and the Debtor.
Paragraph 12 of the Settlement Agreement included a broad release in favor of the Missionary
Entities that covered all potential claims that Cabrini, its estate or the Creditors' Committee, on
behalf of the estate, might assert against the Missionary Entities.[7]  This broad release included
any derivative actions that might be asserted in the interest of the unsecured creditors of Cabrini.
In addition to this release, and as set forth in paragraph 9 of the Settlement Agreement, the
parties contemplated that a plan of reorganization would be confirmed in the case, which would
include an injunction (the "Plan Injunction") that would prevent any creditors who received a
distribution under the plan "from pursuing claims against the [Missionary Entities] that arise out
of the creditors' dealings with the Debtor."  The releases given to the Missionary Entities were
evidently the *quid pro quo* for their agreement to transfer a portion of their secured claim to fund
a plan of reorganization for the benefit of all creditors.

---

that the NY Missionary Sisters took unfair advantage of Cabrini and its unsecured creditors by virtue of their insider
position and control over Cabrini (¶ 288); and that the actions of the NY Missionary Sisters harmed the general
unsecured creditors (¶¶ 290, 320).

[7]With certain exceptions not pertinent to this matter, the release in favor of the Missionary Entities in
paragraph 12 of the Settlement Agreement provided, in relevant part, that

> The Committee, for itself and as representative of the Debtor and the Debtor's estate, hereby fully
> and finally waives, releases, acquits and forever discharges [the Missionary Entities] . . . from any
> and all claims, demands, obligations actions, causes of action, rights or damages which the
> Committee, the Debtor and/or the Debtor's estate, has against the [Missionary Entities], and any of
> them, whether known or unknown, foreseen or unforeseen, whether or not asserted in this
> adversary proceeding arising prior to the date of execution of this stipulation.

The Settlement Motion, which was served on the Mannucci Parties, described the broad release contained in the Settlement Agreement [Settlement Motion, doc. # 423 at ¶ 17(i)]. A copy of that agreement was also attached to the Settlement Motion, and the Settlement Motion disclosed that a plan of reorganization was contemplated that would include the Plan Injunction. [Settlement Motion, doc. # 423 at ¶ 17(g)]. The Mannucci Parties did not object to the Settlement Agreement, and after certain modifications not relevant to this matter, the Settlement Agreement was approved on November 19, 2010 [doc. # 475]. Based upon the Settlement Agreement, Cabrini and the Creditors' Committee proposed a joint plan of reorganization and sought approval of a disclosure statement on December 21, 2010, which the Missionary Entities supported. As provided in the Settlement Agreement, the joint proposed plan of reorganization (the "Plan") included a Plan Injunction that precluded any creditor who received a distribution under the Plan from seeking further recovery from the Missionary Entities based upon any theory which stemmed from such holder's claim against the Debtor.

On December 22, 2010, the Debtor filed a motion seeking approval of the disclosure statement, to which the Mannucci Parties filed a timely objection, alleging that it inappropriately included as property of the estate, available to fund distributions, funds that rightfully belonged to them. In their opposition, the Mannucci Parties asserted that their claims to the funds were based on theories of constructive trust and certain ERISA entitlements.[8] Certain modifications were made to the disclosure statement that more specifically disclosed the Mannucci Parties' reservations and, on January 26, 2011, the Court approved the disclosure statement and scheduled a hearing for January 30, 2011 to consider confirmation of the Plan.

---

[8]This was in contrast to their proofs of claim, which had been filed asserting general unsecured claims.

7

*The State Court Action*

As noted above, as of the Petition Date in 2009, an action was pending against Cabrini in New York Supreme Court.  This action had been commenced on August 5, 2008 and also named as defendants the NY Missionary Sisters and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch").  After the Cabrini chapter 11 petition was filed and the automatic stay went into effect, the state-court action was dismissed with leave to re-plead and, on March 1, 2010, the Mannucci Parties filed the amended complaint (the State Court Complaint) in New York Supreme Court against the NY Missionary Sisters and Merrill Lynch - - but not Cabrini.  In the State Court Complaint, the Mannucci Parties alleged violations of their rights under the Deferred Compensation Plans based  on ERISA and New York common law, including misappropriation and conversion, and sought recovery of damages.[9]  All of the allegations against the NY Missionary Sisters, however, were based upon Cabrini's conduct, and the NY Missionary Sisters' wrongdoing was based on its control of Cabrini.  For example, the Mannucci Parties alleged that the NY Missionary Sisters dominated and controlled Cabrini, and that Cabrini was "the mere instrument, agent and alter ego of the NY Missionary Sisters." *State Court Complaint* at ¶ 20.  The NY Missionary Sisters moved to dismiss the State Court Complaint on the ground that Cabrini was not named as a defendant, and an order was issued by the state court on January 5, 2011, dismissing the action without prejudice because Cabrini was deemed a necessary party

---

[9]Also included in the state-court amended complaint was an allegation of fraud against Merrill Lynch; in connection with the Deferred Compensation Plans, Cabrini had set up separate accounts in the doctors' names at Merrill Lynch.  On June 14, 2010, the Mannucci Parties entered into a stipulation with Merrill Lynch discontinuing, with prejudice, the action as against Merrill Lynch.

8

to the alter ego claims.[10]

### Motion to Fix and Classify Claims

On January 26, 2011, the same date set for the hearing to consider approval of the disclosure statement, the Mannucci Parties filed a motion in the Bankruptcy Court seeking to lift the automatic stay to add the Debtor as a defendant in the state-court action, which Cabrini and the Creditors' Committee opposed.  Thereafter, on February 4, 2011, Cabrini filed a motion (the "Claims Motion") in the Bankruptcy Court seeking to fix the amounts of the Mannucci Parties' claims and to classify them as general unsecured claims.  The Missionary Entities joined in the Claims Motion, and the Mannucci Parties filed an opposition to it.  Cabrini argued that the funds in the Deferred Compensation Plans had been Cabrini's property and, therefore, there was no wrongful "taking" when it used those funds.  Rather, Cabrini maintained, its inability to fund payments to the Mannucci Parties out of the Merrill Lynch accounts was a breach of contract only.  The Mannucci Parties responded with the contention that the funds in the Merrill Lynch accounts had been their property because they were ERISA funds.  Alternatively, the Mannucci Parties contended that a constructive trust for their benefit had been, or should be, impressed upon the funds.  At a hearing on March 23, 2011, the Court agreed to hold the lift-stay motion in abeyance until after it had ruled on the issues involved in the Claims Motion.

### Plan Confirmation

The confirmation hearing went forward on March 30, 2011.  The only opposition was from the Mannucci Parties, who specifically opposed the scope of the Plan Injunction to the

---

[10]On April 5, 2012, the Appellate Division, First Department, affirmed the N.Y. Supreme Court's decision. *Mannucci v. Missionary Sisters*, 941 N.Y.S.2d 493, 494 (1st Dep't. 2012).

extent that it might impede their ability to pursue their state-court action against the NY

Missionary Sisters.  To allow for a consensual form of order confirming the plan, the parties

thereupon negotiated over the scope of the Plan Injunction.  Each side submitted suggested

language, and the Court ultimately entered an order (the "Confirmation Order") that, in

paragraph 19, enjoined those who held claims against Cabrini from "commencing or continuing

in any manner any action or other proceeding with respect to a Claim against the Debtor or based

upon a theory which arises out of such holder's Claim against the Debtor."  However, paragraph

19 of the Confirmation Order also provided that, with respect to potential actions against the NY

Missionary Sisters, "the injunction precludes only those causes of action that were either (a)

created by virtue of the filing of the bankruptcy or (b) that are otherwise property of the Estate,

including derivative actions."  Further, paragraph 20 of the Confirmation Order provided that the

order "does not address the Mannucci Parties' [lift-stay motion], which the Court currently is

holding in abeyance."

*Adversary Proceedings*

Thereafter, the Court determined that the issues raised in the Claims Motion should be

addressed in the context of an adversary proceeding, and on May 23, 2011, the parties

commenced respective adversary proceedings on the issue of ownership of the funds.  Those

adversary proceedings were subsequently procedurally consolidated, and each side moved for

summary judgment (the "Summary Judgment Motions").  In its motion, Cabrini argued that the

plain language of the agreements established that the funds remained Cabrini's property; that the

absence of trust language in the agreements established that the funds were not held in trust for

the doctors; that the funds had not been contributed by the doctors or withheld from their wages,

10

and thus, the funds were not excluded from the debtor's estate pursuant to § 541(b)(7) of the

Bankruptcy Code;[11] and, finally, that even if the funds were determined to be trust funds on a

statutory or common law theory, the absence of a *res* rendered the Mannucci Parties general

unsecured creditors.  In response, the Mannucci Parties argued that, pursuant to § 541(b)(7) of

the Bankruptcy Code, the funds in the Deferred Compensation Plans were excluded from

Cabrini's estate as proceeds of an ERISA pension benefit plan.  Alternatively, the doctors argued

that, pursuant to section 541(d) of the Bankruptcy Code,[12] the funds were exempted from

Cabrini's estate because they were held by Cabrini in trust for the doctors. The Court held a

hearing on the Summary Judgment Motions on December 7, 2011, and, thereafter, issued an

Opinion, dated February 16, 2012 (the "Summary Judgment Opinion").

     In the Summary Judgment Opinion, the Court concluded that there were factual disputes

concerning (i) whether the Deferred Compensation Plans met ERISA standards for a funded

plan, and (ii) even if a trust had been created, whether the plans were "top hat" plans whose

funds were held subject to creditor claims.[13]  In any event, the Court concluded, based on the

---

[11]Section 541(b)(7) provides, in relevant part, that property of the estate does not include amounts that an employer receives from employees, or withholds from their wages, as contributions to, *inter alia*, certain benefit plans subject to ERISA or certain deferred compensation plans.

[12] Section 541(d) of the Bankruptcy Code provides, in relevant part, that
    [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not
    an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal
    title to such property but not to the extent of any equitable interest in such property that the debtor
    does not hold.

[13]Top-hat plans provide a way for management to put aside income in a manner that does not qualify for express tax deferred treatment but nevertheless permit employees to defer receiving a portion of their income for income tax purposes.  As one court recently stated,
    [a] top hat plan may create a trust (often referred to as a "rabbi" trust) into which the employer
    deposits funds sufficient to cover its obligations under the plan without affecting its "unfunded"
    status, so long as the employees have no interest in the trust and the trust assets are considered part
    of the company's general assets.
*In re Washington Mutual, Inc.*, 450 B.R. 490, 494 (D. Del. 2011) (citation omitted).  In the proceedings before this

plain language of the parties' agreements, no express trusts were created and the existence of

written agreements precluded the Mannucci Parties' efforts to impose a constructive trust on the

Debtor's property.  Moreover, notwithstanding its determination that certain factual issues were

still in dispute, the Court found that the Mannucci Parties would be unable to satisfy the

requirement of tracing the funds to an identifiable *res*.  The Court found that the funds in the

Merrill Lynch accounts had been commingled with the funds in Cabrini's general operating

accounts and, therefore, had been integrated into the enterprise, which continued to operate for

several years after the commingling.  Most of Cabrini's funds had been spent by the time of the

filing, and the Mannucci Parties acknowledged that they could not trace "their" funds.  Although

the Mannucci Parties had requested that the Court "relax" the tracing requirement, the Court

determined that such relief was not warranted under the facts of the case, noting that, although

the Mannucci Parties had taken some action once they became aware that the funds had been

removed from the Merrill Lynch accounts, they had not sought immediate relief.  Therefore, the

Court concluded, as of the Petition Date, the funds were not excluded from the bankruptcy estate

under § 541(b)(7) of the Bankruptcy Code as ERISA funds, and no assets were held in trust that

would be exempted from the estate under§ 541(d) of the Bankruptcy Code.[14]

An order (the "Summary Judgment Order") was entered on February 29, 2012, granting

Cabrini's motion and denying the Mannucci Parties' motion for summary judgment.  Further, in

the Order, the Mannucci Parties' proofs of claim were fixed in amounts certain and classified as

---

Court, the significance of the establishment of separate accounts was not reached - *i.e.*, whether a separate account constituted a "funding" of the plan or whether it was merely a record-keeping mechanism to facilitate Cabrini's ability to comply with its obligations under the terms of a particular deferred compensation plan.

[14]The tracing requirement also precluded any claim seeking to impose a constructive trust premised upon rights concerning the funds under ERISA.

general unsecured claims.  The Mannucci Parties filed an appeal (the "Summary Judgment Appeal") and in their statement of issues on appeal asserted, among other things, that it was error for the Bankruptcy Court to refrain from ruling on the issue of the ownership of the funds in the accounts connected to the Deferred Compensation Plans.

*Renewed Motion to Lift the Stay*

On March 14, 2012, the state court having determined that Cabrini was a necessary party to their alter ego action against the NY Missionary Sisters, the Mannucci Parties renewed their motion to lift the stay, seeking to name Cabrini as a defendant.  They maintain in their motion that they seek to name Cabrini as a defendant merely to comply with applicable pleading rules, and that they will not seek any monetary judgment against Cabrini.  Cabrini responded, asserting that it would have no opposition to the request to lift the stay if the applicable order provided that the Mannucci parties are (1) limited to naming Cabrini as a nominal defendant in the state-court action; (2) prohibited from seeking any monetary judgment against Cabrini; and (3) prohibited from seeking any judgment in the state-court action that would change or otherwise modify the order that the Bankruptcy Court entered granting summary judgment in favor of Cabrini and against the Mannucci Parties.

The NY Missionary Sisters, however, opposed the request to lift the stay, arguing that any action against them or against Cabrini would violate the Plan Injunction, or alternatively, that they had been released from any such claims by the Settlement Agreement.  The Missionary Sisters further contended that if the stay were lifted and the Mannucci Parties pursued the issue of ownership rights in the funds before the state court, there could be inconsistent rulings because the same issues would be pending before the District Court now hearing the appeal from

13

the Summary Judgment Order.  Further, the NY Missionary Sisters maintained, they would be

prejudiced because in any lawsuit based on an alter ego theory, Cabrini would first have to be

found liable for wrongful conduct, but it would have no economic stake in the outcome and no

incentive to defend the lawsuit.

The Court heard oral argument on the matter on April 11, 2012, and took it under

advisement.[15]

## DISCUSSION

The first, critical question in resolving the instant motion for relief from the stay is

whether the alter ego claims that the Mannucci Parties seek to pursue against the NY Missionary

Sisters are property of the Debtor's estate or claims that are personal to them.  An estate

representative such as a debtor in possession or a trustee has standing to pursue claims that

belong to the debtor, but the representative ordinarily does not have standing to sue third parties

on behalf of the estate's creditors.  *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416,

434 (1972); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991).  Since

one of the goals of the Bankruptcy Code is to preserve property of the bankruptcy estate and

ensure that similarly situated creditors receive equal distributions, *S.I. Acquisition, Inc. v.

Eastway Delivery Serv., Inc. (In re S. I. Acquisition, Inc.)*, 817 F.2d 1142, 1152 (5th Cir. 1987),

if a cause of action belongs to the debtor, only the trustee or debtor in possession may pursue it.

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989).  On the other

hand, if a cause of action belongs to a creditor personally, the creditor is the proper party to

pursue it because an estate representative can only pursue claims that are "property of the

---

[15]This case was transferred to the undersigned, prior to argument on the instant motion, on March 1, 2012.

14

estate." *In re Ozark Restaurant Equip. Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir. 1987).

Section 541 of the Bankruptcy Code defines property of the estate. Pursuant to § 541(a)(1) of the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Courts have given § 541(a)(1) a broad construction. *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987); *S. I. Acquisition*, 817 F.2d at 1149, citing *In re MortgageAmerica*, 714 F.2d 1266, 1273 (5th Cir. 1983) (noting that property of the estate is broadly defined). If a cause of action "belongs" to the *debtor* at the commencement of the case, it is property of the debtor's estate, and the trustee has authority to pursue it. *Ozark*, 816 F.2d at 1225; *see also Mitchell v. Mitchell (In re Mitchell Excavators, Inc.)*, 734 F.2d 129, 131 (2d Cir. 1984). Although the trustee conventionally is the proper party to pursue such claims, the court in an appropriate case may give other entities standing to assert them. *Id.*; *see also Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904-05 (2d Cir. 1985) (recognizing the standing of a creditors' committee to pursue a debtor's cause of action against a third-party where the trustee or debtor in possession unjustifiably fails to bring the action, and the committee first obtains court approval); *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001). In this case, the Creditors' Committee was given standing to pursue the Debtor's claims against the NY Missionary Sisters, and as discussed above, settled and released the NY Missionary Sisters from all estate claims.

### *Alter Ego Claims*

Ordinarily, the corporate form shields shareholders from corporate liabilities, as the "parent and subsidiary corporations are separate entities, having separate assets and liabilities."

15

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman),*

*Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (citations omitted). There are, however,

instances where the circumstances warrant disregarding the corporate veil and imposing liability

on the shareholders or the controlling party.  The alter ego doctrine permits the corporate form to

be disregarded when, in practice, the corporate form has been abused or there exists such an

identity or unity between the entities that it becomes necessary to ignore the legal distinctions

between them to prevent an unjust result.  *Koch*, 831 F.2d at 1344; *S.I. Acquisition*, 817 F.2d at

1152.  In such instances, the equitable remedy of piercing the corporate veil is imposed to hold

the shareholders or parent personally liable for the obligations of the controlled alter ego.  *Koch*,

831 F.2d at 1344.[16]

Whether the controlled entity or a creditor of such entity has standing to bring an alter

ego claim against a controlling parent is a matter of state law.  *St. Paul*, 884 F.2d 688, 700 (2d

Cir. 1989).  The applicable state law is the law of the state of incorporation or formation, based

on the premise that the law that created the entity to protect shareholders or others should

determine whether the corporate form will be ignored to eliminate that protection.  *Kalb, Voorhis*

---

[16]New York courts are reluctant to disregard the corporate form.  *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir. 1990).  Nevertheless, under New York law, the corporate veil may be pierced when there has been fraud or when the corporation has been used as an alter ego.  *Id.*  New York does not recognize a separate cause of action to pierce the corporate veil.  *Hart v. Jassem*, 43 A.D.3d 997, 998, 843 N.Y.S.2d 121, 122-23 (2d Dep't. 2007).  The remedy of piercing the corporate veil is "equitable in nature" and the dominated corporation itself must be "liable for the obligation sought to be imposed." *Morris v. Dep't. of Taxation and Finance*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810, 623 N.E.2d 1157, 1160 (N.Y. 1993).  Generally, to pierce a corporate veil, the claimant must show that there was complete domination in respect of the transaction attacked, and such domination was used to commit a fraud or wrong against the plaintiff, which resulted in injury.  *Morris*, 82 N.Y.2d at 141, 603 N.Y.S.2d at 810-11, 623 N.E.2d at 1160-61.  Through domination and control, the owner must have "abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Id.* at 142, 623 N.E.2d at 1161.  In addition, equity will intervene to pierce a corporate veil, even in the absence of fraud, when the domination and disregard of the corporate form is so pervasive that one may conclude that the controlled corporation "primarily transacts the dominator's business instead of its own and can be called the other's alter ego." *Campone v. Pisciotta Servs., Inc.*, 87 A.D.3d 1104, 930 N.Y.S.2d 62 (2d Dep't 2011), quoting *Matter of Island Seafood Co. v. Golub Corp.*, 303 A.D.2d 892, 893 (3d Dep't 2003).

16

*& Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2d Cir. 1993).

Under the law of certain states, a corporation may assert an alter ego claim against its parent corporation and thereby pierce its own corporate veil.  *See*, *e.g.*, *St. Paul*, 884 F.2d at 703 (Ohio); *Koch*, 831 F.2d at 1346 (Indiana and Illinois);[17] *S.I. Acquisition*, 817 F.2d at 1152-53 (Texas).  However, under the law of other states, a corporation cannot maintain such claims and, therefore, those claims would not be property of a debtor's estate.  See, e.g., *Ozark*, 816 F.2d 1225-1226 (Arkansas);[18] *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248 1252 (9th Cir. 2010) (California).  The applicable law of the State of New York takes the following approach.  Under the law of New York, "'a trustee may bring an alter ego cause of action on behalf of a corporate debtor in an attempt to collect property of the estate for the benefit of all creditors if such an action is not personal to any particular creditor.'"  *Kogan v. Hillyer (In re Gosconcert)*, 158 B.R. 24 (S.D.N.Y. 1993), quoting, *Green v. Bate Records, Inc. (In re 10th Avenue Record Distributors, Inc.)*, 97 B.R. 163, 165-66 (Bankr. S.D.N.Y. 1989); *see also*, *Goldhaber v. Tri-Equities, Inc. (In re Patridge Jr. & Sons, Inc.)*, 112 B.R. 593, 596 (Bankr. S.D.N.Y. 1990).

A cause of action is considered "personal" if there is injury to only one or a select group of specific creditors, and other creditors have no interest in the action.  *Koch*, 831 F.2d at 1348-49.  The injury must be a particular injury that can be traced to the conduct of the entity controlling the debtor corporation.  *St. Paul*, 884 F.2d at 704.  If the direct injury stemming from

---

[17]Subsequently, the Illinois Supreme Court rejected the *Koch* court's interpretation of Illinois alter-ego law, concluding that it was "not the law in Illinois."  *In re Rehab. Of Centaur Ins. Col*, 158 Ill.2d 166 198 Ill.Dec. 404, 632 N.E.2d 1015, 1019 (1994).

[18]While the *Ozark* court concluded that a veil piercing action under Arkansas law was personal to the corporate creditors and did not become property of the debtor's estate or enforceable by the trustee, the court acknowledged that a trustee would be able to enforce an alter ego claim in states that permitted a corporation to pierce its corporate veil.  *Ozark*, 816 F.2d 1226 n.7.

the misuse of the corporate form and misappropriation of corporate assets is to the controlled

entity, and merely reduces assets available to pay creditors, the cause of action belongs to the

corporation. *St. Paul*, 884 F.2d at 805; *Koch*, 831 F.2d at 1350. In the absence of a

particularized injury to a particular creditor, the rationale is that "all unsecured creditors are to be

treated equally if their injuries are not different in kind." *St. Paul*, 884 F.2d at 704. In assessing

whether the "action accrues individually to a claimant or generally to the corporation, a court

must look to the injury for which relief is sought and consider whether it is peculiar and personal

to the claimant or general and common to the corporation and creditors." *Koch*, 831 F.3d at

1339. The injury cannot be "a secondary effect from the harm done to [the corporation]." *St.

Paul*, 884 F.2d at 704.

### *The Mannucci Parties' Claims*

The foregoing principles can be applied to the facts of this dispute as they appear in the

motion for relief from the stay and the opposition thereto. The Mannucci Parties contend that

the causes of action asserted in the state-court action are particular to them and that any recovery

on their alter ego theory would not inure to the benefit of other creditors. However, neither in

their state-court complaint nor in their papers on this motion have they alleged that the NY

Missionary Sisters wronged them directly rather than by virtue of their alleged control of

Cabrini. For example, their claim in the State Court Complaint is that the NY Missionary Sisters

controlled and dominated Cabrini to the general disadvantage of all Cabrini's creditors. Thus,

¶ 20 of the State Court Complaint asserts "upon information and belief" that "the Missionary

Sisters exercise complete control and complete domination of Cabrini. Cabrini is the mere

instrument, agent and alter ego of the Missionary Sisters." The State Court Complaint goes on to

18

detail the NY Missionary Sisters' alleged control of the Cabrini Board of Trustees, "thereby

leaving Cabrini with a lack of its own independent business discretion," *State Court Complaint*

at ¶ 24.  However, it does not specify any particular injury to the Mannucci Parties.

The one possible claim of particularized injury caused by the NY Missionary Sisters is

that the Missionary Sisters generally exerted "control over Cabrini's financial affairs, including

control and responsibility over the Deferred Compensation Plans, to their own benefit."  *State

Court Complaint* at ¶26; see also ¶ 29.  However, the Mannucci Parties do not contend that the

NY Missionary Sisters directly converted the funds in the Merrill Lynch accounts; the

allegations of the amended complaint make it clear that the funds were removed by Cabrini and

used for Cabrini's own corporate purposes, not diverted to the treasury of the Missionary Sisters.

For example, it is alleged that "Cabrini's then President and CEO Robert Chaloner sent a

substantially identical letter to each of the Plaintiffs stating that Cabrini was in desperate need of

working capital in order to maintain its operations and that, as a result, Cabrini would

'temporarily move' hundreds of thousands of dollars from each of the Deferred Compensation

plans into Cabrini's own general operating account."  *State Court Complaint* at ¶ 51.  It is

alleged "on information and belief" that "the Missionary Sisters knew when Plaintiffs' funds

were taken that Cabrini was in financial distress," and it is claimed that at the same time the

Missionary Sisters entered into "financial transactions . . . to secure most of their own alleged

loans to Cabrini."  *State Court Complaint* at ¶ 55.  But, again, the wrongdoing asserted against

the Missionary Sisters is general direction and control and action to the detriment of all of

Cabrini's creditors.

Moreover, the Mannucci Parties' contention that the alter ego causes of action are

19

particular to them and not generalized presumes that the funds in the Merrill Lynch accounts were actually qualifying ERISA funds or otherwise held in trust for them. However, the Mannucci Parties never explain exactly what protection they were entitled to under ERISA. In prior proceedings, this Court has determined the status of their claims concerning those funds as of the Petition Date, which is the relevant date for determining what constitutes property of a debtor's estate.[19]  In the context of the Summary Judgment Motions, although the Court did not reach the issue whether those funds had at one time been qualifying ERISA or trust funds, it did determine that as of the Petition Date, the Mannucci Parties held only general unsecured claims against the estate. This supports the conclusion that the Mannucci Parties have no asserted particularized claims.

Finally, the Mannucci Parties contend that even if they do not hold particularized claims against the NY Missionary Sisters, the estate's causes of action were abandoned to them when the Debtor failed to pursue them and failed to object to this Motion. However, the causes of action were not abandoned but were settled and released. In exchange for the transfer of a portion of their secured claims, the Missionary Entities were released in paragraph 12 of the Settlement Agreement from any "causes of action, rights or damages which the Committee, the Debtor and/or the Debtor's estate, has against the [Missionary Entities], and any of them, whether known or unknown, foreseen or unforeseen, whether or not asserted in this adversary proceeding arising prior to the date of execution of this stipulation." Pursuit of estate claims was specifically barred by the Plan Injunction.

---

[19]The filing of a petition commences a voluntary bankruptcy case. 11 U.S.C. § 301. Under §541 of the Bankruptcy Code, the commencement of a case creates an estate that is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

In support of their position, the Mannucci Parties cite *In re Curtina Int'l*, 15 B.R. 993 (Bankr. S.D.N.Y. 1981), where a vendor-creditor, who had sold goods to the debtor, sought to pierce the debtor's corporate veil to recover the price of the goods from the debtor's principals. *Id*. 994-95.  The *Curtina* court concluded that the vendor-creditor was not seeking to recover assets for the benefit of the estate but trying to recover money that it was owed by non-debtor defendants as the alter egos of the debtor.  *Id*. at 995.  It appears, however, that the *Curtina* trustee had not challenged the creditors' right to recover from the debtor's fiduciaries and had not asserted any interest in the creditor's recovery.  *See Koch*, 831 F.2d at 1346 (noting that "[t]he *Curtina* trustee chose not to assert an alter ego claim and determined that the creditor's pursuit of his action was a private controversy in which he had no interest").  Indeed, in *Koch*, the Seventh Circuit viewed the *Curtina* trustee as having abandoned the cause of action to the vendor-creditor. *Id*. at 1346-47.  It pointedly noted that where a trustee does not abandon an estate cause of action, any attempt by a third-party to prosecute such cause of action is precluded. *Id*. at 1347.  In this case, as previously noted, all general causes of action of the estate against the NY Missionary Sisters, including the alter ego and domination and control claims asserted against the NY Missionary Sisters by the Committee on behalf of the estate, were not abandoned but were settled as part of an agreement among the Debtor, the Creditors' Committee and the Missionary Entities that was approved by the Court.  As noted, the Mannucci Parties received notice of the Settlement Agreement and did not object to it.

Based upon the foregoing, the motion for relief from the stay must be denied.  In any event, one other factor leads to this result.  As previously noted, one of the issues that the Mannucci Parties have designated for decision by the District Court in the Summary Judgment

Appeal is whether the Bankruptcy Court erred in not deciding the issue of the ownership of the funds. Therefore, that issue is before the district court in that appeal. If the state-court action were to proceed against the debtor, it could lead to inconsistent rulings on that issue, and the Court is without jurisdiction to allow such a result. *In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y.1994) (noting that when a notice of appeal is filed, the bankruptcy court is divested of "any further jurisdiction over the issues appealed" (citation omitted), *see also*, *In re Millenium Global Emerging Credit Master Fund Ltd.*, No. 11-13171, 2012 WL 1889955 at * 4 (Bankr. S.D.N.Y. May 25, 2012) (noting that "an appeal divests a bankruptcy court of jurisdiction over all aspects of the case that are the subject of the appeal").

## CONCLUSION

For the reasons stated above, based on the present record, the Mannucci Parties' renewed motion to lift the automatic stay to pursue alter ego causes of action against the NY Missionary Sisters is denied. Counsel for the NY Missionary Sisters may settle an Order consistent with this Memorandum of Decision on five days' notice.

Dated: June 15, 2012
       New York, New York


                                 **s/Allan L. Gropper**
                                 UNITED STATES BANKRUPTCY JUDGE